FILED

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

2011 JUN -3 P 2: 20

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,  )  )  )  )  Plaintiff,  )  )  vs.  )  )  COMPUTER SCIENCES CORPORATION, )  MICHAEL W. LAPHEN and MICHAEL J. )  MANCUSO,  )  )  Defendants.  )  )  ) | Civil Action No. _1: 11 cv 610_  TSE/IDD  DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT
### FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## SUMMARY OF THE ACTION

1.      This is a securities class action brought on behalf of all persons who purchased Computer Sciences Corporation ("Computer Sciences" or the "Company") common stock between August 11, 2010 and May 25, 2011, inclusive (the "Class Period").  This action is brought against Computer Sciences, its Chief Executive Officer ("CEO") Michael W. Laphen ("Laphen"), and its Chief Financial Officer ("CFO") Michael Mancuso ("Mancuso"), for violations of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5, promulgated thereunder.

## INTRODUCTION AND OVERVIEW

2.      Computer Sciences is a leader in the information technology ("IT") and professional services industry, offering an array of services to clients in the commercial and government markets and specializing in the application of complex IT implementation and strategic objectives.  Its service offerings include IT and business process outsourcing, and IT and professional services. According to the Company, IT and professional services include systems integration, consulting and other professional services.  Consulting and professional services include advising clients on the strategic acquisition and utilization of IT and on business strategy, security, modeling, simulation, engineering, operations, change management and business process reengineering.  The Company delivers these services in three service lines or sectors: North American Public Sector, Managed Services Sector, and Business Solutions & Services, as follows:

- North American Public Sector ("NPS") – The NPS segment operates principally within a regulatory environment subject to government contracting and accounting requirements, including Federal Acquisition Regulations, Cost Accounting Standards and audits by various U.S. federal agencies.

- Managed Services Sector ("MSS") – The MSS segment provides large-scale infrastructure and application outsourcing solutions offerings as well as midsize services delivery to customers globally.

- Business Solutions & Services ("BSS") – The BSS segment provides industry specific consulting and systems integration services, business process outsourcing, and intellectual property ("IP") based software solutions. These service offerings and clientele overlap.

3.      The Company has operations throughout North America, Europe and the Asia-Pacific region, including India and Australia.

4.      On August 11, 2010, the first day of the Class Period, the Company reported its first quarter 2011 ("1Q11") financial results.  Although the Company's 1Q11 revenue results missed analyst's *revenue* expectations, they beat Wall Street consensus *earnings* expectations by one penny.  Notwithstanding the revenue shortfall (due to delays in government procurement contracts and the potential renegotiation of a large implementation contract with the United Kingdom's National Health Service ("NHS")), the Company boasted about its operating margin and cash flow results as well as its execution of new business and backlog, particularly in its MSS line of business.  Defendants reported that they were encouraged by both the size and quality of the Company's pipeline, and thus, notwithstanding the Company's 1Q11 revenue shortfall, Computer Sciences was primed for accelerated growth in the second half of the fiscal year ("FY").  On the same day, August 11, 2010, the defendants caused the Company to file its Form 10-Q with the United States Securities and Exchange Commission ("SEC") reporting its 1Q11 financial results and certifying its financial statements and internal controls in accordance with §§302 and 906 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley").

5.      On November 10, 2010, defendants caused Computer Sciences to report its 2Q11 financial results.  Citing delays in its NPS division, the Company again reported disappointing revenue results.  The Company also disclosed that accounting irregularities arising out of its MSS Nordic region would require the Company to take a $40 million charge during 2Q11, and it confirmed that the total value of its large contract with NHS would decline, but "not much."  Defendants also reduced the Company's FY11 forecasted revenue and margins due to NHS and Nordic region adjustments, claiming that despite these adjustments, the Company had experienced a "*solid quarter in new business bookings*," and that 2Q11 "*pre-tax margins and operating margins*

- 2 -

*improved sequentially*." Accordingly, the Company *increased* its FY11 bookings forecast by $500 million and boosted its FY11 earnings per share ("EPS") forecast by between $0.05 and $0.15 per share. Defendants further assured investors that *98% of Computer Sciences' forecasted revenue would come from contracts already in backlog*, and, therefore, defendants were "*still bullish on the year.*" Between November 10, 2010 and February 8, 2011, the Company's stock price rose by more than $8.00 per share to a high of over $56 per share.

6.       On February 1, 2011, Computer Sciences issued a press release announcing that the SEC had initiated a formal investigation into accounting irregularities at the Company. One week later, on February 9, 2011, the Company shocked investors with its 3Q11 financial report and associated disclosures, announcing that, notwithstanding that on November 10, 2010 defendants had increased Computer Sciences' FY11 bookings estimates by $500 million due to the purported strength of its backlog of new business, defendants were reducing the Company's FY11 bookings forecast *by an astonishing $2.5 billion* because of "slip[page]" of new bookings in 3Q11. Even worse, contrary to defendants' prior assurances that 98% of FY11 revenue was already in backlog and defendants expected acceleration in the second half, FY11 revenue would be reduced by an *additional $300 million*. And defendants revealed that despite their prior representations that Computer Sciences would post EPS *growth* in FY11, in fact, FY11 EPS would *decline* by $0.25 per share.

7.       In addition, on February 9, 2011, defendants disclosed that the accounting irregularities in the Company's MSS Nordic region – which defendants had told investors on November 10, 2010 were "*fixed*" and "*behind us*" – had doubled, ballooning from requiring a $40 million charge to requiring a charge of more than $81 million, including undisclosed customer credit agreements and unaccounted for liabilities, some as high as $5 million or $10 million individually. The SEC investigation of these accounting irregularities is continuing. Finally, the Company

- 3 -

disclosed that because of defects during implementation of its software system at the NHS, the NHS was considering *"termination of all or parts of the contract"* due to Computer Sciences' breach of contract and failure to meet an implementation milestone. Defendants further admitted that because of the NHS development delays, the Company would reduce 4Q11 revenue *by at least $175 million*.

8.      On this news, investors sold off Computer Sciences' shares causing the Company's stock price to decline by more than $8.00 per share on heavy volume of more than 12 million shares to less than $49.00 per share by the close of trading on February 9, 2011.

9.      Despite the disclosures regarding government and new business bookings declines, during the February 9, 2011 conference call, the Company assured investors that its new FY11 bookings figure of $16 billion was the "right number," and that it had already factored in the government delays. The Company also said that the new bookings forecast assumed the government budget delays related to appropriations bills would not get resolved until after the Company's fiscal year, thus signaling that these forecasted new bookings were firm.

10.     After the February 9, 2011 stock price decline, Computer Sciences' stock price continued to trade at artificially inflated levels.

11.     On May 2, 2011, the Company shocked investors again with the announcement of its 4Q11 financial results. The Company reported that it was close to an agreement with the NHS on a revised contract and updated FY11 guidance. Specifically, the Company disclosed that it would miss even reduced FY11 revenue expectations by $100 million and earnings expectations by $0.45 per share, and would remove *an additional $2 billion* from its previously reduced new booking outlook, citing federal procurement delays.

12.     The May 2, 2011 disclosures sent the Company's share price spiraling further downward. On May 3, 2011, Computer Sciences' share price declined approximately 13% from a

close of $50.55 per share on May 2, 2011 to a close of $44.03 per share on May 3, 2011, on unusually large volume.

13.     Finally, on May 25, 2011, after the market closed, the Company issued a press release pre-announcing its 4Q11 and FY11 financial results, and making additional disclosures. Among other things, the Company reported 4Q11 earnings results of $1.09 per share, which missed Wall Street consensus estimates of $1.16, and that FY11 earnings would be below the reduced EPS forecast of $4.75 which had been recently revised on May 2, 2011.

14.     In addition, the Company also disclosed that its Audit Committee had, on May 2, 2011, begun an internal investigation into the MSS accounting irregularities *and certain other accounting matters identified by the committee* and the SEC. Thus, notwithstanding earlier assurances of the limited scope of the MSS Nordic accounting issues, the Company disclosed that the accounting investigation had been expanded and was not sufficiently complete to timely file its Form 10-K, which was due by May 31, 2011. The press release stated in part:

### CSC REPORTS PRELIMINARY FOURTH QUARTER RESULTS

. . . CSC today reported preliminary fourth quarter fiscal 2011 revenue of $4.20 billion and fully diluted earnings per share (EPS including discontinued operations) of $1.09 compared to fourth quarter fiscal 2010 revenue of $4.20 billion and EPS of $1.66.

\*     \*     \*

**Investigation Update; Preliminary Results Subject to Change**

As previously disclosed, in fiscal year 2011 the Company initiated an investigation into certain accounting errors in the Company's Managed Services Sector (MSS), primarily involving accounting irregularities in the Nordic region. *Initially, the investigation was conducted by Company personnel, but outside Company counsel and forensic accountants retained by such counsel later assisted in the Company's investigation. . . . On May 2, 2011, the Audit Committee of the Board of Directors commenced an independent investigation into matters relating to MSS and the Nordic region, matters identified by subpoenas issued by the SEC's Division of Enforcement and certain other accounting matters identified by the Audit Committee and retained independent counsel to represent CSC on behalf of, and under the exclusive direction of, the Audit Committee in connection with such independent investigation.*

\*   \*   \*

*The investigation of the accounting irregularities in the Nordic region is not sufficiently complete so as to allow the Audit Committee and the Company to determine the appropriateness of filing the Company's financial statements for the year ended April 1, 2011. Consequently, the Company will not be able to file its Form 10-K for the year ended April 1, 2011 before the required filing date of May 31, 2011.*

15.     In response to the Company's May 25, 2011 disclosures, on May 26, 2011, the Company's stock price plummeted $5.71 per share (or 12%), on trading volume of more than 14 million shares to close at $38.38 per share as the expanded extent of potential accounting irregularities and the miss of financial FY11 earnings results were revealed.

16.     The Class Period representations by defendants concerning the financial condition and prospects for Computer Sciences, including the adequacy of Computer Sciences' internal controls, were each materially false and misleading when made because they failed to disclose the true facts, which were then known to or recklessly disregarded by defendants, including:

(a)     The Company's historical and current financial results from the Company's MSS unit, which had been incorporated into the Company's consolidated financial statements, were false and in violation of the Company's internal accounting policies and Generally Accepted Accounting Principles ("GAAP");

(b)     The implementation of the Company's Lorenzo 1.9 software at the NHS was experiencing severe technical difficulties, rendering the Company unable to meet its customer contract milestones such that the entirety of the contract was at risk of termination;

(c)     The Company was experiencing significant weakness in demand for its NPS products and services and bookings for new business for its products were *declining*; and

(d)     In light of (a)-(c) above, there was no reasonable basis for the FY11 revenue, earnings, bookings and margin forecasts made to the public during the Class Period.

## JURISDICTION AND VENUE

17.     Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

18.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b), because Computer Sciences' operations are headquartered in this district and many of the acts and practices complained of herein occurred in substantial part in this district.

## PARTIES

19.     Plaintiff City of Roseville Employees' Retirement System purchased the common stock of Computer Sciences during the Class Period as set forth in the certification attached hereto and was damaged as the result of defendants' wrongdoing as alleged in this complaint.

20.     Defendant Computer Sciences is incorporated in Nevada and trades on the NYSE under the symbol "CSC." The Company is headquartered in Falls Church, Virginia.

21.     Defendant Michael W. Laphen ("Laphen") is and was, at all relevant times during the Class Period, President, CEO and Chairman of the Board of Directors of the Company.

22.     Defendant Michael J. Mancuso ("Mancuso") is and was, at all relevant times during the Class Period, Vice President and CFO of the Company.

23.     The defendants named in ¶¶21-22 are referred to herein as the "Individual Defendants."

## CONTROL PERSONS

24.     As officers and controlling persons of a publicly held company whose common stock was and is traded on the NYSE and is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and

to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

25.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board and/or executive and managerial positions with Computer Sciences, each of the Individual Defendants had access to the adverse undisclosed information about Computer Sciences' financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Computer Sciences and its business or adopted by the Company materially false and misleading.

26.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

27.     The Company and the Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Computer Sciences common stock by disseminating materially false and misleading statements and/or concealing

material adverse facts. The scheme: (i) deceived the investing public regarding Computer Sciences'

business, operations, management and the intrinsic value of Computer Sciences common stock; and

(ii) caused plaintiff and other members of the Class to purchase Computer Sciences common stock at

artificially inflated prices.

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

28.      On August 11, 2010, the Company issued its 1Q11 financial results, announcing that

the Company had exceeded consensus EPS estimates by $0.01, reporting EPS of $0.91. The

defendants reaffirmed Computer Sciences' FY11 guidance stating:

**CSC Reports First Quarter Results**

*Solid performance, reaffirms guidance*

> . . . CSC today reported first quarter fiscal 2011 Revenue of $3.94 billion and
> fully diluted earnings per share (EPS) of $0.91 compared to first quarter fiscal 2010
> Revenue of $3.90 billion and EPS of $0.85.

*   *   *

- New business awards of $3.2 billion for the quarter compared to $3.5 billion
  for the previous year.

- ***Pre-tax margin of 5.45% for the quarter, an increase of 71 basis points
  from the previous year.***

- ***Operating margin of 7.13% for the quarter, an increase of 32 basis points
  from the previous year.***

*   *   *

> Commenting on the results, CSC Chairman and Chief Executive Officer,
> Michael Laphen said, "I am pleased with our operational improvements and the
> corresponding financial results, ***particularly the margin and cash flow
> performance.***"

*   *   *

> ***"I am encouraged by the size and quality of our current pipeline," said
> Laphen. "We are seeing increased demand emerging from some regions and
> within some industries.*** Our strategic targets of Cloud, Cyber and Healthcare, as
> well as network management are all indicating positive signs. Although our
> businesses are impacted by the overall sluggish recovery and, to a lesser extent

government spending, we have a very robust backlog and I remain optimistic that we will realize meaningful growth beginning in the second half of our fiscal year."

The Company reconfirmed guidance for the full year as follows:

*Bookings in excess of $18 billion, revenue in the range of $16.8 billion to $17.2 billion, operating margin between 9% and 9.25%, EPS in the $5.30 to $5.40 range,* and Free Cash Flow in excess of 90% of net income attributable to CSC common shareholders.

29.     On August 11, 2010, the defendants caused the Company to file with the SEC its Form 10-Q for the period ending July 2, 2010, which repeated the publicly reported results for its 1Q11. The Form 10-Q also included Sarbanes-Oxley §302 and §902 certifications executed by Laphen and Mancuso confirming the accuracy of the Company's financial statements and internal controls over financial reporting, stating:

I, Michael W. Laphen, certify that:

1.     I have reviewed this report on Form 10-Q of Computer Sciences Corporation;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act rules 13a-15(f) and 15d-15(f)) for the registrant and have:

     a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

                    *        *        *

     c.     *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the*

*effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation* . . . .

\*        \*        \*

5.        The registrant's other certifying officers and I have disclosed, *based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors* (or persons performing the equivalent functions):

a.        *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and

b.        *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.*[1]

30.        On September 14, 2010, defendant Laphen presented at the Kaufman Bros.'s 13th Annual Investor Conference in New York City, where he repeated his August 11, 2010 comments, confirming:

- Computer Sciences would post FY11 growth of 4% to 7%.

- There were no added delays in government procurement contracts.

- The Company saw no additional government procurement delays on key contracts.

- Although the U.K. government was likely to reduce the scope of the Company's NHS contract, *it would not be in the near term, thus the changes in the NHS contract would have no impact on near-term cash flows.*

- *Computer Sciences argued that changes to the NHS contract would be clarified soon, that concerns about U.S. government spending cuts were overblown, and that Computer Sciences was on track to meet FY11 guidance.*

31.        On November 10, 2010, the Company reported its 2Q11 financial results in a press release. The release provided specific revenue, pre-tax earnings and gross margin results for the quarter. The Company also disclosed for the first time that it would make "adjustments" to its

---

[1]        Defendant Mancuso's certification was filed with the SEC on the same day and was substantially identical to Laphen's certification.

historical financial statements related to accounting irregularities in its Nordic region. The release acknowledged that the Company had experienced a slowdown in customer decision-making, which would reduce the Company's FY11 revenue outlook by at least $200 million, and lowered FY11 margin growth from a range of 9%-9.25% to 8.5%-9.0% due to accounting irregularities in the Nordic region. Notwithstanding these disclosures, the Company increased its bookings forecast from $18 billion to $18.5 billion on the basis of apparent "new" bookings and *increased* its FY11 earnings outlook from $5.30-$5.40 to $5.35-$5.45. The release stated:

**CSC Reports Second Quarter Results**

*Sequential Improvements in Revenue and Profit*

... CSC today reported second quarter fiscal 2011 revenue of $4.0 billion and fully diluted earnings per share (EPS) of $1.18 compared to second quarter fiscal 2010 revenue of $4.0 billion and EPS of $1.40 ($1.15 after normalizing for the tax rate). ...

Commenting on the results, CSC Chairman and Chief Executive Officer, Michael Laphen said, "Our underlying performance in the quarter continues to track in a positive direction. *We achieved a solid quarter in new business bookings which supports our anticipated growth in the second half of the fiscal year. Our pre-tax margin and operating margin improved sequentially*, this despite a series of non-recurring accounting adjustments in MSS, primarily in the Nordics Region."

\* \* \*

"While our NPS business is still experiencing a slowdown in the pace of customer decisions, our continued success in capturing sizeable IDIQ awards positions us for meaningful second half growth," said Laphen.

\* \* \*

The company updated its guidance for the full year, *increasing New Business Bookings and EPS while modifying its Revenue and Margin range as a consequence of the aforementioned NPS award delays and the adjustments in the Nordics*. Free Cash Flow guidance is unchanged.

The revised guidance is:

| | |
|---|---|
| New Business Bookings | In excess of $18.5 billion |
| Revenue | $16.5 – $17.0 billion |
| Margin Rate | 8.5% – 9.0% |
| EPS | $5.35 – $5.45 |

32.     On November 10, 2010, the Company held a nationwide conference call for analysts and investors to discuss the 2Q11 financial results. The call was hosted by defendants Mancuso and Laphen. During the call, defendants assured investors that *98% of the Company's projected 2011 revenue was already in backlog*. The Company emphasized that although issues with the Nordic region had contributed to margin shortfall in the quarter, the issue had been fixed, with defendant Mancuso stating:

> Year-over-year comparisons of revenue, operating earnings, margin and EPS require several adjustments to normalize for divestitures, claims settlements, the Nordics adjustment, and a significantly different tax rate.
>
> . . . *[O]nly 2% of our in-year revenue is dependent on new business that is not now in backlog.*
>
> . . . *Our identified qualified pipeline that Mike Laphen referred to gives us the confidence that our $18.5 billion-plus guidance target is achievable.*
>
> \*      \*      \*
>
> *I also want to point out that the Nordics margin adjustments also included a $36 million revenue reversal. . . .*
>
> . . . *NPS, despite lower revenue, is $22 million better than last year. MSS is dramatically lower, predominantly impacted by the charges taken in our Nordics business to correct misapplication of internal accounting policies, US GAAP and accounting irregularities.*
>
> \*      \*      \*
>
> In reflecting on how you should think about the Nordics adjustment . . . *[t]he good news is we found it, fixed it and put it behind us.*
>
> *So, again, to summarize how we feel, we are still bullish on the year.* We feel good about our second-half revenue growth.

33.     During the November 10, 2010 conference call, analysts inquired specifically about the reduced margins resulting from the Nordic region accounting issues and the margin impact of the

renegotiation of the Company's large contract with NHS. Defendants stated that there would be no

change in overall margins resulting from the renegotiated contract with NHS, and specifically stated

that the Company did not have any other underperforming businesses:

> [Analyst:] First question on the margin front, your new full-year margin guidance has, as you just said, Mike, the top end of 9% in terms of range for the year. But help us understand what it is without the Nordics adjustment for the full year.
>
> [Mancuso:] Off the top of my head, Darrin, the Nordics adjustment is approximately $40 million, *net*, at this point. So if you were to add back $40 million of OI for the year, you'd have about a 0.25-point impact on the year, roughly.

*    *    *

> [Mancuso:] *I'm not going to get into the revenue impact on the NHS. But I would tell you that the margin rate itself is not affected in terms of its rate.* The revenue line will be smaller, to some degree, *not much, but some. But the margin – there's not a change in the margin.* It's just the contribution of the NHS in the year for margin will be less than it was and was anticipated in the prior guidance.
>
> *As far as the other impacts, the Nordics was $40 million-plus, $40 millionish, was the problem there. Other than that, margins are intact. We don't have any other issues, underperforming businesses, etc., etc.*

34.     On November 10, 2010, Oppenheimer & Co. issued a report discussing the

Company's 2Q11 results, including the downward revision of the FY11 revenue forecast and FY11

margin estimates due to the Nordic region issues and the renegotiation of the NHS contract.

Notwithstanding the reductions to the revenue and earnings outlook, Oppenheimer noted that,

according to defendants, bookings trends and new deals were increasing (from $18 billion in 1Q11

to $18.5+ billion at the end of 2Q11) and that more than *98% of the Company's forecasted revenue

was already in backlog.* The report stated:

> Mixed F2Q Results; Demand Outlook Beginning to Brighten
>
> ... While there were a lot of moving parts in the quarter (regarding divestiture, acct. charge, and renegotiated NHS contract), *the bottom line is that CSC's overall demand environment is improving. CSC is seeing "definite signs of recovery," through improving momentum with bookings and robust growth in pipeline of pending deals. ...*

*. . . [G]iven improving demand conditions, increase in new deals signed through F1Q/F2Q* (which should begin to contribute over the next few quarters), *and the resolution of several protests in the NPS unit, visibility into full-year revenue appears to be improving. CSC now has ~98% of the midpoint of guidance accounted for through actual recurring revenue/backlog under contract and recurring ST project revenues.*

*     *     *

*Importantly, given the book of business initiated in 1Q and 2Q, coupled with growth in pipeline/revenue backlog, management continues to expect a substantial jump in run-rate through F2H11 and into FY12.*

*     *     *

*Demand environment showing signs of progress. CSC's demand environment is showing clear signs of improvement, as new business awards grew to $4.5B (up 41% sequentially; first QoQ growth since F2Q10). Strength was led by growth in NPS bookings ($2.9B; up from F1Q's $1.2B) . . . . Overall, CSC's pipeline of pending deals remains healthy and continues to build. The pipeline for new business stands at $24B, and CSC has also qualified for an additional $6B+ of IDIQ awards (not included in backlog). Further, CSC cites a $42B backlog of revenues from NPS and MSS segments and the NHS contract,* which equates to ~3 years of revenue. *Despite the steep 2H ramp implied by FY11 revenue guidance, much of that revenue appears to be already under contract. . . .*

**NHS program update: early adopters continue to go live; signed contract on renegotiation expected shortly.** As of November 1, the third Lorenzo 1.9 early-adopter deployment has been completed in the Birmingham Women's NHS Foundation Trust. By all accounts, the process went smoothly and early feedback is positive; the system is clearly maturing, and CSC is improving the deployment process to eliminate the early difficulties faced at Morecambe Bay. After the fourth early-adopter acute trust deployment is concluded, CSC will move on to full deployment of the platform across the NHS, which should generate additional revenue recognition milestones for CSC over the coming quarters. As these deployments pick up speed, NHS should have a larger impact on the top line moving into fiscal 2012.

Regarding the ongoing contract renegotiation with the NHS, management believes that the parties have substantially reached agreement, and should have signed contract in-hand within the next few weeks. While the overall contract value is expected to be reduced by about £500M, the scope of the agreement will be reduced concurrently, generating little to no margin impact for CSC. We believe that these issues are already well-understood by investors, and management's updated guidance now reflects the expected reduction in NHS run-rate (together with impact from ~$100M run-rate divestiture in NPS during the quarter).

35.     On November 10, 2010, the Company filed with the SEC its Form 10-Q for its 2Q11

results. The Form 10-Q repeated the 2Q11 financial results and further represented that the scope

and impact of the accounting errors in the Company's Nordic region was at $40 million for the first

six months of FY 2011:

*Managed Services Sector (MSS) Out-of-Period Adjustments*

        The Company's MSS segment incurred various adjustments, primarily in
Europe's Nordic region, netting to approximately $30 million of charges in the
second quarter and $40 million in the first six months of fiscal 2011 that should have
been recorded in prior periods but were immaterial to previous and current year
consolidated results. ***Charges resulted from accounting errors and the
misapplication of internal accounting policies and U.S. GAAP, as well as from
accounting irregularities in the Nordic region, principally affecting prepaid
accounts and outsourcing contract costs.***

                                *       *       *

        Under the direction of the Company's Chief Executive Officer and Chief
Financial Officer, the Company has evaluated its disclosure controls and procedures
as of October 1, 2010. We have identified deficiencies that aggregate to a material
weakness in our internal control over financial reporting. These deficiencies are
related to a lack of appropriate tone at the top of the MSS Nordic business unit
combined with inadequate monitoring controls over the financial position and results
of operations of the underlying business, and a deterioration of the effectiveness of
certain account reconciliations within MSS.

        These deficiencies were identified in a review of the Company's MSS
business and reviews of the Company's monitoring controls. The review of the MSS
Nordic business revealed accounting errors and irregularities resulting in adjustments
that should have been recorded in prior years . . . . As a result of this material
weakness in the operating effectiveness of our controls, the Chief Executive Officer
and Chief Financial Officer have concluded that the Company's disclosure controls
and procedures were not effective as of October 1, 2010.

36.     On December 8, 2010, the Company, and specifically defendant Mancuso, presented

at the Barclays Capital Global Technology Conference to discuss the Company's financial outlook

and demand for the Company's products and services. Mancuso, discussing the Company's FY11

margin forecasts, stated that setting aside the accounting issues in the Nordic region, the Company

could easily beat the 25-50 basis point forecast it had set earlier in the fiscal year and the Company

was in fact already on track to do so:

[Mancuso:]  We operate the IT environment for a fair amount of the intelligence community within the federal government.  Certainly from the condition of the world where we are, there is not going to be a cutback in the Intel side of spending as it relates to the mission that is in front of our intelligence agency in this crazy world we live in.

*...And I had mentioned earlier in one of the meetings that we have in fiscal – in calendar 2010, we have been awarded on the federal side in our NPS segment over $10 billion – we have qualified for over $10 billion of IDIQ awards this year, some of which task orders have been issued against and have appeared in our backlog. . . .*

But by history and knowing the number of bidders and the requirements within the contracts, *we know we are going to get a substantial amount of that $10 billion of procurement spend in satisfying the requirements under these task orders.*

\*     \*     \*

[Analyst:]  Okay.  Let's just shift over for a moment to your margin profile.  You have talked about 25 or 50 – 250 basis points of margin upside per year annually over the next few years.  Can you help us understand where that is coming from?  Is it business mix?  Is it more cost-cutting operations? Just help us understand how if that is still achievable now and how?

[Mancuso:]  Well, to the latter point, I think 25 to 50 basis points in improvement in margin is still extremely doable and doable over the medium term.

\*     \*     \*

*I think you will see the natural improvement in our margins over time, and we will be able to meet if not beat – but certainly meet the 25 to 50 basis point improvements that we set out.*  We did it in '08 to '09, '09 to 2010 and on track to do it in FY 11, setting aside an issue we had in our Nordics region that we reported on last quarter.  *If you set that aside, we would easily meet the 25 or 50 basis point improvement this year.*

## THE TRUTH BEGINS TO REACH THE MARKET

37.     On February 1, 2011, the Company filed a Form 8-K with the SEC announcing that it had received notification that the SEC had launched a formal investigation into the accounting irregularities at its Nordic region MSS segment:

On January 28, 2011. Computer Sciences Corporation (the "Company") was notified by the United States Securities and Exchange Commission that the Commission has commenced a formal civil investigation relating to the Company's previously disclosed accounting adjustments in the Company's Managed Services

Sector segment, primarily in Europe's Nordic region.  The Company is cooperating with the Commission's investigation.

38.     On February 9, 2011, the Company issued its 3Q11 results in a release which was disseminated to the market via the newswire.  The Company's reported EPS missed Wall Street analysts' consensus revenue expectations and, while earnings of $1.54 were above expectations, EPS were positively benefited (approx. $0.50) due to a lower tax rate.  Despite the fact that defendants had on November 10, 2010 caused analysts and investors to expect a $500 million *increase* in FY11 bookings, defendants disclosed that FY11 bookings would be *reduced by $2.5 billion*, and that FY11 revenue guidance would be slashed by an additional $300 million.  Defendants also reported that Computer Sciences' FY11 margins would decline to as low as 8% due to the Nordic region accounting irregularities, which  defendants on February 9, 2011 admitted had ballooned by more than 100%, to $81 million, from the amount reported at the end of 2Q11.  FY11 earnings guidance was also drastically reduced by up to $0.25 per share.

39.     On February 9, 2011, the Company also convened a nationwide conference call for investors and analysts to discuss Computer Sciences' 3Q11 results.   Defendants disclosed government contract delays and the increased magnitude and breadth of the accounting irregularities in the Nordic region.  With respect to the NHS contract, which was reportedly being renegotiated, the Company disclosed that the NHS had only days earlier accused the Company of breach of contract for failure to meet its contract milestones:

> [Laphen:] *Third quarter profitability was primarily impacted by some trailing effects from the previously disclosed Nordics issue.*
>
> *. . . The operating income recovery in the fourth quarter combined with the improved tax rate brings our full-year EPS guidance to $5.20.*
>
> *Topline revenue guidance for the full year is impacted by a couple of factors.  NPS delays in new awards as well as the impact of temporary funding shortages on existing contracts, and there is a shift of an NHS milestone from the fourth quarter to early next fiscal year.*

*         *         *

Our *new* business bookings for Q3 were softer than we had expected, coming in at $2.3 billion.

\*   \*   \*

*Since our last call, clients slipped award dates for some $6.6 billion of opportunities out of our fiscal year 2011 into fiscal year 2012. Of this total, $3.9 billion are in NPS, and $2.7 billion are in the MSS pipeline.*

*These opportunities are delayed, not lost, and they remain in our competitive pipeline. The volume of these delays requires however that we amend our bookings guidance for the fiscal year 2011 to $16 billion in TCV.*

\*   \*   \*

*On February 4, NHS notified us that it believes our delay in achieving a milestone related to the Pennine Trust implementation constitutes a breach of contract.*

\*   \*   \*

The financial impact of shifting the NHS milestone into the next fiscal year is included in our fiscal year guidance.

\*   \*   \*

[Mancuso:] *[I]n NPS, we continued to experience delays by the federal government in awarding contracts despite previously announced decision dates. . . .*

*Again this quarter our margins were negatively impacted by additional charges stemming from our Nordics business, the result of our continuing cleanup actions.*

\*   \*   \*

*[O]ur full-year guidance [figures] . . . which are lower than our prior guidance reflect the slowdown in orders and revenue resulting from the award delays and the NHS milestone we talked about earlier.*

*Operating income margin has been reduced primarily because of lower revenue, mix and the Nordics and lower EPS is a fallout of both.*

40.    With respect to the accounting irregularities in the Company's Nordic region, which

defendants had assured investors had been corralled in 2Q11, analysts questioned whether more

exposure or irregularities would be revealed through the recently announced SEC investigation:

[Analyst:] [O]n the Nordics region issues . . . I think last quarter you said something similar. How can we feel confident that this is not going to reoccur . . . ?

\*   \*   \*

[Mancuso:]  As far as the Nordics is concerned, one way to think about this thing, we've taken the Nordics organization, its financial statements, and turned it literally upside down.

\*   \*   \*

We're highly confident that we have most of the issues identified, but that's not to say that something won't pop, which it did this quarter that we didn't anticipate.

\*   \*   \*

[Analyst:]  Mike, on NHS, . . . [i]s the only impact from the deferral of the milestone from Pennine, is that only on a free cash flow impact or did that also impact revenue and EPS in the fourth quarter?

[Mancuso:]  That impacted *revenue and EPS. . . .*  I won't give you a profitability number because I'm not able to give that. *But the revenue impact was about $175 million in the fourth quarter.*

\*   \*   \*

[Analyst:]  So going back to the Nordics, I might've missed it, but can you provide some detail on what makes up the earnings hit in terms of the components?  How much [is audit] costs, how much may be a reversal of prior recognized revenue and profits?

\*   \*   \*

[Mancuso:]  *As far as the details of Nordics, I don't want to get into a line by line item in terms of quantification.*

*It was a potpourri of issues like capitalizing expense items and deferring the recognition in the P&L, hanging them up on the balance sheet, credit agreements, customer credit agreements that were not book kept, therefore the books didn't reflect the obligation.*

*It was any combination of those kinds of things, a smattering of small items, a few $5 million and $10 million items, but pervasive in the sense that it added up to a large number.*

41.     On February 9, 2011, the Company filed its 3Q11 Form 10-Q with the SEC.  The

Form 10-Q disclosed that in "the aggregate, the Nordic region charges totaled $23 million in the

third quarter and $81 million for the first nine months of fiscal 2011."  Defendants also disclosed

that "[t]he charges resulted from accounting irregularities in the Nordic region and to a lesser extent,

from accounting errors and misapplication of U.S. GAAP in the Nordic region and other parts of MSS. These errors affected principally revenue, prepaid accounts, outsourcing contract costs, and other long-term liabilities." Finally, defendants admitted:

> *As previously reported in the second quarter, we identified deficiencies that aggregated to a material weakness in our internal control over financial reporting. These deficiencies are related to a lack of appropriate tone at the top of the MSS Nordic business unit combined with inadequate MSS segment monitoring controls over the financial position and results of operations, and a deterioration of the effectiveness of certain account reconciliations.*

> . . . As a result of this material weakness in the operating effectiveness of our controls, the Chief Executive Officer and Chief Financial Officer have concluded that *the Company's disclosure controls and procedures were not effective as of December 31, 2010.*

42.     The February 9, 2011 Form 10-Q also addressed the milestone shift in the Company's delivery of services and implementation of its Lorenzo 1.9 applications on the NHS contract. The Form 10-Q disclosed for the first time that in addition to notifying the Company that it may be in breach of the contract for failing to meet contract milestones, that *NHS was considering termination of all or parts of the contract* and modifications could result in further reduction in total contract value and potentially a change to previously recognized profits:

> The Company's contract with the U.K.'s National Health Service ("NHS") to deliver an integrated electronic patient records system with an announced value of approximately $5.4 billion is a large and complex contract and is included in the BSS segment. . . .

> *Implementation of the software release known as Lorenzo Release 1.9 at the fourth early adopter, Pennine Care NHS Foundation Trust, has been delayed and is now expected to occur in the first quarter of fiscal year 2012.* On February 4, 2011, the NHS formally notified the Company that it believes the Company's failure to achieve a key milestone related to the Pennine implementation by January 28, 2011, constitutes a breach of contract *and the NHS is considering its position on termination of all or parts of the contract* . . . . Both the NHS and the Company have indicated their intent to continue discussions regarding modifications to the contract with the agreed mutual intent to reach agreement as soon as practicable on terms satisfactory to both parties. *These modifications, if agreed, could result in a further reduction to total contract value in addition to the reduction described above. The contract is currently profitable and the Company expects to recover its investment. Future events, including the results of the current negotiations between the parties, could result in a charge to reduce the contract profitability*

*recognized to date, reduced future profitability and have an adverse impact on the Company's cash flows.*

43.     On February 9, 2011, in response to the Company's disclosures, Cowen and Co. issued a report detailing the Company's disclosures and the risks to the Company.  The report emphasized investors' concerns about defendants' "lack of transparency":

**CSC-Q3FY11- Lowers Guidance On NHS**

**Milestone Miss, Federal Spending Delays**

   **Conclusion**: We maintain our Neutral rating on CSC's stock based on a host of negative issues including: *(1) Reduced FY'11 revenues and EPS guidance; (2) DoD and Federal spending delays; (3) NHS performance milestone miss; (4) Negative impact on OM by charges related to CSC's Nordics operation. Accordingly, we remain concerned over CSC's earnings quality, and lack of transparency related to revenue/margin/FCF contributions from the NHS contract.*

44.     As the facts began to reach the market, Computer Sciences' stock price declined more than $8.00 per share from its close on February 8, 2011 to a close of $48.43 per share on February 9, 2011, on more than 12 million shares traded, or an increase of more than 700% over the prior day's volume.

45.     Despite the disclosures regarding government and new business bookings delays, the Company, during the February 9, 2011 conference call, nevertheless assured investors that the Company was not losing market share on government contracts, its new FY11 bookings forecast of $16 billion was the "right number," and it had indeed already factored in the impact of government delays.  The Company also said that the new bookings forecast assumed the government budget delays related to upcoming appropriations bills would not get resolved until after the Company's fiscal year, thus signaling that these forecasted new bookings were firm:

   [Laphen:]  With regard to new business, chart eight lays out our year-over-year new bookings results by quarter.

\*          \*          \*

*We anticipate Q4 to exceed last year based on contract negotiations underway and a sizable number of proposals in evaluation. We think on balance, $16 billion is about the right number for the year given the federal government delays discussed earlier.*

\*     \*     \*

[Analyst:] I wonder if we could talk a little bit more about the government delays. I know you commented on this earlier, but maybe you could give us just a little bit more color on why you expect these to be delays and why it's not lost or maybe reduced business.

[Laphen:] Well the – in terms of the new business that was shifted out, those opportunities are still there. They have not been canceled by the government. And we are not aware of any plans to cancel them.

\*     \*     \*

[Analyst:] Thanks for squeezing me in, guys. Just two quick ones, if I could.

First on the continuing resolution, obviously that's nothing new and it's been going on for a while and I think early March is the current expiration date on that. What are you guys assuming from a planning perspective?

Are you assuming that all the appropriations bills get done by March 2 or 3 whatever the deadline is there? Or are you assuming that perhaps the CR will extend perhaps as long as the full government fiscal year? What is your sense?

[Laphen:] We are assuming for our fourth-quarter picture that it does not get resolved during this fiscal year.

46.     After the February 9, 2011 stock price decline, Computer Sciences' stock price continued to trade artificially inflated levels.

47.     On May 2, 2011, the Company shocked investors again with the announcement of the status of its 4Q11 financial guidance update on negotiations with NHS. The Company reported that it was near to reaching an agreement with the NHS on changes to the current contract and updated its FY11 guidance. With respect to FY11, the Company reported that it would miss even reduced FY11 revenue expectations by $100 million, it would miss earnings expectations by $0.45 per share and would remove an *additional $2 billion from its previously reduced new booking outlook*, citing federal procurement delays.

**CSC Provides Update on NHS MOU Status and FY2011 Guidance**

*Fourth Quarter Earnings Call Rescheduled*

. . . CSC announced today that it anticipates concluding a non-binding memorandum of understanding (MOU) with the National Health Service (NHS).

\*      \*      \*

Therefore and primarily due to the anticipated MOU, a related NHS fourth quarter milestone revenue shift, and a slightly higher tax rate, the company is updating its Fiscal 2011 guidance. Earnings per share (EPS) guidance has been adjusted downward as the result of an inception to date reduction in contract profit to a rate that should still be accretive to the company's long term profit goals. The revised contract scope and schedule has also resulted in lower fourth quarter milestone payments and advances and therefore Free Cash Flow expressed as a percent of Net Income is at 80 percent versus the previous guidance of >90 percent.

***New business awards were also further impacted primarily due to delayed procurement decisions within the federal sector.***

Below is a comparison of the current and prior guidance:

|  | Current Guidance FY2011* | February 9 FY2011 Guidance |
|---|---|---|
| New Business Awards | $14.0 billion | $16.0 billion |
| Revenue | $16.1 billion | $16.2 billion |
| Operating Margin | 7.7% | 8% - 8.5% |
| EPS | $4.75 | $5.20 |
| Free Cash Flow as % Net Income | 80% | >90% |

48.     These new May 2, 2011 disclosures sent the Company's share price spiraling further downward. On May 3, 2011, Computer Sciences' share price declined approximately 13% from a close of $50.55 per share on May 2, 2011 to a close of $44.03 per share on May 3, 2011, on unusually large volume.

49.     On May 11, 2011 *Bloomberg* published an article entitled "CSC Suspended From U.K Government Contracts, Cameron Says." The article quoted U.K. Prime Minister David Cameron as stating that, as opposed to defendants' May 2, 2011 claims that a memorandum of understanding with the NHS was soon to be signed, there were "'no plans to sign any new contracts

with Computer Sciences'" until audit reviews of the contract, its progress and expenditures had been reviewed.

### CSC Suspended From U.K. Government Contracts, Cameron Says

Computer Sciences Corp. (CSC), the provider of computer services to companies and U.S. government agencies, won't win any new business with the U.K. government, the country's prime minister said today.

*The government won't sign any additional contracts with CSC until reviews of missed deadlines on the system it's building for the Department of Health are completed, U.K. Prime Minister David Cameron told lawmakers during his weekly question-and-answer session.*

"We are absolutely determined to achieve better value for money," Cameron said in Parliament in London. *"There are no plans to sign any new contracts with Computer Sciences Corp. until the National Audit Office report has been reviewed, and until the Public Accounts Committee meetings and major project authorization reviews have taken place."*

CSC is working to revise its contract with the U.K. Government's National Health Services, the company said last week, causing the shares to fall the most in seven months. The company also said its full-year sales and profit for the year through March probably missed its forecasts.

"The Prime Minister's comments today confirmed that the NHS program reviews must be completed before any NHS agreement would be finalized," Chris Grandis, a spokesman for Falls Church, Virginia-based CSC, said in an e-mailed statement. Existing contracts with the government aren't affected by the reviews, he said.

Cameron said the government "will examine all the available options under the current contract, including the option of terminating some or indeed all of the contract."

50.     Finally, on May 25, 2011, after the market closed, the Company issued a press release preannouncing its 4Q11 and FY11 financial results, and making additional disclosures. The Company reported that 4Q11 earnings of $1.09 would miss Wall Street consensus estimates of $1.16 per share, and FY11 earnings would be below even the reduced EPS forecast of $4.75, which had been recently revised on May 2, 2011. The Company also disclosed that its Audit Committee had, on May 2, 2011, begun an internal investigation into the MSS accounting irregularities *and certain other accounting matters identified by the committee* and the SEC. Thus, notwithstanding earlier

assurances of the limited scope of the MSS Nordic accounting issues, the Company disclosed that

the accounting investigation had expanded and was not sufficiently complete to timely file its Form

10-K, which was due by May 31, 2011. The press release stated in part:

### CSC REPORTS PRELIMINARY FOURTH QUARTER RESULTS

. . . CSC today reported preliminary fourth quarter fiscal 2011 revenue of $4.20 billion and fully diluted earnings per share (EPS including discontinued operations) of $1.09 compared to fourth quarter fiscal 2010 revenue of $4.20 billion and EPS of $1.66.

. . . "Although Fiscal Year 2011 was challenging given the NHS uncertainty, the unexpected difficulties in the Nordics and the delays in the Federal budgets, I am pleased with the sequential and year over year revenue growth achieved in our commercial business. Excluding the challenges, our business performed as expected in terms of operating margin and free cash flow."

The Company also announced preliminary full year revenue of $16.04 billion and EPS (including discontinued operations) of $4.73 compared to fiscal 2010 revenue of $15.92 billion and EPS of $5.28. *The reduction in the Company's preliminary earnings per share for fiscal 2011 as compared to fiscal 2010 is primarily due to a profit adjustment related to the Company's contract with National Health Service in the United Kingdom, net out of period adjustments in the Company's Managed Services Sector and a higher effective tax rate.*

\*     \*     \*

### Investigation Update; Preliminary Results Subject to Change

As previously disclosed, in fiscal year 2011 the Company initiated an investigation into certain accounting errors in the Company's Managed Services Sector (MSS), primarily involving accounting irregularities in the Nordic region. *Initially, the investigation was conducted by Company personnel, but outside Company counsel and forensic accountants retained by such counsel later assisted in the Company's investigation. . . . On May 2, 2011, the Audit Committee of the Board of Directors commenced an independent investigation into matters relating to MSS and the Nordic region, matters identified by subpoenas issued by the SEC's Division of Enforcement and certain other accounting matters identified by the Audit Committee and retained independent counsel to represent CSC on behalf of, and under the exclusive direction of, the Audit Committee in connection with such independent investigation. . . .*

In addition, the SEC's Division of Corporation Finance has issued comment letters to the Company requesting additional information regarding its previously disclosed adjustments in connection with the above-referenced accounting errors, the Company's conclusions regarding such adjustments and the Company's analysis of

the effectiveness of its disclosure controls and procedures and its internal control over financial reporting. The Company is responding to such comments.

> *The investigation of the accounting irregularities in the Nordic region is not sufficiently complete so as to allow the Audit Committee and the Company to determine the appropriateness of filing the Company's financial statements for the year ended April 1, 2011. Consequently, the Company will not be able to file its Form 10-K for the year ended April 1, 2011 before the required filing date of May 31, 2011. . . .*

> Because the Company has not issued its financial statements for the year ended April 1, 2011, *all financial results and other financial data described in this press release should be considered preliminary and are subject to change to reflect any necessary additional corrections or adjustments, or changes in accounting estimates, that are identified in connection with these matters.* In addition, the outcomes of the SEC and Audit Committee investigations are uncertain at this time.

51.     In response to the Company's May 25, 2011 disclosures, on May 26, 2011, the Company's stock price plummeted $5.71 per share (or 12%), on trading volume of more than 14 million shares to close at $38.38 as the expanded extent of potential accounting irregularities and miss of financial FY11 earnings results were revealed.

52.     The Class Period representations by defendants concerning the financial condition and prospects for Computer Sciences, including the adequacy of Computer Sciences' internal controls, were each materially false and misleading when made because they failed to disclose the true facts, which were then known to or recklessly disregarded by defendants, including:

(a)     The Company's historical and current financial results from the Company's MSS unit, which had been incorporated into the Company's consolidated financial statements, were false and in violation of the Company's internal accounting policies and GAAP;

(b)     That implementation of the Company's Lorenzo 1.9 software at the NHS had been experiencing severe technical difficulties rendering the Company unable to meet its contract milestones such that the entirety of the contract was becoming substantially less profitable was at risk of total termination;

(c)     The Company was experiencing significant weakness in demand for its NPS products and services and bookings for new business for its products were *declining*; and

(d)     In light of (a)-(c) above, there was no reasonable basis for the FY11 revenue, earnings, bookings and margin forecasts made to the public during the Class Period.

## ADDITIONAL SCIENTER ALLEGATIONS

53.     As alleged herein, Computer Sciences and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Computer Sciences, their control over, and/or receipt and/or modification of Computer Sciences' allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Computer Sciences, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

54.     During the Class Period, as detailed herein, defendants made false and misleading statements about Computer Sciences' business and prospects and engaged in a scheme to deceive the market. This artificially inflated Computer Sciences' stock price and operated as a fraud or deceit on Class Period purchasers. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Computer Sciences' stock price fell precipitously, as the prior artificial inflation came out of the stock price over time. As a result of their purchases of Computer Sciences common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

- 28 -

## APPLICABILITY OF PRESUMPTION OF
## RELIANCE: FRAUD ON THE MARKET

55.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased Computer Sciences common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

56.     At all relevant times, the market for Computer Sciences common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, Computer Sciences filed periodic public reports with the SEC; and

(b)     Computer Sciences regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

### COUNT I

#### For Violation of §10(b) of the 1934 Act and Rule 10b-5
#### Against All Defendants

57.     Plaintiff incorporates ¶¶1-56 by reference.

58.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Computer Sciences common stock during the Class Period.

60.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Computer Sciences common stock. Plaintiff and the Class would not have purchased Computer Sciences common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

61.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Computer Sciences common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

62.     Plaintiff incorporates ¶¶1-61 by reference.

63.     The Individual Defendants acted as controlling persons of Computer Sciences within the meaning of §20 of the 1934 Act. By virtue of their positions and their power to control public statements about Computer Sciences, the Individual Defendants had the power and ability to control the actions of Computer Sciences and its employees. Computer Sciences controlled the Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

64.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or acquired Computer Sciences common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their family members, directors and officers of Computer Sciences and their families and affiliates.

65.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Computer Sciences has more than 155 million shares of stock outstanding, owned by thousands of persons.

66.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

        (a)     Whether the 1934 Act was violated by defendants;

        (b)     Whether defendants omitted and/or misrepresented material facts;

        (c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

       (d)    Whether defendants knew or recklessly disregarded that their statements were false and misleading;

       (e)    Whether the price of Computer Sciences common stock was artificially inflated; and

       (f)    The extent of damage sustained by Class members and the appropriate measure of damages.

67.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

68.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

69.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiff and the members of the Class damages and interest;

C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: June 3, 2011

LAW OFFICES OF CRAIG C. REILLY
CRAIG C. REILLY, VSB #20942

_____
CRAIG C. REILLY

111 Oronoco Street
Alexandria, VA  22314
Telephone:  703/549-5354
703/549-2604 (fax)
craig.reilly@ccreillylaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone: 415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Computer Sciences_Roseville.doc

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.     (a)     Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*City of Roseville Employees' Retirement System v. EnergySolutions, Inc., et al., No. 09-cv-08633 (S.D.N.Y.)*
*City of Roseville Employees' Retirement System v. Sterling Financial Corporation, et al., No. 2:09-cv-00368-EFS (E.D. Wash.)*

(b)     Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

(c)     Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*City of Roseville Employees' Retirement System v. Horizon Lines, Inc., et al., No. 08-cv-00969-HB (D. Del.)*
*City of Roseville Employees' Retirement System v. Textron Inc., et al., No. 09-cv-00367 (D.R.I.)*
*City of Roseville Employees' Retirement System v. Nokia Corporation, et al., No. 1:10-cv-00967-GBD (S.D.N.Y.)*

COMPUTER SCIENCES

*City of Roseville Employees' Retirement system v. Boston Scientific Corporation, et al.*, Case No. No. 1:10-cv-10593-PBS (D. Mass.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __/__ day of __JUNE__, 2011.

CITY OF ROSEVILLE EMPLOYEES'
RETIREMENT SYSTEM

By: _John Chinlin_____

Its: _CHAIRMAN_____

- 2 -

COMPUTER SCIENCES

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 12/10/2010 | 1,330 | $47.00 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 09/03/2010 | 345 | $42.36 |

*Opening position of 4,205 shares.