**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |  |
|---|---|---|
| IN RE COMPUTER SCIENCES | ) | |
| CORPORATION SECURITIES | ) | Civil Action No. 1:11-cv-610-TSE-IDD |
| LITIGATION | ) | |
| | ) | |
| ———————————————— | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

SKADDEN, ARPS, SLATE, MEAGHER &  FLOM LLP

David E. Carney (Va. Bar No 43914)
Jennifer L. Spaziano (admitted *pro hac vice*)
1440 New York Avenue NW
Washington, DC 20005
Telephone:  (202) 371-7000
Facsimile:  (202) 393-5760
Email:  David.Carney@skadden.com
Email:  Jen.Spaziano@skadden.com

Jay B. Kasner (admitted *pro hac vice*)
Scott D. Musoff (admitted *pro hac vice*)
Four Times Square
New York, NY 10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
Email:  Jay.Kasner@skadden.com
Email:  Scott.Musoff@skadden.com

*Counsel for Computer Sciences Corporation,
Michael W. Laphen, Michael J. Mancuso and Donald G. DeBuck*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................1

RELEVANT FACTUAL BACKGROUND .......................................................................4

     A.     Ontario's Allegations ...............................................................................5

     B.     Ontario's CSC Stock Purchase History....................................................5

     C.     Ontario's Trading Strategy .......................................................................6

           1.     *Quantitative Trading Methodology* ................................................6

           2.     *Internal Value Investing Strategy* .................................................8

           3.     *External Manager Strategy* ...........................................................8

           4.     *Basket Index Strategy*...................................................................9

I.     The Proposed Class Does Not Satisfy Rule 23(a) Because Ontario Is Subject To Unique Defenses That Are Not Typical of the Proposed Class .....................................11

     A.     Ontario Purchased After the Filing of the Initial Complaint................................14

     B.     Ontario Purchased Soon After CSC's Alleged Curative Disclosures...................15

     C.     Ontario's History of Post-Disclosure Purchasing .................................................15

     D.     Ontario Extends the Class Period to Mask Its Unusual Post-Disclosure Purchases ...........................................................................................................16

     E.     Ontario Continues to Buy and Hold Significant Amounts of CSC Stock Despite Accusing CSC of Fraud .......................................................................17

II.     Ontario Cannot Fairly and Adequately Represent the Putative Class Due to Its Financial Conflict of Interest ...........................................................................................17

III.     Individualized Issues Will Not Predominate Because The Market for CSC Stock Is Not Efficient.  Even If It Were, Ontario Did Not Rely on the Efficiency of the Market and Thus the Putative Class Does Not Satisfy Rule 23(a) or 23(b) ....................22

     A.     The Market For CSC Stock Is Not Efficient and  Individual Issues Predominate...................................................................................................24

     B.     Ontario Did Not Rely on the Efficiency of the Market.......................................26

CONCLUSION.................................................................................................................30

i

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Affiliated Ute v. United States*, 406 U.S. 128 (1972) ...................................................................25

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ...........................................................17

*Ballan v. Upjohn Co.*, 159 F.R.D. 473 (W.D. Mich. 1994) .........................................................19

*Basic*, *Inc. v. Levinson*, 485 U.S. 224 (1988) ........................................................... 22, 23, 26, 27

*In re BearingPoint, Inc. Securities Litigation*, 232 F.R.D. 534 (E.D. Va. 2006) ................... 13, 29

*Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307 (5th Cir. 2005) ..................................................23

*Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998) ............. 11, 17

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ...........................................................23, 25

*In re Cendant Corp. Litigation*, 182 F.R.D. 144 (D.N.J.), *subsequent
    determination by* 191 F.R.D. 387 (D.N.J. 1998), *opinion superseded on
    other grounds* by No. Civ. A. 98-1664, 2000 WL 1288307 (D.N.J. Apr. 7,
    2000) ............................................................................................................................22

*In re Cendant Corp. Litigation*, 264 F.3d 201 (3d Cir. 2001) *subsequent
    determination by* 191 F.R.D. 387 (D.N.J. 1998), *opinion superseded on
    other grounds* by No. Civ. A. 98-1664, 2000 WL 1288307 (D.N.J. Apr. 7,
    2000) ............................................................................................................................19

*In re Countrywide Financial Corp. Securities Litigation*, 273 F.R.D. 586 (C.D.
    Cal. 2009) ............................................................................................................. 13, 29, 30

*Cox v. Collins*, 7 F.3d 394 (4th Cir. 1993) ................................................................................26

*Degulis v. LXR Biotechnology, Inc.*, 176 F.R.D. 123 (S.D.N.Y. 1997) .......................................12

*In re DVI Inc. Securities Litigation*, 249 F.R.D. 196 (E.D. Pa. 2008) ........................................13

*In re Dynegy, Inc. Securities Litigation*, 226 F.R.D. 263 (S.D. Tex. 2005) ................................19

*Gariety v. Grant Thornton, LLP*, 368 F.3d 356 (4th Cir. 2004) ......................................22, 23, 24

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    903 F.2d 176 (2d Cir. 1990) ........................................................................................11

*Jaroslawicz v. Engelhard Corp.*, 724 F. Supp. 294 (D.N.J. 1989) ..............................................26

*Lake Wright Hospitality, LLC v. Holiday Hospitality Franchising, Inc.*, Civil
   Action No. 2:07cv530, 2009 WL 2606254 (E.D. Va. Aug. 20, 2009)............................24

*Malone v. Microdyne Corp.*, 148 F.R.D. 153 (E.D. Va. 1993) ....................................13

*Monroe v. City of Charlottesville, Virginia*, 579 F.3d 380 (4th Cir. 2009) ................10

*In re Moody's Corp. Securities Litigation*, 274 F.R.D. 480 (S.D.N.Y. 2011) ............23

*Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. LaBranche & Co.*,
   229 F.R.D. 395 (S.D.N.Y. 2004)....................................................................................19

*Plant v. Merrifield Town Center Ltd. Partnership*, Nos. 1:08cv374 and 1:08cv566,
   2008 U.S. Dist. LEXIS 92385 (E.D. Va. Nov. 12, 2008).............................................10

*Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131 (S.D.N.Y. 2007) .................12, 13

*Rolex Employees Retirement Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658 (D.
   Or. 1991)...................................................................................................................12, 14

*In re Safeguard Scientifics*, 216 F.R.D. 577 (E.D. Pa. 2003)................................12, 17

*In re Seagate Technology II Securities Litigation*, 843 F. Supp. 1341 (N.D. Cal.
   1994) ..............................................................................................................................18

*Shelton v. Pargo, Inc.*, 582 F.2d 1298 (4th Cir. 1978)................................................18

*Shiring v. Tier Technologies*, 244 F.R.D. 307 (E.D. Va. 2007) ................. 10, 11, 16, 22

*In re Taco Bell Wage & Hour Actions*, No. 1:07-cv-01314-OWW-DLB, 2011 WL
   4479730 (E.D. Cal. Sept. 26, 2011) ..............................................................................24

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*, 546
   F.3d 196 (2d Cir. 2008) .................................................................................................25

*Thorn v. Jefferson-Pilot Life Insurance Co.*, 445 F.3d 311 (4th Cir. 2006)............1, 10

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).........................................1, 10

*In re Washington Mutual, Inc. Securities, Derivatives & ERISA Litigation*, Nos.
   2:08-md-1919 MJP, C08-387 MJP, 2010 WL 4272567 (W.D. Wash. Oct.
   12, 2010) .....................................................................................................................2, 16

*Weintraub v. Texasgulf Inc.*, 564 F. Supp. 1466 (S.D.N.Y. 1983) ..............................12

**Statutes & Rules**

Fed. R. Civ. P. 23(a)(3) ..............................................................................................4, 11

Fed. R. Civ. P. 23(a)(4) ..................................................................................................4

Fed. R. Civ. P. 23(b)(3) ...........................................................................................11, 22

**Other Authorities**

7A C. Wright *et al.*, *Federal Practice and Procedure* § 1764 (2d ed. 1986) ..............................11

Defendants Computer Sciences Corporation ("CSC"), Michael W. Laphen, Michael J. Mancuso and Donald G. DeBuck (collectively, "Defendants"), through their undersigned counsel, submit this memorandum in opposition to the Motion for Class Certification filed by Ontario Teachers' Pension Plan Board ("Ontario") on September 22, 2011 (the "Motion").[1]

## PRELIMINARY STATEMENT

Supreme Court and Fourth Circuit precedent make clear that Ontario bears the evidentiary burden of establishing that all of the requirements of Rule 23 have been met in order for class certification to be appropriate.[2]  Instead of satisfying this standard, Ontario has filed a boilerplate set of motion papers without any evidentiary or expert support.  The only certification it submitted was a transmittal declaration from an in-house lawyer setting forth, without any further explanation, the numerous and inconsistent trades in CSC stock in which Ontario engaged, including those post-disclosure and post-litigation trades of which this Court has already taken note.[3]  This is insufficient to meet the burden required by *Wal-Mart*.

First, as this Court recognized at the hearing for the selection of lead plaintiff, Ontario

---

[1]   In accordance with the Court's comments at the August 26, 2011 hearing, Ontario noticed this Motion for hearing on November 4, 2011 at 2:00 p.m., the same time as Defendants' motion to dismiss is scheduled.  (*See* Excerpts of Transcript of August 26, 2011 Motions Hearing ("8/26/11 Tr.") at 50:3-9 attached as Ex. 1 to the Declaration of David E. Carney in Support of Defendants' Opposition to Lead Plaintiff's Motion for Class Certification ("Carney Declaration") ("it seems to me that I should resolve the motion to dismiss under the heightened PSLRA pleading standard before I consider certification of the class").)  This Motion, however, has been set for hearing on November 4, 2011 at 10:00 a.m.  (Dkt. 36.)

[2]   *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *Thorn v. Jefferson-Pilot Life Insurance Co.*, 445 F.3d 311, 321 (4th Cir. 2006).

[3]   *See* Ex. A to the Declaration of Jeffrey M. Davis in Support of Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel (Dkt. 46-2) ("Ontario's Certification" or "Ontario's Cert."), attached as Ex. B to the Declaration of Joseph A. Fonti in Support of Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel (Dkt. 46).

needs to answer the following question (in front of a jury if necessary): how can it allege that CSC and its current senior management engaged in a massive, three-year intentionally fraudulent scheme to violate the US securities laws while at the same time buying and holding an enormous amount of CSC stock? (*See* 8/26/11 Tr. 24:6-11.) Even the limited discovery conducted thus far – a single deposition of an in-house attorney without any documents having been produced by Ontario – has confirmed that Ontario will be unable adequately to answer this question. Ontario continued to purchase CSC stock not only *after* CSC's alleged corrective disclosures which Ontario claims revealed CSC's fraud, but also *after* the original complaint was filed in this action, *after* the class period as defined in the initial complaints, *after* it moved to be lead plaintiff, *after* its newly expanded class period and even *after* the hearing before this Court in which concerns were raised about Ontario's post-disclosure purchases.[4] Nor is this the first time that Ontario has engaged in such questionable and unusual practices.[5] Here, instead of explaining its conduct, Ontario has simply attempted to obfuscate the substantial scope of its post-disclosure purchases by inappropriately expanding the end of the class period from May 25, 2011 – as initially defined by other plaintiffs – to August 9, 2011 in a transparent attempt to include many of the post-disclosure trades at issue at the Lead Plaintiff hearing.

Second, although Ontario faces a significant financial conflict with other class members, it has presented no evidence to refute this conflict except for conclusory assertions at deposition that it will meet its obligations to the putative class. Specifically, as a result of Ontario's current

---

[4]   On August 26, 2011, Ontario represented to this Court that only 10 percent of its purchases came after the February 9, 2011 disclosure. (*See* 8/26/11 Tr. at 39:25-40:13.) However, due to their continued post-disclosure purchases, Ontario has now made 24.8 percent of all of its CSC share purchases after the February 9, 2011 disclosure. (*See* Ontario's Cert. (Dkt. 46-2).)

[5]   *See In re Wash. Mutual, Inc. Sec., Derivatives & ERISA Litig.*, Nos. 2:08-md-1919 MJP, C08-387 MJP, 2010 WL 4272567, at *6 (W.D. Wash. Oct. 12, 2010).

holdings of nearly 1 million shares of CSC stock (worth more than $26 million), Ontario has a substantial financial interest in CSC's continued success that conflicts with those class members that have no continued interest in CSC and merely seek to maximize their recovery in this action. Indeed, economic evidence supported by the accompanying expert declaration of Mukesh Bajaj dated October 14, 2011 ("Bajaj Declaration") (Carney Decl. Ex. 2), demonstrates that for every dollar Ontario seeks to recover through this litigation it can suffer 4.61 times as much in losses to its current holdings, rendering it subject to an inherent and irreconcilable conflict.  Moreover, Ontario's continued holdings call into question its ability to stand behind its allegations. Specifically, Ontario's allegations that one of the CSC contracts at issue "may be worthless" and that current CSC management engaged in a deliberate fraud are belied by Ontario's continued holding of millions of dollars worth of CSC stock.

Finally, prior to filing its Motion, Ontario asked whether Defendants would concede that the market for CSC stock was efficient and stated that it was "fully prepared to establish market efficiency" including by "submission of an expert declaration."  (*See* Carney Decl. Ex. 3.) Defendants responded that they were not prepared to so concede, yet Ontario chose to file this Motion without any expert support of its claim of market efficiency.  Apparently, Ontario was unable to obtain such support, and Defendants now submit expert evidence through the accompanying Bajaj Declaration that rebuts the presumption of reliance.  (Carney Decl. Ex. 2.) Thus, as discussed more fully below, Ontario's Motion should be denied for at least the following reasons:

- Ontario purchased CSC stock *after* the filing of initial complaint, *after* the end of the proposed class period and even *after* it sought the appointment of lead plaintiff. Ontario therefore is subject to a unique reliance defense and attack on its credibility not applicable to all members of the class.  Accordingly, Ontario is not a typical class representative as required by Rule 23(a)(3) of the Federal Rules of Civil Procedure.  (*See* Section I *infra*.)

3

- Ontario's ongoing financial interest in CSC creates a fundamental conflict between Ontario, which has an obligation to its pension fund beneficiaries to maximize their current holdings in CSC, and the proposed class, which has an interest in maximizing any recovery in this case even to the detriment of current CSC shareholders. Ontario therefore cannot fairly and adequately represent the class it seeks to represent here. *See* Fed. R. Civ. P. 23(a)(4). (*See* Section II *infra*.)

- Ontario has failed to establish that CSC stock traded on an efficient market. Therefore, class members cannot invoke the presumption of reliance using the fraud on the market theory. Thus, unique issues of reliance predominate over individual issues which defeats certification under Rule 23(b). Moreover, even if the market in CSC stock were efficient, Ontario's unique trading strategies demonstrate that it did not rely on the efficiency of the market in making investment decisions. Consequently, Ontario's claims are not typical of those of the class it seeks to represent. *See* Fed. R. Civ. P. 23(a)(3). (*See* Section III *infra*.)

## RELEVANT FACTUAL BACKGROUND

Founded in 1959 and headquartered in Falls Church, Virginia, CSC operates in the information technology and personal services industry. Its clients are comprised of governments and commercial enterprises that engage in the development, deployment and ongoing operation of information technology services. (Consolidated Class Action Complaint (the "Complaint") (Dkt. 48.) ¶ 13.)[6]

On June 3, 2011, the first of four complaints was filed alleging that CSC and certain of its officers violated the Securities Exchange Act of 1934 and SEC Rule 10b-5, 15 U.S.C. § 78j(b). On August 29, 2011, this Court entered an Order consolidating the cases and appointing Ontario as Lead Plaintiff.[7] On September 26, 2011, Ontario filed its Complaint (Dkt. 48). Ontario seeks

---

[6] References to the Complaint are to "Compl. ¶__." In paraphrasing the Complaint's general allegations, Defendants are not suggesting that the Complaint satisfies the heightened pleading requirements of Fed. R. Civ. P. 9(b) or the Private Securities Litigation Reform Act. Defendants will establish in their motion to dismiss that will be filed on October 18, 2011, that Ontario fails to allege its claims with the particularity required by federal law.

[7] Ontario's appointment as Lead Plaintiff does not obviate the need for careful consideration of the pending Motion. *See* August 29, 2011 Order (Dkt. 36) at 2 ("This ruling does not address the question whether the alleged class or classes should be certified pursuant to Rule 23, Fed. R. Civ. P., or how any class or classes should be structured in the event of certification.").

to certify a class of "all persons and entities that purchased or acquired [CSC] common stock between August 5, 2008 and August 9, 2011, inclusive (the "Class Period"), and who were damaged thereby."  (*See* Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification ("Pl. Mem.") (Dkt. 45) at 1.)

### A.      Ontario's Allegations

In an attempt to assert a claim under the federal securities laws, Ontario alleges two separate and distinct "fraudulent schemes."  First, the Complaint alleges, based almost exclusively on the anonymous statements of disgruntled former employees, that CSC failed to timely disclose certain accounting irregularities pertaining to CSC's operations in the Nordic region.  (Compl. ¶ 2.)  Second, again based largely on the statements of a *single* disgruntled employee who left CSC just days after the start of the proposed Class Period, the Complaint alleges that starting in May 2008, CSC knew, but failed to disclose, that it could not fulfill its contractual obligations to the National Health Services of the UK ("NHS").  (*Id.* ¶¶ 1 & 48.) Ontario alleges that CSC made corrective disclosures on four dates in 2011.  (*See, e.g.*, February 9, 2011 Disclosure (*Id.* ¶¶ 248-63); May 2, 2011 Disclosure (*id.* ¶¶ 264-68); May 25, 2011 Disclosure (*id.* ¶¶ 269-83); August 10, 2011 Disclosure (*id.* ¶¶ 286-91).)

### B.      Ontario's CSC Stock Purchase History

Ontario is the largest pension plan in Canada, investing the pension fund's assets and administering the pensions of 295,000 active and retired teachers in Ontario.  (Compl. ¶ 8.) Ontario is not a passive investor, but a very active trader that displays the activism normally reserved for hedge funds.  At the start of the Class Period, Ontario held 29,900 shares of CSC stock.  (*See* Ontario's Cert. (Dkt. 46-2).)  It then sold almost all of those shares approximately one month into the proposed Class Period and thereby, under its theory, profited from Defendants' alleged conduct.  Thereafter, throughout the Class Period, Ontario frequently bought

and sold CSC stock, including 41 purchases (ranging between 700 shares to 87,400 shares per transaction) and 8 sales (ranging between 1,795 shares to 28,300 shares per transaction).  (*Id.*) Rather than being a "long-term investor" in CSC, as Ontario represented at the hearing on competing motions for appointment of Lead Plaintiff (*see* 8/26/11 Tr. at 24:22-23), Ontario bought or sold CSC stock an average of approximately once every 22.4 days over the course of the approximately three-year Class Period.  (*Id.*)  In addition, Ontario frequently purchased CSC stock in close proximity to the *very* CSC announcements it now claims disclosed the truth of CSC's alleged prior misstatements or omissions.  (*See, e.g.*, February 9, 2011 Disclosure (Compl. ¶¶ 248-63); May 2, 2011 Disclosure (*id.* ¶¶ 264-68); August 10, 2011 Disclosure (*id.* ¶¶ 286-91).)

Moreover, Ontario has continued actively to trade CSC stock since both the filing of the first original complaint and the end of the amended Class Period.  (*See* Ontario's Cert. (Dkt. 46-2).)  According to Ontario's Certification, since the first of the consolidated actions was filed on June 3, 2011, Ontario has actually increased its holdings in CSC stock by 23,905 shares as of September 21, 2011.  (*See id.*)  As a result, as of October 3, 2011, Ontario held 993,114 shares of CSC stock worth over $26 million.  (*See* Excerpts from the Deposition of Jeffrey M. Davis, Esq., dated October 4, 2011 ("Davis") at 299:13-16, attached as Ex. 4 to Carney Decl.)

### C. Ontario's Trading Strategy

Ontario's unusual trading history and post-litigation/post-class period transactions can be understood better by analyzing Ontario's four unique and complex trading strategies.  Ontario used these strategies "to maximize returns and outperform the markets in which [they] invest." (*See* Ontario's 2010 Annual Report ("Annual Report") at 29 attached as Ex. 5 to Carney Decl.)

#### 1. *Quantitative Trading Methodology*

Ontario entered into two separate types of trades under what it terms the Quantitative Trading Methodology:  (1) a "quality trade" and (2) a "cash flow trade."  In a so-called "quality

trade" one of Ontario's portfolio managers purchased a "basket" of securities. (Davis at 15:9-22:17.) These securities were drawn from a universe of three different stock indices and based on "certain qualities or criteria of financial tasks having met certain scores under financial testing." (*Id.*; *see also id.* at 32:2-23; 34:7-23.) Financial scoring of the stocks in the basket was based on return on equity, stability in earnings and debt-to-equity ratio. The strategy eschewed consideration of CSC's narrative disclosures – including those the Complaint alleges are misleading. (*See id.* at 40:23-41:3 (Portfolio manager "did not use the disclosures . . . in February of 2011 or . . . May 2011 in making the determination to concentrate the basket and have CSC be sold.").) Indeed, the manager did not review "actual narrative disclosure." (*Id.* at 176:19-177:9.) Although government spending lay at the core of CSC's business, the manager did not consider the impact of government spending on CSC. (*Id.* at 178:14-18.)

During the Class Period, under this "quality trade" methodology, Ontario sold 28,300 shares of CSC stock on September 18, 2008, when it closed out a "quality trade" it first entered in 2005. (*Id.* at 146:5-8.) Thus, under Ontario's theory, it profited from the alleged fraudulent conduct having sold over $1.17 million of CSC stock when the market was allegedly inflated. The second quality trade started on February 13, 2009, when Ontario purchased a "basket" of 91 different securities, one of which was CSC stock, for a total of approximately $150 million. (*Id.* at 29:2-35:5.) As part of this trade, Ontario purchased 29,600 shares of CSC stock on February 13, 2009. As Ontario continually rebalanced its basket of 91 securities, it bought 27,500 shares of CSC stock on February 24, 2010 and sold 14,300 and 14,500 shares on November 17, 2010 and December 2, 2010, respectively. It then bought 17,800 shares on February 3, 2010. However, by May 2, 2011, Ontario decided its quality trade was not working, so it "close[d] out" that trade. (*Id.* at 32:18-23.) As part of the close out, on May 2, 2011, Ontario "concentrated the

trading" and reduced the basket of all of the securities making up the quality trade from 91 to 41 securities, "because they were improving the original concept of the trade to reflect . . . the behavior they wanted it to exhibit in the environment that was now 2011." (*Id.* at 35:12-19.) A casualty of this close out was CSC stock, which, along with 49 other stocks, "fell out of the basket" and were sold by Ontario on May 2, 2011. (*Id.* at 34:18-23.)

###### 2.    *Internal Value Investing Strategy*

Ontario's so-called internal value investing strategy was "a trade in a basket of securities out of a universe that is created from two concepts:  (i) it being owned by at least one of the external managers with discretionary trading authority on behalf of Ontario Teachers; and (ii) scoring based on certain financial criteria in a relative manner to one another." (*Id.* at 45:25-46:8.)  This meant that before Ontario could even consider purchasing a security under this strategy, it first had to be one of the securities bought by an external manager tasked with discretionary trading authority.  Once a stock was bought by such an external manager, this Ontario strategy then considered the price-to-earnings ratio, price-to-cash flow ratio and enterprise value relative to EBITDA in determining whether to purchase. (*Id.* at 56:19-57:20.) Like the other quantitative trading strategies, the internal value investing strategy was not "looking at the disclosure of CSC." (*Id.* at 179:19-25.)  During the Class Period, Ontario purchased 503,800 CSC shares based on this investment strategy. (*See* Carney Decl. at Ex. 6 (chart describing Ontario transactions of CSC stock pursuant to internal value investing strategy).)

###### 3.    *External Manager Strategy*

Ontario also utilized an external Luxembourg-based manager, ValueInvest, which was vested with complete discretion to buy, sell and vote CSC and other shares on behalf of Ontario. In fact, Ontario's 30(b)(6) representative testified that ValueInvest had wide discretion to

purchase and sell shares of CSC stock, but could not specify whether Ontario had the legal right to instruct it to not buy or sell such shares.  (Davis at 325:8-16.)  ValueInvest formed its "own view of the intrinsic value of every issuer and then applying what they would describe as a margin of safety to that intrinsic value."  (*Id.* at 110:12-111:6.)  ValueInvest believed it could outperform the market.  It purchased stocks when it "believed that value was greater than what the market had efficiently priced in based on all the publicly available information."  (*Id.* at 229:2-5.)  Utilizing this investment strategy, ValueInvest purchased 462,800 shares of CSC stock for Ontario.  (Carney Decl. at Ex. 6  (chart describing transactions involving CSC stock made by ValueInvest on Ontario's behalf).)  Thus, a full 85 percent of Ontario's purchases of CSC stock were affected either by ValueInvest or by the portfolio manager that was permitted to purchase only after ValueInvest did so.  (Bajaj Decl. ¶ 34, n.28.)

    *4. Basket Index Strategy*

   Under the so-called basket index strategy, Ontario purchased a basket of securities to mirror the S&P 500 Index.  As was the case with respect to the quality trade strategy, the portfolio manager did not review any CSC disclosures in connection with making transactions to copy the index.  (Davis at 172:20-175:2.)  For example, the manager was unaware of the February 10, 2010 CSC press release while making purchases of the company's stock in that time frame.  (*Id.*)  Transactions utilizing this methodology, while numerous, were not especially large in share volume as compared to the above discussed strategies.  (Carney Decl. at Ex. 6.)

       *    *    *

   Notably, all of the strategies except the internal value investing strategy produced a purchase or sale of CSC stock after June 3, 2011, the date on which the first of these underlying actions commenced.  The manager replicating the S&P index sold 1,795 shares of CSC stock on June 17, 2011.  Then, on June 28, 2011, ValueInvest bought 56,700 CSC shares for over $2.1

million.   Another internal portfolio manager sold 75,500 shares on August 19, 2011 in a so-called "cash flow trade."   ValueInvest later bought another 44,400 shares on August 23, 2011. Finally, the Ontario manager replicating the S&P index bought 100 shares on September 16, 2011.   Illustrative of the effect of the divergent trading strategies, Ontario *sold* 75,500 shares at *$27.5998* on August 19, 2011 and *bought* 44,400 shares at the higher price of *$28.1995* just four days later.   (*See* Ontario's Cert. (Dkt. 46-2).)

**ARGUMENT**

**ONTARIO HAS NOT MET ITS BURDEN TO CERTIFY A CLASS**

As the Supreme Court recently held, a party seeking class certification bears the burden of showing that class certification is appropriate.   A lead plaintiff cannot rely on a perfunctory evidentiary showing, but rather must "prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."   *Wal-Mart*, 131 S. Ct. at 2551; *see generally Plant v. Merrifield Town Ctr. Ltd. P'ship*, Nos. 1:08cv374 and 1:08cv566, 2008 U.S. Dist. LEXIS 92385 at *5 (E.D. Va. Nov. 12, 2008) (Ellis, J.) ("'Courts considering class certification must rigorously apply the requirements of Rule 23.'" (citations omitted).)   Thus, as the Fourth Circuit has "stressed in case after case . . . it is *not the defendant* who bears the burden of showing that the proposed class *does not comply* with Rule 23, but . . . it *is the plaintiff* who bears the burden of showing that the class *does comply* with Rule 23."   *Thorn*, 455 F.3d at 321.   To meet this burden, a plaintiff must establish that *all* the requirements of Rule 23(a) have been met.   *See Monroe v. City of Charlottesville, Va.*, 579 F.3d 380, 384 (4th Cir. 2009).

This Court has framed a two-part inquiry regarding the propriety of class certification. *Shiring v. Tier Techs.*, 244 F.R.D. 307, 312 (E.D. Va. 2007).   First, the court determines whether the proposed class meets the prerequisites of Rule 23(a):  (1) the class must be so numerous that joinder of all members is impracticable; (2) questions of law or fact must be common to the class;

(3) the claims or defenses of the representative party must be typical of the claims or defenses of the class; and (4) the representative party must fairly and adequately protect the interests of the class. *Id*. If these prerequisites are met, the court then determines whether class treatment is appropriate under Rule 23(b). *Id*. Here, Ontario seeks certification under Rule 23(b)(3), claiming "questions of law or fact common to class members predominate over any questions affecting only individual members" (Fed. R. Civ. P. 23(b)(3)). (Pl. Mem. at 16-20.) As discussed below, Ontario cannot meet its burden of showing that the proposed class satisfies the threshold requirements of Rules 23(a) or 23(b)(3) because it cannot demonstrate it is a typical or adequate class representative or a predominance of common questions.

## I. THE PROPOSED CLASS DOES NOT SATISFY RULE 23(A) BECAUSE ONTARIO IS SUBJECT TO UNIQUE DEFENSES THAT ARE NOT TYPICAL OF THE PROPOSED CLASS

Ontario has failed to sustain its burden of showing that its "claims or defenses . . . are typical of the claims or defenses of the class." Fed. R. Civ. P. 23 (a)(3). In determining whether the typicality requirement is met, the Court must determine whether the named plaintiff will prosecute the same claims as the class as a whole. *Cf. Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998). When the named plaintiff is subject to unique defenses that threaten to become the focus of the litigation, class certification is inappropriate. *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990). "[T]here is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Id*. (citing 7A C. Wright *et al.*, *Federal Practice and Procedure* § 1764, at 259-60 (2d ed. 1986)). This Court has recognized that "'the presence of even *an arguable defense* peculiar to the named plaintiff . . . may destroy the required typicality.'" *Shiring*, 244 F.R.D. at 313 (alterations in original) (citations omitted).

As agreed at the August 26, 2011 conference, Ontario "bought after the disclosures of –

some of the accounting disclosures, and that [] imperils or makes [Ontario] more vulnerable as a lead plaintiff." (8/26/11 Tr. at 22:4-7.) Indeed, a lead plaintiff's unusual post-disclosure purchases subject it to unique defenses regarding reliance which threaten to become the focus of the litigation, rendering the lead plaintiff atypical. *See Rocco v. Nam Tai Elec., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) ("'A person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative.'") (citation omitted); *In re Safeguard Scientics*, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (finding a "compelling reason" to rebut the presumption of reliance where the "Lead Plaintiff [] increased his holdings in [defendant] stock even after public disclosure of the alleged fraud" because these purchases showed he "would have made–and in fact did–purchase stock regardless of the fraudulent omissions"); *Rolex Emps. Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991) (finding lead plaintiff atypical because his continuing "to trade in the stock in [defendant] after he learned of the alleged misrepresentations" subjected him to unique defenses); *see also Degulis v. LXR Biotechnology, Inc.*, 176 F.R.D. 123, 127 (S.D.N.Y. 1997) (granting discovery regarding plaintiff's brokerage accounts because plaintiff's "sophistication and trading strategies is relevant to the pending class certification motion," specifically, unique reliance defenses); *Weintraub v. Texasgulf Inc.*, 564 F. Supp. 1466, 1471 (S.D.N.Y. 1983) (noting that "hedging operation" established "that plaintiff is not an adequate representative of the class" because he was "a sophisticated speculative trader whose unusual trading activities will give rise to unique defenses").

Ontario's attempt to distinguish *Rocco* fails. (Pl. Mem. at 12-13.) Plaintiff there had performed his own analysis and had concluded that not only had goodwill been overstated, as the company had disclosed, but so had inventory. 245 F.R.D. at 136. Contrary to the implication in

Ontario's distinction (Pl. Mem. at 12-13), inside information was not involved.  The court held that plaintiff's post-class purchases rendered him atypical because they could become the focus of the litigation.  *Rocco*, 245 F.R.D. at 136.  Here, too, Ontario had performed an analysis, determined that CSC's disclosures were allegedly misleading, sought to be appointed lead plaintiff and, yet, continued purchasing CSC stock.

Ontario's other cited cases (Pl. Mem. at 9-12) do not support its claim that its post-disclosure purchases do not render it atypical.  Each involved a situation where the post-disclosure purchases were not, as here, unusual.  For example, in *In re BearingPoint, Inc. Securities Litigation*, 232 F.R.D. 534 (E.D. Va. 2006), the lead plaintiff had purchased all of its BearingPoint stock prior to the filing of the complaint.  *Id.* at 539-40.  Moreover, although the plaintiff did make purchases after an initial corrective disclosure, the market reacted "quite modestly" to that disclosure and the "sharp drop" in stock price did not come until after plaintiff purchased shares.  *Id.*  Similarly, in *Malone v. Microdyne Corp.*, 148 F.R.D. 153 (E.D. Va. 1993), lead plaintiff had no history, as here, of making post-disclosure purchases, and, in fact, unlike here, his purchases were made *before* the disclosure of virtually all the negative news and after management had given investors "comfort" that earnings expectation would be met.  *Id.* at 155.[8] As discussed below, Ontario's post-disclosure purchases here are highly unusual for various reasons and thus render Ontario atypical.

---

[8]   Moreover, several of Ontario's cases acknowledge that typicality issues arise where, as here, the post-disclosure purchases are unusual.  (*See, e.g.*, Pl. Mem. at 9 (citing *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 603 (C.D. Cal. 2009), which notes that "[o]f course, *unusual* post-disclosure trading patterns present typicality problems"); Pl Mem. at 12 (citing *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 204 n.13 (E.D. Pa. 2008), which notes that "[o]f course, the Court recognizes that there are certain limited circumstances under which post-disclosure purchases may defeat an investor's attempt to utilize the fraud on the market presumption").)

## A.    <u>Ontario Purchased After the Filing of the Initial Complaint</u>

Ontario's Certification demonstrates that its post-disclosure purchases here were large, reflect an unusual pattern and were made well after the complained of disclosures and, indeed, even after the first class action complaint was filed on June 3, 2011 and after Ontario sought to be lead plaintiff.  Following May 25, 2011, the end of the originally defined class period, Ontario purchased the following CSC shares: 69,400 shares worth $2,737,420.54 on June 1, 2011; 56,700 shares worth $2,111,468.31 on June 28, 2011; 44,400 shares worth $1,252,723.80 on August 23, 2011; and 100 shares worth $2,927.50 on September 16, 2011.  In sum, Ontario purchased 170,600 shares worth $6,104,540.15 *after* the end of the original class period, more than the 10 percent they claimed at the lead plaintiff hearing.  (8/26/11 Tr. at 39:25-40:5.)

To make matters worse, even after Ontario moved for Lead Plaintiff status on August 2, 2011 (Dkt. 16), Ontario sold 75,500 shares for over $2 million on August 19, 2011, but bought 44,400 shares for over $1.2 million on August 23 and another 100 shares on September 16, 2011. (*See* Ontario's Cert. (Dkt. 46-2).)  Incredibly, this purchase on September 16, 2011, came *after* this Court had already communicated to Ontario's counsel at the August 26, 2011 hearing that a post-disclosure purchase could raise a unique issue for Ontario because Ontario was continuing to invest in a company it is accusing of fraud.  These purchases render Ontario atypical as it shows it would have and actually did make its purchases despite the prior allegedly fraudulent disclosures.  *Rolex*, 136 F.R.D. at 664.  As this Court noted at the August 26 conference:

> Let's be more concrete about this.  Let's suppose we get to a jury trial, and in the jury trial the lead plaintiff argues to the jury, 'These people committed fraud,' which is a very serious allegation.  It's really a matter of dishonesty.  These people committed fraud. And in response to that, CSC says, 'They kept buying from us. Does that sound like fraud to you?'  So what do you tell the jury in your rebuttal?

(*See* 8/26/11 Tr. at 24:6-11.)

Surprisingly, after discovering the alleged "fraudulent statements" and despite knowing

14

that its advisor, ValueInvest, was purchasing shares in CSC, Ontario failed to inform ValueInvest that it moved to be lead plaintiff in the CSC securities litigation or to determine if ValueInvest would change its CSC trading strategy.  As a result, ValueInvest bought over $1 million of CSC stock on behalf of Ontario after Ontario moved to be lead plaintiff.  Ontario obviously did not consider its allegations of fraudulent conduct serious enough to even convey to ValueInvest because "ValueInvest did not become aware of [Ontario's] motion – [Ontario's] moving to be lead plaintiff in this case against CSC" until after its purchase of 44,400 shares on August 23, 2011, after the Lead Plaintiff was chosen.  (*Id.* at 268:22-24.)  Ontario's failure to notify its external investment manager of claimed fraud highlights the unusual trading through which Ontario continued to acquire CSC stock and has put Ontario, once again, in the "uncomfortable" position of having to explain an increased investment in a company which it alleges committed fraud.  As discussed more fully below (Section I(C) *infra*), another court has previously characterized such trading by Ontario as "uncomfortable."  Defendants respectfully submit it is more than "uncomfortable," especially the second time.

### B.      Ontario Purchased Soon After CSC's Alleged Curative Disclosures

As indicated above, Ontario purchased 17,800 shares of CSC stock two days after the February 9, 2011 disclosure.  It bought another 45,500 shares within two weeks of the May 2, 2011 disclosure.  It purchased another 69,400 shares of CSC stock seven days after the May 25, 2011 disclosure.  And it even bought 44,400 shares less than two weeks after the August 10, 2011 disclosure and an additional 100 shares on September 16, 2011.  All of these raise unique issues regarding the basis for Ontario's purchases.

### C.      Ontario's History of Post-Disclosure Purchasing

This is not the first time that Ontario has engaged in post-complaint purchases.  Indeed, as Ontario acknowledges, in *Washington Mutual,* Ontario also made substantial post-disclosure

purchases.  (Pl. Mem. at 10.)  Although, as Ontario notes (*see id*; Davis at 22:10), that court did

not find Ontario to be atypical as a result of its post-disclosure purchases at issue there, Ontario

fails to mention the *Washington Mutual* court's stated concern with the potential defenses and

severe conflicts such purchases create.  The court in Seattle specifically expressed concern that

Ontario's post-disclosure purchases were "an uncomfortable fact to explain to the fact finder"

even if "plaintiff's counsel assumes he may never have to explain it because 'these cases never

go to trial.'"  *Washington Mutual*, 2010 WL 4272567 at *6.  Ontario apparently was not

"uncomfortable" enough to not engage in such conflict producing activity yet again.  Ontario's

behavior alone – especially in light of the criticism leveled at it in *Washington Mutual* – further

renders Ontario's post-disclosure purchases here unusual.

### D. Ontario Extends the Class Period to Mask Its Unusual Post-Disclosure Purchases

Ontario's transparent attempt to reduce the number of post-class period transactions by

extending the end of the class period from May 25, 2011 to August 9, 2011 (Compl. ¶ 21) does

not mitigate this Court's concerns and, indeed, raises more issues than it addresses.  Ontario, for

example, does not explain why it did not mention its intent to expand the class period either in its

motion which was filed before the end of its newly proposed Class Period or at the hearing

which occurred after but, instead, only expanded the class period after this Court clearly stated

its concerns regarding Ontario's post-disclosure purchases.  It also does not alter the fact that

Ontario engaged in numerous transactions during the period it also claims the alleged fraud was

revealed.  This tactical maneuver, which attempts to move a significant portion of Ontario's post-

class purchases, as originally defined, within the newly defined class period, is nothing more

than an attempt to avoid this Court's criticism and the maneuver itself raises issues with respect

to the Ontario's credibility, typicality and adequacy.  *Shiring*, 244 F.R.D. at 316-17 (misstated

certification of class representative raises questions about credibility and adequacy).

### E.     Ontario Continues to Buy and Hold Significant Amounts of CSC Stock Despite Accusing CSC of Fraud

Ontario's unusual post-disclosure purchases are impossible to reconcile with certain allegations in Ontario's Complaint.  For example, Ontario cannot reconcile its purchase of CSC stock while at the same time asserting that CSC's $5.4 billion contract with the NHS "may be worthless."[9]  (Compl. ¶¶ 1, 35.)  Indeed, such continued investment would directly conflict with Ontario's duty "to invest the pension fund in order to try to generate a return to pay the pensioners' pension—pensions and to do so at the appropriate level of risk and try to generate a return that maximizes at the appropriate level of risk."  (Davis at 298:22-299:3.)  This Court showed just this concern at the lead plaintiff hearing (8/26/11 Tr. at 24:6-14), and yet, Ontario has failed adequately to address it.  And as discussed more fully below in Section II, Ontario's continued, massive exposure to CSC creates an irreconcilable conflict with securing a recovery for the proposed class.

## II.   ONTARIO CANNOT FAIRLY AND ADEQUATELY REPRESENT THE PUTATIVE CLASS DUE TO ITS FINANCIAL CONFLICT OF INTEREST

The proposed class also fails because Ontario is not an adequate class representative.  A party is not an adequate class representative where its own interests conflict with the interests of the proposed class members.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 & n.20 (1997); *Broussard*, 155 F.3d at 337-38.  Without any substantive analysis regarding its burden of establishing the requirements of Rule 23(a), Ontario simply declares no conflicts exist because it

---

[9]   Ontario's evasive testimony, when asked repeatedly the simple question of whether Ontario believed that the contract between the NHS and CSC may be worthless (*see* Davis at 281:17-293:13), further demonstrates the precarious position it faces when its post-disclosure purchases are juxtaposed against the allegations in the Complaint.  *In re Safeguard Scientifics*, 216 F.R.D. at 582.

allegedly "purchased CSC stock during the Class Period and was injured by the same material misrepresentations and omissions." (Pl. Mem. at 13-14.) This assertion ignores a glaring conflict that renders Ontario an inadequate class representative. Specifically, as a result of the above-described trading practices and post-disclosure transactions, Ontario has acquired a substantial holding of CSC stock that would cause it to actually *lose* money for its pension holders if it were to obtain a recovery in this action. This places Ontario in direct conflict with other class members who do not have such a financial interest in CSC.

As a pension fund, Ontario's primary fiduciary duty is to its pension holders and its primary fiduciary obligation is to maximize performance of the pension fund. (Carney Dec. Ex. 7 (excerpt from Ontario's website discussing the "fiduciary duty" Ontario owes its members, stating that this includes, among other things, "[s]eek[ing] the best returns for our members with appropriate risk").) As Mr. Davis stated at his deposition, "[i]t is [Ontario's] duty to invest the pension fund in order to try to generate a return . . . and to do so at the appropriate level of risk and try to generate a return that maximizes at the appropriate level of risk." (Davis at 298:22 – 299:3.) As a class representative, however, Ontario also would owe fiduciary duties to other potential class members and its primary duty would be to maximize recovery for the class. *See Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1305-06 (4th Cir. 1978) (discussing a class representative's ongoing fiduciary duties to a class). Ontario's unique situation of continuing to own nearly one million shares, however, creates a fundamental and material conflict between its duty to its pension holders and its putative duty to the proposed class.

As several courts have noted, class members who continue to retain shares after the end of the class period may be inadequate class representatives because their interests conflict with those who sold their shares. *See In re Seagate Tech. II Sec. Litig.*, 843 F. Supp. 1341, 1364 (N.D.

Cal. 1994) ("An equity-holding plaintiff may, of course, decide to seek from the defendant company the damages he suffered due to the alleged fraud.  But as an equity holder, this plaintiff may well seek to defeat other class members' recoveries."); *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 482-83 (W.D. Mich. 1994) (same).  Thus, where, as here, a lead plaintiff retains very large holdings in the defendant's stock such that it has a financial interest in its equity holdings several times larger than its alleged losses, the lead plaintiff has a conflict rendering it an inadequate representative.  *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co.*, 229 F.R.D. 395, 414 n.29 (S.D.N.Y. 2004) (noting that where "a proposed lead plaintiff group has been shown to have a financial interest in a defendant several times greater than the group's alleged losses with respect to the underlying claim against that defendant, the group has been found to have a sufficient conflict of interest precluding its appointment as lead plaintiff").[10]

As discussed above, according to the transactions described in Ontario's Certification, and as confirmed at the Davis deposition, Ontario continues to own 993,114 shares of CSC stock. (Ontario's Cert. (Dkt. 46-2); Davis at 299:13-16.)  This significant holding in CSC stock places it in a position that is fundamentally in conflict with potential class members.  As discussed in the

---

[10]  Although some courts have held that a lead plaintiff's retention of an equity interest in a defendant does not create an inherent conflict precluding class certification, many of those cases involved a purported conflict that, unlike here, was merely hypothetical or immaterial. For example, in Ontario's cited authority *In re Dynegy, Inc. Securities Litigation*, 226 F.R.D. 263 (S.D. Tex. 2005) (cited at Pl. Mem. at 12, 17, 18), the court rejected the defendants' argument there that there was a conflict between the lead plaintiff who had sold all of its shares and hypothetical putative class members who may still retain their shares because the conflict was merely hypothetical; the court did note the possibility that such a conflict could exist where a particular party's holdings were massive. *Id.* at 277.  Similarly, *In re Cendant Corp. Litigation*, 264 F.3d 201 (3d Cir. 2001) "call[ed] . . . to the attention of district courts for future cases" the issue of "whether the [equity] conflict . . . in a particular case is sufficiently severe so as to prevent a putative class from satisfying Rule 23's requirements for class certification" but not deciding the issue in the case before it because "no party on appeal objects to class certification based on [an equity] conflict[]." *Id.* at 244 n.25.

Bajaj Declaration, the equity ratio, which represents the ratio between the entity's potential recovery in a securities class action and its potential loss of equity in its current holdings in the defendant corporation, for Ontario is 4.61. (Bajaj Decl. ¶ 14.)  In other words, assuming Ontario and the putative class prevailed in this action, for every dollar Ontario recovered in damages it would lose $4.61 in equity value of its current CSC holdings. *Id.*

When confronted with this significant conflict at his deposition, Ontario's representative could not adequately respond and, in fact, made every attempt possible to avoid answering this uncomfortable question. (Davis at 298:19-307:7.)  First, Mr. Davis made every attempt to avoid answering plain questions of whether Ontario could "pursue a judgment against CSC in this action in which [Ontario's] recovery in this action would be less than the decrease in value that judgment would cause to its present holdings in CSC stock." (*Id.* at 299:17-22; *see id.* at 299:24-300:13 (claiming that the answer is "highly dependant on so many variables" and he could not "speculate" as to whether "the impact of recovering [damages in this action] would impact [Ontario's] holdings in CSC"); *id.* at 300:21-301:9 (acknowledging his understanding that the question posed is whether the equity conflict "create[s] an obstacle to the duty that [Ontario is] trying maximize value" but then responding that he "think[s] that [Ontario] can pursue the action that [its] pursuing right now").)

Second, after being pushed on this issue, Mr. Davis finally responded with a substantive answer as to whether Ontario could pursue a judgment in "which [Ontario's] recovery in this action would be less than the decease in value that judgment would cause to its present holding in CSC stock" (*id.* at 299:17-22) stating that he "believe[s] it could" pursue such a result notwithstanding Ontario's duty to its pension holders to maximize return at an acceptable risk because he believed "the recovery itself would ultimately improve the value of the stock and

ultimately improve the behavior within [CSC]" (*id.* at 301:24-302:16).  This assertion, however, ignores that Ontario is not seeking changes to corporate governance, which would not involve the substantial financial harm to Ontario that would result if Ontario recovers here, but is purely seeking money damages for past shareholders.

Next, Mr. Davis attempted to argue that the change in the value of Ontario's equity would not necessarily be a real change if Ontario did not sell the holdings immediately even though he acknowledged that Ontario does "mark-to-market [its] net assets":

> Q: So consistent with its duties to its pensioners, [Ontario] could seek a recovery in this action -- let's say, for every dollar it received in this action, it caused its holdings to go down by $3, it would be allowed to pursue that consistent with its duties to its pension holders?
>
> \*\*\*\*\*\*\*\*
>
> A: You're asking me to come up with a scenario that would only be in the situation that at the very day that we would receive a judgment, we would also sell our stock in the company and crystallize our return as a result of -- well, to the extent the point at which that judgment was reflected in that stock price, it's very speculative, but I believe that [Ontario] is continuing to be a holder of securities of CSC and seeking the recovery and won't necessarily sell its securities on the day it received that judgment in your theoretical example. So it could . . . .

(Davis at 302:17 – 303:18.)

Finally, however, even Mr. Davis had to acknowledge that if Ontario were placed in the position of seeking judgment in this action whereby Ontario's recovery would be less than the decrease in the value of its CSC stock holdings it would face "a very theoretical hypothetical conflict" although he did not believe this was a "realistic conflict."  (*Id.* at 304:13-306:22.)  As the Bajaj Declaration makes clear, however, this is much more than a theoretical, hypothetical conflict.  (Bajaj Decl. ¶¶ 12-14.)  As another court held in denying class certification to a similarly conflicted lead representative, "logic and simple mathematics speak louder [than pledges to the court]" and thus the court did "not believe nor find that [the lead plaintiff] c[ould]

21

overcome this substantial conflict of interest and fully protect the interest of the [other class members]." *In re Cendant Corp. Litig.*, 182 F.R.D. 144, 149 (D.N.J.), *subsequent determination by* 191 F.R.D. 387 (D.N.J. 1998), *opinion superseded on other grounds* by No. Civ. A. 98-1664, 2000 WL 1288307 (D.N.J. Apr. 7, 2000).   The same conclusion is warranted here.   The conclusory assertions by Ontario that it will seek the highest recovery for the class does not "speak louder" than the "simple mathematics" indicating that Ontario may suffer a net loss for its pension holders if it seeks maximum recovery in this action.  (*See* Bajaj Decl. ¶¶ 12-15.)

Ontario's fundamental and manifest conflict with other class members establishes that Ontario is not an adequate class representative and thus that class certification is not warranted.

### III.   INDIVIDUALIZED ISSUES WILL NOT PREDOMINATE BECAUSE THE MARKET FOR CSC STOCK IS NOT EFFICIENT.  EVEN IF IT WERE, ONTARIO DID NOT RELY ON THE EFFICIENCY OF THE MARKET AND THUS THE PUTATIVE CLASS DOES NOT SATISFY RULE 23(a) OR 23(b)

As discussed above, the inquiry regarding the propriety of class certification is a two-part analysis.  *See Shiring*, 244 F.R.D. at 312.  First, the court must determine whether the proposed class meets the prerequisites of Rule 23(a).  *Id*.  Second, the court must determine whether class treatment is appropriate under Rule 23(b).   *Id*.  Ontario seeks certification pursuant to Rule 23(b)(3), claiming "questions of law or fact common to class members predominate over any questions affecting only individual members" (Fed. R. Civ. P. 23(b)(3)).  (Pl. Mem. at 16-20.)

Reliance is one of the elements of Ontario's claims under Section 10(b) of the Exchange Act.  Typically, individualized issues of reliance predominate and, therefore, class treatment of such claims under Rule 23(b)(3) is inappropriate.  *See Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 371 (4th Cir. 2004).  Ontario attempts to establish a predominance of common issues through the rebuttable presumption of reliance established under the fraud on the market theory, under which a plaintiff must first establish that the stock traded on an efficient market.  *See Basic*,

*Inc. v. Levinson*, 485 U.S. 224, 248 n.27 (1988).  Ontario bears the burden of demonstrating each element of the fraud-on-the-market theory, including market efficiency.  *See In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 489 (S.D.N.Y. 2011).  To meet this burden, however, Ontario must do more than allege that a stock traded on an efficient market.  *See Gariety*, 368 F.3d at 365.  Even in larger securities markets, plaintiffs bear the burden "of making a preliminary showing of market efficiency at the class certification stage."  *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313 (5th Cir. 2005).

In determining whether shares trade on an efficient market, courts often consider the following factors as indicia of market efficiency:

> (1) average trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC Registration Form S-3 (as opposed to Form S-1 or S-2); (5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price;" (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider owned stock.

*See Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989); *see also Gariety*, 368 F.3d at 368 (noting that courts reference the *Cammer* factors to determine whether a security trades on an efficient market).  As discussed below, Ontario has not met its burden of showing, through any expert testimony or otherwise, that CSC shares traded on an efficient market.  In contrast, the Bajaj Declaration demonstrates that the market for CSC shares was inefficient; thereby rebutting the fraud on the market presumption.  *See Basic*, 485 U.S. at 248 n.27.  Therefore, neither Ontario nor any other class member is entitled to the presumption of reliance under the fraud on the market theory.  *Id.*  Moreover, even if this Court finds that individual issues of reliance do not predominate, Ontario's trading strategies subject it to unique reliance defenses which render it an atypical plaintiff.

23

A.      **The Market For CSC Stock Is Not Efficient and**
        **Individual Issues Predominate**

Ontario's barebones assertions regarding the efficiency of the market for CSC stock does

not meet the burden for establishing market efficiency.  This failure is particularly egregious

considering Ontario's September 2, 2011 letter to counsel for CSC seeking CSC's concurrence

that the market was efficient.  (*See* Carney Decl. Ex. 3.)  In that letter, Ontario noted it was "fully

prepared to establish market efficiency" including by "submission of an expert declaration."

(*Id.*)[11]  Rather than submit such an expert declaration, Ontario attempts to minimize its burden by

setting forth conclusory and unsupported statements that the market for CSC stock was efficient

because it was listed on the New York Stock Exchange, was "actively traded in sufficiently large

volumes" and there "was an abundance of analyst coverage."  (Pl. Mem. at 17-18.)  Such a

conclusory showing is insufficient.  *Gariety*, 368 F.3d at 365.

Importantly, Ontario does not discuss the most important indicia of market efficiency: the

cause and effect relationship to new material information.  (Bajaj Decl. ¶ 22.)  Courts have held

that "'[e]vidence that unexpected corporate events or financial releases cause an immediate

response in the price of a security has been considered 'the most important *Cammer* factor' and

'the essence of an efficient market and the foundation for the fraud on the market theory.'"

---

[11]   Recognizing that it failed to meet its burden of establishing market efficiency, Ontario once
again contacted CSC on October 7, 2011 seeking a stipulation on market efficiency.  (*See*
Letter from Joseph Fonti dated October 7, 2011, attached to the Carney Decl. as Ex. 8.)
Having now twice attempted to sidestep its burden of proving market efficiency, any
attempts to submit expert testimony on market efficiency on reply in order to belatedly meet
its burden should be rejected.  *See Lake Wright Hospitality, LLC v. Holiday Hospitality
Franchising, Inc.*, Civil Action No. 2:07cv530, 2009 WL 2606254, at *31 (E.D. Va. Aug. 20,
2009) (refusing to rely on any new evidence presented in a reply brief) (adopting
Magistrate's Report and Recommendation); *In re Taco Bell Wage & Hour Actions*, No.
1:07-cv-01314-OWW-DLB, 2011 WL 4479730, at *7 (E.D. Cal. Sept. 26, 2011) (finding
that expert's supplemental declaration was inadmissible because "[n]ew evidence or analysis
presented for the first time in a reply [to a class certification motion] will not be considered").

24

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 207 (2d Cir. 2008) (citations omitted); *see also Cammer*, 711 F. Supp. at 1291 ("[T]he most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.").

Ontario avoided discussing the most important factor for good reason. For 15 of the 16 alleged misstatements, the price of CSC stock was not impacted in a manner one would expect if the market was efficient.[12] If these statements had an immediate impact on the price of the stock, one would expect the price to increase by a statistically measurable amount following an alleged misstatement. But here, for 13 of the alleged misstatements there was no statistically measurable increase. For two of the other misstatement dates there was a statistically measurable change in price; but the price went down, not up, which is obviously entirely inconsistent with an alleged misrepresentation purportedly artificially inflating the stock price. As a matter of fact, on seven of the dates where Ontario alleges that misstatements caused price *inflation*, the CSC stock price *actually dropped* on a market-adjusted basis.[13] (*See* Bajaj Event Study attached as Appendix 2 to the Bajaj Decl.) On the only date when CSC stock price did statistically go up, there existed a multitude of positive announcements that could account for CSC's excess returns. (Bajaj Decl. ¶

---

[12]   As the Bajaj Declaration shows, "of the 16 alleged misstatement dates, the excess return for CSC stock was statistically insignificant following 13 alleged misstatements. CSC stock's excess return following two of the remaining three alleged misstatements (made on August 5, 2008 and August 11, 2010), though statistically significant, was negative and, therefore, did not lead to any positive price impact." (Bajaj Decl. ¶ 29.)

[13]   Ontario cannot argue that the presumption of reliance articulated in *Affiliated Ute* is applicable because that presumption only applies where the action is based purely on alleged omissions. *Affiliated Ute v. United States*, 406 U.S. 128 (1972). The Fourth Circuit will not apply *Affiliated Ute*'s presumption "when the plaintiff alleges both nondisclosure and positive misrepresentation instead of only nondisclosure." *See Cox v. Collins*, 7 F.3d 394, 395-96 (4th Cir. 1993) (citations omitted).

30.)  As a result, CSC's expert report shows that the alleged misstatements did not impact CSC's share price, thereby severing the link between Ontario's purchases and the presumption of reliance on the fraud-on-the-market theory.  *See Basic*, 485 U.S. at 248.  Because the class cannot invoke the presumption of reliance, individual issues of reliance predominate and no class can be certified.

### B.     Ontario Did Not Rely on the Efficiency of the Market

Even if this Court concludes that there were an efficient market for CSC stock and that reliance on the integrity of the market is therefore presumed, such a presumption is rebuttable by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."  *Basic*, 485 U.S. at 248.  One way the presumption may be rebutted, for example, is by showing that plaintiff "would have divested themselves of their . . . shares without relying on the integrity of the market."  *Id.* at 249. The presumption also may be rebutted "by individualized proof that focuses on a claimant's idiosyncratic investment choices." *Jaroslawicz v. Engelhard Corp.*, 724 F. Supp. 294, 300 (D.N.J. 1989).

Even at this litigation's early stage, before Ontario has produced a single document, the evidence demonstrates not just "any" showing of severance, as required by *Basic*, but a high degree of separation between the alleged misrepresentations and Ontario's 49 purchases and sales of CSC stock.  As noted above, Ontario utilized four separate portfolio managers, each of which employed a unique, sophisticated trading strategy to purchase and sell CSC stock.  The presumption of reliance on the integrity of the market is rebutted as to three of these strategies (the fourth involved only a small number of shares) and certainly as to Ontario's trading as a whole.  (Bajaj Decl. ¶¶ 34, 43.)

The portfolio manager that utilized the so-called "quantitative trading" methodology

relied on historical, quantitative information – while intentionally ignoring narrative disclosures – in making investment decisions relating to CSC stock. Ontario's testimony demonstrates the absence of reliance on the allegedly false disclosures in utilizing this strategy: the portfolio manager "did not use the disclosures . . . in February of 2011 or . . . May 2011 in making the determination to concentrate the basket and have CSC be sold." (Davis at 40:23-41:3; *see also id.* at 176:24-177:9.) Ontario also implicitly admitted the so-called "quality trade" did not take into account current market price as the only financial factors the quality trade strategy considered were return-on-equity, stability of earnings and debt-to-equity. (*Id.* at 18:3-15.) These three metrics, by definition, rely on historical information: return on equity means historical net income as a percentage of historical stockholders equity; stability of earnings focuses on historical earnings; and debt-to-equity means the historic ratio between the corporation's debt and its stockholders equity. None of these metrics considers price, further rebutting the presumption that Ontario relied on market integrity. (Bajaj Decl. ¶ 36.)

Moreover, Ontario's purchase in February 2009 was solely so that Ontario could start a "quality trade" and its sale in May 2011 was affected because Ontario ended that trade. These transactions were thus based on a shift in Ontario's portfolio strategy, rather than anything specific to CSC. Ontario thus increased and decreased it share holdings without reliance on the integrity of the market for CSC stock. *See Basic*, 485 U.S. at 249. Similarly, the purchases and sales between the February 2009 open of the trade and its May 2011 close were designed to maintain the concept underlying the trade, rather than in reliance on any market information about CSC. (*Id.* at 185:10-186:4.) And, of course, buying and selling to maintain a stable basket of 91 securities over a two-year period meant decisions were significantly driven by factors affecting the other 90 stocks in the basket, rather than CSC itself.

27

The second trading strategy – using an outside portfolio manager, a Luxembourg firm that enjoyed complete discretion to buy, sell or vote CSC stock on Ontario's behalf – inherently rebuts the presumption of reliance on the integrity of the market.   The strategy utilized by ValueInvest was anything but reliance on the integrity of the market.   Rather than buy stocks based on their trading price, ValueInvest analyzed a company's so-called "intrinsic value."   After reaching a judgment about that value, it then reached another judgment about "a margin of safety," or a discount to reflect industry and company-specific risk.   (*Id.* at 112:5-122:15.)   This is not relying on the integrity of the market.   (Bajaj Decl. ¶ 38.)   ValueInvest bought when

> the intrinsic value of the company, based on their methodology, based on the ten-year history, based on the risks that we talked about, the whole methodology, was – it would be – it was greater than what the market viewed  I don't think that they purported to attribute to the market their methodology.

(Davis at 229:18-25.)[14]

The third trading strategy was executed by an internal portfolio manager whom Ontario permitted to buy or sell only if ValueInvest first bought or sold that stock.   That manager then used price-to-earnings ratio, price-to-cash flow ratio and enterprise value-to-EBITA ratio. (*Id.* at 57:3-20.)   Ontario admitted that the portfolio manager using this strategy did not rely upon specific CSC disclosures: "So when he purchased securities . . . during the class period, I don't

---

[14]   Ontario's disclosures in its Annual Report raise additional questions about whether it truly relied on the integrity of the market because, like ValueInvest, it claimed that it could outperform the market through "active management":

> Management does not believe that passive investing through conventional public equity and fixed income market indices can generate the risk-adjusted returns that the plan requires.   Active management is instrumental to the ongoing success of the plan.   It involves selecting investments that we believe to be undervalued and employing both fundamental and qualitative-based strategies.   The objective is to exceed the returns available from passively investing in benchmark indices at asset-mix policy weights.

(Annual Report at 29; Carney Decl. Ex. 5.)

28

believe he was looking at the disclosures of CSC." (*Id.* at 179:19-22.) This strategy is at odds with reliance on the integrity of the market. (Bajaj Decl. ¶ 37.)

Ontario's fourth trading methodology – the "basket index strategy," a strategy meant to replicate the S&P 500 stock index (*id.* at 41:4-23) depends largely on the performance of the other 499 securities, rather than just CSC itself, demonstrating severance between the alleged fraudulent disclosures and the alleged injury. Moreover, it was acknowledged that the fund manager that utilized this strategy did not consider CSC's disclosures in making investing decisions, but sought solely to replicate the S&P 500 stock index. (*Id.* at 173:10-174:25.)

The use of these four trading strategies also produced inconsistent investment decisions, where Ontario bought and sold CSC stock at virtually the same time. For example, ValueInvest bought 87,400 shares of CSC stock on November 16, 2010 and the "quality trade" manager sold 14,300 shares the very next day (November 17, 2010). Over the next two days, ValueInvest and Ontario's S&P Index manager bought CSC shares. (*See* Bajaj Decl. ¶¶ 41-42.)

The cases upon which Ontario relies in support of the fraud-on-the-market theory are all readily distinguishable because none contains the overwhelming evidence existing here rebutting the presumption of reliance on the integrity of the market. In *BearingPoint*, 232 F.R.D. 534, defendants did not rebut the presumption that plaintiff relied on the integrity of the market, such as by use of any one, much less four, of the unique trading strategies that exist here. Furthermore, unlike this case, defendants in *BearingPoint* did not submit any expert testimony to rebut the presumption of reliance. In *In re Countrywide Financial Corp. Securities Litigation*, 273 F.R.D. 586 (C.D. Cal. 2009), although the court considered "index purchases" as relying on the integrity of the market, these purchases were made to match the index and excluded "idiosyncratic motivations." *Id* at 602. But here, other than perhaps the basket index strategy,

there certainly are idiosyncratic motivations for Ontario's trading pattern.   And even *Countrywide* recognized that "[o]f course, *unusual* post-disclosure trading patterns present typicality problems."   *Id.* at 603.   While *Countrywide* found that an exact mirror of the S&P index alone would be insufficient to rebut the presumption of reliance on the integrity of the market, this argument wholly dissipates when the putative lead plaintiff used four different, independent and divergent strategies.

In short, the existence of four different, independent and inconsistent trading strategies, all of which to some degree were severed from CSC's disclosures, defeats the presumption of reliance.   (Bajaj Decl. ¶ 43.)   Ontario relied on myriad factors other than the integrity of the market which raises unique defenses peculiar to Ontario, which cannot meet the requirements of Fed. R. Civ. P. 23(a)(3).

## **CONCLUSION**

For all the foregoing reasons, Plaintiff's Motion should be denied.

Respectfully submitted,

_____October 14, 2011_____
                Date

                                                            /s/_____
Jay B. Kasner (admitted *pro hac vice*)                     David E. Carney (Va. Bar No. 43914)
Scott D. Musoff (admitted *pro hac vice*)                   Jennifer L. Spaziano (admitted *pro hac vice*)
Skadden, Arps, Slate, Meagher & Flom LLP                    Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square                                           1440 New York Avenue, N.W.
New York, NY 10036                                          Washington, DC 20005
Telephone:  (212) 735-3000                                  Telephone:  (202) 371-7000
Facsimile:  (212) 735-2000                                  Facsimile:  (202) 393-5760
Jay.Kasner@skadden.com                                      David.Carney@skadden.com
Scott.Musoff@skadden.com                                    Jen.Spaziano@skadden.com

*Counsel for Computer Sciences Corporation,*
*Michael W. Laphen, Michael J. Mancuso and Donald G. DeBuck*

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2011, I will electronically file the foregoing Defendants' Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification with the Clerk of Court using the CM/ECF system, which shall send notification of such filing (NEF) to the following:

Benjamin G. Chew
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
bchew@pattonboggs.com

*Local Counsel for Lead Plaintiff Ontario Teachers' Pension Plan Board*

Craig Crandall Reilly
Law Office of Craig C. Randall
111 Oronoco St.
Alexandria, VA 22314
craig.reilly@ccreillylaw.com

*Counsel for Plaintiffs City of Roseville Employee's Retirement System (Case No. 1:11-cv-00610), Arthur I Murphy (Case No. 1:11-cv-00636) and Norton Goldman (Case No. 1:11-cv-00777)*

Thomas A. Dubbs
Jonathan M. Plasse
Joseph A. Fonti
Dominic J. Auld
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
tdubbs@labaton.com
jplasse@labaton.com
jfonti@labaton.com
dauld@labaton.com

*Counsel for Lead Plaintiff Ontario Teachers' Pension Plan Board*

Elizabeth Kathleen Tripodi
Finkelstein Thompson LLP
1050 30th St. NW
Washington, DC 20007
etripodi@finkelsteinthompson.com

*Counsel for Plaintiff Hilary Kramer (Case No. 1:11-cv-00751)*

Dated:  October 14, 2011

/s/ _____
David E. Carney (Va. Bar No. 43914)
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone:  (202) 371-7000
Facsimile:  (202) 393-5760
David.Carney@skadden.com

*Counsel for Computer Sciences Corporation, Michael W. Laphen, Michael J. Mancuso and Donald G. DeBuck*