**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| IN RE COMPUTER SCIENCES | ) | |
| CORPORATION SECURITIES | ) | Civil Action No. 1:11-cv-610-TSE-IDD |
| LITIGATION | ) | |
| | ) | |
| _____ | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

SKADDEN, ARPS, SLATE, MEAGHER &  FLOM LLP

David E. Carney (Va. Bar No 43914)
Jennifer L. Spaziano (admitted *pro hac vice*)
1440 New York Avenue NW
Washington, DC 20005
Telephone:  (202) 371-7000
Facsimile:  (202) 393-5760
Email:  David.Carney@skadden.com
Email:  Jen.Spaziano@skadden.com

Jay B. Kasner (admitted *pro hac vice*)
Scott D. Musoff (admitted *pro hac vice*)
Four Times Square
New York, NY 10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
Email:  Jay.Kasner@skadden.com
Email:  Scott.Musoff@skadden.com

*Counsel for Computer Sciences Corporation,
Michael W. Laphen, Michael J. Mancuso and Donald G. DeBuck*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

RELEVANT FACTUAL BACKGROUND ............................................................... 6

    A.    The Company and Its Officers ................................................................ 6

    B.    CSC Discovers, Discloses and Remediates Accounting Irregularities in the Nordic Region ...................................................................................... 7

    C.    CSC Works Cooperatively with the NHS Toward Implementation of a Fully-Integrated Patient and Medical Records System Throughout the UK .................. 8

ARGUMENT ...................................................................................................... 12

I.    COUNTS I AND II OF THE COMPLAINT DO NOT STATE A CLAIM FOR VIOLATION OF SECTION 10(b) OR RULE 10b-5 .................................... 12

    A.    The Complaint Does Not Allege With The Required Particularity Any Facts Giving Rise To A Strong Inference That Any Defendant Acted With Scienter ... 13

        1.    The Complaint Fails To Allege Scienter With Respect To Accounting In The Nordic Region ............................................................. 14

        2.    The Complaint Fails To Allege Scienter With Respect To CSC's Internal Controls ........................................................................ 18

        3.    The Complaint Fails To Allege Scienter With Respect To The NHS Program ........................................................................................ 20

    B.    The Complaint Does Not Sufficiently Allege That Defendants Made False Statements Or Omissions Of Material Fact Regarding CSC's Financial Results, Internal Controls Or The NHS Program ........................................... 23

        1.    The Complaint Fails To Properly Allege The Speaker Of The Purportedly False Statements ................................................. 23

        2.    The Complaint Does Not Sufficiently Allege That The Company's FY 2009 And FY 2011 Financial Results Were False Or Misleading ........... 24

        3.    The Complaint Does Not Sufficiently Allege That Statements Regarding CSC's Internal Controls Were False ...................................... 25

        4.    The Complaint Does Not Sufficiently Allege That Statements Regarding The NHS Program Were False Or Misleading ....................... 25

(a)     Many Of The Challenged Statements Are Forward-Looking
        Statements Protected Under Both Common Law And The
        PSLRA's Safe Harbor...................................................................26

(b)     Many Of The Challenged Statements Constitute Inactionable
        "Puffery"....................................................................................28

(c)     The Information Allegedly Omitted From The Purported NHS
        Statements Was Publicly Disclosed............................................29

II.     COUNT III OF THE COMPLAINT DOES NOT STATE A CLAIM UNDER
        SECTION 20(a).........................................................................................30

CONCLUSION.....................................................................................................30

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Borrow v. nVIEW Corp.*, 829 F. Supp. 828 (E.D. Va. 1993) ......................................................29

*Coronel v. Quanta Cap. Holdings Ltd.*, No. 07-1405, 2009 WL 174656
    (S.D.N.Y. Jan. 26, 2009).....................................................................................25

*Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618 (4th Cir. 2008)..........................................12, 13

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ...............................................................2

*Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004) ............................................................9

*Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007) ...........................................5, 16

*Hillson Partners Ltd. P'ship v. Adage, Inc.*, 2 F.3d 204 (4th Cir. 1994)...............................27, 28

*In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561 (D. Md. 2005) .............................. 14, 22, 30

*In re Alpharma Sec. Litig.*, 372 F.3d 137 (3d Cir. 2004) ......................................................14-15

*In re Apple Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012 (N.D. Cal. 2002).........................20

*In re Cable & Wireless, PLC, Sec. Litig.*, 321 F. Supp. 2d 749 (E.D. Va. 2004)........................28

*In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240 (8th Cir. 2008)...................................................19

*In re Coinstar Inc. Sec. Litig.*, No. 11-133, 2011 WL 4712206 (W.D. Wash. Oct. 6, 2011) .......23

*In re Constellation Energy Group, Inc. Sec. Litig.*, 738 F. Supp. 2d 614 (D. Md. 2010)............28

*In re Downey Sec. Litig.*, No. 08-3261, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)..............16

*In re Gander Mountain Co. Sec. Litig.*, No. 05-183, 2006 WL 140670
    (D. Minn. Jan. 17, 2006) ......................................................................... 18, 22

*In re Inspire Pharm., Inc. Sec. Litig.*, 515 F. Supp. 2d 631 (M.D.N.C. 2007)............................25

*In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620 (E.D. Va. 2000)......................*passim*

*In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379 (4th Cir. 2005) ...........................................16

*In re Rackable Sys., Inc. Sec. Litig.*, No. 09-222, 2010 WL 3447857
    (N.D. Cal. Aug. 27, 2010)...............................................................................19

*In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560 (W.D. Va. 2006) .......................................19

*In re USEC Sec. Litig.*, 190 F. Supp. 2d 808 (D. Md. 2002).......................................................26

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
  537 F.3d 527 (5th Cir. 2008)........................................................................19-20, 26

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
  432 F. Supp. 2d 571 (E.D. Va. 2006) ...................................................*passim*

*Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011) .......................5, 23

*Johnson v. Pozen Inc.*, 1:07CV599, 2009 WL 426235 (M.D.N.C. Feb. 19, 2009)......................10

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001)...........................................................................14

*Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462 (4th Cir. 2011) ..................................................6

*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007)...............................................24

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006)...............................1, 2

*Noble Asset Mgmt. v. Allos Therapeutics, Inc.*, No. CIVA-04CV-1030-RPM,
  2005 WL 4161977 (D. Colo. Oct. 20, 2005) ...................................................29

*Nolte v. Cap. One Fin. Corp.*, 390 F.3d 311 (4th Cir. 2004) .........................................14, 23, 29

*Ottmann v. Hangar Orthopedic Group, Inc.*, 353 F.3d 338 (4th Cir. 2003)...................13, 22, 30

*PEC Solutions, Inc. Sec. Litig.*, No. 03-331, 2004 WL 1854202 (E.D. Va. May 25, 2004),
  *aff'd*, 418 F.3d 379 (4th Cir. 2005) .........................................................23, 27

*Raab v. Gen. Physics Corp.*, 4 F.3d 286 (4th Cir. 1993) .....................................................*passim*

*Rosner v. Star Gas Partners, L.P.*, No. 07-1687-cv, 2009 WL 2581565
  (2d Cir. Aug. 20, 2009).................................................................................29

*SEC v. Daifoitis*, No. 11-137, 2011 WL 3295139 (N.D. Cal. Aug. 1, 2011).............................24

*Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707 (E.D. Va. 2003).............................20, 24

*Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162 (4th Cir. 2007)....................................*passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)....................................*passim*

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) ...................................................29

## **Statutes and Rules**

15 U.S.C. § 77z-1..............................................................................................................1

15 U.S.C. § 77z-2..............................................................................................................1

15 U.S.C. § 78j(b) .............................................................................................................2

15 U.S.C. § 78u-4 ...............................................................................................................1

15 U.S.C. § 78u-5 ................................................................................................... 1, 26, 27

17 C.F.R. § 240.10b-5 .........................................................................................................2

Fed. R. Civ. P. 9(b) ............................................................................................................1

Computer Sciences Corporation ("CSC" or the "Company"), Michael W. Laphen, Michael J. Mancuso and Donald G. DeBuck (the "Individual Defendants" and, together with the Company, "Defendants"), through their undersigned counsel, respectfully submit this memorandum in support of their motion to dismiss the Consolidated Class Action Complaint (the "Complaint") filed by Plaintiff Ontario Teachers' Pension Plan Board ("Ontario").

## PRELIMINARY STATEMENT

In claims of fraud, Federal Rule of Civil Procedure 9(b) requires a party to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). A primary purpose of this heightened pleading requirement is to allow courts to identify and dispose of unfounded fraud claims early. *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 171 (4th Cir. 2007). But even with the protections afforded by Rule 9(b), Congress felt the *in terrorem* effect of securities fraud class action litigation was injuring "'the entire U.S. economy.'" *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (citation omitted).

As a result, in 1995 Congress passed the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (the "PSLRA") (codified in part at 15 U.S.C. §§ 77z-1, z-2, 78u-4, u-5), the purpose of which was "to curb" perceived abuses. *Dabit*, 547 U.S. at 81; *see also Teachers*, 477 F.3d at 171 (PSLRA was enacted to curtail the "routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action") (quotation omitted). To accomplish this, the PSLRA (among other things) provides a safe harbor for liability based upon so-called "forward-looking statements" and requires that securities fraud complaints specify (1) each misleading statement; (2) the factual basis on which the belief that a statement is misleading is formed; and (3) facts giving rise to a strong inference that the defendant acted with

1

the requisite state of mind.  *Dabit*, 547 U.S. at 81-82; *see also Teachers*, 477 F.3d at 172.  The Supreme Court has consistently reaffirmed the PSLRA's purpose in having district courts serve as gatekeepers to enforce these heightened pleading standards.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007); *Dabit*, 547 U.S. at 81-82; *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341, 347-48 (2005).

This action epitomizes the type of lawsuit the PSLRA was designed to eliminate.  Specifically, this action arises out of declines in CSC's stock price since February 2011.  Plaintiff attempts to cast this decline as the product of a three-year "fraud"[1] – yet it fails to allege a single fact, much less particularized facts, that gives rise to the requisite "strong inference" that each Defendant engaged in fraudulent conduct.  In fact, the "lengthy [class] period strengthens a competing inference that the plaintiff[] filed [its] complaint simply to embark on a fishing expedition with the hope of catching a valid claim."  *Teachers*, 477 F.3d at 185.

The Complaint is based on two distinct purportedly "fraudulent" schemes, both of which are claimed to violate Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  The first relates to CSC's disclosure in November 2010 that it had identified accounting errors in its Managed Services Sector ("MSS") segment, primarily involving irregularities in its "Nordic Region," which encompasses Norway, Sweden and Denmark.  The Company's 10-K filed on June 15, 2011 identified a total of $91 million in pre-tax charges originating out of CSC's MSS operations in the Nordic Region that should have been

---

[1]   In its motion to be appointed lead plaintiff, Ontario sought to act on behalf of purchasers of CSC stock between May 21, 2009 and May 25, 2011.  (*See* Dkt. 16.)  The Complaint expands that period by more than a year – from August 5, 2008 through August 9, 2011 (the "proposed class period").  (Compl. ¶ 1.)

recorded in previous years and $40 million in favorable adjustments to operating income principally out of other MSS operations.  The net impact of the out-of-period adjustments was immaterial to CSC's financial results for the periods affected by the adjustments – less than 1% effect on any line item on the Consolidated Balance Sheet for fiscal years 2011 and 2010, less than 0.5% impact on cash provided by operating and investing activities and no impact on cash from financing activities for fiscal years 2011, 2010 and 2009.  The Complaint alleges no facts suggesting that Defendants knew any of these issues before they were disclosed.  As this Court has recognized, "mere allegations that statements made in one report should have been made in earlier reports do not make out a claim of securities fraud."  *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 635 (E.D. Va. 2000) (Ellis, J.).  To the contrary, as Plaintiff acknowledges, CSC itself identified these issues, determined that many of the errors were the result of intentional misconduct by certain individuals in the Nordic Region and disclosed such conduct and the resulting financial impact to the public.  Moreover, CSC identified weaknesses in its internal controls, developed remediation plans and implemented measures to address the material weakness within the proposed class period.  These facts demonstrate diligence – not scienter.

The second – entirely separate – purportedly "fraudulent scheme" relates to CSC's performance of its contractual obligations to the United Kingdom's National Health Service ("NHS") to build a computerized medical records system and develop the necessary software – called "Lorenzo" – to create digitized medical records for all residents living within certain UK regions.  Plaintiff alleges that Defendants' statements regarding the NHS program during the proposed class period were false because Defendants had known, at least since May 2008, that CSC could not deliver the Lorenzo system as promised.  But delays and difficulties associated with the NHS program have been publicly reported – by CSC and many others – since its

inception in 2002. As a result of these delays and difficulties, the scope and deadlines for the program have been amended multiple times, including in April 2009. The Company's efforts to perform this highly complex, multi-year program do not give rise to a claim for securities fraud.

Indeed, Plaintiff's allegations do not – and cannot – meet the heightened pleading standards of the PSLRA. First, Plaintiff's allegations do not raise a "strong inference" of scienter as to *any* Defendant, let alone one that is as cogent and at least as compelling as the non-fraudulent inferences, as required by *Tellabs*, 551 U.S. at 323-24. (*See* Section I *infra*.) Despite its length, the Complaint is devoid of any facts warranting the conclusion that any of the statements complained of were knowingly false when made or were intended by Defendants to deceive. While Plaintiff touts the information it obtained from a handful of obviously disgruntled former employees, this inherently suspect information does not plausibly suggest – much less support the requisite "strong inference" – that any Defendant acted with scienter:

- The "Director of Internal Audit and Corporate Risk Management" left CSC in August 2008 – the first month of the proposed three-year class period. (Compl. ¶ 30.) Thus, he was not in a position to know anything about CSC's audits of the Nordic Region or its performance of its obligations to the NHS during the proposed class period.

- As late as April 2011, the "Deputy Head of Testing" acknowledged that, notwithstanding his own opinions regarding problems with the Lorenzo software, the Company continued to believe that it would "succeed" in implementing the software in connection with the NHS program. (Compl. ¶ 66.)

- The Senior Vice President of Global Infrastructure Services for CSC in the UK retired from CSC in November 2006, long before the start of the proposed class period. (Proposed Corrected Compl. ¶ 30.) In any event, all he proffered was (i) the unremarkable statement that, through his departure in 2006, CSC routinely capitalized contract acquisition costs, a practice that, when properly conducted, is compliant with Generally Accepted Accounting Principles ("GAAP") and (ii) a description of Laphen's management style. (*Id.* ¶¶ 79 and 100.)[2]

---

[2]    This source was identified in the Complaint as the "Vice President for Operations for CSC in the United Kingdom" and alleged to have retired in 2007. (Compl. ¶ 30.) On October 14, 2011, without explanation, Plaintiff filed a Motion for Leave to File a Corrected Complaint
*(cont'd)*

- The "Nordic Finance Director" and "Nordic Finance Manager" – both of whom were involved in the improper conduct in the Nordic Region – stated that the Company conducted audits of the Nordic region in 2008, 2009 and 2010 (Compl. ¶¶ 82, 84 and 98), thereby undermining any suggestion that Defendants turned a blind eye to the accounting in the region.

In fact, the information provided by these anonymous sources supports the conclusion that CSC was a responsible company that performed extensive diligence regarding significant contracts, (*see* Compl. ¶¶ 49-50 and 57-58), and routinely audited the Nordic Region (*see id.* ¶¶ 82-84).

<u>Second</u>, the Complaint does not sufficiently allege that any Defendant made false statements or omissions of material fact regarding CSC's financial results, its internal controls or the NHS program. (*See* Section II *infra*.) In particular:

- The Complaint fails to plead with the requisite specificity which Individual Defendant "made" each of the allegedly false statements as required by the Supreme Court's recent decision in *Janus Capital Group, Inc. v. First Derivative Traders,* 131 S. Ct. 2296, 2302 (2011).

- The Complaint is devoid of particular facts identifying which statements were false and why they were untrue.

- Many of the alleged false and misleading statements are forward-looking and optimistic statements as to CSC's projected performance that are protected from liability under the PSLRA's safe harbor or inactionable "puffery."

- The information allegedly omitted from the purported NHS statements was publicly disclosed during the proposed class period.

For all these reasons, the Complaint should be dismissed.

_____

*(cont'd from previous page)*

to "correct[] the referenced individual's title and resignation date." (Doc. 56 at 1.) Plaintiff's last-minute change does not render this source's information any more compelling – to the contrary, he apparently left the Company in November 2006, almost *two years* before the start of the proposed class period. It does, however, highlight the inherent unreliability of allegations based on information provided by anonymous sources. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist.").

## RELEVANT FACTUAL BACKGROUND[3]

### A.    The Company and Its Officers

Headquartered in Falls Church, Virginia, CSC is a global information technology and business services company.  (Compl. ¶ 13.)  Through its 93,000 employees, CSC serves clients around the world in the commercial and government markets, assisting in their use of information technology to improve operations and profitability, focus on core competencies and achieve business results.  (*Id.*; Ex. 24, 8/10/11 8-K.)[4]  CSC's annual revenue exceeds $16.0 billion.  (Ex. 14, 5/21/10 10-K at 20; Ex. 23, 6/15/11 10-K at 14.)

Michael W. Laphen served as CSC's Chairman of the Board, President and Chief Executive Officer throughout the proposed class period.  (Compl. ¶ 15.)  Michael J. Mancuso joined CSC in December 2008 – four months *after* the start of the proposed class period – and has served as its Chief Financial Officer since that time.  (*Id.* ¶ 16.)  Donald G. DeBuck served as CSC's Controller throughout the proposed class period and as Interim Chief Financial Officer during the period February 2008 to December 2008.  (*Id.* ¶ 17.)  The Complaint does not allege that Laphen, Mancuso or DeBuck sold stock, received bonuses or otherwise obtained a personal benefit from the supposed inflation of the Company's stock price.

---

[3]  This background is drawn from the factual allegations of the Complaint.  While the Court must, on this motion only, accept as true well-pleaded factual allegations, it "owe[s] no allegiance to unwarranted inferences, unreasonable conclusions, or arguments drawn from those facts."  *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011) (citation and internal quotations omitted).

[4]  Copies of relevant excerpts from the publicly available documents referred to in this motion are appended as exhibits to the accompanying declaration of David E. Carney and referred to herein as "Ex. []."  The Court may properly consider all of these documents.  *See Tellabs*, 551 U.S. at 322 (on motion to dismiss court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

### B.   CSC Discovers, Discloses and Remediates Accounting Irregularities in the Nordic Region

On November 10, 2010, CSC disclosed that the MSS segment, "primarily in Europe's Nordic region," incurred various adjustments netting to $30 million of out-of-period, nonrecurring charges for the second quarter and $40 million for the first six months of FY 2011 resulting from "accounting errors and the misapplication of internal accounting policies and U.S. GAAP, as well as from accounting irregularities in the Nordic region." (Ex. 18, 11/10/10 10-Q at 33; Compl. ¶ 6.)[5] CSC identified these errors through "a review of the Company's MSS business and reviews of the Company's monitoring controls." (Ex. 18, 11/10/10 10-Q at 37.) CSC further disclosed that, "[u]nder the direction of [Laphen and Mancuso], the Company has evaluated its disclosure controls and procedures as of October 1, 2010," and "identified deficiencies that aggregate to a material weakness in [its] internal control over financial reporting." (*Id.* at 38.) CSC began developing a remediation plan and initiated measures to address these deficiencies, including "the replacement of certain managers and staff, strengthened controllership responsibilities, improved monitoring controls and oversight, and increased discipline associated with account reconciliations." (*Id.* at 39.) In addition to ongoing Company-wide ethics and compliance programs, management decided to "conduct focused training for MSS Nordic employees to emphasize the importance of adherence to CSC management principles, code of conduct and ethical policies and business practices in the conduct of our business." (*Id.*)

On February 9, 2011, CSC disclosed various nonrecurring out-of-period MSS adjustments primarily in the Nordic Region, netting to approximately $18 million of pre-tax

---

[5]   CSC's fiscal year begins on the first Saturday closest to April 1 and ends on the last Friday closest to April 1. (*See* Compl. at 21 n.2.)

charges in the third quarter and $58 million through the first nine months of the fiscal year.  (Ex. 20, 2/9/11 10-Q at 33; Compl. ¶ 6.)  CSC reported that the majority of the Nordic charges were likely the result of "suspected intentional misconduct of certain former employees" in the Nordic Region.  (*Id.*)  CSC further disclosed that it was "continuing to review these matters and has initiated a forensic investigation."  (Ex. 20, 2/9/11 10-Q at 33.)

On June 15, 2011, CSC disclosed that, as a result of its continuing investigation, it had identified a total of $91 million in pre-tax charges that should have been recorded in previous years.  (Ex. 23, 6/15/11 10-K at 53.)  CSC attributed the majority of the $91 million of adjustments to "accounting irregularities arising from suspected intentional misconduct by certain former employees in our Danish subsidiaries."  (*Id.*)  CSC also identified other out-of-period adjustments netting to $40 million that increased operating income and $17 million of positive out-of-period adjustments related to income tax benefits.  (*Id.*)  As noted in the 10-K, CSC determined that "[t]he net impact of the out of period adjustments was immaterial to the consolidated results, financial position and cash flows for each fiscal year affected by the adjustments"  (*id.* at 55) – a disclosure the truth of which Plaintiff does not challenge.  Specifically, the adjustments had less than 1% impact on any line item on the Consolidated Balance Sheet for FY 2011 and 2010, less than 0.5% impact on cash provided by operating and investing activities and no impact on cash from financing activities for FY 2011, 2010 and 2009.  (*Id.*)  CSC also determined that the material weakness identified in internal controls had been remediated as of April 1, 2011.  (*Id.* at 93.)

### C. CSC Works Cooperatively with the NHS Toward Implementation of a Fully-Integrated Patient and Medical Records System Throughout the UK

The NHS manages the provision of public health care to all UK residents.  (Compl. ¶ 36.)  In 2002, the NHS implemented a massive program to procure and deliver a fully-integrated

patient and medical records system throughout England.  (*Id.*)  CSC was one of four service providers retained by the NHS to deliver the IT system.  (*Id.* ¶ 37.)  Plaintiff describes the NHS program as a single contract with a well-defined set of obligations (*see, e.g.*, *id.* ¶¶ 1-4, 31-38, 48-55, 61 and 63) – even substituting the term "NHS *Contract*" when purportedly quoting from statements discussing the "NHS *Program*" (*see id.* ¶¶ 120, 121, 135 and 165).  But this characterization cannot be squared with the public record, including documents cited throughout the Complaint.  As these documents show, the NHS program was complex and multi-faceted, with multiple contracts, multiple contractors and multiple amendments throughout its course.  (*See* Ex. 23, 6/15/11 10-K at 83.)  Indeed, as Plaintiff acknowledges, the initial goal of the program was to have the underlying Lorenzo software fully implemented by 2012, with the program completed by 2014.  (Compl. ¶ 37.)  However, the completion dates have since been revised as to all contractors and the current delivery date reset to 2016.  (*Id.*)

From its inception, the NHS program was widely reported to be very challenging with ongoing complications.  In April 2007, more than a year before the start of the proposed class period, the House of Commons Committee of Public Accounts reported that (i) the piloting and deployment of the care records portion of the program was running two years behind schedule and (ii) the Lorenzo software still was not available.  (Ex. 27 at 3, 6.)[6]  In 2007, Accenture withdrew from the program and CSC took over Accenture's obligations.  (Compl. ¶ 37.)  In 2008, Fujitsu withdrew from the program.  (*Id.*)

---

[6]   Plaintiff cites a Report published by the Committee of Public Accounts on August 3, 2011 (*see* Compl. ¶¶ 41-55), but fails to cite any of the earlier Reports.  Because these Reports are publicly available government reports, the Court may take judicial notice of them and consider them in ruling on this motion.  *See Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 582 (E.D. Va. 2006); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004).

Thereafter, in a January 27, 2009 Report, the Committee of Public Accounts reported:

- "Recent progress in deploying the new care records systems has been very disappointing . . . . "

- "By the end of 2008 the Lorenzo care records software had still not gone live throughout a single Acute Trust."

- "The planned approach to deploy elements of the clinical functionality of Lorenzo (release 1) ahead of the patient administration system (release 2) is untested, and therefore poses a higher risk than previous deployments under the Programme."

- There are "serious concerns about the prospects for future deployments of Lorenzo."

(Ex. 28 at 5-6.) The Report noted that, as a result of these delays, "[t]he Department and the NHS are working with suppliers and should update the deployment timetables." (*Id.* at 5.) In fact, the initial contract was amended in April 2009 and CSC and the NHS "have entered into variation agreements subsequent to the 2009 amendment agreeing to various operational terms and conditions." (*See* Ex. 23, 6/15/11 10-K at 83.) The 2009 amendment "included mutual releases of all claims existing at the time of the amendment." (*Id.*)[7]

As is often the case when companies embark on complex projects, CSC itself disclosed – in the very same statements that Plaintiff claims were false or misleading – the delays and difficulties CSC was experiencing with the program, including their financial impact:

- August 13, 2008. CSC disclosed a "lower level of revenue" from the NHS program due to "the timing of milestones of approximately $14 million." (Ex. 2, 8/13/08 10-Q at 38.)

---

[7]   CSC analysts frequently reported on the NHS program delays (*see* Exs. 29-36) and on the April 2009 amendments to the scope of the program. (*See* Ex. 30 at 1 (reporting on the NHS's April 2009 agreement "to provide extra funding, scale back functionality, remove previous release schedules, and remove the concept of single shared system in order to move the project along ahead of the 2010 general election"); Ex. 31 at 3 (noting that CSC and NHS reached an agreement "resetting" the contract).) These reports may be considered "even where the materials were not specifically referenced in the complaint." *Johnson v. Pozen Inc.*, 1:07CV599, 2009 WL 426235, at *1 (M.D.N.C. Feb. 19, 2009).

- **November 12, 2008**.  CSC disclosed that it had passed the original "go live" date for the program.  (Ex. 4, 11/13/08 8-K at 9.)

- **February 10, 2009**.  CSC disclosed that "there has been some delay in the implementation of the [Lorenzo] capability."  (Ex. 6, 2/11/09 8-K at 10.)

- **August 6, 2009**.  CSC disclosed that an early adopter site had "pushed [the Lorenzo deployment] out a bit."  (Ex. 9, 8/10/09 8-K at 10.)

- **February 10, 2010**.  CSC disclosed that $15 million of the $345 million revenue decline in its Business Solutions & Services segment came from milestone delays on the NHS program.  (Ex. 12, 2/10/10 10-Q at 40.)

- **May 21, 2010**.  CSC reported a 1.2% or $49 million decline in revenue from milestone delays.  (Ex. 14, 5/21/10 10-K at 29.)[8]

In addition, as early as February 2010, CSC publicly disclosed that, as a result of the UK's "austerity program" and to address delays in development and deployment of the Lorenzo system, the NHS had begun discussions with CSC to enter into a memorandum of understanding ("MOU") that would again amend CSC's obligations under the NHS program.  (Ex. 13, 2/11/10 8-K at 4.)  During the proposed class period, CSC made regular, quarterly announcements updating the market on the status of the MOU discussions.  (Ex. 14, 5/21/10 10-K at 40; Ex. 17, 8/12/10 8-K at 5, 10; Ex. 19, 11/12/10 8-K at 5; Ex. 21, 2/10/11 8-K at 4.)  In these announcements, CSC acknowledged that modifications to the NHS program could "affect the scope of the work and total contract value."  (Ex. 14, 5/21/10 10-K at 40; Ex. 16, 8/11/10 10-Q at 33; Ex. 18, 11/10/10 10-Q at 36; Ex. 20, 2/9/11 10-Q at 23.)  CSC also projected that modifications could reduce the value of the NHS program by approximately £500 million and

---

[8]  Just as it recognized delays and difficulties in implementation of the program, CSC also disclosed that it met agreed-to milestones with the NHS, received payments for these milestones and expanded the Lorenzo deployments (Ex. 3, 11/12/08 10-Q at 42; Ex. 4, 11/13/08 8-K at 6; Ex. 6, 2/11/09 8-K at 7, 14; Ex. 7, 5/21/09 8-K at 9; Ex. 10, 11/12/09 8-K at 10; Ex. 15, 5/21/10 8-K at 3, 8), thereby undermining any claim that the Lorenzo software was so defective that it was undeliverable.  (*See* Compl ¶¶ 33, 60.)

that "unforeseen future events . . . could potentially adversely impact [CSC's recovery of its investment] and the Company's liquidity." (Ex. 18, 11/10/10 10-Q at 36.)

On February 9, 2011, CSC disclosed that it had received a formal notice from the NHS claiming that CSC's alleged failure to implement the Lorenzo system at a particular site constituted a breach of contract and stating that it was considering terminating all or parts of the contract. (Ex. 20, 2/9/11 10-Q at 32.) Since then, CSC has repeatedly disclosed to the public the fact of its ongoing discussions with the NHS toward execution of an MOU. (*See* Ex. 22, 5/27/11 8-K at 3; Ex. 23, 6/15/11 10-K at 31-33; Ex. 26, 8/11/11 8-K at 3.)

## ARGUMENT

## THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

I.    **COUNTS I AND II OF THE COMPLAINT DO NOT STATE A CLAIM FOR VIOLATION OF SECTION 10(b) OR RULE 10b-5.**

To state a claim under section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), a plaintiff must allege facts sufficient to show that "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008). Such a complaint "must state with particularity the circumstances constituting the fraud or mistake." *Id.* at 629 (citation omitted). It "must include '*each statement* alleged to have been misleading, *the reason* or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state *with particularity all facts* on which the belief is formed.'" *Teachers*, 477 F.3d at 172 (quoting 15 U.S.C. § 78u-4(b)(1)). And it must state with particularity "*facts giving rise to a strong inference* that the defendant acted with the required state of mind." *Id.*; *Tellabs,* 551 U.S. at 321. "A plaintiff must show either 'intentional misconduct' or such 'severe recklessness' that the

danger of misleading investors was 'either known to the defendant or so obvious that the defendant must have been aware of it.'" *Cozzarelli*, 549 F.3d at 623 (citing *Ottmann v. Hangar Orthopedic Group, Inc.*, 353 F.3d 338, 343-44 (4th Cir. 2003)).  "A complaint that fails to comply with these requirements *must* – on any defendant's motion – be dismissed." *MicroStrategy*, 115 F. Supp. 2d at 628 (emphasis added).

### A.   The Complaint Does Not Allege With The Required Particularity Any Facts Giving Rise To A Strong Inference That Any Defendant Acted With Scienter.

In determining whether pleadings give rise to a strong inference of scienter, the Court "must take into account plausible opposing inferences" "rationally drawn from the facts alleged" and "must engage in a comparative evaluation" of those inferences.  *Tellabs*, 551 U.S. at 314, 323.  A complaint must be dismissed unless "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.   "[W]hen the facts as a whole more plausibly suggest that the defendant acted innocently – or even negligently – rather than with intent or severe recklessness, the action must be dismissed."  *Cozzarelli*, 549 F.3d at 624.  A plaintiff also "must allege facts that support a 'strong inference' that *each* defendant acted with at least recklessness in making the false statement."  *Teachers*, 477 F.3d at 184.  "[I]f the defendant is a corporation, a plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents."  *Id.*

Here, there is no allegation that any Individual Defendant had a personal financial motive to commit securities fraud.  Unlike in *MicroStrategy*, where the individual defendants "reaped over $90 million from sales of substantial portions of their holdings during the Class Period," 115 F. Supp. 2d at 643, the Complaint here is devoid of *any* allegation that *any* Individual Defendant (or anyone at CSC) sold stock, received bonuses or otherwise obtained a personal

benefit from the supposed inflation of the Company's stock price that would constitute a motive to commit securities fraud. This omission weighs against a finding of scienter. *Tellabs*, 551 U.S. at 325 (lack of personal motive is a "relevant consideration" in assessing scienter); *see also Ottmann*, 353 F.3d at 348; *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 576-77 (D. Md. 2005); *cf. Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (where motive is not apparent, "the strength of the circumstantial allegations must be correspondingly greater").

### 1.   The Complaint Fails To Allege Scienter With Respect To Accounting In The Nordic Region.

As noted above, CSC itself (1) identified the accounting errors in the Nordic Region; (2) undertook an investigation of those issues; (3) disclosed its findings to the public; and (4) remediated the material weakness. Nevertheless, Plaintiff asserts that Defendants "knew of or at least recklessly disregarded, that no later than 2008, the accounting in the Nordic Region was improper." (Compl. at 24.) As discussed below, the facts alleged do not support any inference of scienter, let alone the cogent, persuasive and strong inference required by the PSLRA.

First, there is not a single allegation in the Complaint even suggesting that *any* Defendant had *actual* knowledge that the numbers reported by the Nordic Region during fiscal year 2010 were inaccurate at the time they were issued. *See Nolte v. Cap. One Fin. Corp.*, 390 F.3d 311, 316 (4th Cir. 2004) (affirming dismissal of complaint where plaintiffs failed to allege that corporate agents who made public statements actually knew of information in question); *Iron Workers*, 432 F. Supp. 2d at 592-93 (dismissing complaint that failed to allege defendants had actual knowledge of the misleading statement and how they acted to deceive investors).[9]

---

[9]   In paragraph 72, Plaintiff suggests that the intentional misconduct of individuals in the Nordic Region can be imputed to Defendants. However, allegations that local managers directed misconduct are not sufficient to establish scienter on the part of a company or high-level executives. *See, e.g.*, *In re Alpharma Sec. Litig.*, 372 F.3d 137, 151 (3d Cir. 2004)

*(cont'd)*

Second, Plaintiff's allegations are internally inconsistent. Plaintiff alleges, based on information purportedly provided by the Director of Internal Audit, that senior EMEA (Europe, Middle East and Africa) management did not want the Internal Audit Department in the Nordic Region and that the Nordic Region was not included in the annual internal audit plan for 2006 through 2008. (*Id.* ¶¶ 74-75.) Yet, Plaintiff specifically alleges that Scott Delanty, the Chief Audit Executive, did not raise the lack of financial audits in the Nordic Region with the Audit Committee. (*Id.* ¶ 75.) Plaintiff then alleges, in paragraphs 82-84, based on information provided by the Nordic Finance Director, "that accountants from EMEA visited the Nordic Region in May 2008, and assessed the Nordic Region's account reconciliations and determined that the Nordic Region had significant accounting and internal control deficiencies." (*Id.* ¶ 82.) According to the Complaint, a "several-week review" was conducted and the accountants prepared a report, which, under usual practice, would have been sent to DeBuck, Delanty and the Audit Committee. (*Id.* ¶ 84.) Plaintiff thus alleges on the one hand that senior EMEA management did not want Internal Audit in the Nordic Region and, on the other, that EMEA management conducted its own extensive review of the Nordic Region, identified "significant" deficiencies and reported these deficiencies to Internal Audit and many others. This ambiguity "count[s] against inferring scienter." *Tellabs*, 551 U.S. at 326.

Third, Plaintiff's allegations are patently insufficient to demonstrate scienter on the part of any of the Defendants. With respect to the report of the EMEA audit in 2008, Plaintiff does not allege that the Individual Defendants actually possessed the report and only speculates that

_____
*(cont'd from previous page)*

(affirming dismissal where Complaint was "devoid of allegations" that would establish that Alpharma's Brazil division was "so central to Alpharma's business that its increased revenue figures should have received particular attention from company executives").

DeBuck (but not Mancuso or Laphen) received it.  (Compl. ¶ 84.)  This is not sufficient to allege

scienter on behalf of DeBuck, *In re Downey Sec. Litig.*, No. 08-3261, 2009 WL 2767670, at *9

n.6 (C.D. Cal. Aug. 21, 2009) (allegation that defendant should have received information per

company policy is insufficient to establish scienter), let alone as to Mancuso or Laphen.

In support of its assertion that Defendants "knew or recklessly disregarded" the fact that

the Nordic Region was improperly capitalizing expenses, Plaintiff presents information provided

by two individuals who themselves were involved in the accounting improprieties – the Nordic

Finance Director and the Nordic Finance Manager – both of whom conclusorily assert that "top

management in EMEA knew of and approved" their improper accounting practices.  (*Id.* ¶¶ 77-

78.)[10]  This inherently suspect information does not "compellingly" demonstrate scienter on

behalf of the unidentified top management in EMEA, *see Higginbotham*, 495 F.3d at 757, much

less on behalf of the Defendants.[11]  Nor does the fact that the Nordic Region's accounting

practices resulted in GAAP violations support an inference of scienter.  As this Court has

recognized, "scienter requires more than a misapplication of accounting principles."

*MicroStrategy*, 115 F. Supp. 2d at 635 (quotation omitted); *see also In re PEC Solutions, Inc.

Sec. Litig.*, 418 F.3d 379, 389 (4th Cir. 2005) (same).[12]

[10]  As a result of the misconduct identified in the Nordic Region, "roughly half of the senior finance staff was terminated, resigned or redeployed."  (Ex. 23, 6/15/11 10-K at 91.)

[11]  The information attributed to the Senior Vice President of Global Infrastructure Services is not relevant to the scienter analysis.  The only fact attributed to this source is the unremarkable statement that, through his departure in 2006, CSC routinely capitalized contract acquisition costs (*see* Prop. Corr. Compl. ¶ 73), a practice that, when properly conducted, complies with GAAP.  The information attributed to the Interim Nordic Finance Manager in paragraph 85 says nothing about what Defendants knew and therefore is not relevant to the scienter analysis.

[12]  Plaintiff also alleges in conclusory fashion that CSC's statements were false or misleading because of "Defendants' requirements that business regions meet unrealistic revenue targets

*(cont'd)*

16

Fourth, the facts alleged demonstrate diligence – not scienter – on the part of CSC.  The Complaint alleges that EMEA management conducted a review of the Nordic Region in the Fall 2008.  (Compl. ¶ 82.)  It alleges that EMEA accountants returned to the Nordic Region in the Fall 2009.  (*Id.* ¶ 84.)  It alleges that the 2009 review noted "improvement" but still identified deficiencies.  (*Id.*)  And it alleges that, thereafter, CSC identified the accounting irregularities in the Nordic Region and disclosed them to the public as they were discovered.  (*Id.* ¶ 6.)

Fifth, Plaintiff's allegations are contradicted by the documents it cites.  Plaintiff asserts that CSC would have "missed its EPS guidance of $4.25 for FY 2010 by $0.38" if the Nordic Region accounts had been correct.  (Compl. ¶¶ 5, 69.)  But CSC reported EPS of $5.28 in FY 2010 – $1.03 *higher* than the EPS guidance of $4.25.  (Ex. 14, 5/21/10 10-K at 54; Ex. 15, 5/21/10 8-K at 5.)  In any event, allegations that a company "was motivated to engage in fraud in order to meet expectations as to its performance . . . adds little by itself to the scienter calculus, because these are motives 'possessed, to a certain degree, by every corporate officer.'"  *MicroStrategy*, 115 F. Supp. 2d at 648.

Moreover, during fiscal year 2010, CSC *voluntarily* incurred $70 million of expenses – a $25 million contribution to its 401(k) plan and a $45 million interest payment upon the voluntary retirement of notes – that decreased CSC's earnings for the year.  (Ex. 13, 2/11/10 8-K at 6; Ex. 14, 5/21/10 8-K at 5.)  As a result, CSC incurred a $0.33 *reduction* to EPS for fiscal year 2010.  (Ex. 13, 2/11/10 8-K at 6.)  The fact that CSC voluntarily *reduced* its earnings for FY 2010 weighs against a finding that Defendants knowingly or recklessly allowed the Nordic Region to engage in improper accounting for the purpose of *inflating* the Company's earnings.

_____

*(cont'd from previous page)*
through any means."  (Compl. ¶¶ 115, 123, 130, 139, 152, 170, 188, 216, 227 and 244.)  But the Complaint fails to allege a single fact to support this assertion.

Finally, further weighing against a finding of scienter, CSC's out-of-period accounting adjustments in FY 2011 included both $91 million of charges *reducing* income and $40 million of adjustments *increasing* income.  (Ex. 23, 6/15/11 10-K at 53.)   The fact that many of the accounting adjustments were in CSC's favor weighs in favor of "a nonculpable state of mind." *MicroStrategy*, 115 F. Supp. 2d at 635 ("[W]hen the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter . . . [or] a nonculpable state of mind.").

### 2.    The Complaint Fails To Allege Scienter With Respect To CSC's Internal Controls.

Plaintiff's allegations of scienter with respect to CSC's internal controls are equally deficient.  First, relying solely on a letter written by a former Internal Audit Director to the Chairman of CSC's Audit Committee on September 2, 2008 (before Defendant Mancuso's arrival at the Company and only a month into the three-year class period), Plaintiff asserts that Defendants knew CSC's Internal Audit Department lacked independence.  (Compl. ¶¶ 92-96.) The Complaint quotes from the letter and highlights the various issues about which the former Internal Audit Director complained at that time.  (*Id.*)  But the former Internal Audit Director left CSC in August 2008 – the first month of the class period.   (*Id.* ¶ 30.)  He therefore was not in a position to know what CSC did in response to his letter or anything about the Internal Audit Department after August 2008.  The Complaint is silent as to this relevant time frame.  The information attributed to the former Internal Audit Director thus does not support a finding of scienter with respect to any Defendant. *See In re Gander Mountain Co. Sec. Litig.*, No. 05-183, 2006 WL 140670, *9-11 (D. Minn. Jan. 17, 2006) (information from confidential witnesses who left a company before class period is "unreliable" for purposes of assessing scienter); *see also In*

*re Rackable Sys., Inc. Sec. Litig.*, No. 09-222, 2010 WL 3447857, at *9-10 (N.D. Cal. Aug. 27, 2010); *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 570 (W.D. Va. 2006).

The Complaint then purports to allege facts that supposedly establish scienter on the part of "Defendants" but only DeBuck and Laphen are addressed.  (*See* Compl. ¶¶ 97-102.)  As to DeBuck, Plaintiff repeats its allegations with respect to the 2008 review of the Nordic Region conducted by EMEA, asserting that because DeBuck knew of internal control failures in the Nordic Region's account reconciliation processes as of May 2008, that "contributes to the strong inference that DeBuck acted with fraudulent scienter when he certified CSC's public filings." (*Id.* ¶ 99.)  For all the reasons discussed in Section I.A.1, this allegation does not give rise to an inference of scienter.  Nor does the fact that the Company ultimately identified material weaknesses in its internal controls in FY 2011 establish scienter for past statements certifying the effectiveness of internal controls.  *See In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008) (company's admission that it must improve "internal controls and training" cannot give rise to strong inference of scienter that prior statements certifying effectiveness of internal controls were knowingly false when made).

With respect to Laphen, the Complaint describes his "hands-on" management style based on information attributed to an anonymous source who left CSC in November 2006, well before the start of the proposed class period.  (Compl. ¶¶ 101-102.)  Plaintiff then concludes that "[h]aving conferred with Nordic COO [Ivor] Canavan on at least a monthly basis, and receiving financial status reports, Laphen had access to information that revealed that the Nordic Region had not obtained significant new business, and was contracting rather than growing." (*Id.* ¶ 102). Even if Laphen's practices in FY 2010 were the same as they were in 2006, these facts do not support a "strong inference" that Laphen acted with scienter.  *See Indiana Elec. Workers'*

19

*Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 541-42 (5th Cir. 2008) (allegations that executive had "hands-on management style" and knew everything in company is insufficient to support strong inference of scienter); *In re Apple Computer, Inc., Sec. Litig.*, 243 F. Supp. 2d 1012, 1026 (N.D. Cal. 2002) (same); *see also Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 715 (E.D. Va. 2003) (rejecting allegations that defendants must have had knowledge because their corporate positions gave them access to "internal corporate documents, conversations and connections with other corporate officers and employees").

The Complaint is silent with respect to Mancuso (*see id.* ¶¶ 92-102), an omission that "count[s] against inferring scienter." *Tellabs*, 551 U.S. at 326.

### 3. The Complaint Fails To Allege Scienter With Respect To The NHS Program.

Plaintiff's central scienter allegation with respect to the NHS program is that "CSC has long known that it could never operationally and technologically perform the NHS Contract's terms due to fatal flaws with the software's conception, development, and implementation." (Compl. ¶ 40.)  The Complaint devotes numerous pages to developing this supposed fact – citing a report of the UK Committee of Public Accounts and reciting information conveyed by disgruntled former employees regarding May and September 2008 reviews of the NHS program. (*See id.* ¶¶ 41-60.)  Once again, the facts alleged do not give rise to an inference of scienter.

First, nothing in the Committee of Public Accounts Report suggests that anyone at CSC – much less any Individual Defendant – believed at any time that the Company could not satisfy its obligations to the NHS.  In alleging otherwise, Plaintiff asserts as fact *questions* asked by members of the UK Parliament and mischaracterizes the careful responses of Sherri Thureen, CSC's President of UK Healthcare.  For example, in paragraph 46, Plaintiff describes Thureen's reference to ongoing negotiations with NHS regarding a MOU as an "admi[ssion] that CSC

20

could not deliver."  Then, Plaintiff suggests that Thureen "deflected" a question and thereby "did not reject" its premise.  (Compl. ¶¶ 46-47.)  Plaintiff then assumes as fact CSC's acknowledgment of the premise of the question.  (*Id.*)  Whatever the UK politicians may have believed or not believed during their questioning of Thureen, the Report simply cannot be read as an acknowledgement by Thureen of those facts.  The statements of these UK politicians certainly do not demonstrate scienter on the part of *Defendants*.

The information provided by the Internal Audit Director likewise is insufficient to demonstrate scienter on the part of Defendants.  As noted above, the Internal Audit Director left the Company in August 2008, at the very start of the proposed class period and four months before Mancuso joined the Company.  Thus, even assuming he is correct in his personal belief that DeBuck and Laphen would have received a report on the May review of the NHS program (*see* Compl. ¶ 55), he was not in a position to know what these Defendants did with the report.  Indeed, as discussed in Section I.A.2, he was not in a position to know anything about what happened over the next three years – including agreed upon changes to the NHS program that altered the Company's contractual obligations.

Moreover, the Complaint does not allege that the former Internal Audit Director ever saw the report that purportedly was provided to the Board.  It does not allege the actual contents of that report.  And it does not allege that the report contained the former Internal Audit Director's view that "there were definite GAAP violations" and that "the loss that needed to be recognized at that time was a material amount."  (*See* Compl. ¶ 54-55.)  In fact, according to the Complaint, one of the issues the former Internal Audit Director raised after his departure from the Company was the fact that "there had not been any financial audit of the NHS Contract or audit of controls over the contract."  (*Id.* ¶ 94.)  The Complaint thus again is internally inconsistent, alleging on

the one hand that Defendants knew in May 2008 that CSC should have recognized a loss on the NHS program and, on the other, that there had been no financial audit of the program. This ambiguity "count[s] against inferring scienter." *Tellabs*, 551 U.S. at 326.

But more importantly, in relying on statements regarding a May 2008 review of the NHS program, Plaintiff ignores the public fact that CSC's obligations under the NHS program *changed* in April 2009. Accordingly, whatever the former Internal Audit Director may have believed in May 2008, CSC's obligations to the NHS were shortly thereafter amended both in scope and timing. Therefore, whether or not CSC was able to perform its obligations in May 2008 had no bearing on whether it could perform its amended obligations and thus is irrelevant to Defendants' scienter when making statements regarding those amended obligations throughout the lengthy proposed class period. *See Gander Mountain Co.*, 2006 WL 140670 at *9-10.

The information attributed to the former Deputy Head of Testing similarly does not support an inference of scienter as he simply repeats the delays and difficulties that were disclosed to the public. (*See* Compl. ¶¶ 56-66.) Indeed, he confirms that, as late as April 2011, Laphen believed CSC would succeed in implementing the Lorenzo software by "August 2011." (*Id.* ¶ 66.) The Deputy Head of Testing's disagreement with Laphen does not suggest scienter.

At bottom, the facts alleged suggest only that there were delays and setbacks in connection with the implementation of the NHS program. But, as discussed above, these facts were publicly disclosed before, during and after the proposed class period, thus weighing against an inference of scienter. *See Ottmann*, 353 F.3d at 348 (truthful disclosure that reflects negatively on a company "militates against a finding that [defendants] acted with a culpable state of mind"); *Acterna*, 378 F. Supp. 2d at 577 ("[D]isclosures throughout the Class Period of unfavorable information about the company weigh[] against an inference of scienter . . . .").

**B.     The Complaint Does Not Sufficiently Allege That Defendants Made False Statements Or Omissions Of Material Fact Regarding CSC's Financial Results, Internal Controls Or The NHS Program.**

The Complaint should be dismissed for the additional reason that it fails to allege an actionable false or misleading statement. *See PEC Solutions, Inc. Sec. Litig.*, No. 03-331, 2004 WL 1854202, at *7 (E.D. Va. May 25, 2004) (dismissing securities fraud claim where the complaint rested "on mischaracterizations of the public record, exaggeration of [statements], and isolation of [those] statements from their context and from the wealth of information publicly available when [they] were made"), *aff'd*, 418 F.3d 379 (4th Cir. 2005).   To allege a false statement or omission of material fact, Plaintiff "must point to a specific factual statement or omission – that is, one that is demonstrable as being true or false." *Nolte*, 390 F.3d at 315. Plaintiff also must explain why the statement is false or how the omitted fact renders the statement misleading. *Ottmann*, 353 F.3d at 343.

**1.     The Complaint Fails To Properly Allege The Speaker Of The Purportedly False Statements.**

As a threshold matter, the Complaint should be dismissed because it fails to plead with the requisite specificity which Individual Defendant "made" each of the allegedly false statements. "For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc.*, 131 S. Ct. at 2302.   "[I]n the ordinary case, attribution within a statement . . . is strong evidence that a statement was made by – and only by – the party to whom it is attributed." *Id.*   As a result, a 10(b) claim against an individual defendant is not actionable unless accompanied by allegations that the individual actually made the allegedly false statement(s) at issue. *See In re Coinstar Inc. Sec. Litig.*, No. 11-133, 2011 WL 4712206, at *10- 11 (W.D. Wash. Oct. 6, 2011) (finding under *Janus* that corporate executives cannot be liable

under section 10(b) for statements that were not made by them); *SEC v. Daifotis*, No. 11-137, 2011 WL 3295139, at *3-4 (N.D. Cal. Aug. 1, 2011) (same); *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 155 (2d Cir. 2007) ("[A] party can incur liability only if a misstatement is attributed to it at the time of dissemination.").   Plaintiff violates *Janus* by repeatedly making blanket assertions that "Defendants" made the allegedly false and misleading statements – including in August and November 2008, *before* Mancuso joined the Company. (*See* Comp. ¶¶ 115-119, 123-124, 130-131, 139-140, 152-155, 170-173, 188-192, 216-220, 227-228, and 244-246.)   Such sloppy pleading contravenes both *Janus* and the heightened pleading standards for a 10(b) claim.   *See Iron Workers*, 432 F. Supp. 2d at 579 ("Grouping defendants together in a pleading fails to satisfy the requirement that the who, what, when, where, why, and how, be pled with specificity."); *Smith*, 286 F. Supp. 2d at 716 (E.D. Va. 2003) (same).[13]

> ## 2.   The Complaint Does Not Sufficiently Allege That The Company's FY 2009 And FY 2011 Financial Results Were False or Misleading.

In paragraphs 108, 117, 125, 132, 221 and 230-239, Plaintiff recites financial results reported by CSC during FY 2009 and the first two quarters of FY 2011.[14]   Then, in conclusory fashion, Plaintiff asserts that these statements were false for a hodgepodge of reasons, none of

---

[13]   Similarly, it is unclear if Plaintiff is alleging that Defendants are responsible for the statements made by independent research analysts that it sprinkles throughout the Complaint. (*See, e.g.*, Compl. ¶¶ 114, 122, 128, 129, 138, 144, 150, 151, 160, 169, 178, 187, 194, 215, 239, 243 and 246.)   Defendants cannot be held liable for these statements because Plaintiff has failed (i) to plead any particular facts demonstrating that Defendants "sufficiently entangled themselves" with such statements so as to render the statements "attributable" to Defendants; and (ii) to specify what information was supplied to the analyst, "who supplied [it], how it was supplied, or how [each Defendant] could have controlled the content of" the analysts' reports."   *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 288 (4th Cir. 1993).

[14]   In light of its disclosures regarding the Nordic Region accounting errors, CSC does not dispute that its FY 2010 financial results were inaccurate – though clearly not fraudulent or material for the reasons discussed above.

which is tied to any particular financial result.  (*See* Compl. ¶¶ 115, 116, 123, 124, 130, 131, 139, 140, 227, 228, 244 and 245.)  Such imprecise and incomplete pleading is not sufficient.  *See Iron Workers*, 432 F. Supp. 2d at 582-83 (dismissing 10(b) claim where plaintiff failed to "point to each statement" and explain why they were false or misleading); *In re Inspire Pharm., Inc. Sec. Litig.*, 515 F. Supp. 2d 631, 636 (M.D.N.C. 2007) (same).

### 3.   The Complaint Does Not Sufficiently Allege That Statements Regarding CSC's Internal Controls Were False Or Misleading.

In paragraphs 109, 118, 126, 134, 145, 146, 162, 163, 179, 180, 205, 206, 222 and 223, Plaintiff parrots the statements made by the Company concerning internal controls.  The Complaint alleges that these statements were false and misleading because the Company concluded – in late-2010 – that there were weaknesses in its internal controls pertaining specifically to the Nordic Region.  (*See* Compl. ¶ 90.)  The Complaint, however, does not allege facts that plausibly suggest the weaknesses in internal controls that were identified in late 2010 existed throughout the proposed class period or that any Defendant did not believe his statements about CSC's internal controls at the time they were made.  Accordingly, the Complaint fails to allege that any statement made by Defendants with respect to the Company's internal controls was false.  *See Coronel v. Quanta Cap. Holdings Ltd.*, No. 07-1405, 2009 WL 174656, at *29 (S.D.N.Y. Jan. 26, 2009) (disclosure of internal control weaknesses does not mean that prior internal control certifications were untrue when made).

### 4.   The Complaint Does Not Sufficiently Allege That Statements Regarding The NHS Program Were False Or Misleading.

Finally, in paragraphs 110-114, 119-122, 127-129, 135-138, 147-151, 164-169, 181-187, 207-215, 224-226 and 240-243, Plaintiff purports to allege false or misleading statements regarding CSC's performance of its obligations in connection with the NHS program.  The crux of Plaintiff's allegations is that the Company knew, as of 2008, that it could not deliver "from an

operations and technological perspective as required by the Contract" and that, as of May 2008, the Company should have recognized a loss on the program.  (*See, e.g.*, Compl. ¶ 124.)  As discussed above, however, the allegations do not support these bold conclusions even as to statements made in 2008.  They have no bearing on statements made after CSC's contractual obligations were amended.  *See Indiana Elec.*, 537 F.3d at 541-42 (alleged omissions about contract problems were not misleading where they did not "create[] an impression of a state of affairs that differs in a material way from the one that actually exists").  In any event, as discussed below, the challenged statements regarding the NHS program are not actionable.

(a)   <strong>Many Of The Challenged Statements Are Forward-Looking Statements Protected Under Both Common Law And The PSRLA's Safe Harbor.</strong>

Forward-looking statements are statements projecting revenue, management's plans or objectives or future economic performance.  *See* 15 U.S.C. § 78u-5(i).  Their truth is only discernable based on future events.  *See Raab*, 4 F.3d at 290 (vague predictive statements and omissions of uncertain future events that do not make guarantees "are generally not actionable under the securities laws"); *see also In re USEC Sec. Litig.*, 190 F. Supp. 2d 808, 822 (D. Md. 2002) ("Predictive statements are much less likely to be actionable under the securities laws because a reasonable investor knows of the risk and uncertainties involved in predicting the future.").  The Complaint is replete with such forward-looking statements.  It alleges that CSC falsely represented each quarter that "the Company expects to recover its investment" on the NHS program.  (*See, e.g.*, Compl. ¶¶ 110, 119, 127, 147, 164, 181, 207 and 224.)[15]  It alleges

---

[15]   The Company also disclosed in each quarter that the project "is currently profitable," (*see* Compl. ¶¶ 110, 119, 127, 147, 164, 181, 207 and 224), based on the net investment as the date the statement was made and the contract assets.  (*See, e.g.*, Ex. 11, 11/12/09 10-Q at 41.) For the reasons discussed in Section I.A.3, the facts alleged do not contradict this statement.

that CSC falsely represented that the Lorenzo system was "on schedule" or "on track."  (*See, e.g.*, Compl. ¶¶ 120, 127, 148, 149, 168, 182 and 184.)  And it alleges that CSC falsely represented its expectations for the NHS program in the future.  (*See, e.g.*, Compl. ¶¶ 112, 113, 120, 121, 128, 135, 137, 166, 182, 184 and 186.)  Such predictions of uncertain, future events are not actionable under the securities laws.  *See Hillson Partners Ltd. P'ship v. Adage, Inc.*, 2 F.3d 204, 213 (4th Cir. 1994) (statement that a major corporate project is "on schedule" is not actionable where allegations do not establish that defendants did not believe project was "on schedule").

Indeed, the PSLRA insulates such forward-looking statements from civil liability under the federal securities laws.   Under the PSLRA, there is no liability for a forward-looking statement that is either "(i) identified as a forward-looking statement, and . . . accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or "(ii) immaterial."  15 U.S.C. § 78u-5(c)(1)(A).   If a forward-looking statement is not accompanied by sufficient cautionary language (and is material), a defendant is liable only if the statement was made with "actual knowledge" of its false or misleading nature.  *Id.* § 78u-5(c)(1)(B)(i).

Here, CSC disclosed – in the same 10-Qs that Plaintiff alleges were false and misleading – that "unforeseen future events to the extent they add costs beyond those included in the Company's current estimated costs to complete could potentially adversely impact [the Company's recovery of its investment in the NHS program] and the Company's liquidity."  (*See, e.g.*, Ex. 11, 11/12/09 10-Q at 41.)  *See PEC Solutions*, 2004 WL 1854202, at *7 ("[C]autionary language is meaningful if it conveys information about factors that could realistically cause results to materially differ from those projected.").   Similar cautionary statements were made during the analyst calls at which the NHS program was discussed.  (*See* Ex. 10, 11/11/09 8-K at

27

6.)   In addition, under *Raab* and *Hillson*, the challenged statements are not material because reasonable investors know that significant projects "may run into unforeseen problems and delays." *Hillson*, 42 F.3d at 213.   Finally, as discussed more fully in Section I.A.3, Plaintiff has failed to allege that Defendants had actual knowledge of any contemporaneous facts that would vitiate the protections afforded by the safe harbor for forward-looking statements.

**(b)     Many Of The Challenged Statements Constitute Inactionable "Puffery."**

Moreover, the vast majority of the challenged NHS statements consist primarily of "[s]oft," "puffing" statements and statements of corporate opinion that are not actionable as a matter of law.   *Raab*, 4 F.3d at 289-90.   Plaintiff challenges numerous statements by Laphen regarding his "hopes" and "expectations" regarding the program, (*see* Compl. ¶¶ 112, 113, 165 and 182), his views regarding the Company's "confidence" in and "progress" on the program (*see id.* ¶¶ 111, 120, 121, 135, 137, 148, 168, 184 and 186), and the feedback received from the NHS (*see id.* ¶¶ 127 and 137).   Such loosely optimistic statements are not actionable because they are so lacking in specificity that no reasonable investor would rely on them.   *See, e.g.*, *Raab*, 4 F.3d at 90 ("Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesman."); *In re Constellation Energy Group, Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 630 (D. Md. 2010) (soft "expressions of optimism," including statements that company is "well positioned" for growth and believes it has access to "sufficient liquidity to meet our reserves," are not actionable) (citations omitted); *In re Cable & Wireless, PLC, Sec. Litig.*, 321 F. Supp. 2d 749, 766-67 (E.D. Va. 2004) (rejecting "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information

28

available"); *cf. Borrow v. nVIEW Corp.*, 829 F. Supp. 828, 838 (E.D. Va. 1993) (company has no

duty to disclose "pejorative characterizations" of its business under the securities laws).

Indeed, under *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), in order to

plead that an expressed opinion constitutes a false factual statement, "the complaint must allege

that the opinion expressed was different from the opinion actually held by the speaker." *Nolte*,

390 F.3d at 315 (citing *Virginia Bankshares*, 501 U.S. at 1093).  In other words, the plaintiff in

such a case must allege facts supporting a strong inference that the statement was disbelieved by

its maker.  *Virginia Bankshares*, 501 U.S. at 1093.  Plaintiff alleges no facts suggesting that

Laphen did not believe his statements.

> **(c)    The Information Allegedly Omitted From The Challenged NHS Statements Was Publicly Disclosed.**

Finally, the statements are not false or misleading because information regarding the

status of the NHS program, including the delays which underlie the Complaint, were well-known

to the public.  As discussed above, these issues were discussed in official UK reports, in analyst

reports and by CSC itself.  In the context of these negative disclosures, any positive statements

by Defendants are not actionably false.  *See, e.g., Noble Asset Mgmt. v. Allos Therapeutics, Inc.*,

No. CIVA-04CV-1030-RPM, 2005 WL 4161977, at *12 (D. Colo. Oct. 20, 2005) (positive

statements were immaterial in context of negative disclosures and total mix of information

available to investors); *see also Rosner v. Star Gas Partners, L.P.*, No. 07-1687-cv, 2009 WL

2581565, at *1 (2d Cir. Aug. 20, 2009) (positive statements about progress on business

improvement plan could not have misled investors where defendant company disclosed, months

before end of proposed class period, that it suffered from high customer attrition related to

business improvement plan).  Moreover, these public disclosures "excuse" any purported

omissions regarding the status of the NHS program.  *See Raab*, 4 F.3d at 289 (defendants' failure

to disclose slowdown in defense contracting was immaterial under the fraud-on-the-market doctrine when this information had been disclosed in a separate, publicly available document); *Iron Workers*, 432 F. Supp. 2d at 580-81 (finding that publicly available information in analyst reports cured any omissions).

## II.   COUNT III OF THE COMPLAINT DOES NOT STATE A CLAIM UNDER SECTION 20(a).

Because the Complaint does not assert an underlying violation of the Exchange Act, Plaintiff's Section 20(a) claims against the Individual Defendants must be dismissed as well.  *See Ottmann*, 353 F.3d at 342 n.2.  In addition, Plaintiff "does not plead any facts from which it reasonably can be inferred " that Mancuso "was a control person" from August 2008 through December 2008 when he had no affiliation with CSC.  *MicroStrategy*, 115 F. Supp. 2d at 661.

## CONCLUSION

For all the foregoing reasons, the Motion to Dismiss should be granted.  Because amendment would be futile, the Complaint should be dismissed without leave to amend. *Acterna*, 378 F. Supp. 2d at 591.

<table>
<tr><td>       October 18, 2011       <br>Date</td><td>Respectfully submitted,</td></tr>
</table>

|  |  |
|---|---|
|  | /s/_____ |
| Jay B. Kasner (admitted *pro hac vice*) | David E. Carney (Va. Bar No. 43914) |
| Scott D. Musoff (admitted *pro hac vice*) | Jennifer L. Spaziano (admitted *pro hac vice*) |
| Skadden, Arps, Slate, Meagher & Flom LLP | Skadden, Arps, Slate, Meagher & Flom LLP |
| Four Times Square | 1440 New York Avenue, NW |
| New York, NY 10036 | Washington, DC 20005 |
| Telephone:  (212) 735-3000 | Telephone:  (202) 371-7000 |
| Facsimile:  (212) 735-2000 | Facsimile:  (202) 393-5760 |
| Jay.Kasner@skadden.com | David.Carney@skadden.com |
| Scott.Musoff@skadden.com | Jen.Spaziano@skadden.com |

*Counsel for Computer Sciences Corporation,*
*Michael W. Laphen, Michael J. Mancuso and Donald G. DeBuck*

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 18, 2011, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing (NEF) to the following:

Benjamin G. Chew
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
bchew@pattonboggs.com

*Local Counsel for Lead Plaintiff Ontario Teachers' Pension Plan Board*

Craig Crandall Reilly
LAW OFFICE OF CRAIG C. RANDALL
111 Oronoco St.
Alexandria, VA 22314
craig.reilly@ccreillylaw.com

*Counsel for Plaintiffs City of Roseville Employee's Retirement System* (Case No. 1:11-cv-00610), *Arthur I Murphy* (Case No. 1:11-cv-00636) and *Norton Goldman* (Case No. 1:11-cv-00777)

Thomas A. Dubbs
Jonathan M. Plasse
Joseph A. Fonti
Dominic J. Auld
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
tdubbs@labaton.com
jplasse@labaton.com
jfonti@labaton.com
dauld@labaton.com

*Counsel for Lead Plaintiff Ontario Teachers' Pension Plan Board*

Elizabeth Kathleen Tripodi
LEVI & KORSINSKY LLP
1101 30th Street, NW
Suite 115
Washington, DC, 20007
etripodi@zlk.com

*Counsel for Plaintiff Hilary Kramer* (Case No. 1:11-cv-00751)

Dated:  October 18, 2011

/s/
David E. Carney (Va. Bar No. 43914)
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone:  (202) 371-7000
Facsimile:  (202) 393-5760
David.Carney@skadden.com

*Counsel for Computer Sciences Corporation, Michael W. Laphen, Michael J. Mancuso, and Donald G. DeBuck*