UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

IN RE COMPUTER SCIENCES
CORPORATION SECURITIES LITIGATION

Civ. A. No. 1:11-cv-610-TSE-IDD

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

**PATTON BOGGS LLP**

Benjamin G. Chew (VSB#29113)
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6015
Facsimile: (202) 457-6315

*Local Counsel for Lead Plaintiff
Ontario Teachers' and
Local Counsel for the Proposed Class*

**LABATON SUCHAROW LLP**

Thomas A. Dubbs (admitted *pro hac vice*)
Jonathan M. Plasse (admitted *pro hac vice*)
Joseph A. Fonti (admitted *pro hac vice*)
Dominic J. Auld (admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 883-7044

*Counsel for Lead Plaintiff Ontario Teachers'
and Lead Counsel for the Proposed Class*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...........................................................................................................................1

SUMMARY OF ALLEGATIONS ..................................................................................................3

ARGUMENT .................................................................................................................................10

I.     The Complaint States A Claim Under Section 10(b) Against All
Defendants .........................................................................................................................10

       A.     The Complaint Pleads A Strong Inference Of Scienter .........................................10

           1.     Confidential Sources Support A Strong Inference Of Scienter ...................11

           2.     Defendants Knew Facts And Had Access To Information That
Contradicted Their Public Statements ..........................................................12

           3.     Scienter Is Adequately Pled As To CSC........................................................16

           4.     Additional Facts That Support A Strong Inference Of Scienter ...................18

       B.     Defendants Do Not Dispute That The Revelation Of The Fraud
Caused Investors' Losses ......................................................................................20

       C.     Defendants' False Statements And Omissions Were Material .............................20

       D.     Defendants' Truth-On-The-Market Defense Fails.................................................23

       E.     Defendants' Statements Were False And Misleading ...........................................24

           1.     Defendants' False Statements Are Not Subject To The Safe
Harbor ...........................................................................................................26

           2.     Plaintiff Pleads With Particularity The "Maker" Of Each
Statement.......................................................................................................28

II.    The Complaint Adequately Alleges Liability Under Section 20(a)...................................29

CONCLUSION..............................................................................................................................30

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*Adams v. Kinder-Morgan, Inc.*,
    340 F.3d 1083 (10th Cir. 2003) ...............................................................12

*In re Alpharma Sec. Litig.*,
    372 F.3d 137 (3d Cir. 2004)......................................................................16

*In re Apple Computer Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) .............................................................23, 24

*Asher v. Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004) ...............................................................23, 24

*In re AT&T Corp. Sec. Litig.*,
    2002 WL 31190863 (D.N.J. Jan. 30, 2002).........................................23, 27

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005).......................................................17

*Commc'ns Workers of Am. Plan for Emps. Pensions & Death Benefits v.*
    *CSK Auto Corp.*,
    525 F. Supp. 2d 1116 (D. Ariz. 2007) ......................................................11

*In re Coinstar Inc. Sec. Litig.*,
    2011 WL 4712206 (W.D. Wash. Oct. 6, 2011) ........................................29

*In re Constar Int'l Inc. Sec. Litig.*,
    585 F.3d 774 (3d Cir. 2009)......................................................................20

*Coronel v. Quanta Cap. Holdings Ltd.*,
    2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) .............................................25

*In re Conventry Healthcare, Inc. Sec. Litig.*,
    2011 WL 3880431 (D. Md. Aug. 30, 2011) ..............................................12

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)..................................................................................20

*Florida State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) ....................................................................12

*Ganino v. Citizens Utils. Co.*,
　　228 F.3d 154 (2d Cir. 2000)..................................................................22

*Greebel v. FTP Software, Inc.*,
　　194 F.3d 185 (1st Cir. 1999) ................................................................12

*Greenhouse v. MCG Capital Corp.*,
　　392 F.3d 650 (4th Cir. 2004) ...............................................................21

*Higginbotham v. Baxter Int'l Inc.*,
　　495 F.3d 753 (7th Cir. 2007) ...............................................................11

*Hillson Partners Ltd. P'ship v. Adage, Inc.*,
　　42 F.3d 204 (4th Cir. 1994) ...........................................................26, 27

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*,
　　537 F.3d 527 (5th Cir. 2008) ...............................................................26

*In re Inspire Pharms. Inc.*,
　　515 F. Supp. 2d 631 (M.D.N.C. 2007) .................................................25

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
　　432 F. Supp. 2d 571 (E.D. Va. 2006) ..............................................24, 25

*Janus Capital Grp, Inc. v. First Derivative Traders*,
　　131 S. Ct. 2296 (2011).........................................................................28

*Katyle v. Penn Nat'l Gaming, Inc.*,
　　637 F.3d 462 (4th Cir. 2011) .....................................................2, 20, 24

*Latham v. Matthews*,
　　662 F. Supp. 2d 441 (D.S.C. 2009).....................................................28

*Litwin v. Blackstone Grp., L.P.*,
　　634 F.3d 706 (2d Cir. 2011)................................................................22

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
　　513 F.3d 702 (7th Cir. 2008) .......................................................*passim*

*In re Marsh & McClennan Cos., Inc. Sec. Litig.*,
　　501 F. Supp. 2d 452 (S.D.N.Y. 2006)..................................................17

*Matrixx Initiatives v. Siracusano*,
　　131 S. Ct. 1309 (2011)........................................................................21

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) .................................................................. *passim*

*Noble Asset Mgmt. v. Allos Therapeutics, Inc.*,
2005 WL 4161977 (D. Colo. Oct. 20, 2005) ...............................................24

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).......................................................................12, 27

*In re Oxford Health Plans, Inc.*,
187 F.R.D. 133 (S.D.N.Y. 1999) ........................................................................27

*In re PEC Solutions Sec. Litig.*,
2004 WL 1854202 (E.D. Va. May 25, 2004) ...............................................28

*In re Pub. Emps. Ret. Ass'n of Colo. v. Deloitte & Touche LLP*,
551 F.3d 305 (4th Cir. 2009) ........................................................................11

*Raab v. Gen. Physics Corp.*,
4 F.3d 286 (4th Cir. 1993) .............................................................................23

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
351 F. Supp. 2d 334 (D. Md. 2004).............................................................22, 25

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)...............................................................................15

*In re Scottish Re Grp. Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007).............................................................25

*In re Sears, Roebuck & Co. Sec. Litig.*,
291 F. Supp. 2d 722 (N.D. Ill. 2003) .........................................................18

*S. Ferry LP No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ......................................................................18

*Stratte-McClure v. Morgan Stanley*,
784 F. Supp. 2d 373 (S.D.N.Y. 2011)...........................................................18

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)........................................................................................21

*Teachers' Ret. Sys. of La. v. Hunter*,
477 F.3d 162 (4th Cir. 2007) ................................................................12, 16, 20

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) ...................................................................................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................... 10, 11, 14

*In re Van der Moolen Holdings N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (E.D. Pa. Apr. 7, 2003) ............................................................ 15

*In re Viropharma Inc., Sec. Litig.*
    2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) ............................................................... 15

Lead Plaintiff Ontario Teachers' Pension Plan Board respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss the consolidated class action complaint ("D. Br.").[1]

## **INTRODUCTION**

This case arises out of two fraudulent schemes: (i) the fraudulent concealment of the fact that CSC could <u>not</u> perform—as opposed to delayed performance—under its $5.4 billion contract with the NHS; and (ii) Defendants' fraudulent statements concerning CSC's financial results and internal controls throughout the Class Period.

As to NHS, Defendants argue that "the facts alleged suggest only that there were delays and setbacks in connection with the implementation of the NHS Program. But, . . . these facts were publicly disclosed before, during and after the proposed class period." D. Br. 22, 29. Defendants' attacks are not premised on the true allegations. This case has nothing to do with unforeseen delays and setbacks. CSC and the Individual Defendants have "long known that [CSC] ***could never*** <u>operationally and technologically perform</u> the NHS Contract's terms due to fatal flaws with the software's conception, development, and implementation." ¶40 (emphasis added). With precise detail, the Complaint alleges that no later than May 2008, CSC concluded that the contract could not be performed, a fact confirmed by internal CSC documents and reports throughout the Class Period. Defendants do not dispute this conclusion, which was corroborated when parts of the NHS Contract were terminated due CSC's inability to perform.

---

[1] All terms not defined herein shall have the meaning ascribed to them in the Corrected Consolidated Class Action Complaint, Dkt. No. 63 (the "Complaint"). Citations to "¶__" are to the paragraphs of the Complaint. The Declaration of Joseph A. Fonti in Support of Lead Plaintiff's Opposition to Defendants' Motion to Dismiss is referred to as "Fonti Decl.".

Defendants also contend that the Complaint fails to allege their fraudulent scienter with respect to improper accounting and ineffective internal controls.  To this end, Defendants make factual contentions that CSC was diligent in uncovering the fraud and that the Individual Defendants were simply unaware of any improprieties.  Defendants cannot side-step their admission that CSC's financial statements were false due to "intentional misconduct" by authorized agents of the Company.  CSC, at a minimum, is liable for these admitted intentional false statements.  In addition, the Individual Defendants cannot dispute that they had access to information that contradicted their public misstatements that the Company's internal controls over financial reporting were effective.

Tellingly, Defendants do not dispute the element of loss causation—"*i.e.*, that the defendant's material representation or omission 'caused the loss for which the plaintiff seeks to recover damages.'"  *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 465 (4th Cir. 2011), *cert. denied*, 2011 WL 4530363 (U.S. Oct. 3, 2011) (citation omitted).  In other words, Defendants do not contest that CSC's share price fell 50% as the truth about their fraudulent misstatements was revealed.  ¶7.

Rather than grapple with the Complaint's allegations, Defendants raise other peripheral arguments divorced from the well-pled facts.  In view of investors' undisputed reaction to the truth, the significance of the NHS Contract, and the revelation of accounting and financial improprieties, Defendants' attempts to dispute materiality strain credulity.  Defendants' argument that their statements were not false also fails.  Defendants do not, nor can they, identify a single statement that disclosed CSC's inability to deliver on the NHS Contract or that the Company's financials were misstated and internal controls were ineffective.

## SUMMARY OF ALLEGATIONS

**Investors Learn The Truth**: Investors first began to learn the truth of Defendants'
unlawful conduct on February 9, 2011.  During the February 9 Earnings Call, Defendants
revealed that they had failed to perform under the NHS Contract, and that the NHS was
threatening to hold CSC in breach.  ¶¶257, 297.  As Laphen explained, NHS refused to pay
$175 million and threatened possible ***termination of all or parts*** of the contract," ¶¶248, 259,
299, which, as Mancuso revealed, "impacted revenues and EPS."  ¶257.  Only months earlier,
however, in May 2010, Mancuso had told analysts that CSC was "not NHS dependent in meeting
our numbers."  ¶213.  Later, on November 10, 2010, Defendants reassured investors that CSC
was "days" from signing a memorandum of understanding revising the contract, but the financial
impact of the revisions would be "minimal."  ¶¶258, 260.

Defendants also revealed on February 9, 2011 that suspected "intentional misconduct"—
*i.e.*, fraud—was the cause of accounting charges primarily in the Nordic Region.  ¶¶248, 253,
297.  Three months earlier, Defendant Mancuso had told investors that $40 million in Nordic-
related charges were a "bump in the road" that had been found, fixed, and put behind CSC.
¶¶231, 297.  On February 9, investors learned that the accounting charges had doubled, the
problems were "pervasive in the sense that they added up to a large number," and the "cleanup is
ongoing."  ¶¶251-52.  Mancuso further revealed that the charges were due to a "potpourri of
issues, like capitalizing expense items and deferring the recognition in the P&L," violations of
fundamental GAAP requirements.  ¶252.  According to CSC's February 9 Press Release, the
Nordic-related intentional accounting misconduct was the "primary[]" reason why CSC missed
its earnings guidance.  ¶250.  Defendants also revealed a "material weakness" in CSC's internal
controls over its public disclosures.  ¶254.  Analysts probed Defendants regarding the SEC's
formal enforcement investigation, but Defendants refused to comment.  ¶250.

The market reacted harshly to these disclosures, sending CSC's stock down $8.11 per share, or 14.34%, on volume over nine times the average daily volume during the Class Period. ¶¶263, 300-302. Analysts reported that "the risks inherent in CSC's significant exposure to the NHS Contract (hence, the recent milestone miss) remain our primary concern." ¶262. Similarly, with respect to the accounting fraud, analysts concluded that these disclosures "raise credibility concerns," ¶255, as the accounting issues "impacted earnings and surprised investors." ¶¶256, 300. The analysts also feared that the "Nordics issue (or the associated SEC inquiry) [will] continue to drag operating performance." ¶255.

On May 2, 2011, Defendants were forced to adjust earnings guidance as a result of the Pennine Trust's termination of its portion of the NHS Contract due to Defendants' breach. CSC's press release revealed that the "revised contract scope" due to the Pennine termination resulted in a reduction of Free Cash Flow expressed as a percent of Net Income by over 11%. ¶¶265-66. The breach and resulting termination also caused CSC to miss the already-reduced FY2011 revenue expectations by $100 million, and to miss earnings expectations by $0.45 per share, or nearly 9%. ¶¶264-66, 303.

In reaction to the May 2, 2011 Press Release, the Company's share price dropped $6.52, or 12.9%. ¶¶268, 306. As one analyst put it, CSC was "finally writing down" the NHS Contract following Pennine's "withdrawal from the Lorenzo system implementation by CSC, a big blow to CSC's plans." ¶¶266, 305.

On May 25, 2011, investors were again surprised by further revelations related to CSC's breach of the NHS Contract as well as the Company's accounting improprieties. ¶¶269-83, 307-11. With respect to the NHS Contract, Mancuso revealed during the May 25 Earnings Call that $0.34 of the $0.45 EPS reduction for FY2011 was the result of Defendants' breach. ¶¶278, 309.

4

Precisely, the Company was required to reduce the inception-to-date margin on previously recognized revenue.  ¶¶278, 282, 309, 310 (analyst's reaction).

Also on <u>May 25, 2011</u>, Defendants revealed that on May 2, six months after Mancuso said the Nordic-related accounting issues were "behind" CSC, the Board's Audit Committee had launched an "independent investigation," retaining independent counsel and forensic accountants.  ¶¶270, 307.  Further, Defendants revealed that the SEC Division of Enforcement was pursuing matters beyond the Nordic-related intentional misconduct.  ¶¶270-72, 307.  Those investigations would result in the delayed filing of the Company's Form 10K.  ¶¶279, 307.  Defendants were forced to report that CSC would miss its already-reduced quarterly guidance of $1.16 by at least $0.07, or 6%, ¶¶274, 308, and lower operating income, which Laphen explained was "primarily the result of the Nordics correction."  ¶¶276, 308.

In response to the Company's May 25, 2011 disclosures, CSC's stock price plummeted $5.71 per share, or <u>12.95</u>%, to close at $38.38 per share, and trading volume was over 10 times the average daily volume during the Class Period.  ¶¶283, 311.

Analysts expressed "renewed concern around the Nordic accounting issues," especially in view of the SEC's investigation.  ¶¶280, 310.  As analysts put it:  "CSC expected the issue to be a one-time item, . . . the issue persisted . . . the SEC initiated an investigation into the issue . . . and CSC's audit committee started an independent investigation," ¶¶279, 310; the SEC probe was focused on "possibly wider accounting issues beyond the Nordic Region."  ¶¶280, 310.

At the close of the Class Period, on <u>August 10, 2011</u>, Defendants disclosed that they were "advise[d] by outside counsel" to suspend CSC's $1 billion open-market share repurchase plan because of the SEC's ongoing investigation.  ¶¶286, 312.  Defendants stated that, far from their

assurances in November 2010 that operating margins remained "intact," they declined up to 24%.  ¶¶287, 313.  Defendants also disclosed little progress on the NHS Contract.  ¶¶288, 312.

In response to the Company's August 10, 2011 disclosures, the Company's stock price dropped 11.67%, decreasing $3.73 per share, from a close of $31.97, on over eight times the average daily volume during the Class Period.  ¶¶291, 315.  In total, as a result of Defendants' fraudulent conduct, CSC's stock price plummeted 50% between February 8, 2011 (the day before the first partially corrective disclosure) and August 10, 2011.  ¶7.

**NHS Contract**: Though investors did not learn the fact until February 9, 2011, Defendants knew by the start of the Class Period that CSC was incapable of delivering the NHS Contract.  *See, e.g.*, ¶¶33, 48-55, 248.  Indeed, certain Members of Parliament confronted CSC regarding its knowledge by 2006, if not from the outset of the contract in 2003, that the NHS Contract was not achievable.  *See, e.g.*, ¶¶44-45, 47.  As a Member of Parliament on the Committee of Public Accounts (the "PAC") put it:

> [i]t is true though, isn't it, that CSC knew in ***February 2006*** that Lorenzo was a complete dog?  Scott Logan wrote a report—it was an Accenture and CSC joint review of Lorenzo—which said, "There is no well defined scope and therefore no believable plan for releases."  You have known that Lorenzo was hopeless for ***over five years***, have you not?  ¶47.

In response, CSC's spokeswoman conceded that the NHS Contract "is not working," and did not reject or attempt to refute the Member's position or the conclusion of the 2006 Accenture/CSC joint review.  ¶47; *see* Fonti Decl. Ex. A, EV 5 (excerpts of Parliamentary proceeding).  On August 3, 2011, the UK Government and Parliament issued a report concluding CSC "has yet to deliver the bulk of the systems it is contracted to supply," but has implemented a large number of "stopgap" "interim systems," which are not compliant with the contract.  ¶42.

6

As our investigation revealed, the CSC Board of Directors commissioned the DA Red Team to review the NHS Contract.  ¶49.  The team concluded by <u>May 2008</u> that "from a technology and operating perspective" CSC "could not deliver the solution set that [CSC] had contracted with NHS."  ¶51.  Specifically, in the Spring 2008, the Board commissioned a review of the NHS Contract.  The DA Red Team, headed by Brian Fillebrown, assessed the financial, technical, and operational performance of the contract.  ¶¶49-50.  After several weeks of fact finding, DA Red Team members arrived at a "very consistent message": CSC <u>could not meet</u> the terms of the contract.  ¶51.  The team "knew that the contract was a loser and CSC should have recognized a loss in 2008," ¶52, as required by GAAP.  ¶¶53-54.  Fillebrown assembled a report detailing these findings for presentation to the Board, which included Laphen, and also would have sent a copy to DeBuck in the usual course.  ¶¶55, 84, 98.  This report and the conclusions of the DA Red Team were never publicly disclosed.  *See* ¶¶54, 248.

In a letter dated <u>September 2, 2008</u>, the Director of Internal Audit wrote to the Audit Committee to personally report the problems the DA Red Team found with the NHS Contract. ¶93.  Identifying the NHS Contract as the "most visible and highest risk contract in CSC's portfolio," the Director of Internal Audit stated that the contract had never been financially audited.  ¶94.  He also stated that the "Delivery Assurance Red Team found numerous issues in the current contract" and that the "risk profile was 50% higher than the numbers estimated by internal audit."  *Id.*  Nevertheless, this letter went unanswered until July 2011.  ¶96.

In <u>September 2008</u>, another Delivery Assurance Team—the Testing Review Team— further concluded that the Lorenzo software, the backbone of the NHS project, could not be operationally and technologically delivered in accordance with the NHS Contract.  ¶58.  The testing results were "abysmal," with an unacceptable level of high severity defects that caused

the system to fail.  ¶¶58-60.  These defects were "high and grossly beyond" what the NHS would

accept.  ¶¶60, 62.  The Deputy Head of Testing provided this detailed analysis to the Testing

Review Team.  ¶58.  He also sent the analysis to his boss, Richard Bradley, then-Head of

Testing, and believes that Bradley sent the analysis to Laphen.  In response, Bradley told the

Deputy Head of Testing to "shut up."  *Id.*

Testing results and internal CSC documents continued to show that the terms of the NHS

Contract could not be met.  ¶63.  By <u>April 2011</u>, CSC still had not resolved Lorenzo's technical

and testing problems.  ¶64.  By the end of the Class Period, CSC had implemented the

preliminary ("beta") version of Lorenzo (version 1.9) in only one of 166 NHS trusts.  ¶39.  The

fully-functional software has never been successfully implemented.  *Id.*  As the Deputy Head of

Testing wrote to Laphen in <u>April 2011</u>: the "project is on a death-march where almost as many

defects are being introduced as are being fixed.  Look at the defect reports."  ¶66.

Due to CSC's inability to deliver, the Pennine Trust withdrew from the contract and the

NHS threatened complete termination, resulting in at least $175 million in immediate lost

revenue and a write down of the contract's entire value by $2 billion, or 37%.  ¶¶35, 248.

**Intentional Accounting Misstatements And Ineffective Internal Controls**: Also on

February 9, 2011, investors learned for the first time that CSC's financial statements for FY2010

were false and misleading due to suspected "intentional misconduct."  ¶248.  The SEC elevated

its inquiry to formal status and the Company launched a forensic probe.  ¶250.

CSC's operating income was overstated by $91 million, 95% of which arose from the

Nordic Region.  ¶68.  Of the amount of intentional overstatement, $66 million, or 73%, was due

to "inappropriately capitalized" operating costs.  ¶76.  These capitalization methods, however,

were known and approved by senior management in EMEA during the Class Period, if not before, and had not changed since at least 2007.  ¶¶77-79, 85.

Investors soon learned that CSC's FY2010 earnings per share, a key metric for investors, was intentionally overstated by nearly 9%.  ¶69.  Operating margins, another key metric, were similarly inflated each quarter of FY2010.  *Id.*  Defendants also revealed that CSC maintained improper account reconciliations—the process to determine that an account's balance is accurate and supported by the transaction history.  ¶80.  As the AICPA Audit and Accounting Guide states, account reconciliations are a "fundamental control."  ¶81.

In May 2008, EMEA accountants visited the Nordic Region and concluded that the account reconciliations were so deficient that CSC lacked sufficient support to properly and accurately assess the Nordic Region's financial condition.  ¶¶83, 98.  Furthermore, the Nordic Region lacked proper procedures and controls for conducting balance sheet reconciliations, making it difficult, if not impossible, to determine the accuracy of many account balances.  ¶83.  In the usual course, DeBuck and Delanty would have received the 2008 EMEA-Nordic Report, which included the accountants' conclusions.  ¶¶55, 83-84; 97-99.

The improper accounting in the Nordic Region was apparent from at least the outset of the Class Period.  *See, e.g.*, ¶¶73-75, 85.  Before May 2008, the Nordic Region had been identified by the Internal Audit Department as a "risk area."  ¶73.  The former Director of Internal Audit, who was responsible for developing the annual audit plan (2005 through August 2008), was told each year by Paul Fowler, the Head of Internal Audit for EMEA, that the Nordic Region was not to be audited.  ¶74.  It was apparent that Bryan Brady, the EMEA CFO and Fowler's superior, did not want the Nordic Region financially audited.  *Id.*  The Director of Internal Audit advised Scott Delanty of his concerns.  ¶75.  Delanty could have overruled Brady,

but elected not to.  *Id.*  As corroborated by the Interim Nordic Finance Director, who was

dispatched to the Nordic Region in April 2010, although prior reports had identified improper

accounting in the Nordic Region, the financial accounting never improved.  ¶85.

Defendants, as well as CSC's Audit Committee, knew of the ineffective internal controls,

various conflicting interests, and unreliability of CSC's financial reporting by no later than

September 2008.  ¶¶92-96.  In his letter to the Audit Committee Chair, Laphen, and DeBuck, the

former Director of Internal Audit wrote: "the internal audit practice poses a significant risk both

to CSC and its shareholders. . . .  Issues raised and questions around loss of independence have

gone unaddressed."  ¶93.  The letter expressly concluded that Delanty, the Chief Audit

Executive, who acquiesced repeatedly to management's demands, had "seriously compromised

the integrity of the [internal audit] practice *as well as the financials of this firm*."  ¶¶93, 95.

## ARGUMENT

### I.      The Complaint States A Claim Under Section 10(b) Against All Defendants

Consistent with the law of this Circuit, Ontario Teachers' well-pled allegations satisfy the

pleading standards under Section 10(b) of the Exchange Act and the PSLRA.[2]

#### A.      The Complaint Pleads A Strong Inference Of Scienter

"Accept[ing] all factual allegations in the complaint as true," *Tellabs, Inc. v. Makor*

*Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), the Court is to determine on this motion whether

"*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether

any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 323 (emphasis in

original).  This "holistic analysis" is based on "logic, common sense, and human experience,"

---

[2] Defendants' primary contentions suggesting that the alleged false statements were both immaterial and already widely known (*i.e.*, the truth was on the market) are unsupportable, as fully addressed *infra* Sections I.C., I.D.  Defendants have not disputed loss causation, the implications of which are set forth *infra* Section I.B.

and "otherwise-unremarkable facts may take on added significance when combined with each other" creating a "synergistic effect on probative value."  *MicroStrategy*, 115 F. Supp. 2d at 631.

A "strong inference" of scienter is one that "a reasonable person would deem . . . cogent," *Tellabs*, 551 U.S. at 324, and "*at least as likely* as any plausible opposing inference." *Id*. at 328 (emphasis in original).  It need not be a "smoking gun."  *Id.* at 323-24.  As such, *Tellabs* makes clear that a "tie goes to the Plaintiff" in terms of competing inferences as to scienter.  *Commc'ns Workers of Am. Plan for Employees' Pensions & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007).

Scienter may be alleged by pleading either intentional misconduct or recklessness.  *Pub. Emps. Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009).  Here, the Complaint adequately alleges scienter based on both actual knowledge of facts contrary to Defendants' public statements and Defendants' reckless disregard of the truth.[3]

### 1. Confidential Sources Support A Strong Inference Of Scienter

In contesting Plaintiff's scienter allegations, Defendants argue that allegations derived from confidential sources are inherently unreliable, citing *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753 (7th Cir. 2007), a decision that is no longer good law within its own circuit, let alone in the Fourth Circuit.  D. Br. 5, 16.  Defendants ignore that *Higginbotham* was limited to its facts when the Seventh Circuit decided *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 711-12 (7th Cir. 2008) ("*Tellabs II*"), on remand from the Supreme Court.  The Seventh Circuit joined the Second, Third, Fifth, and Ninth Circuits holding that "absence of proper names does not invalidate the drawing of a strong inference from informants' assertions."  *Id.* at 712.

---

[3] Defendants' argument regarding the absence of motive and opportunity allegations, D. Br. 14, is without moment.  *See Tellabs*, 551 U.S. at 325 ("Absence of a motive allegation is not fatal . . . allegations must be considered collectively"); *MicroStrategy*, 115 F. Supp. 2d at 631.

Joining this consensus by adopting the standard of *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000), the Fourth Circuit has held that confidential sources <u>can</u> support a strong inference of scienter, so long as the complaint "describe[s] the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *See Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007) (citation and quotation marks omitted).  Defendants do not refer to this standard, and do not argue the confidential source allegations in the Complaint fail to satisfy it.  Nor could they, as, far from "disgruntled," the sources were prominent and held highly relevant positions at CSC, and provided detailed information and personal knowledge of the facts alleged.

Instead, contrary to *Tellabs* and *Hunter*, Defendants take each confidential source's allegation in isolation and challenge whether it is alone sufficient to establish scienter.  *See, e.g.*, D. Br. 21.  Consistent with *Hunter*, courts should examine confidential source allegations "in conjunction" with all other allegations to determine whether they collectively raise a strong inference of scienter.  *See In re Conventry Healthcare, Inc. Sec. Litig.*, 2011 WL 3880431, at *3-4 (D. Md. Aug. 30, 2011) (citing *Hunter*, 477 F.3d at 174).

### 2. Defendants Knew Facts And Had Access To Information That Contradicted Their Public Statements

"[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).[4]

---

[4] *Accord Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1088-89, 1105 (10th Cir. 2003); *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 662 (8th Cir. 2001); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 370 n.21 (D. N.D. 2004) (recognizing the same state law principle as *Novak*).

The Complaint alleges that Defendants contemporaneously had specific knowledge and access to information that contradicted their public statements concerning the status and ability to perform the NHS Contract:

- <u>May 2008 – DA Red Team Report</u>: In May 2008, the Board commissioned the DA Red Team review, which concluded that "from a technology and operating perspective . . . [CSC] could not deliver the solution set that [CSC] had contracted with NHS."  ¶51.  Fillebrown prepared the team's report, which was sent to the Board, including Laphen, and in the usual course would have gone to DeBuck.  ¶¶55, 84, 98.

- <u>September 2008 – Testing Is "Abysmal"</u>: In September 2008, the Deputy Head of Testing reported to the Testing Review Team that the quality of testing and results for all Lorenzo releases were "abysmal," and that the Lorenzo releases could not be delivered on time.  ¶58.  The Deputy Head of Testing sent the analysis to his boss, Bradley, and believes that Bradley sent it to Laphen.  *Id.*

- <u>Laphen Held Weekly Meetings Specifically Addressing The NHS Contract</u>: Laphen held weekly meetings with Browberger and Kelly.  ¶64.  As Laphen told investors, the NHS Contract was "the one that [he] stay[s] on top of most of all and watch most closely."  *Id.*  In particular, based on the abysmal testing result, by August 2009, Laphen knew, or recklessly disregarded, that CSC could not deliver the four Lorenzo "early adopter" installations as promised.  *Id.*

- <u>"Complete Dog" Since 2006</u>: A Member of Parliament questioned during an investigative hearing whether "CSC knew in February 2006 that Lorenzo was a complete dog?"  The PM pointed to an Accenture/CSC joint review of Lorenzo that concluded that there was "no well defined scope and therefore no believable plan for releases."  When faced with the question, CSC's representative did not refute that CSC had "known that Lorenzo was hopeless for over five years."  ¶47.

- <u>2008-2009 – Severe Defects Persist</u>: Throughout 2008 and 2009, the level of defects that caused the system to fail were "grossly beyond" acceptable.  ¶¶60, 62.

- <u>2010 – Testing Results Unchanged</u>: A CSC consultant prepared a report criticizing the quality of the testing carried out at CSC.  ¶65.

- <u>April 2011 – Lorenzo Is On A "Death March"</u>: In April 2011, the Deputy Head of Testing sent Laphen an email candidly telling him that because "[t]he project is on a death-march where almost as many defects are being introduced as are being fixed," Lorenzo could not be delivered consistent with the contract's requirements.  ¶66.

Also during the Class Period, Defendants had knowledge and access to information that contradicted their misstatements that internal controls were effective and that CSC's financial statements were accurate.  These allegations include:

- Internal Audit "Seriously Compromised": The Director of Internal Audit's September 2008 letter to the Audit Committee Chairman, copied to Laphen and DeBuck, reported that Delanty's capitulation to management had caused a "loss of independence" in CSC's Internal Audit Division.  ¶¶93, 95.  This "seriously compromised" the internal audit function and CSC's financial statements—a quintessential control—and "pose[d] a significant risk both to CSC and its shareholders."  ¶93.[5]

- No Financial Audits: The September 2008 letter also spelled out that the NHS Contract, CSC's "most visible and high risk contract," had not been financially audited since at least 2005, if ever.  ¶¶94-95.

- Insufficient Data To Assess Nordic Financial Condition: In May 2008, accountants concluded that the Nordic Region's internal controls were significantly deficient.  The account reconciliations—a "fundamental control" under GAAP—were specifically identified as deficient.  ¶81.  The accountants lacked sufficient data to properly and accurately assess the Nordic Region's financial condition.  ¶¶81-83.  The accountants, in turn, prepared the 2008 EMEA-Nordic Report, which in the usual course would have gone to DeBuck.  ¶¶84, 98.[6]

- Monthly Conference Calls And Semi-Annual Meetings: Laphen held monthly conference calls with all EMEA regional managers, including Ivor Canavan, wherein the regional managers provided "excruciating detail" To Laphen about operations and

---

[5] Defendants' argument that the Complaint does not "even suggest that any Defendant had actual knowledge" that the Nordic Region's financials were false is off the mark.  D. Br. 14-15.  In addition to alleging that CSC is liable for the admitted intentional misconduct in the Nordic Region, *see infra* Section I.A.3, the Complaint alleges Defendants knew or recklessly disregarded the ineffective internal controls in the Nordic Region and further recklessly disregarded that the financial statements were false.  ¶¶92-102.

[6] Defendants submit that the visit of accountants from EMEA to the Nordic Region presents an "inconsistency" in the allegations.  D. Br. 15.  Not so.  EMEA's senior management did not want internal auditors to conduct a "financial audit" in the Nordic Region.  ¶74.  A financial audit is conducted pursuant to Generally Accepted Auditing Standards to determine whether the financial statements comply with GAAP.  *See MicroStrategy*, 115 F. Supp. 2d at 651 n.60.  The accountants (from EMEA) could not conduct a financial audit; the Nordic Region lacked support for its account balances, let alone support for a full financial audit.  ¶83.  Defendants' reliance on *Tellabs* is misplaced.  D. Br. 15.  There the complaint did not state whether the conduct at issue was improper or legitimate.  551 U.S. at 325-26.  No such ambiguity exists here.

financial performance.  ¶100.  Laphen and DeBuck also held semi-annual in-person meetings with EMEA regional managers to review financial results and projections.  ¶¶100-101.  Laphen and DeBuck knew that the Nordic Region had not obtained significant new business: absent accounting fraud, Nordic could not justify the revenue it was reporting.  ¶102.[7]

- Long-Standing Internal Control Deficiencies: As the Interim Nordic Finance Director corroborated, previous accountant reports had identified the problems, which had been ongoing for a long period.  However, the quality of the financial accounting was never improved.  ¶85.[8]

These various, consistent allegations evidence that Defendants had information that contradicted their public statements.  Defendants do not dispute they had access to this information.  Under similar facts, in *In re Van der Moolen Holdings N.V. Sec. Litig.*, ("*VMH*"), the court concluded that mere availability of specifically alleged reports supported the inference that senior management was aware of, or had access to, the information contained in the reports.  405 F. Supp. 2d 388, 408 (S.D.N.Y. 2005).  Similarly, in *In re Viropharma, Inc. Sec. Litig.*, the court concluded that defendants' access to "non-public annual reports" made "clear the Defendants were aware of data that contradicted their statements."  2003 WL 1824914, at *9 (E.D. Pa. Apr. 7, 2003).  The Complaint need not "allege with particularity that the defendant

---

[7] Defendants criticize these allegations because they arise from the UK Sr. VP for GIS, who left CSC in November 2006.  D. Br. 19; ¶¶30, 100.  Yet, "[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001); *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 970 (N.D. Cal. 2005) ("The proposed class period dates function only to define the plaintiff class, not to restrict the universe of relevant or actionable facts in this case.").

[8] Defendants suggest that the allegations supported by the Nordic Finance Director and the Nordic Finance Manager are "inherently suspect" because they were involved in the accounting.  Defendants ignore, however, the consistency of these allegations with CSC's ultimate disclosures, the accounts of other sources, and the corroboration by the very person who was dispatched to the Nordic Region to replace them.  ¶85.  Moreover, that in 2009 the accountants identified some improvements while still identifying deficiencies in the Nordic Region's accounting renders more plausible that the very same deficiencies that were identified in 2008 and in 2010 continued throughout the entire period.  *Cf.* D. Br. 17.

engaged in the physical act of reading a report," *VMH*, 405 F. Supp. 2d at 407, as access to information is sufficient.

### 3.  Scienter Is Adequately Pled As To CSC

The Fourth Circuit, like the Seventh and Second Circuits, has recognized scienter of a corporation separate from that of any individual defendant.  If "the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents." *Hunter*, 477 F.3d at 184; *see also Tellabs II*, 513 F.3d at 710 ("it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud"); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008) ("it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant"). The Complaint has adequately alleged CSC's scienter, and specifically pleads Count I as against the Company alone.  ¶¶320-31.[9]

**CSC's Scienter Regarding NHS**: As detailed above and in the Complaint, CSC's Board commissioned the May 2008 DA Red Team review, which concluded that the NHS Contract was undeliverable from a "technology and operating perspective," and was a "loser" that should have been written down at that time.  ¶¶48-55.  Fillebrown, VP for Contract Performance and Quality

---

[9] Defendants do not dispute the corporate scienter doctrine.  Instead, despite the Fourth Circuit's recognition of the doctrine, Defendants cite to *In re Alpharma Sec. Litig.*, 372 F.3d 137 (3d Cir. 2004) for the different proposition that scienter of a regional manager may not be imputed to the individual defendants.  D. Br. 14 n.9.  The Complaint does not allege imputation of intentional misconduct to the Individual Defendants.  CSC is liable because its authorized agent, or agents, though they are not named as defendants, acted with fraudulent intent separate and apart from the Individual Defendants.  ¶¶71-72, 320-31.  *See* Hazen, 4 Law Sec. Reg. § 12.8 (6th ed.) ("Corporate scienter is necessarily derived from its employees or directors.") (internal quotations and citations omitted); Rstmt. (Third) Of Agency § 7.03 (2006).

Assurance, and the VP who runs the DA Review program Company-wide, ¶50 prepared the

report to the Board.  Similarly, Richard Bradley, then-Head of Testing was told repeatedly that

Lorenzo testing was a failure and could not be delivered under the contract.  ¶¶57-60.  Indeed, as

Members of Parliament stated during investigative hearings: "[i]t is true though, isn't it, that

**CSC knew** in February 2006 that Lorenzo was a complete dog? . . . You have known that

Lorenzo was hopeless for over five years, have you not?"  ¶47.

**CSC's Scienter Regarding Accounting Misconduct And Ineffective Controls**:  CSC

has admitted that its financial statements for FY2010 were misstated due to suspected intentional

misconduct.  ¶¶68-72.  CSC has also stated that the intentional misconduct was committed by,

among others, Ivor Canavan, the COO for the Nordic Region from 2007 until April 2010, who

reported to the Vice President of Finance for EMEA.  ¶71.  Canavan was an authorized agent of

CSC, and by his actions bound CSC.  ¶72.  "Courts have readily attributed the scienter of

management-level employees to corporate defendants."  *In re Marsh & McClennan Cos., Inc.*

*Sec. Litig.*, 501 F. Supp. 2d 452, 482 (S.D.N.Y. 2006); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d

430, 442-43 (S.D.N.Y. 2005) (corporate scienter established by actions of "senior managers" and

regional VP).

The fraudulent knowledge of other authorized agents of CSC also support a strong

inference of scienter.  For instance:

- Scott Delanty, the Chief Auditing Executive, intentionally or recklessly caused CSC's Internal Audit Department to be ineffective and lack independence.  ¶¶92-96. Delanty also knew that the Nordic Region had not been financially audited by the Internal Audit Division for at least three years, but failed to report this inadequacy to the Audit Committee or to take corrective measures.  ¶¶75, 95.

- CSC concedes that $66 million of the $91 million in charges resulted from the improper overcapitalization of contract expenses.  ¶76.  Top management in EMEA knew of and approved this improper capitalization method. ¶¶77-78.

- The EMEA accountants concluded that the Nordic Region lacked sufficient support for the account balances to be able to properly and accurately assess the region's financial condition.  The 2008 EMEA-Nordic Report was provided to senior EMEA management and in the ordinary course was provided to DeBuck.  ¶¶82-85.

## 4.    Additional Facts That Support A Strong Inference Of Scienter

**The Significance Of The NHS Contract To CSC**:  The $5.4 billion NHS Contract was the largest IT project in history, and had significant headline news value to CSC.  ¶¶31, 38.  "Officers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance."  *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (quotations and citation omitted).  A corporate officer has "a duty to familiarize themselves with the core operations of the company."  *Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 389 (S.D.N.Y. 2011) (concluding that CEO and CFO, among other officers of the bank, had a duty be familiar with a multi-billion-dollar derivatives contract).[10]

As alleged in the Complaint and set forth herein, the NHS Contract was central to CSC, and Laphen was keenly focused on it.  ¶55 (Laphen: The NHS Contract is what "I stay on top of most of all and watch most closely.").  Laphen held weekly meetings with the two CSC executives in charge of testing the Lorenzo system in connection with the NHS Contract.  ¶64.

**The Simplicity And Duration Of The Accounting And Internal Control Errors**:  The improper accounting and ineffective internal controls existed by the outset of the Class Period.  The DA Red Team concluded that under the percentage-completion method of accounting, CSC

---

[10] *See also S. Ferry LP No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008) (core operations inference remains part of holistic scienter analysis prescribed by *Tellabs*); *MicroStrategy*, 115 F. Supp. 2d at 639 ("It would strain credulity to conclude that no probative value at all attaches to MicroStrategy's failure to apply to three of the most important contracts in its corporate life" appropriate GAAP.).

was required to take an immediate loss on the NHS Contract in May 2008.  ¶53.  At that same

time, the Nordic Region had been identified as a "risk area," ¶74, and EMEA accountants

concluded that the region lacked sufficient support for the account balances (*i.e.*, account

reconciliations) to assess the Nordic Region's financial condition.  ¶83.  As corroborated by the

Interim Nordic Finance Director, prior accounting reports identified the accounting and control

problems in the Nordic Region, but they were never remedied.  ¶85.  Ultimately, CSC admitted

that over 73% of the fraudulent accounting resulted from improper capitalization of operating

costs,  ¶76, but the capitalization method was approved by top EMEA management.  ¶77.

Contract accounting principles and percentage of completion methodologies applicable to

the NHS Contract "are not complex."  *MicroStrategy*, 115 F. Supp. 2d at 637-38 (they "boil[]

down to the well-worn adage, 'Don't count your chickens before they hatch.'").  Similarly,

improper capitalization of expenses, which should be expensed, is basic GAAP.  The AICPA

Audit and Accounting Guide regards account reconciliations as a "fundamental control."  ¶81.

And among the chief controls at any public company is the Internal Audit Department, which the

Board knew lacked independence by September 2008.  ¶¶93-95.

**Fraud Impacted CSC's Financial Statements**:  CSC's financial statements were false

both because Defendants refused to take the necessary loss on the NHS Contract and because of

the intentional misconduct in the Nordic Region.  Defendants have admitted that, but for the

accounting fraud, CSC would have missed FY 2010 operating income EPS guidance by $0.38, or

approximately 9%. ¶69.[11]  Here the "general motive took more concrete form owing to"

---

[11] Defendants attempt to point out a purported error in the Complaint—*i.e.*, that "CSC
reported EPS of $5.28 in FY2010—$1.03 *higher* than the EPS guidance of $4.25."  D. Br. 17
(emphasis in original).  This attempt ignores that the key metric for investors and analysts is
income from continuing operations (or "adjusted EPS"), ¶231, which is the basis for analysts'

*(continued … )*

Defendants' concealment of the loss on the NHS Contract and their calculation and

dissemination of CSC's earnings guidance, which CSC barely met only because of the fraud.

*See MicroStrategy*, 115 F. Supp. 2d at 648.

### B. Defendants Do Not Dispute That The Revelation Of The Fraud Caused Investors' Losses

Defendants do not contest the element of loss causation—"*i.e.*, that the defendant's

material representation or omission 'caused the loss for which the plaintiff seeks to recover

damages.'"  *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 465 (4th Cir. 2011), *cert. denied*,

2011 WL 4530363 (U.S. Oct. 3, 2011) (citation omitted).  Defendants do not dispute that the

Complaint alleged with "sufficient specificity" that the corrective disclosures, ¶¶87-99,

"reveal[ed] to the market in some sense the fraudulent nature" of Defendants' schemes, and that

the disclosures "*relate back*" to Defendants' misrepresentations and omissions.  *See Katyle*, 637

F.3d at 473 (emphasis in original); *see also Hunter*, 477 F.3d at 186.  In other words, Defendants

do not contest that CSC's "share price fell significantly after the truth became known."  *Dura*

*Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

### C. Defendants' False Statements And Omissions Were Material

By not disputing loss causation, Defendants have undermined any argument that their

misrepresentations and omissions are immaterial as a matter of law.  The "majority rule" is that a

stock price drop in response to a corrective disclosure is "*some* evidence" of materiality.

*See Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 660-61 (4th Cir. 2004) (emphasis in

original); *see also In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 784 (3d Cir. 2009) (holding

---

*( ... continued)*
consensus EPS estimates.  The adjusted EPS excludes non-recurring, non-operational charges,
such as the 401(k) plan contributions and one-time interest payments that Defendants point to.
D. Br. 17.  CSC reported adjusted EPS of $4.26.  ¶201.  Fonti Decl. Ex. B, 16.  Thus, but for the
fraud, CSC would have missed estimates by $0.38.  ¶69.

that "a drop in stock price in an efficient market is one way to show materiality").  As is

undisputed, Defendants disclosed information that revealed to the market the fraudulent nature of

their schemes and related back to their misrepresentations and omissions, causing CSC's stock

price to decline 14.34%, 12.9%, 12.95%, and 11.67%, respectively, on each disclosure date.

¶¶302, 306, 311, 315.  These market reactions are strong evidence of materiality.

     To be material, an omitted or misrepresented fact must "have been viewed by the

reasonable investor as having significantly altered the 'total mix' of information made

available."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). "Materiality is an

objective and fact-specific determination."  *MicroStrategy*, 115 F. Supp. 2d at 657 ; *see also*

*Matrixx Initiatives v. Siracusano*, 131 S. Ct. 1309, 1312 (2011) (rejecting a bright-line rule for

materiality and requiring a fact-specific inquiry of the source, content, and context of the alleged

misstatement).

     Defendants advance two arguments against materiality.  First, Defendants argue that the

NHS misstatements should not be considered material because reasonable investors know that

significant projects "may run into unforeseen problems and delays."  D. Br. 28 (citation omitted).

Second, Defendants assert that the $91 million in unrecorded Nordic charges is a minimal sum

and that it should be netted against other non-fraud-related positive adjustments that CSC

identified from other regions.  D. Br. 3.  These attacks are unavailing.

     The NHS Contract, worth $5.4 billion in revenue and the largest IT project ever, also had

significant headline news value to CSC.  ¶¶31, 38.  As Laphen himself stated, the "performance

and delivery" of the NHS Contract was "the most significant" risk he was managing and the one

he "stay[ed] on top of most of all and watch[ed] most closely."  ¶55.  To dispute that reasonable

investors would care that CSC knew as early as May 2008 that it was incapable of performing

the NHS Contract "strains credulity," given that the contract was "among the most important transactions in [the Company's] history."  *See MicroStrategy*, 115 F. Supp. 2d at 657.

As for the Nordic charges, the Complaint alleges that, but for the accounting fraud, CSC would have missed its earnings guidance by nearly 9% for FY2010.  ¶69.  "[E]arnings reports are among the pieces of data that investors find most relevant to their investment decisions" and for this reason are generally found to be material.  *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 164 (2d Cir. 2000) (citation omitted).  And while Defendants focus solely on CSC's gross revenues of $16 billion, the Company's operating income for FY2010 was less than 9% of revenues.  ¶13.  Further, Defendants' attempt to net the impact of the Nordic-related accounting fraud with unrelated charges does not undermine materiality.  To allow a company "to aggregate negative and positive effects . . . would effectively sanction misstatements" where the net effect was immaterial.  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 719 (2d Cir. 2011), *cert. denied*, 2011 WL 4532981 (U.S. Oct. 3, 2011).[12]  In sum, Defendants cannot establish at the pleading stage that "no reasonable juror" could determine that the alleged misstatements and omissions were immaterial to a reasonable investor.  *See MicroStrategy*, 115 F. Supp. 2d at 657.[13]

---

[12] CSC's accounting misstatements are material for the following additional reasons: (i) materiality is measured by the "reasonable investor" standard, and the improper recognition of earnings "must raise in the mind of a reasonable investor concerns about the management of a company," *MicroStrategy*, 115 F. Supp. 2d at 657; (ii) courts have rejected solely quantitative measures of materiality, *see Litwin*, 634 F.3d at 714; and (iii) the SEC is scrutinizing Defendants' "conclusions regarding the materiality of [the Nordic-related] adjustments." *See* Fonti Decl. Ex. C, 5-6 (Excerpt of CSC's Form 10K filed June 15, 2011).

[13] Defendants also argue that some of the alleged false statements are mere puffery.  D. Br. 28-29.  A puffing statement is *per se* immaterial.  *See In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 399 (D. Md. 2004) (refuting defendants' argument that alleged statements are "immaterial puffery"); *In re AT&T Corp. Sec. Litig.*, CIV. 00-CV5364, 2002 WL 31190863, at *23 (D.N.J. Jan. 30, 2002) (statements that "presented material facts to investors" are not mere puffery).  Thus, this argument is unavailing.

D.    **Defendants' Truth-On-The-Market Defense Fails**

Ignoring the allegations of the Complaint, Defendants contend that "the status of the NHS program" was "well-known to the public." D. Br. 29. This argument raises a "truth-on-the-market" defense, which is "intensely fact-specific" and "rarely an appropriate basis" for dismissal. *See Ganino*, 228 F.3d at 167, 168; *see also Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) (holding that truth-on-the-market is not available at the pleading stage). To the extent the defense is available, Defendants must show that corrective information was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by" the misstatements. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989).

The Fourth Circuit applied the *Apple Computer* standard in *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993), which Defendants cite. D. Br. 29-30. The defendants in *Raab*, however, met their burden because the very information they omitted in their annual report—a slowdown in government contract awards—was contemporaneously disclosed in a press release. 4 F.3d at 289. In addition, the court concluded defendants had not made any misrepresentations.

In contrast, Defendants do not and cannot claim that they disclosed that CSC was unable to perform under the NHS Contract. ¶¶32-33. Defendants actually stated the opposite, falsely reassuring investors that CSC's performance was "on track." ¶¶168, 184.[14] When Defendants finally disclosed that the NHS was threatening to hold CSC in breach of the contract for failure to perform, the stock price fell sharply 14.34%, showing that this information had not previously

---

[14] The analyst reports that Defendants submit further contradict their argument. As one analyst noted, "despite some well-publicized delays and general negativity from the media," "[w]e belive CSC's execution on the contract has mostly been in line with expectations." Dkt. No. 60-29.

reached the market. ¶¶299-302; *see Asher*, 377 F.3d at 734 (rejecting truth-on-the-market argument because of the "sharp drop" in the stock price).[15] Thus, Defendants cannot show beyond factual dispute that the full truth about the NHS Contract entered the market at all, let alone that it was publicly disseminated with "a degree of intensity and credibility" to counter Defendants' false statements.[16] *Apple Computer*, 886 F.2d at 1116.

### E. Defendants' Statements Were False And Misleading

The PSLRA requires that the Complaint specify each statement alleged to have been misleading and the reasons why the statement is misleading. *See MicroStrategy*, 115 F. Supp. 2d at 628 (citing 15 U.S.C. § 78u–4(b)). Here, Defendants concede that CSC's financial statements for FY2010 were false, in part due to intentional misconduct in the Nordic Region. D. Br. 24 n.14. Defendants also do not contest that CSC's financial statements for FY2009 and FY2011 were false.[17] Instead, they submit a number of unavailing arguments addressed below:

- The Reasons The Financial Statements Are False Are Complete And Precise: the Complaint alleges that Defendants' financial statements were false for a variety of reasons, including: (i) the DA Red Team concluded by May 2008 that from a "technology and operational perspective," CSC could not perform the NHS Contract; (ii) as a result, CSC should have recognized a loss on the contract; (iii) the EMEA

---

[15] Defendants' own expert's opinion further undermines any factual contention. In opposition to Class Certification, Defendants submit the Bajaj Declaration, concluding that the strong declines of CSC's share price on the alleged corrective disclosure dates (2/9/11, 5/2/11, 5/25/11, and 8/10/11) were caused by the corrective disclosure with statistical confidence exceeding 95%. Bajaj Decl. Appx. 2 (Dkt. No. 54-2).

[16] Defendants' other cited cases are distinguishable. *See Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 580-81 (E.D. Va. 2006) (defendants' formation of strategic alliances had been disclosed in analyst reports, and defendants did not make any inconsistent representations); *Noble Asset Mgmt. v. Allos Therapeutics, Inc.*, 2005 WL 4161977 (D. Colo. Oct. 20, 2005) (when defendants disclosed positive results of post-hoc subgroup analysis, published guidance stated that FDA considered such results preliminary).

[17] Having conceded loss causation, Defendants do not dispute that corrective disclosures revealed the fraudulent nature of their schemes, and that the disclosures related back to their misrepresentations and omissions. *See Katyle*, 637 F.3d at 473. This concession is inconsistent with Defendants' conclusory arguments that certain allegations of falsity are insufficient.

2008 Report concluded that the Nordic Region lacked sufficient support for the account balances to be able to properly and accurately assess the Nordic Region's financial condition. *See, e.g.*, ¶¶57, 82-84.  These allegations are sufficient.[18]

- <u>Defendants Were Aware Of Weak Internal Controls Since 2008</u>: (i) the <u>May 2008</u> EMEA Report concluded that the Nordic Region lacked sufficient data to properly and accurately assess the region's financial condition, ¶¶97-99; (ii) in <u>September 2008</u>, having previously identified Nordic as a "risk area," ¶74, the Director of Internal Audit wrote to the Board: the Internal Audit Department "pose[d] a significant risk both to CSC and its shareholders," ¶93; and (iii) as corroborated by the Interim Nordic Finance Director, the accounting issues identified in <u>April 2010</u> had been identified in prior accounting reports, but not improved, ¶85.  Despite Defendants' knowledge, these ineffective controls continued until 2011.  ¶¶90-91, 97-102.[19]  Indeed, in November 2010, when Mancuso knew the investigation of the Nordic Region was ongoing, he falsely assured investors the problems were already behind the Company.  ¶235.

- <u>The Amendment Of The NHS Contract Does Not Alter The Fact That CSC Could Not Perform</u>: Defendants do not and cannot point to a single disclosure relating to CSC's inability to perform the NHS Contract.  Improperly raising a competing fact at the pleading stage, Defendants suggest that the April 2009 amendment may have lowered the bar for CSC.  D. Br. 22, 26.  Assuming their fact *arguendo*, it does not raise a competing inference that is **more** compelling than the inference that CSC was at all times incapable of performing under the contract, as confirmed when Pennine Trust terminated CSC for failing to perform under the contract.[20]

---

[18]  In *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571 (E.D.Va. 2006), the case Defendants cite, the complaint alleged a material ***omission***.  The court rejected the alleged omissions, concluding that there was no duty to disclose the particular information and in any event it was publicly available in analyst reports.  *Id.* at 582.  Defendants citation to *In re Inspire Pharm. Inc. Sec. Litig.* is similarly unavailing.  515 F. Supp. 2d 631, 637 (M.D.N.C. 2007), *aff'd sub nom. Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618 (4th Cir. 2008) (no duty to disclose the "end point" goal of drug study).

[19] Defendants' misstatements on internal controls appear in sworn statements mandated by the Sarbanes-Oxley Act, which prescribes civil and criminal liability for false certifications with the SEC.  *See In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 392 (S.D.N.Y. 2007) (holding that allegations based on former finance executive's statement that it was "common knowledge at the company that its internal systems were inadequate" were sufficient to plead falsity); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d at 374 (D. Md. 2004); *Coronel v. Quanta Cap. Holdings Ltd.*, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009), which Defendants cite, is inapposite because there, plaintiffs failed to allege that statements about internal controls were false and the company's financial results were accurate.

[20] Unlike in *Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 541 (5th Cir. 2008), where the later disclosure of negative information regarding a

*(continued … )*

1.     __Defendants' False Statements Are Not Subject To The Safe Harbor__

Defendants are not entitled to safe-harbor protection of the PSLRA, D. Br. 26-28,

because (i) they made representations about the present status of CSC's ability to perform under

the contract without any reasonable basis, (ii) they had actual knowledge that their statements

were false, and (iii) their statements were not accompanied by meaningful cautionary language.

Where a statement makes a "mixed" representation about the present and the future, it "is

not entitled to the safe harbor with respect to the part of the statement that refers to the present."

*Tellabs II*, 513 F.3d at 705 (noting that the statement, "sales . . . were 'still going strong,'"

represented "both that current sales were strong and that they would continue to be so").  To the

extent a statement, such as "[w]e are on track," refers to "*current* facts," defendants must have "a

reasonable basis" for that belief.  *See Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204,

214 (4th Cir. 1994) (emphasis in original); *Tellabs II*, 513 F.3d at 705 (noting that "still going

strong" would be actionable if defendants knew sales were about to collapse).

Here, Defendants single out statements—*e.g.*, Lorenzo is "on schedule" and "on track"—

that are "mixed present/future statement[s]."[21]  *See Tellabs II*, 513 F.3d at 705.  Such statements

represented, *inter alia*, that CSC was presently able to perform the NHS Contract.  As stated

above, *supra* I.A, these representations had no reasonable basis.[22]  Further, Defendants ignore a

---

contract did not render any previous omissions false, Defendants' positive statements regarding
the NHS Contract did in fact "create an impression of a state of affairs that differ[ed] in a
material way from the one that actually exist[ed]."

[21] Defendants also point to their repeated statement that "the project is ***currently*** profitable"
and "the Company expects to recover its investment."  D. Br. 26-27, citing ¶¶110, 119, 127, 147,
164, 181, 207, 224 (emphasis added).  As alleged, Defendants knew, or recklessly disregarded,
that the contract was not profitable and that they should not recover their investment.  ¶¶51-55.

[22] Defendants' citation to *Hillson*, 42 F.3d at 213, does not support their safe-harbor
argument.  D. Br. 27.  Here, Defendants had contemporaneous access to the facts that
*(continued … )*

host of other alleged misstatements that clearly involve representations of existing fact.  *See, e.g.*, ¶113 (Lorenzo was "going through the final stages of testing"); ¶127 ("[T]wo key milestones for the NHS were achieved in the third quarter"; feedback "has been very encouraging:"); ¶148 ("Operationally, we continue to deliver results for our clients"); ¶168 ("[We] accomplish[ed] the key development milestones last year, and we are on track again this year").[23]

Similarly, Defendants cannot evade liability for any statements that are knowingly false when made.  *See Novak*, 216 F.3d at 315 ("the complaint allege[d] that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true"); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) (holding that statements based upon defendants' "beliefs" are actionable because there was "evidence that the defendants were aware of undisclosed facts that seriously undermined the accuracy of their alleged opinions or beliefs").

Defendants' statements also were not accompanied by meaningful cautionary language. Indeed, Defendants point to only a single boilerplate statement regarding "unforeseen future events" as "cautionary language."  D. Br. 27.  But to fall within the safe harbor provision, the language must "inform investors of the specific type of risks the Plaintiffs now allege"—that

---

*( … continued)*

contradicted their public statements.  ¶¶51-55, 57-60, 62-64.  Thus, unlike in *Hillson*, none of CSC's performance "problems and delays" were "unforeseen."

[23] Even when confronted with specific information out of the U.K. regarding "delays," "postponements," and other problems with the NHS Contract, Laphen assured investors that Defendants' "confidence continues to build," "we are pleased with our progress," "[w]here we are today is incorporated into the guidance," and for the fourth quarter "we are on target relative to that." (¶¶121, 128).  Laphen and Mancuso also expressly contradicted press reports.  ¶¶137, 149, 208.  Not only did Laphen know these statements were false, but he lied to investors when specifically asked to clarify public information.  Indeed, "the safe harbor provision does not afford corporations a free pass to lie to investors."  *In re AT&T Corp. Sec. Litig.*, Civ. 2002 WL 31190863, at *14 (D.N.J. Jan. 30, 2002).

CSC was incapable of performing under the NHS Contract.  *See Latham v. Matthews*, 662 F.
Supp. 2d 441, 462 (D.S.C. 2009) ("The safe harbor provision does not apply when the
'meaningful cautionary language' is wholly different than the material facts known to the
Defendants that eventually cause the forward-looking statements to be false.").  Defendants
cannot point to any such language.[24]

### 2.	Plaintiff Pleads With Particularity The "Maker" Of Each Statement

Citing *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011)
("*Janus*"), Defendants argue that the Complaint fails to identify the speaker of the false
statements.  D. Br. 23-24.  But they ignore the allegations of the Complaint.  They also ignore
the holding of *Janus*, which determined that an investment advisor was not liable for a mutual
fund's prospectus, where the fund was the advisor's client and both were separate corporate
entities.  *Janus*, 131 S. Ct. at 2303 ("The maker of a statement is the entity with authority over
the content of the statement and whether and how to communicate it.").

Here, the Complaint alleges specifically who made each statement.  For instance,
DeBuck signed Forms 8-K filed with the SEC that attached CSC's press releases on August 5,
2008 and November 12, 2008, ¶¶108, 117, and Mancuso signed the same for each quarter
thereafter, ¶¶125, 132, 141, 156, 174, 196, 221.  Similarly, the Complaint identifies Laphen as
the speaker of each quote in each press release.  ¶¶108, 117, 125, 132, 141, 156, 174, 196, 221,
233.  With respect to statements made during the earnings calls, the Complaint identifies the
Individual Defendant making such statement.  ¶¶111-13, 120-21, 127, 135-37, 143, 148-49, 158-

---

[24] Defendants' citation to *In re PEC Solutions Sec. Litig.*, 2004 WL 1854202 (E.D. Va. May
25, 2004), *aff'd*, 18 F.3d 379 (4th Cir. 2005), is unavailing.  There, plaintiffs failed to allege
defendants' financial projections were false because Defendants "cannot be held liable for failing
to disclose facts that did not exist."  *Id.* at *6.  Here, the Complaint does not allege false financial
projections, but current statements of contemporaneously known facts.

59, 165-66, 176-77, 182-86, 198-200, 208-214, 225-26, 231, 35-37, 240-42.  In addition, the

Complaint identifies the Individual Defendants who signed each Form 10-Q and 10K, ¶¶15-17,

108, 117, 125, 133, 142, 157, 175, 197, 221, and specifies the signors of the SOX certifications

attached thereto, ¶¶15-17, 109, 118, 126, 134, 145-46 162-63, 179-80, 205-06, 222-23.[25]

Ignoring these well-pled allegations, Defendants point to the Complaint's detailed

reasons why Defendants' statements are false and misleading, while ignoring the preceding

paragraphs of the Complaint that identify the speakers.  D. Br. 24 (citing ¶¶115-16 123-24, 130-

31, 139-40, 152-55, 170-73, 188-92, 195, 216-20, 227-28, 244-45, which identify the reasons

statements are false).[26]

## II.   The Complaint Adequately Alleges Liability Under Section 20(a)

The Complaint adequately pleads that the Individual Defendants are liable as control

persons under Section 20(a) of the Exchange Act.  Section 20(a) requires pleading an underlying

violation by a controlled person or entity, and control over the primary violator by the defendant.

*MicroStrategy*, 115 F. Supp. 2d at 661.  The Individual Defendants do not contest that they are

"control persons" of CSC.[27]  They only argue that Plaintiffs have not adequately alleged an

underlying Section 10(b) claim.  *See* D. Br. 30.  Because the Complaint sufficiently alleges

---

[25] The Complaint identifies each of Mancuso's false statements during his employment at CSC beginning on December 1, 2008.  The Complaint also does not allege any false statements by analysts.  The inclusion of the analyst reports demonstrates the market's reaction to Defendants' false statements, ¶¶114, 122, 128, 138, 144, 150, 151, 160, 167, 169, 178, 187, 194, 215, 243, while the Individual Defendants' responses to analysts' questions are alleged to be false, ¶¶128, 137, 149, 166, 183-85, 200, 210, 213-14, 225-26, 235-37, 242.

[26] Defendants' reliance on *In re Coinstar Inc. Sec. Litig.*, 2011 WL 4712206 (W.D. Wash. Oct. 6, 2011) is unavailing.  There, only with respect to oral statements, the court held only the speakers of the statements could be held liable.  *Id.* at *10.  Here, the Complaint alleges liability from press releases, filings with the SEC, and written public statements, along with oral statements attributed specifically to an Individual Defendant.

[27] Plaintiffs plead that Defendant Mancuso became a control person when he joined CSC on December 1, 2008.

securities fraud violations against CSC and the Individual Defendants, control person liability is

established against the Individual Defendants.  *See MicroStrategy*, 115 F. Supp. 2d at 661.

**CONCLUSION**

For the reasons stated herein, Defendants' motion to dismiss the Complaint should be

denied.


Dated: October 25, 2011

Respectfully submitted,

By: */s/ Benjamin G. Chew*

**PATTON BOGGS LLP**                              **LABATON SUCHAROW LLP**

Benjamin G. Chew (VSB#29113)          Thomas A. Dubbs (admitted *pro hac vice*)
2550 M Street, NW                             Jonathan M. Plasse (admitted *pro hac vice*)
Washington, DC 20037                       Joseph A. Fonti (admitted *pro hac vice*)
Telephone: (202) 457-6015                 Dominic J. Auld (admitted *pro hac vice*)
Facsimile: (202) 457-6315                  140 Broadway
                                                       New York, NY 10005
                                                       Telephone: (212) 907-0700
                                                       Facsimile: (212) 883-7044


*Local Counsel for Lead Plaintiff*            *Counsel for Lead Plaintiff Ontario Teachers'*
*Ontario Teachers' and Local Counsel for the*   *and Lead Counsel for the Proposed Class*
*Proposed Class*

CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of October 2011, I will electronically file the Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to the counsel shown below.

Craig Crandall Reilly, Esq.
Law Office of Craig C. Reilly
111 Oronoco Street
Alexandria, VA 22314
craig.reilly@ccreillylaw.com

*Counsel for Plaintiffs City of Roseville Employee's Retirement System* (Case No. 1:11-cv-00610), *Arthur I. Murphy* (Case No. 1:11-cv-00636)*, and Norton Goldman* (Case No. 1:11-cv-00777) served via ECF

Elizabeth K. Tripodi
Levi & Korsinsky, LLP
1101 30th Street NW, Suite 115
Washington, DC 20007
etripodi@zlk.com

*Counsel for Plaintiff Hilary Kramer*
(Case No. 1:11-cv-00751) served via ECF

David Emmett Carney, Esq.
Skadden Arps Slate Meagher & Flom LLP
1440 New York Avenue NW
Washington, DC 20005-2111
david.carney@skadden.com

*Counsel for Defendants* served via ECF

 */s/ Benjamin G. Chew*
Benjamin G. Chew (VSB#29113)
**PATTON BOGGS LLP**
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6015
Facsimile: (202) 457-6315
Email: bchew@pattonboggs.com

*Local Counsel for Lead Plaintiff Ontario Teachers' and Local Counsel for the Proposed Class*