## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

IN RE COMPUTER SCIENCES    )
CORPORATION SECURITIES    )    **Case No. 1:11cv610**
LITIGATION    )

### <u>MEMORANDUM OPINION</u>

In this federal securities fraud action against a publicly traded technology services

company, a putative class of plaintiffs alleges that the corporation and several of its officers

violated § 10(b)[1] and Rule 10b-5[2] by knowingly or recklessly making false or misleading

statements of material fact in the following three respects:

> (i) Defendants knew or recklessly disregarded that the revenue figures
> submitted by one of the corporation's divisions, the Nordic Region, were
> fraudulently inflated, and nonetheless relied on these fraudulent figures to
> overstate the corporation's revenue for fiscal year 2010;

> (ii) Defendants repeatedly affirmed the soundness of the corporation's
> internal accounting controls notwithstanding deficiencies that defendants
> knew of or recklessly disregarded; and,

> (iii) Defendants touted the corporation's progress in performing on the
> corporation's contract with the United Kingdom's National Health Service
> (the "NHS Contract"), one of the corporation's most substantial contracts,
> while failing to disclose information known to defendants that cast serious
> doubt on the corporation's ability to perform.

---

[1] Section 10(b) of the Securities Exchange Act of 1934 makes it "unlawful for any person . . .
[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative
or deceptive device or contrivance[.]" 15 U.S.C. § 78j.

[2] Securities Exchange Commission Rule 10b-5 makes it:

> unlawful for any person . . . [t]o make any untrue statement of a material
> fact or to omit to state a material fact necessary in order to make the
> statements made, in the light of the circumstances under which they were
> made, not misleading . . . in connection with the purchase or sale of any
> security.

17 C.F.R. § 240.10b-5.

At issue on a threshold dismissal motion is whether, under the pleading standards set forth in the Private Securities Litigation Reform Act of 1995 (the "PSLRA"),[3] the corporation's statements concerning its earnings, its internal accounting controls, and its ability to perform on the NHS Contract were materially false or misleading, and whether the complaint supports a "strong inference" that any of these statements were made with the required fraudulent intent. 15 U.S.C. § 78u-4(b)(2)(A).

For the reasons that follow, the motion must be granted in part and denied in part. It must be granted insofar as the Complaint[4] fails to plead facts which warrant the PSLRA's required strong inference of defendant's scienter with respect to earnings misstatements attributable to the Nordic Region fraud. The motion must also be granted insofar as the Complaint fails to plead a strong inference that the corporation's former and current chief financial officers (Messrs. DeBuck and Mancuso) acted with the required scienter with respect to the NHS Contract. Finally, the motion must be granted insofar as the Complaint fails to plead a strong inference that Mr. Mancuso acted with scienter when making statements about the Company's internal controls. In all other respects, the motion must be denied, as the allegations that the corporation and its chief executive officer made misleading statements of material fact about the NHS Contract satisfy the threshold PSLRA pleading standard. Similarly, the allegations that the corporation, its chief executive officer, and its former chief financial officer, Mr. DeBuck, made misleading statements concerning the corporation's internal controls after receiving the former Internal Audit Director's letter also pass PSLRA muster.

---

[3] Pub. L. No. 104-67, 109 Stat. 737 (codified in part at 15 U.S.C. §§ 77z-1, 77z-2, 78u-4, & 78u-5).

[4] As explained *infra*, the "Complaint" refers to the currently operative Corrected Amended Consolidated Class Action Complaint filed on October 19, 2011.

Because the pleading deficiencies noted here might be remedied by the allegation of additional or more detailed facts, it is appropriate to grant plaintiffs leave to amend their complaint in these respects.

## I.

Defendant Computer Sciences Corporation ("CSC") is a global information technology and business services company headquartered in Falls Church, Virginia. CSC common stock trades on the New York Stock Exchange under the ticker symbol "CSC." At all relevant times, defendant Michael W. Laphen served as CSC's Chairman of the Board, President, and CEO. Defendant Donald G. DeBuck served as CSC's Corporate Controller and also served as Interim CFO from February 2008 until December 2008, at which time defendant Michael J. Mancuso became CSC's CFO.

On June 3, 2011, named plaintiff City of Roseville Employees' Retirement System filed the instant action against CSC, Laphen, and Mancuso. Thereafter, the Ontario Teachers' Pension Plan Board ("Ontario Teachers") and several others moved (i) for consolidation of this matter with other essentially similar actions filed in this forum, (ii) for appointment as lead plaintiff, and (iii) for approval of the proposed lead plaintiff's choice of lead counsel. Following oral argument on the motions, an Order issued on August 29, 2011 consolidating this matter with the three essentially similar actions under case number 1:11cv610 and captioned as "In re Computer Sciences Corporation Securities Litigation." *See In re Computer Sci. Corp. Secs. Litig.*, No. 1:11cv610 (E.D. Va. Aug. 29, 2011) (Order). The August 29 Order also granted Ontario Teachers' motion for appointment as lead plaintiff and for Ontario Teachers' approval of its choice of lead counsel, and directed Ontario Teachers to file an amended consolidated complaint. Ontario Teachers complied by filing an initial amended complaint on September 26, 2011 and

then filed the currently operative Corrected Consolidated Class Action Complaint (the "Complaint") against CSC, Laphen, DeBuck, and Mancuso on October 19, 2011.

The Complaint alleges that during the proposed class period—from August 5, 2008 until August 9, 2011, inclusive—defendants committed securities fraud in violation of § 10(b) and Rule 10b-5 in three respects. First, the Complaint alleges that defendants knew or recklessly disregarded that revenue figures from CSC's operations in the Nordic Region, which consists of offices in Denmark, Sweden, Norway, and Finland, were falsely inflated, and notwithstanding this, defendants published CSC's revenue figures incorporating the Nordic Region's false data. Second, the Complaint alleges that defendants knew or recklessly disregarded that CSC's internal accounting controls were inadequate, and despite knowing this, defendants repeatedly made public statements that CSC's internal controls were in fact adequate. Finally, the Complaint alleges that defendants knew or recklessly disregarded that CSC's own analysts had concluded that CSC could not perform the NHS Contract as required, and despite this, defendants persisted in providing misleading, optimistic assessments of CSC's progress on the NHS Contract to the public. The pertinent facts for each aspect of the alleged fraud are summarized here.

The Nordic Region

In February 2011, CSC disclosed that accounting deficiencies in the Nordic Region resulted in the company overstating its fiscal-year 2010 operating income by $86 million. As a result, CSC's quarterly press releases stating the company's fiscal-year 2010 income between August 2009 and May 2010, as well as the pertinent 10-Q Forms signed by the CFO during this time period, all falsely overstated CSC's actual income in that fiscal year. Compl. ¶¶ 68–69. Also falsely overstated were CSC's fiscal-year 2010 earnings per share and operating margins.

*Id.* ¶¶ 69 & 80. CSC itself "attributed the majority" of the overstated income to "accounting

irregularities arising from suspected intentional misconduct by certain former employees" in the

Nordic Region. *Id.* ¶ 70. These employees included (i) the Nordic Region's COO, who held

that position until April 2010, and (ii) others who reported to the Vice President of Finance for

Europe, the Middle East, and Africa ("EMEA"), who in turn reported to defendant Mancuso. *Id.*

¶ 71. In particular, CSC's internal investigation revealed that labor costs on outsourcing

contracts had been inappropriately capitalized. According to former Nordic Region employees,

"top management in EMEA" approved of this capitalization method. *Id.* ¶ 77.

Thus, the Complaint alleges, and CSC does not dispute, that CSC's fiscal-year 2010

earnings were falsely overstated. The Complaint further alleges that these earnings

overstatements violated § 10(b) and Rule 10b-5 inasmuch as defendants knew about, or

recklessly disregarded, the Nordic Region's accounting problems at the time that the individual

defendants provided earnings guidance[5] between August 2009 and May 2010. According to the

Nordic Finance Director, who worked in CSC's Denmark office from December 2007 until April

2010, deficiencies in the Nordic Region's account reconciliations pre-dated his assuming that

position in December 2007. Compl. ¶ 82. In May 2008, CSC accountants conducted a several-

week review of the Nordic Region's accounts, which at that time had been identified as a "risk

area" by CSC's Internal Audit Department, and concluded that the Nordic Region's internal

controls were deficient. *Id.* ¶¶ 73 & 82. Specifically, according to the Nordic Finance Director,

CSC's accountants, as a result of their 2008 review, could not "properly and accurately assess"

the Nordic Region's finances and observed that the Nordic Region "lacked proper procedures

and controls for conducting balance sheet account reconciliations." *Id.* ¶ 83. The accountants

---

[5] "Earnings guidance" refers to the individual defendants' publicly announced projections of
CSC's earnings for a given quarter or year.

stated their conclusions in a report (the "2008 EMEA-Nordic Report"), which according to the

Nordic Finance Director "would have been sent to DeBuck" and to the Audit Committee, of

which defendant Laphen was then a member. *Id.* ¶ 84.Internal Controls

On a quarterly basis between August 2008 and August 2011, CSC's CEO and CFO[6]

stated in CSC's 10-Q Forms that CSC's reports to the SEC (1) "does not contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statements

made . . . not misleading"; (2) "fairly present[s] in all material respects the financial condition,

results of operations and cash flows of" the Company; (3) is subject to effective disclosure

controls and procedures; (4) is subject to internal control over financial reporting, to provide

"reasonable assurance regarding the reliability of financial reporting and the preparation of the

financial statements for external purposes in accordance with [generally accepted accounting

principles ('GAAP')]"; (5) has been evaluated for the effectiveness of CSC's internal control

over financial reporting; (6) discloses "[a]ll significant deficiencies and material weaknesses in

the design or operation of internal control over financial reporting"; (7) discloses any "fraud,

whether or not material, that involves management or other employees who have a significant

role in the registrant's internal controls over financial reporting"; and (8) "presents, in all

material respects, the financial condition and results of operations of the Company" in

compliance with the Exchange Act. Compl. ¶¶ 109, 118, 126, 134, 145, 146, 162, 163, 179, 180,

205, 206, 222, & 223.

The Complaint provides two reasons to support the allegation that these statements

regarding CSC's internal controls were materially false and were made with fraudulent intent.

---

[6] Laphen (as CSC's CEO) and DeBuck (as CSC's interim CFO at that time) signed CSC's 10-Q
Forms for the first two quarters of fiscal-year 2009, while Laphen (still as CSC's CEO) and
Mancuso (as CSC's incoming permanent CFO) signed CSC's 10-Q Forms thereafter.

First, the Complaint notes that CSC's internal controls were ineffective in that they failed to detect the accounting fraud in the Nordic Region until November 2010, at which time the fraud had been ongoing for several years. Compl. ¶¶ 97–99. Second, the Complaint identifies a September 2, 2008 letter that CSC's Director of Internal Audit and Corporate Risk Management (the "Internal Audit Director"), who held that position from August 2005 until August 2008 and reported directly to CSC's Chief Audit Executive during that period, sent to the Chairman of CSC's Audit Committee with copies to Laphen and DeBuck. In this letter, the Internal Audit Director stated his "belief . . . that the internal audit practice poses a significant risk both to CSC and its shareholders" and that "[i]ssues raised and questions around loss of independence have gone unaddressed" in that the Internal Audit had "not maintained its independence." *Id.* ¶ 93 (emphasis removed). The letter also relayed the Internal Audit Director's belief that the Chief Audit Executive "has seriously compromised the integrity of the practice as well as the financials of this firm" and that the Chief Audit Executive's "failure[]" to raise several accounting issues "have cost this firm many millions of dollars[.]" *Id.* (emphasis removed). Finally, the letter noted that neither a financial audit of the NHS Contract nor an audit of the controls over the contract had been performed. *Id.* ¶ 94.

The NHS Contract

In October 2002, the UK's Department of Health established a program "to procure and deliver a fully-integrated patient and medical records IT system throughout the UK[.]" Compl. ¶ 36. CSC was one of four service providers that contracted with the UK's NHS to deliver the electronic patient records system (the "NHS Contract"). At signing, the NHS Contract had a value to CSC of $5.4 billion and was to be completed no later than 2012. When two of the four service providers subsequently withdrew—Accenture in 2007, and then Fujitsu in 2008—CSC

assumed those providers' obligations under the NHS Contract. This required CSC to implement the system in regions in addition to those for which CSC had originally contracted. *Id.* ¶ 37. These additional obligations led in part to some delays in CSC's contract performance. Originally, CSC was scheduled to deliver the "core component" of the electronic records system, a computer program known as "Lorenzo," for use no later than 2012. *Id.* ¶ 2. In mid-2008, following significant delays, the scheduled date for Lorenzo's delivery was reset to 2016.

The Complaint alleges that in February 2007, Laphen stated on an earnings call[7] that "in terms of contractual performance and delivery, NHS is the most significant" and that the NHS Contract "is the one that I stay on top of most of all and watch most closely." Compl. ¶ 55. When asked about service-related issues in the August 2008 earnings call, Laphen stated that the matter "has my utmost attention." *Id.* ¶ 113. In early 2008, the CSC Board commissioned a review of the NHS Contract's "financial and operational feasibility." *Id.* ¶ 49. The Delivery Assurance Review Red Team (the "DA Red Team") that performed this Board-ordered review consisted of five specialists led by Brian Fillebrown, CSC's VP for Contract Performance and Quality Assurance. Also on the DA Red Team was CSC's Internal Audit Director. For two weeks, the DA Red Team worked in the UK to "assess[] the progress and projections related to the NHS Contract," with several of the team members working in India thereafter to "assess[] the development of Lorenzo." *Id.* ¶ 50. After the DA Red Team completed its review of the NHS Contract in 2008, it prepared and presented a report to CSC's Board.

The Complaint alleges that the DA Red Team members concluded "from a technology and operating perspective" that CSC "could not perform the NHS Contract." Compl. ¶ 51. In particular, the members were "very consistent in [the] message that we [CSC] could not meet our

---

[7] "Earnings call" refers to a public teleconference between CSC officers and representatives of investors during which the CSC officers would give earnings guidance for a particular quarter.

deadline" and that CSC "could not deliver the solution set that we had contracted with NHS." *Id.* ¶ 51. As the DA Red Team's financial auditing expert, the Internal Audit Director further concluded that "CSC should have recognized a loss in 2008" on the NHS Program given "very murky" financial records and "definite GAAP violations[.]" *Id.* ¶¶ 52–53 (emphasis removed). Based on the DA Red Team's review of the NHS program, the VP for Contract Performance and Quality Assurance made a report to the Board in May 2008 (the "DA Red Team Report"). *Id.* ¶ 55. The Complaint further alleges that Laphen received this report as a Board member, and according to the Internal Audit Director, "the internal practice was for DeBuck and Laphen to receive this type of report prior to its presentation to the Board[.]" *Id.*

The DA Red Team members' doubts concerning CSC's ability to satisfy its contractual obligations to NHS were neither acknowledged nor mentioned in CSC's public statements, which the Complaint alleges were materially misleading. Thus, the Complaint notes that in August 2008, defendants Laphen and DeBuck stated in CSC's filed Form 10-Q that the NHS Contract "is currently profitable and the company expects to recover its investment." Compl. ¶ 110. During the August 2008 earnings call, Laphen stated that "[s]ignificant progress is being made with the final testing of the Lorenzo release at our three early adopter sites." *Id.* ¶ 111. Laphen also stated that these three early adopter sites have "had the software for several months and are all now in the latter stages of their testing cycles." *Id.* Furthermore, Laphen stated that "[g]o-live will happen as soon as all parties are satisfied on quality and that there is no risk to patient's [*sic*] safety." *Id.* Elaborating further, Laphen stated that "our expectation at this point is that the go-live will occur by the end of this month," although Laphen cautioned that "[w]e obviously can't guarantee that[.]" *Id.*

The Complaint further alleges that the DA Red Team members' doubts also went unmentioned in the November 2008 earnings call, during which Laphen noted that "[t]his quarter [] witnessed an important milestone in our NHS program with the launch of Lorenzo in two early adopter sites." (Doc. 60-4 at 7).  Later in the call, one analyst call noted that "[w]e are hearing some delays, some postponements out there" and asked Laphen if "the kinds of delays we are hearing about" are "incorporated into your guidance" and whether investors should "expect an adverse impact [on CSC] if we see these kinds of developments within NHS." (Doc. 60-4 at 9– 10).  Laphen responded that "[i]t's a matter of just making sure that everybody is absolutely comfortable with turning the switch all alive" and that "[w]here we are today is incorporated into the guidance." (*Id.*).  Laphen also added that "[w]e have steadily made progress in delivering on our commitments to the NHS," that "[o]ur confidence continues to build on the [Program]," and that the company is "pleased with our progress." Compl. ¶ 121 (emphasis removed). Furthermore, in response to another analyst's observation that "the implementation or rollouts are behind schedule from original plan and the schedule to go live has been postponed," Laphen stated that although he believed the "original go live" to have been "around the September [2008] timeframe," he acknowledged that "[w]e are obviously past that" but also added that "[w]e don't expect to be much further past that." (Doc. 60-4 at 10).

On October 18, 2011, all defendants moved for dismissal of the Complaint under Rule 12(b)(6), Fed. R. Civ. P. and under the PSLRA chiefly on two grounds: first, that defendants made no false or misleading statements of material fact; and second, that in any event the Complaint fails to support a strong inference that any such statement was made with the requisite scienter.  Defendants' dismissal motion has been fully briefed and argued and is ripe for disposition.

## II.

It is axiomatic that a plaintiff alleging a violation of § 10(b) and Rule 10b-5 must show

the following:

> (1) the defendants made a false statement or omission of material fact; (2) with
> scienter; (3) upon which the plaintiffs justifiably relied; (4) that proximately
> caused the plaintiffs' damages.

*Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004) (citing *Hillson Partners Ltd.*

*P'ship v. Adage, Inc.*, 42 F.3d 204, 208 (4th Cir. 1994)).  To survive a threshold dismissal

motion, a securities fraud complaint must do more than state a facially "plausible" claim under

*Iqbal* and *Twombly*.[8]  Instead, where, as here, a defendant seeks dismissal of a securities fraud

complaint, the sufficiency of the complaint's allegations must be scrutinized under the

heightened pleading requirements set forth in the PSLRA,[9] which were "targeted at perceived

---

[8] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[9] The Fourth Circuit has listed several often-cited reasons for heightened pleading requirements in fraud actions, which include:

> protecting defendants' reputations from baseless accusations, eliminating
> unmeritorious suits that are brought only for their nuisance value,
> discouraging fishing expeditions brought in the dim hope of discovering a
> fraud, and providing defendants with detailed information in order to
> enable them to effectively defend against a claim.

*Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche, LLP*, 551 F.3d 305, 311 (4th Cir. 2009).

abuses of the class-action vehicle in litigation involving nationally traded securities." *Merrill Lynch, Pierce, Fenner & Smith v Dabit*, 547 U.S. 71, 81 (2006).[10]

Pertinent here, the PSLRA requires that a complaint alleging a violation of § 10(b) and Rule 10b-5 must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" 15 U.S.C. § 78u-4(b)(1). Moreover, the PSLRA requires that a securities fraud complaint "with respect to each act or omission alleged . . . state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). Courts interpreting this standard reached varying results prior to 2007, when a majority of the Supreme Court held that a securities fraud complaint must "plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007). To be "strong," such an inference of scienter "must be cogent and compelling" compared to other, nonculpable explanations. *Tellabs*, 551 U.S. at 324. The scienter inquiry therefore involves a "holistic" evaluation that credits the Complaint's allegations with "the inferential weight warranted by context and common sense." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009). Thus, it must be determined "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets [the strong-inference] standard." *Tellabs*,

---

[10] Specifically, in enacting the PSLRA, Congress observed that securities fraud actions "can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 322 (2007) (describing the PSLRA's purpose as "check[ing] against abusive litigation by private parties" and of "curb[ing] frivolous, lawyer-driven litigation").   In this respect, "[t]he PSLRA was deliberately intended to stiffen the requirements for securities lawsuits" and must be interpreted consistently with this intent. *Auto. Indus. Pension Trust Fund v. Textron Inc.*, 682 F.3d 34, 38 (1st Cir. 2012) (citing *Dabit*, 547 U.S. at 81–82); *accord Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 620 (4th Cir. 1999) (noting that the PSLRA "indisputably seeks to make pleading scienter more difficult for plaintiffs").

551 U.S. at 322–24. If the inference that defendants "acted innocently, or even negligently, [is] more compelling than the inference that they acted with the requisite scienter," the Complaint must be dismissed. *Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009).

In sum, with respect to each public statement alleged to have violated the securities laws, it must be determined, on the basis of the Complaint and any other document that may properly be considered on a dismissal motion,[11] whether (i) the statement constitutes a false or misleading statement of material fact, and (ii) whether the Complaint's allegations support a strong inference that the statement was made with the requisite scienter.

The Nordic Region

The parties do not dispute at this stage that public statements made by Laphen and Mancuso on behalf of CSC overstated CSC's fiscal-year 2010 operating income by $86 million owing to the Nordic Region's accounting problems. As the Fourth Circuit has held, the misstatement element is satisfied "[i]f a reasonable investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision[.]" *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999). CSC concedes—as it must—that "in light of its disclosures regarding the Nordic Region accounting errors . . . its FY 2010 financial results were inaccurate[.]" Defs.' Br. 24 n.14. There is, therefore, at this stage no dispute that the Complaint adequately pleads the misstatement element the securities fraud claim.

---

[11] *See Phillips*, 190 F.3d at 618 (considering article not attached to a complaint where it was explicitly relied on in the complaint for at least one statement); *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) (stating that, in a securities fraud case, a court "must examine the facts as a whole, including facts found in documents incorporated into the complaint by reference") (internal quotations and citation omitted); *In re PEC Solutions, Inc. Secs. Litig.*, 418 F.3d 379, 388 n.7 (4th Cir. 2005) (noting that when a complaint "relies upon a public document a court may as well without converting the motion to dismiss into a motion for summary judgment").

The parties' dispute focuses not on the misstatement element, but rather on whether the Complaint's allegations satisfy the PSLRA's requirement that the allegations support a strong inference of fraudulent intent. With respect to defendants Laphen and Mancuso, who made the false earnings statements on behalf of CSC, the issue is whether these defendants made the false earnings statements with scienter, *i.e.*, "an intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313 (citation omitted). Explaining the meaning of § 10(b)'s prohibition on the use of a "manipulative or deceptive device or contrivance," the Supreme Court concluded in *Ernst & Ernst v. Hochfelder* that the statutory text "connot[es] intentional or willful conduct designed to deceive or defraud investors" and therefore "strongly suggest[s] that § 10(b) was intended to proscribe knowing or intentional misconduct." 425 U.S. 185, 197–99 (1976); *accord Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1796 (2010) (characterizing scienter as "*an intent to deceive—* not merely innocently or negligently"). Furthermore, because recklessness may be a form of intent, this circuit has held that "[p]leading recklessness is sufficient to satisfy the scienter requirement." *BearingPoint*, 576 F.3d at 181. And, the Fourth Circuit has defined a reckless act in the securities fraud context as an act that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant *must have been aware of it*." *Ottman v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 344 (4th Cir. 2003) (quoting *Phillips*, 190 F.3d at 621) (emphasis added). Thus, the scienter inquiry must focus sharply on whether the challenged statements "were the result of merely careless mistakes at the management level" or, instead, "of an intent to deceive or a reckless indifference to whether the statements were misleading." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.* ("*Tellabs II*"), 513 F.3d 702, 709 (7th Cir. 2008).

A review of the Complaint's allegations makes clear that they do not meet the PSLRA's strong-inference standard. Specifically, the Complaint fails to allege facts that make the inference that Laphen or Mancuso acted with scienter regarding the fiscal-year 2010 earnings overstatement as likely as the inference that Laphen and Mancuso acted innocently or negligently. The Complaint's basis for alleging scienter consists chiefly of the following facts: (i) that certain CSC employees in the Nordic Region had been improperly capitalizing expenses in violation of GAAP and with approval from "senior EMEA management;" (ii) that CSC's Internal Audit Department had identified the Nordic Region as a "risk area;" (iii) that the 2008 EMEA-Nordic Report noting deficiencies in the Nordic Region's accounting practices "would have been sent" to Laphen and DeBuck; and (iv) that Laphen held regular conference calls and meetings with EMEA regional managers. Compl. ¶¶ 73, 82–85. But these facts, even taken together, do not make the culpable inference, *i.e.*, that the individual defendants actually knew about or at least recklessly disregarded the Nordic Region's accounting problems when the fiscal-year 2010 earnings guidance was given, as likely as the nonculpable inference, *i.e.*, that the individual defendants simply did not know about the fraud in the Nordic Region.

Importantly, the Complaint does not allege facts indicating that the individual defendants actually knew of the accounting fraud in the Nordic Region well before defendants' November 2010 disclosure of the earnings overstatement and defendants' February 2011 disclosure of the Nordic Region fraud. Indeed, defendants' voluntary disclosures of the Nordic Region's accounting problems and the earnings overstatements weigh against an inference of scienter against the individual defendants. As the Fourth Circuit held in *BearingPoint*, "[a] disclosure that meaningfully alerts investors to the risk that financial information is not accurate may suggest that the individuals responsible for the disclosure did not knowingly (or perhaps not even

recklessly) misstate the underlying financial information." 576 F.3d at 187. Additionally, the

Complaint's allegations that the individual defendants recklessly disregarded the inaccuracy of

the Nordic Region's revenue figures fall short in several respects. First, the allegation that senior

EMEA management approved of the improper capitalization method is ambiguous as to whether

it refers to regional managers or instead to one of the individual defendants. And, this ambiguity

"count[s] against inferring scienter[.]" *Tellabs*, 551 U.S. at 326.[12] Next, in alleging that the

2008 EMEA-Nordic Report "would have been sent" to Laphen and DeBuck, the Complaint

merely speculates that Laphen and DeBuck received this report and offers no other facts

supporting this assertion. Moreover, the regular meetings Laphen held with EMEA managers

provides weak support at best, as managers who were perpetuating or at least complicit in the

Nordic Region's accounting fraud surely did not want the fraud to be discovered and presumably

would not have confessed to the individual defendants. In sum, the Complaint identifies

insufficient "red flags to alert senior officers to the unreliability of statements about internal

controls and financial information." *BearingPoint*, 576 F.3d at 188. It is therefore more likely

that defendants' earnings misstatements resulted from "false information fed [to the individual

defendants] from below[.]" *Tellabs II*, 513 F.3d at 709. Thus, given the lack of a strong

inference of scienter in this regard, the allegations as to CSC's fiscal-year 2010 earnings

statements cannot support securities fraud claims against the individual defendants.

---

[12] Moreover, as defendants correctly note, because the confidential sources for this allegation—the Nordic Finance Director and the Nordic Finance Manager—may well have been involved in the accounting fraud, the credibility of those sources is suspect. *Cf. Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757–58 (7th Cir. 2007) (discounting confidential sources' statements that a parent company knew that a subsidiary had been committing fraud). This is not to say that confidentiality alone is sufficient reason to doubt a source's credibility. *Tellabs II*, 513 F.3d at 712 (concluding that "the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions").

Analysis next proceeds to whether securities fraud claims against CSC, as opposed to any individual defendant, can be based on the fiscal-year 2010 earnings overstatement.  At issue is whether CSC may be liable for an officer's false or misleading statement where facts supporting an inference to scienter are not known by the officer making the statement.  In effect, plaintiffs argue that the knowledge from non-officer CSC employees can be imputed to the corporation for purposes of whether a CSC officer's false or misleading statement attributable to CSC was made with scienter.  Defendants, relying on the Fourth Circuit's decision in *Teachers' Retirement System of Louisiana v. Hunter*, 477 F.3d 162 (4th Cir. 2007), respond that to sustain a securities fraud claim, someone authorized to speak for the corporation must have made a materially false or misleading statement while simultaneously possessing the requisite scienter.  The question presented, in other words, is whether § 10(b) and the PSLRA require that the corporate agent making the false or misleading statement and the corporate agent possessing fraudulent intent be one and the same.

Pertinent Fourth Circuit authority supports defendants' position, as precedent points persuasively to the conclusion that in order for a corporation to be liable for securities fraud, "at least one corporate agent" must have "acted with the required state of mind[.]" *i.e.*, made a false or misleading statement of material fact with scienter.  *BearingPoint*, 576 F.3d at 189; *accord Hunter*, 477 F.3d at 184 (holding that "the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation").  This conclusion comports with the holdings of the Second, Fifth, Seventh, and Eleventh Circuits that "[t]o prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter[.]" *Teamsters Local 445 Freight*

*Div. v. Dynex Capital*, 531 F.3d 190, 195–96 (2d Cir. 2008).[13]  A contrary conclusion would be tantamount to the unacceptable proposition that "a fraud, though ordinarily a deliberate act, could be the result of a series of acts none of which was both done with scienter and imputable to the company[.]" *Tellabs II*, 513 F.3d at 707.

Given that corporate liability for securities fraud depends on at least one of its agents making a false or misleading statement with scienter, the Complaint's allegations with respect to the fiscal-year 2010 earnings overstatement cannot support a securities fraud claim against CSC. As explained above, the Complaint's allegations against the only authorized agents alleged to have made false statements on behalf of CSC—Laphen and Mancuso—fail to support a strong inference of scienter.  The regional managers with knowledge of the Nordic Region accounting problems are not alleged to have made any false or misleading statements of material fact on behalf of CSC.  Thus, the Complaint's allegations fail in this respect.

Notwithstanding that the Complaint fails to plead a securities fraud claim with respect to the fiscal-year 2010 earnings misstatements that passes muster under the PSLRA, this failure might be remedied by an amendment.  For instance, plaintiffs might be able to plead additional facts to support the allegation that an individual defendant did receive the 2008 EMEA-Nordic Report.  Accordingly, leave to amend is appropriate with regard to the Complaint's allegations relating to the earnings misstatements owing to the Nordic Region accounting fraud. *See Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc).

---

[13] *Accord Tellabs II*, 513 F.3d at 708 ("To establish corporate liability for a violation of Rule 10b–5 requires 'look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement . . . rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'") (quoting *Southland Securities Corp. v. INSpire Ins. Solutions*, 365 F.3d 353, 366 (5th Cir. 2004)); *Mizzaro v. Home Depot*, 544 F.3d 1230, 1254–55 (11th Cir. 2008) (dismissing complaint that failed to raise strong inference that any corporate agents "were both responsible for issuing the allegedly false public statements and were aware of the alleged fraud").

Internal Controls

Next, analysis proceeds to whether the Complaint's allegations that defendants

knowingly or recklessly made false or misleading statements concerning the adequacy of CSC's

corporate-wide internal controls are sufficient to state a securities fraud claim under the PSLRA.

As with the allegations relating to the Nordic Region misstatement, the dispute here is not

whether the statements about controls compliance were correct, but rather whether the Complaint

pleads the PSLRA's required strong inference of scienter. At several points during the relevant

period, CSC's CEO (Laphen) and CFO (DeBuck and later Mancuso) made statements in the

Company's 10-Q filings about the adequacy of the Company's disclosure and financial reporting

controls, as well as statements that these controls had been evaluated for effectiveness. See

*supra* p. 6.

Plaintiffs assert two arguments to support the adequacy of the allegations that the

statements regarding CSC's internal controls were materially false and were made with

fraudulent intent. First, the Complaint says that CSC's internal controls were ineffective in that

they failed to detect the accounting fraud in the Nordic Region until November 2010, at which

time the fraud had been ongoing for several years. Compl. ¶¶ 97-99. Second, the Complaint

cites a September 2, 2008 letter from CSC's Internal Audit Director that reported several ways in

which the Director felt the internal audit function had been compromised, rendering it an

ineffective part of the Company's internal controls. Compl. ¶¶ 92-96.

First, we address the claim that the controls were ineffective because they failed to detect

promptly the fraud in the Nordic Region. To be sure, failure of a company's internal audit

controls may well lead to a misstatement in the company's financials. Yet, the mere fact of a

misstatement in a company's financials does not establish the fraudulent scienter of particular

- 19 -

company officials. Here, too, the mere fact that accounting fraud in the Nordic Region caused a misstatement of CSC's earnings does not mean that the individual defendants knew of the fraud or of any deficiency in CSC's accounting controls at the time they made the Form 10-Q statements in issue. Nor, as noted above, is there any allegation in the Complaint that warrants a strong inference either that defendants knew about the Nordic Region's accounting problems at the time the form 10-Qs issued, or that defendants knew about control deficiencies in the Nordic Region. Plaintiffs assert that the 2008 EMEA-Nordic Report should have alerted defendants to the controls problems in the Nordic region. Yet, as explained above, the Complaint's statement that certain defendants "would have been sent" the report is insufficient to show that they, in fact, received the report.

Therefore, although the Complaint's allegations that the Nordic Region's fraud went undetected owing to faulty internal accounting controls warrant an inference that the statements in the Form 10-Qs were materially false, the Complaint fails to plead facts that warrant a strong inference that the individual defendants acted with the requisite scienter with respect to the statements in the Form 10-Qs. More precisely, the Complaint fails to "plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference." *Tellabs*, 551 U.S. at 328. The inference that the defendants did not receive the report is at least as strong as the inference that they did, and the Complaint is therefore insufficient in this respect. Although the assertion that the individuals "would have been sent" the 2008 EMEA-Nordic Report, by itself, is insufficient, plaintiffs will be granted leave to amend their complaint in this respect. Additional factual allegations to support the inference that the individual defendants received this report may suffice to meet the PSLRA's scienter pleading requirements.

- 20 -

Second, plaintiff argues that the PSLRA's strong inference of scienter for Laphen and DeBuck is supported by allegations that they both received the September 2, 2008 letter from CSC's former Internal Audit Director and that the letter would have alerted Laphen and DeBuck to problems with the Company's internal controls. Plaintiffs therefore assert that Laphen and DeBuck possessed the requisite scienter when they falsely stated in the Form 10-Qs that the Company maintained appropriate internal accounting controls and evaluated those controls for effectiveness.

This argument succeeds. The contents of the letter and the Complaint's allegation that the letter reflects copies to Laphen and DeBuck warrant an adequately strong inference of scienter. The letter from CSC's former Internal Audit Director dated September 2, 2008 clearly informed readers that the independence of CSC's internal audit function had not been preserved. Specifically, the letter advised that the Internal Audit Department had "not maintained its independence as required under its chart of the [Institute of Internal Auditors'] Code of Professional Conduct," and that "issues raised and questions around loss of independence have gone unaddressed." Compl. ¶ 93. The letter went on to say that the Internal Audit Director believed the Chief Audit Executive had "seriously compromised the integrity of the practice as well as the financial of this firm," and that the Chief Audit Executive had failed to raise multiple accounting and auditing issues with the Audit Committee. Compl. ¶¶ 93 and 95. Nor is there any doubt that the concerns raised in the letter fall well within the general category of internal controls addressed in the Form 10-Q's. The independence of the internal audit function is an integral element of a company's assurance that its internal controls are functioning properly.[14]

_____

[14] Thus, Auditing Standard Number 5 states that "Entity Level Controls include...controls to monitor other controls, including activities of the internal audit function, the audit committee, and self assessment programs." In order for internal audit to monitor and test controls

Although there may be reasons to be skeptical of this letter, including the fact that the letter was sent by a former employee and that it was written at the very beginning of the class period, these reasons do not warrant discounting the allegations it contains. The letter was written by the former Director of Internal Audit, who left the company in August 2008. The proximity in time of the letter to the Internal Audit Director's departure and his position within the Company indicate that his knowledge on such matters would likely have been current and relevant.

In sum, the Complaint's allegations relating to the letter are sufficient to meet the PSLRA's scienter pleading requirement. And, since the complaint sufficiently pleads that "at least one corporate agent" "acted with the required state of mind," *BearingPoint*, 576 F.3d at 189, the allegation is sufficiently pled as to the Company, as well. As plaintiffs do not allege that Mancuso was copied on the letter from the former Internal Audit Director, the allegation is not sufficiently pled with respect to him.

NHS Contract

Finally, it must be determined whether a securities fraud claim can be maintained against these defendants based on allegedly misleading statements regarding CSC's performance on the NHS Contract. The gravamen of the Complaint's allegations in this respect is that defendants

---

effectively, members of the internal audit group must be independent of those responsible for the controls they are evaluating. As stated in the Internal Audit Director's letter, independence was a requirement of CSC's internal audit function per "its chart of the [Institute of Internal Auditors'] Code of Professional Conduct." Compl. ¶ 93. In fact, the Institute of Internal Auditors defines internal auditing as an "independent, objective assurance and consulting activity." Institute of Internal Auditors, Definition of Internal Auditing, available at https://na.theiia.org/standards-guidance/mandatory-guidance/pages/definition-of-internal-auditing.aspx. The Internal Audit Director's letter explicitly states that the Internal Audit Director believed the Company's financials were compromised as a result of the lack of independence of the internal audit function.

knew as of May 2008—when the DA Red Team submitted its report on the feasibility of the

NHS Contract—that CSC could not perform on the NHS Contract, and yet, defendants failed to

disclose this information while also making public statements touting CSC's progress on the

contract.[15] Defendants respond that none of the statements made regarding the NHS Contract

were materially false or misleading, and that in any event, no CSC officer who made such a

statement recklessly disregarded information CSC was incapable of performing. Thus, the

question presented with respect to the NHS Contract is two-fold: (i) whether CSC's public

statements regarding the NHS Contract were misleading in their failure to disclose a material

fact; and (ii) whether the Complaint's allegations support a strong inference that any such

statement was made with scienter.

Of course, defendants are correct that certain statements cannot support a securities fraud

claim if those statements are either non-actionable "puffing" or protected under the PSLRA's

safe-harbor provision. First, certain statements by Laphen on the August and November 2008

earnings calls are undoubtedly "puffing" and thus cannot serve as the basis of a securities fraud

claim. In particular, Laphen's statements that "[w]e have steadily made progress in delivering on

our commitments to the NHS," that "[o]ur confidence continues to build on the [NHS Contract],"

and that the company was "pleased with our progress"[16] are non-actionable, as they are "loosely

optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the

opinions of the speaker, that no reasonable investor could find them important to the total mix of

---

[15] Although certain Members of Parliament stated during a hearing that "CSC knew in February 2006 that Lorenzo was a complete dog" and that "Lorenzo was hopeless for over five years," defendants correctly note that these statements are merely accusations and do not evidence defendants' knowledge at the time that the allegedly actionable statements were made. *See* Compl. ¶ 47 (emphasis removed).

[16] Compl. ¶ 121 (emphasis removed).

information available[.]" *In re Cable & Wireless, PLC, Secs. Litig.*, 321 F. Supp. 2d 749, 766–67 (E.D. Va. 2004); *accord Hillston Partners*, 42 F.3d at 211.[17] Moreover, defendants are correct that certain forward-looking statements fall within the PSLRA's safe harbor provision[18] and thus, at least with respect to the statements' predictive character, cannot support a securities fraud claim. Specifically, Laphen's and DeBuck's statement that "the company expects to recover its investment"[19] on the NHS Contract and Laphen's projections regarding the timetable for Lorenzo's deployment are protected under the PSLRA inasmuch as they are understood as predictions of future events rather than declarations of present expectations.[20]

Nonetheless, certain factual statements of material, *present* fact by Laphen and DeBuck regarding the NHS Contract were misleading insofar as they omitted the DA Red Team members' findings that CSC could not satisfy its obligations under the NHS Contract as it existed at that time. Indeed, Laphen's and DeBuck's statements on the NHS Contract's present profitability, Laphen's updates regarding Lorenzo's implementation in the early adopter sites, and Laphen's present expectations regarding the timeframe for Lorenzo's deployment[21] created

---

[17] The Complaint contains no suggestion that Laphen did not genuinely believe his optimistic statements about Lorenzo. To the contrary, the Complaint alleges that as of April 2011, Laphen "believe[d]" that Lorenzo would "succeed."

[18] 15 U.S.C. § 78u-5.

[19] Compl. ¶ 110.

[20] It cannot be concluded that these statements were made with actual knowledge of their falsity so as to deny them safe-harbor protection because, as explained *infra*, the DA Red Team members' findings support recklessness on the part of Laphen and DeBuck but nonetheless fall somewhat short of supporting actual knowledge.

[21] These assurances contained a forward-looking component but can nonetheless be considered statements of present fact and therefore actionable, as "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Makor Issues & Rights, Ltd. v. Tellabs Inc.* ("*Tellabs II*"), 513 F.3d 702, 705 (7th Cir. 2008)

the misleading impression that CSC was capable of performing on the NHS Contract, when, in

fact, the analysts tasked by CSC's Board to assess CSC's ability to perform all reached a

contrary conclusion. Moreover, the omission of the DA Red Team members' findings is plainly

material in that a reasonable investor would undoubtedly consider the findings "important in

deciding whether to buy or sell the security" and that disclosure of this fact would have

"significantly altered" the "total mix of information made available" to investors. *Longman v.

Food Lion, Inc.*, 197 F.3d 675, 682–83 (4th Cir. 1999).[22]  In particular, a reasonable investor

would surely have considered it important that CSC's own on-the-ground analysts did not

believe CSC could meet critical contractual deadlines in delivering Lorenzo.[23]  Thus, Laphen's

and DeBuck's factual statements regarding the NHS Contract were misleading given the failure

to qualify those statements with the material fact of the DA Red Team members' findings. *See

Ottman*, 353 F.3d at 352 (accepting plaintiffs' argument that defendants "had a duty to disclose"

certain material information and concluding that because defendants had "made positive

comments" during an earnings call the complaint "sufficiently plead that [defendants] made a

misleading omission").

---

(further citing as an example that "[t]he element of prediction in saying that sales are 'still going strong' does not entitle Tellabs to a safe harbor with regard to the statement's representation concerning current sales").

[22] Although a "failure to disclose material information may be excused where that information has been made credibly available to the market by other sources," there is no dispute that as of August and November of 2008, the public was unaware of the DA Red Team members' findings that Lorenzo could not be delivered per the terms of the NHS Contract. *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) (quoting *In re Apple Computer Secs. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989)).

[23] Indeed, the subsequent renegotiation and restructuring of CSC's obligations to NHS in 2009 lends credence to the findings of the DA Red Team members that as of August 2008, CSC was incapable of performing on the NHS Contract as it then existed.

With respect to scienter, a careful examination of the Complaint compels the conclusion that the facts alleged warrant a strong inference that Laphen acted with scienter when making the misleading statements about CSC's performance on the NHS Contract. The NHS Contract was one of CSC's largest, one that Laphen said he "watch[ed] most closely" and had his "utmost attention." Compl. ¶¶ 55, 113. This is an important fact supporting the scienter allegations. *See MicroStrategy*, 115 F. Supp. 2d at 657. The CSC Board, on which Laphen served as Chairman, was responsible for commissioning the DA Red Team to assess the NHS Contract in the first place. In this sense, Laphen expected that the DA Red Team would present its findings to the Board at the completion of its analysis. This factual allegation is also important in assessing the Complaint's scienter allegations. *Cf. In re Van der Moolen Holdings N.V. Secs. Litig.*, 405 F. Supp. 2d 388, 408 (S.D.N.Y. 2005) ("Given [the corporation's] reliance on revenue generated by its Wall Street-based specialists firm, it is reasonable to infer that [the CEO and CFO] kept abreast of company news that appears in *The Wall Street Journal*."). Moreover, the Complaint alleges that the DA Red Team Report was presented to Laphen as a member of the Board. Although the Complaint does not specifically allege the report's contents, other facts alleged warrant the inference that the report reflected the unanimously held findings of the DA Red Team members that CSC "could not perform the NHS Contract[,]" that "we [CSC] could not meet our deadline[,]" and that CSC "could not deliver the solution set that we had contracted with NHS." Compl. ¶ 51.[24]   In sum, given the strength of the inference that the DA Red Team Report reflected the members' particular findings, the Complaint supports a strong inference that

---

[24] And, nothing in this record suggests that Fillebrown, who prepared and presented the report, disagreed with the DA Red Team members' findings, or that he had any reason to hide or downplay these findings.

in making certain statements regarding CSC's performance on the NHS Contract, Laphen at least recklessly disregarded the DA Red Team members' findings that CSC could not perform.[25]

To be sure, other allegations concerning the NHS Contract fail to support a securities fraud claim. In particular, the allegations that there were accounting problems with the NHS Contract[26] and that Lorenzo suffered significant software defects not acceptable to the UK government[27] do not, standing alone, support a strong inference of scienter against any defendant, as the Complaint does not allege facts making it reasonable to infer that Laphen, DeBuck, or Mancuso had knowledge of these problems. Additionally, the Complaint contains several pleading ambiguities, which include the failure to identify with precision the CSC officers or directors who instructed the Deputy Head of Testing to perform an analysis of the Lorenzo software in September 2008. *See Tellabs*, 551 U.S. at 326 (commenting that "omissions and ambiguities count against inferring scienter"). Given this, the Complaint's allegations concerning the NHS Contract cannot support a securities fraud claim against DeBuck or

---

[25] Although defendants make much of the fact that CSC's obligations to the NHS changed after the NHS Contract was renegotiated in April 2009, this fact strengthens the inference of scienter inasmuch as it lends validation to the DA Red Team members' conclusion that CSC could not perform on the NHS Contract as it existed at the time.

[26] The Complaint is ambiguous as to whether the DA Red Team members concurred in the Internal Audit Director's conclusions that "there were definite GAAP violations with percentage-of-completion accounting with the NHS Contract" and that "CSC should have recognized a loss in 2008." Compl. ¶¶ 52&54. Moreover, the Complaint is devoid of specific allegations that the Internal Audit Director brought these concerns to the attention of Fillebrown, who prepared the DA Red Team Report and presented it to the Board.

[27] In September 2008, the Deputy Head of Testing told the Testing Review team that, based his detailed analysis, the quality of the Lorenzo software was "abysmal," that releases thereof could not be delivered on time, and that the defects in Lorenzo were "high and grossly beyond" what the NHS would tolerate. Compl. ¶¶ 58–60. But the response of the Head of Testing, who subsequently told the Deputy Head of Testing to "shut up" after being presented with these findings, casts substantial doubt on the Deputy Head of Testing's "belie[f]" that his report on Lorenzo's defects was sent to Laphen. *Id.* ¶ 58.

Mancuso, as the facts alleged do not support a strong inference of scienter against either defendant. But, surviving dismissal at this stage is the allegation that Laphen, and therefore CSC, made misleading statements of material fact regarding the NHS Contract with the requisite scienter. Thus, the Complaint sufficiently pleads a § 10(b) and Rule 10b-5 violation against Laphen and CSC, and leave to amend with respect to allegations against DeBuck and Mancuso is appropriate.

<h3 style="text-align:center">III.</h3>

In sum, the motion is granted in part and denied in part. It is granted insofar as the Complaint fails to plead facts which warrant the PSLRA's required strong inference of defendant's scienter with respect to earnings misstatements attributable to the Nordic Region fraud. The motion is also granted insofar as the Complaint fails to plead a strong inference that the corporation's former and current chief financial officers acted with the required scienter with respect to the NHS Contract. Finally, the motion must be granted insofar as the Complaint fails to plead a strong inference that Mr. Mancuso acted with scienter when making statements about the Company's internal controls. In all other respects, the motion must be denied, as the allegations that the corporation and its chief executive officer made misleading statements of material fact about the NHS Contract satisfy the threshold PSLRA pleading standard. Similarly, the allegations that the corporation, its chief executive officer, and its former chief financial officer, Mr. DeBuck, made misleading statements concerning the corporation's internal controls after receiving the former Internal Audit Director's letter also pass PSLRA muster.

Nonetheless, because the pleading deficiencies identified here may be remedied by amendment, it is therefore appropriate to grant plaintiffs an opportunity to amend the Complaint so that the shortcomings discussed here may be remedied, and also to maintain the stay of

discovery until the sufficiency of the second amended complaint has been decided.  To reach a different result, and to allow all of the Complaint's allegations to proceed, would in effect render the PSLRA's heightened pleading standards impotent to do the work Congress intended, namely, "to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Tellabs*, 551 U.S. at 322.

An appropriate Order will issue.

Alexandria, Virginia
August 29, 2012

_____

T. S. Ellis, III
United States District Judge