## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

IN RE COMPUTER SCIENCES     )
CORPORATION SECURITIES     )      Case No. 1:11cv610 ~~TSE IDD~~
LITIGATION     )

DEC 1 9 2012

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## MEMORANDUM OPINION

Lead plaintiff, Ontario Teachers' Pension Plan Board ("Ontario Teachers"), in this federal securities class action, seeks certification of the alleged class. Defendants, Computer Sciences Corporation ("CSC"), Michael W. Laphen, and Donald G. DeBuck oppose this motion, arguing that Ontario Teachers, on several grounds, is not an appropriate class representative. At issue, therefore, are the following questions:

1. Does Ontario Teachers meet Rule 23(a)(3), Fed. R. Civ. P.'s typicality requirement where, as here, it purchased stock in Computer Sciences Corporation ("CSC") both after CSC made disclosures correcting earlier allegedly fraudulent statements and after this lawsuit was filed?

2. Does Ontario Teachers meet Rule 23(a)(3)'s typicality requirement, where, as here, Ontario Teachers utilized four independent trading patterns which CSC claims were based on a belief that the New York Stock Exchange ("NYSE") market for CSC shares was inefficient and sometimes resulted in closely timed trades that moved in opposite directions?

3. Does Ontario Teachers meet Rule 23(a)(4)'s requirement that the lead plaintiff fairly and adequately protect the interests of the class, where, as here, it continues to hold a large number of shares of CSC stock, which CSC argues presents a conflict between Ontario Teachers' duties to the class and its duties to the beneficiaries of its pension plan?

4. Has Ontario Teachers adequately demonstrated that the NYSE market for CSC stock was efficient, thereby allowing Ontario Teachers to rely on the fraud-on-the-market doctrine to establish a presumption of reliance?

For the reasons that follow, Ontario Teachers satisfies Rule 23(a)(3)'s typicality requirement, as well as Rule 23(a)(4)'s requirement that it fairly and adequately protect the class. Ontario Teachers also has adequately demonstrated that the NYSE market for CSC stock is

1

efficient. Thus, Ontario Teachers' motion for class certification, for appointment of Ontario Teachers as lead plaintiff, and for appointment of class counsel must be granted.

## I.[1]

Defendant CSC is a global information technology and business services company headquartered in Falls Church, Virginia. CSC common stock trades on the NYSE under the ticker symbol "CSC." During the relevant period, defendant Michael W. Laphen was the Chairman of CSC's Board, its President, and its CEO. Defendant Donald G. DeBuck served as CSC's Corporate Controller and as Interim CFO from February 2008 until December 2008.

On June 3, 2011, plaintiff City of Roseville Employee's Retirement System filed this action, and on August 29, 2011, an Order issued consolidating that case with three other similar cases filed by other plaintiffs and also granting Ontario Teachers' motion for appointment as lead plaintiff, as well as approving its choice of lead counsel. *In re Computer Sciences Corp. Sec. Litig.*, 1:11cv610 (E.D.Va. Aug. 29, 2011) (Order).

Ontario Teachers is Canada's largest single-profession pension plan. During the class period, Ontario Teachers traded extensively in CSC stock on the NYSE, using four trading strategies that operated independently of each other: (i) a basket index strategy, (ii) a quantitative strategy, and (iii) two value investing strategies. At the beginning of the class period, Ontario Teachers held 29,000 shares of CSC's stock. Approximately one month into the class period, Ontario Teachers sold nearly all of its shares and then, over the next three years, proceeded to acquire a large holding in CSC stock. During the class period, Ontario Teachers made 41

---

[1] The facts recited here are derived from the record and are limited to the facts pertinent to the class certification issues presented. For a more complete statement of the facts, *see In re Computer Sciences Corp. Sec. Litig.*, __ F.Supp. 2d __, No. 1:12-cv-1100, 2012 WL 3779349 (E.D.Va. August 29, 2012) (granting in part and denying in part defendants' motion to dismiss).

purchases of CSC stock, ranging in size between 700 and 87,400 shares each, as well as 8 sales of the stock ranging in size from 1,795 to 28,300 shares. Ontario Teachers continued to purchase shares after the allegedly false statements were corrected via public disclosures, and indeed after this action was filed. As of October 3, 2011, Ontario Teachers held nearly 1 million shares of CSC stock, which is approximately 0.64% of outstanding CSC shares.

In the complaint[2], plaintiffs allege that during the putative class period—August 5, 2008 to August 9, 2011, inclusive—defendants committed securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 chiefly in two respects. First, plaintiffs allege that defendants knew or recklessly disregarded that CSC's internal accounting controls were inadequate, and despite knowing this, repeatedly made public statements that CSC's internal controls were in fact adequate. Second, plaintiffs allege that defendants knew or recklessly disregarded that CSC's own analysts had concluded that CSC could not perform the National Health Service ("NHS") contract as required, and despite this, persisted in providing to the public misleading, optimistic assessments of CSC's progress on the NHS contract. Plaintiffs assert that CSC made false and misleading statements about its internal controls and the NHS contract on the various earnings release dates during the class period. [3]

---

[2] The "complaint" as used herein refers to the currently operative Corrected Amended Consolidated Class Action Complaint filed on October 19, 2011.

[3] Plaintiffs also alleged in the complaint that defendants knew or recklessly disregarded that the revenue figures submitted by CSC's Nordic Region division were fraudulently inflated, and nonetheless included those figures in CSC's 2010 revenue. This claim was dismissed pursuant to defendants' Rule 12(b)(6) motion, as the complaint failed to plead facts sufficient to warrant a strong inference of scienter, as required by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Defendants' motion was also granted insofar as the complaint failed to plead facts warranting (i) a strong inference that defendants DeBuck and Mancuso, CSC's Chief Financial Officer, acted with the requisite scienter with respect to the NHS contract, and (ii) a strong inference that defendant Mancu so acted with the requisite scienter when making

3

More specifically, with respect to the allegedly misleading statements on internal controls, on a quarterly basis, CSC's CEO and CFO stated in each of CSC's 10–Q Forms between August 2008 and August 2011 that CSC's internal controls over financial reporting had been evaluated for effectiveness and that the 10-Qs disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting." Compl. ¶¶ 109, 118, 126, 134, 145, 146, 162, 163, 179, 180, 205, 206, 222, & 223.

Plaintiffs assert that defendants could not have made these statements believing them to be true in light of a September 2, 2008 letter that CSC's Director of Internal Audit and Corporate Risk Management (the "Internal Audit Director") from August 2005 until August 2008, sent to the Chairman of CSC's Audit Committee with copies to Laphen and DeBuck. In that letter, the Internal Audit Director expressed his concerns about the loss of the internal audit function's independence and the fact that the absence of independence had gone unaddressed. He also stated his "belief ... that the internal audit practice poses a significant risk both to CSC and its shareholders." *Id.* ¶ 93 (emphasis removed). The letter also stated the Internal Audit Director's belief that the Chief Audit Executive "has seriously compromised the integrity of the practice as well as the financials of this firm" and that the Chief Audit Executive's "failure [ ]" to raise several accounting issues "ha[s] cost this firm many millions of dollars[.]" *Id.* (emphasis removed). Finally, the letter noted that neither a financial audit of the NHS Contract, nor an audit of the controls over the contract, had been performed. *Id.* ¶ 94.

---

statements about CSC's internal controls. *See In re Computer Sciences Corp. Sec. Litig.*, __ F.Supp. 2d __, No. 1:12-cv-1100, 2012 WL 3779349 (E.D.Va. August 29, 2012); *In re Computer Sciences Corp. Sec. Litig.*, 1:11cv610 (E.D.Va. Aug. 29, 2012) (Order). Although plaintiffs were given leave to amend the dismissed claims, they elected not to do so.

As to the NHS contract, the complaint alleges that in early 2008, CSC formed an internal team to review the NHS contract for "financial and operational feasibility." *Id.* ¶ 49. According to the complaint, this team, the Delivery Assurance Review Red Team (the "DA Red Team"), concluded "from a technology and operating perspective" that CSC "could not perform the NHS Contract." Compl. ¶ 51. In particular, the complaint alleges that DA Red Team members were "very consistent in [the] message that we [CSC] could not meet our deadline" and that CSC "could not deliver the solution set that we had contracted with NHS." *Id.* ¶ 51. The complaint further alleges that the Vice President for Contract Performance and Quality Assurance presented a report on the DA Red Team's findings in May of 2008, and that Laphen would have received this report as a Board member. The complaint also alleges that CSC did not publicly disclose the DA Red Team's findings or CSC's problems with the NHS contract and that given these omissions, CSC's continuing positive statements about internal controls and progress under the NHS contract were materially misleading. Plaintiffs claim that the false statements artificially inflated CSC's stock price until CSC made a series of corrective disclosures between February 9, 2011 and August 10, 2011.

## II.

Lead plaintiff Ontario Teachers now seeks certification of the alleged class, as well as appointment of itself as class representative and its counsel as lead counsel. CSC attacks Ontario Teachers' ability to serve as class representative on four grounds. First, CSC does not concede that the NYSE market for CSC stock is efficient and asserts that Ontario Teachers has not met its burden of proving that the market is efficient. Therefore, CSC argues, Ontario Teachers should not be allowed to rely on the fraud-on-the-market theory for proving reliance on the alleged

misstatements. Second, CSC asserts that Ontario Teachers' trading strategies provide CSC with unique defenses to Ontario Teachers' claims and make Ontario Teachers atypical under Rule 23(a)(3), as well as demonstrate that Ontario Teachers itself does not believe the NYSE market for CSC stock is efficient. Third, CSC claims that Ontario Teachers' purchases of CSC stock after the end of the class period also subject Ontario Teachers to unique defenses thereby rendering Ontario Teachers atypical, and hence an unsuitable class representative under Rule 23(a)(3). Fourth, CSC claims that because Ontario Teachers continues to hold a large number of CSC shares, Ontario Teachers' duty to its pension fund beneficiaries to maximize the value of its investments would conflict with its duties to the class as class representative. CSC therefore contends that Ontario Teachers cannot fairly and adequately protect the interests of the class, as required by Rule 23(a)(4). Each of these contentions is separately addressed.

## III.

It is axiomatic that Ontario Teachers, as the party seeking class certification, has the burden of proving that all class certification requirements are met. *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011); *see also Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614 (1997). Therefore, Ontario Teachers has the burden of demonstrating (1) that the class is so numerous that the joinder of all members would be impracticable; (2) that questions of law or fact are common to the class; (3) that the claims or defenses of the representative party are typical of those of the class; and (4) that the representative party will fairly and adequately protect the interests of the class. Rule 23(a), Fed. R. Civ. P. Apart from these Rule 23(a) requirements, Ontario Teachers must also show that the requirements of Rule 23(b)(3) are met, namely that "questions of law or fact common to the members of the class predominate over any

6

questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3), Fed. R. Civ. P. Importantly, as the Supreme Court has recently reiterated, a court must perform a "rigorous analysis" to determine whether the party seeking class certification has borne the burden of establishing the certification requirements. *Wal-Mart Stores*, 131 S.Ct. at 2551. And in doing so, the Supreme Court noted that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Id.* This rigorous analysis required to determine the propriety of class certification is necessary to ensure that class actions remain "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). It remains now to apply these settled principles here.

The class certification dispute in this case is sharply focused. CSC does not dispute numerosity; there is no doubt that the class is so numerous that joinder of all members would be impracticable. Nor does CSC argue that questions of law or fact are not common to the class; they plainly are. Rather, as noted, the parties' class certification dispute focuses on (i) whether the NYSE market for CSC shares was efficient; (ii) whether Ontario Teachers is typical of the plaintiff class under Rule 23(a)(3); and (iii) whether Ontario Teachers will fairly and adequately protect the interests of the class, as required by Rule 23(a)(4).

Before considering these specific questions, it is worth noting that the parties do not dispute the well-settled principles governing Rule 23(a)(3) and Rule 23(a)(4). Typicality under Rule 23(a)(3) is designed to ensure that the class representative's interests will be sufficiently aligned with those of the other class members and "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to

prove the defendant's liability." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001); s*ee also Beck v. Maximus, Inc.*, 457 F.3d 291, 295–96 (3d Cir. 2006); *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001) (stating "[t]he critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality."); *see also* 1 Newberg on Class Actions § 3:29 (5th ed.) (collecting cases reflecting this principle).

No less important than typicality is Rule 23(a)(4)'s adequate representation requirement, the primary purpose of which is to detect and avoid potential conflicts between lead plaintiffs and other class members. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997). Additionally, courts consider whether the potential class representative will be able to pursue the case vigorously. *See* 1 Newberg on Class Actions § 3:54 (5th ed.) (collecting cases). Potential conflicts between class representatives and class members include "differences in the type of relief sought, especially retrospective versus prospective relief; class representatives with current injuries representing a class that includes members who may experience injury in the future; and economic competitors within the same class." *Id.*

## The Efficiency of the NYSE Market for CSC Stock

The efficiency of the NYSE market for CSC shares is addressed first because the class certification decision rests to some degree on market efficiency. Moreover, market efficiency is central to an element of plaintiffs' securities fraud claim, namely the requirement of justifiable reliance on the allegedly false statements.[4] The traditional notion of reliance made class

---

8

certification in federal securities fraud cases nearly impossible because if each individual

plaintiff were required to demonstrate reliance, then individualized issues might well always

predominate over issues common to the class. *See* Rule 23(b)(3), Fed. R. Civ. P. To avoid this

result, the Supreme Court in *Basic v. Levinson*, 485 U.S. 224 (1988), provided an alternative

means of demonstrating reliance. In Justice Blackmun's words:

> "[a]n investor who buys or sells stock at the price set by the market
> does so in reliance on the integrity of that price. Because most
> publicly available information is reflected in market price, an
> investor's reliance on any public material misrepresentations,
> therefore, may be presumed for purposes of a Rule 10b-5 action."

*Basic,* 485 U.S. at 247.

The market efficiency analysis properly begins with the definition of such a market,

which the Fourth Circuit has noted is a market where "'the market price has integrity[;]…it

adjusts rapidly to reflect all new information.'" *Gariety v. Grant Thornton, LLP*, 368 F.3d 356,

367-68 (4th Cir. 2004) (quoting Jonathan R. Macey & Geoffrey P. Miller, *Good Finance, Bad

Economics: An Analysis of the Fraud-on-the-Market Theory*, 42 Stan. L. Rev. 1059, 1060

(1990)). This definition is consistent with the definitions provided by the parties' experts in this

case, as well as the definition provided by Eugene Fama, the individual largely credited with

developing the efficient market hypothesis.[5] In essence, this means that the market for a stock is

---

[4] To prevail under § 10(b) of the Securities Exchange Act and Rule 10b-5, "'a plaintiff must
prove that, in connection with the purchase or sale of a security, (1) the defendant made a false
statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably
relied (4) that proximately caused the plaintiff's damages.'" *Gariety v. Grant Thornton, LLP,*
368 F.3d 356, 362 (4th Cir. 2004) (quoting *Longman v. Food Lion, Inc.,* 197 F.3d 675, 682 (4th
Cir. 1999)).

[5] *See* Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25
Journal of Finance 383 (1970) ("[a] market in which prices always 'fully reflect' available
information is called 'efficient'"); Eugene F. Fama, *Random Walks in Stock Market Prices*, 21

9

efficient if the market price for the stock reflects or incorporates, in a timely fashion, any **material, unexpected** information. If unexpected, material information is perceived by purchasers in the market as positive, they will bid the price of the stock up. If the unexpected, material information is perceived as negative, stockholders will seek to sell their stock, driving the price of the stock down. Of course, information that is not new, or already anticipated or expected, will likely have no effect on stock price when disclosed, as the market will already have taken this information into account.

Given this understanding of an efficient market, courts have had no difficulty identifying certain factors or criteria that indicate that a market is efficient. The Fourth Circuit in *Gariety* identified the following three factors, among others, for courts to consider in determining whether a market is efficient: (1) whether the security is actively traded; (2) the volume of trades in the stock; and (3) the extent to which the security is followed by market professionals. *Gariety*, 368 F.3d at 368. Ontario Teachers has made a strong showing that the market for CSC stock meets these criteria. Specifically, Ontario Teachers has shown that there are over 155 million shares of CSC stock currently outstanding, that CSC's average weekly trading volume is more than 4% of the outstanding shares of CSC stock, and that CSC stock is followed by some 39 analysts who issued more than 300 reports on the stock during the class period. Additionally, the stock is traded on the NYSE, a fact that is not itself necessarily dispositive, but certainly weighs in favor of finding that the stock is traded in the sort of "impersonal, well-developed market for securities" that the Supreme Court envisioned when it adopted the fraud-on-the-market theory in *Basic v. Levinson*. 485 U.S. at 247.

---

Financial Analysts Journal 5, 55-59 (1965) (for the idea that in efficient markets, securities prices reflect all current information).

Other courts have found that stocks with similar weekly trading volumes traded on an efficient market.[6] Indeed, in *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989), a case cited by CSC, the court held that an average weekly trading volume of 2% or more of the outstanding shares "would justify a strong presumption that the market for the security is an efficient one." The weekly trading volume percentage of CSC stock is twice this number. In sum, Ontario Teachers has made an adequate showing that the NYSE market for CSC stock is efficient. Also worth noting is that CSC has cited no case, and none has been found, holding that the NYSE is not an efficient market for shares of common stock traded, as here, in substantial volumes.

Nonetheless, CSC seeks to avoid this conclusion by claiming that Ontario Teachers has not met its burden to establish market efficiency because it has failed to adduce an event study showing that the allegedly false statements made on the earnings release days caused an upward movement in the price of CSC stock. In doing so CSC essentially argues that satisfactory proof of market efficiency requires a confirmatory event study. This argument is unpersuasive and misreads circuit authority. To be sure, the Fourth Circuit has made clear that district courts must conduct a "rigorous analysis of whether... [the security in question] traded in an efficient market" even if the determination overlaps with merits issues, which, of course, it does here. *Gariety*, 368 at 368. And the Fourth Circuit has also made clear that mere assertions that the stock trades in an efficient market are not sufficient. *Id.* Although *Gariety* does not explicitly

---

[6] *See City of Ann Arbor Employees' Retirement System v. Sonoco Products Co.*, 270 F.R.D. 247, 256 (D.S.C. 2010) (finding a stock with a weekly trading volume of 2.61% to have traded in an efficient market); *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 107 (finding an average weekly trading volume of 2-3.5% indicative of market efficiency); *In re Alston SA Securities Litigation*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (finding that an average weekly trading volume of 4.3% of the company's outstanding shares was sufficient to establish market efficiency, noting that the volume exceeded the 1-2% standard).

11

state that the efficiency of the market must be proved by a preponderance of the evidence, other district courts in the Fourth Circuit have applied a preponderance standard. And that standard is clearly correct, given that an efficient market is a surrogate for the reliance element, which itself must be shown by a preponderance of the evidence. *See In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 104 (E.D. Va. 2009); *In re Safety-Kleen Corp. Bondholders Litig.*, No. 3:00-1145-17, 2004 WL 3115870, at *2 (D.S.C. Nov. 1, 2004).

Yet, CSC's argument that an event study showing market efficiency is required for reliance purposes is incorrect for two reasons. First, Fourth Circuit precedent does not require that the efficiency of the market be proved using an event study to show a cause and effect relationship between company announcements and changes in the company's stock price. Of course, event studies may be helpful in proving market efficiency in certain situations, but such studies are neither required by the Fourth Circuit, nor probative in all circumstances. Second, the argument that there would be a positive impact on stock price from each of the allegedly false statements misstates Ontario Teachers' argument by suggesting that Ontario Teachers is implying that the price of the stock rose as a result of the announcements, rather than simply remaining inflated because of these announcements. Additionally, this theory is not in keeping with the key principle underlying the efficient market theory, namely that in an efficient market **material, unexpected** information will be timely reflected in the stock price.

The flaw in CSC's argument that this circuit requires an event study to show market efficiency becomes even more apparent with a close review of the authority on which CSC relies. The source of CSC's argument is *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989), which states that "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price" is "the essence of an efficient

market and the foundation for the fraud-on-the-market theory." Because *Cammer* is cited in *Gariety*, CSC mistakenly concludes that the Fourth Circuit is thereby holding that a cause and effect relationship between unexpected news and changes in the price of CSC stock is the most important element in demonstrating efficiency, and that an event study must be adduced to make such a showing. CSC misreads *Gariety*, which merely cited *Cammer* and its factors as an example of factors to consider, but did not require or even highlight the use of event studies to demonstrate a cause and effect relationship. *Gariety*, 368 F.3d at 368.

On the event study issue, CSC also relies on *In re Federal Home Loan Mortgage Corp.*, 281 F.R.D. 174 (S.D.N.Y. 2012), where a district court in the Southern District of New York concluded, despite the fact that all of the other *Cammer* factors indicated market efficiency, that plaintiffs there had not adequately demonstrated that the market for defendants' stock was efficient because the plaintiffs' event study did not adequately show a cause and effect relationship.[7] Because the court found that plaintiffs had not successfully shown a cause and effect relationship, it held that plaintiffs could not rely on the fraud-on-the-market theory.

Notably, *In re Federal Home Loan Mortgage Corp.* is distinguishable because the stock there in question was a limited series of preferred shares, which are traded in patterns significantly different from the trading patterns typical of common shares. It is not surprising that no other federal courts have concluded that common shares traded on the NYSE are not traded in an efficient market. In sum, there is simply no basis to conclude from the fact that *Gariety* cited *Cammer* that an event study is always required to demonstrate market efficiency in

---

[7] It is worth noting that Dr. Mukesh Bajaj, the defendants' expert witness in this case, was also the defendants' expert witness in *In re Federal Home Loan Mortgage Corp.*

the Fourth Circuit. And to the extent that *Cammer* itself may be read to require an event study, it is not persuasive.

Furthermore, using the allegedly false statements to show market efficiency in this case defies basic logic. The bedrock principle underlying the efficient market theory is that the market will respond quickly to **material, unexpected** news that alters the total mix of information publicly available. The statements that Ontario Teachers alleges were fraudulent—statements that CSC's internal controls were in compliance with the Sarbanes-Oxley Act of 2002's requirements or that the NHS contract was being performed according to schedule—were expected, status-quo statements that would be unlikely to move the market. To be sure, CSC correctly points out that some of the statements on the progress of the NHS contract were essentially positive, but this does not mean that it was new or unexpected information, such that a change in the price of the stock should have been anticipated.

In support of their competing contentions concerning the efficiency of the NYSE as a market for CSC stock, both sides have provided expert affidavits, including event studies that purport to track the movement of the price of CSC stock following CSC's earnings announcements made during the class period, including the announcements where the allegedly false statements were made.[8]   The event study performed by CSC's expert, Dr. Mukesh Bajaj, concluded that there was no statistically significant positive movement in the price of CSC shares when 15 of the 16 allegedly false announcements were made. In response to CSC's event study, Ontario Teachers' expert, Ms. Jane Nettesheim, performed her own event study using different parameters, including a different control period. Ms. Nettesheim's event study focused

---

[8] Neither party has questioned the experts' qualifications under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

on various earnings announcements during the class period, including most of the announcements examined in Dr. Bajaj's event study. Ms. Nettesheim concluded that the absence or presence of statistically significant excess returns on the earnings announcement dates was consistent with a finding of market efficiency based on her analysis of the news released on each event day and the corresponding movement or lack of movement in the stock price. CSC claims that this analysis suffers from various flaws, including failing to show statistically significant changes in the stock price for a sufficient percentage of the dates in the study, cherry-picking news that aligned with the observed change in the stock price, and failing to take into account the volatility of the market in 2007 and 2008. Despite these objections, Ms. Nettesheim's analysis is persuasive because there is no reason to believe that the stock price would rise based on these announcements of essentially status quo, expected information and because Ms. Nettesheim's analysis considered the effect of other information released on the same days.

CSC's expert also argues that the statistically significant reductions in the price of CSC stock following the corrective disclosures—which unquestionably occurred—cannot be used to demonstrate market efficiency. This is so, CSC claims, because its stock was not trading in even a weak-form market at the time of the corrective disclosures, and in order to demonstrate market efficiency using an event study, a stock must have been trading in at least a semi-strong-form market. Dr. Bajaj concluded that the stock traded in something less than a weak-form market based on his finding of serial correlations in stock returns. Ms. Nettesheim countered, claiming that Dr. Bajaj has not demonstrated all of the elements necessary to show that a stock traded in a weak-form market, including showing that the serial correlations could have been used to generate trading profits.[9] Overall, Ms. Nettesheim's arguments are persuasive.

In sum, Ontario Teachers has borne its burden of showing that CSC shares traded in a reasonably efficient market[10] during the class period. Given the number of CSC shares traded weekly on the NYSE, the number of analysts who follow CSC stock on the NYSE, and the way in which corporate information flows freely via the media, there is sufficient evidence to conclude that any unexpected, material information made public would have been timely reflected in the price of CSC stock. Of course, although Ontario Teachers has made the requisite showing to enable it to use the presumption of reliance, that presumption is rebuttable. *Basic*, 485 U.S. at 248-49. Defendants will have the opportunity at trial to rebut the presumption that the NYSE market for CSC shares is an efficient one.

### Ontario Teachers' Trading Strategies

CSC next argues that Ontario Teachers fails the typicality requirement of Rule 23(a)(3) because it is subject to unique defenses owing to its use of certain trading strategies. Ontario Teachers bought and sold CSC stock numerous times during the class period using four different trading strategies that operated independently from each other. First, using the Basket Index Strategy, Ontario Teachers purchased a mix of securities that replicated the S&P 500 index. Second, under the Quantitative Strategy, Ontario Teachers selected stocks from a pool of securities and then analyzed these stocks according to various financial metrics. The stocks that

---

[9] *See* Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work,* 25 The Journal of Finance 383, 414 (1970) (stating that short-term dependence in which trading profits could not be generated because of the transaction fees would not "be of sufficient importance to warrant rejection of the efficient markets model").

[10] Of course, it must be said that the NYSE is not a perfectly efficient market for any stock, as there is no such thing as a perfectly efficient market. Markets are human creations, and nothing humans create is perfect.

performed best under these metrics were purchased. Third, under the Internal Value Investing Strategy, Ontario Teachers' fund manager developed an opinion on the value of a security in question, discounted that value and compared it to the price at which the stock was trading. If the market price was less than the discounted value, the fund purchased the stock. Fourth, Ontario Teachers employed the External Value Investing Strategy in which securities were selected from a group of stocks held by Ontario Teachers' external financial manager, ValueInvest, and then analyzed under various financial metrics, with Ontario Teachers purchasing those stocks it believed were undervalued in the market. In addition, there were times during the class period where Ontario Teachers purchased a block of CSC stock under one trading methodology and then sold a block of CSC stock under a different trading methodology within only a few days of the purchase. Ontario Teachers also purchased stock in close proximity to CSC's corrective disclosures. CSC contends that Ontario Teachers will have to answer for this behavior at trial, subjecting it to unique defenses and making it atypical as a class member.

Rule 23(a)(3) requires that a plaintiff show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class...." A proposed class representative's claim is "typical" when the class representative is "part of the class and possess[es] the same interest and suffer[s] the same injury as the class members." *Lienhart v. Dryvit Sys.*, 255 F.3d 138, 147 (4th Cir. 2001). Even if the same interests and injuries are present for all class members, the typicality of the class representative may be defeated if the class representative is subject to unique defenses that threaten to become the focus of the litigation.[11]

---

[11] *See In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 105 (E.D. Va. 2009); *Shiring v. Tier Technologies, Inc.*, 244 F.R.D. 307, 312-13 (E.D. Va. 2007) (citing *Baffa v. Donaldson, Lufkin &*

Ontario Teachers' claims are plainly typical of the claims of the class, as Ontario Teachers possesses the same interest and has suffered the same injury as the other class members. *See Lienhart*, 255 F.3d at 147. CSC argues that this typicality is outweighed by the unique defenses Ontario Teachers is subject to as a result of its trading strategies. This argument fails to persuade. To begin with, as the testimony of Ontario Teachers' Rule 30(b)(6) witness reflects, each of Ontario Teachers' purchases of CSC stock was the result of an independent investment decision made in reliance on the market price of CSC shares reflecting all of the publicly available information. Jeffrey Davis Depo., 52-53, 156-59, 173-74, 176-77, 188. In other words, although the strategies use different methodologies for selecting shares to purchase, the differing trading strategies all rely on the integrity of the market price to reflect all publicly available information. While CSC will adduce testimony at trial concerning these trading strategies to defend against Ontario Teachers' assertion of reliance on the market, this testimony will not substantially divert the focus of the trial from the main liability issues. *See In re Mills Corp. Sec. Litig.*, 257 F.R.D. at 105. Put differently, there is no reason to fear that Ontario Teachers "will become distracted by the presence of a possible defense applicable only to [it] so that the representation of the rest of the class will suffer." *J.H. Cohn & Co.,* 628 F.2d at 998-99. Moreover, there is no requirement that all members of the class employ precisely the same trading strategy; all that is necessary is that members of the class—using whatever investment strategy they choose—rely in some measure on the allegedly fraudulent statements, even if that reliance is only manifest through purchases of the shares at the price set in an efficient market.

---

*Jenrette Sec. Corp.,* 222 F.3d 52, 59 (2d Cir.2000); *J.H. Cohn & Co. v. American Appraisal Associates, Inc.,* 628 F.2d 994, 998-99 (7th Cir.1980) (explaining that the unique defense rule exists because "[t]he fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer")).

CSC also contends that by using the two value investing strategies to make a total of 85.1% of its purchases during the class period, Ontario Teachers did not rely on the efficiency of the market. According to CSC, these strategies are premised on the notion that the price of the shares on the market does not reflect all of the available information. In support, CSC cites the website of ValueInvest, Ontario Teachers' third-party investment manager. This ValueInvest website states "[i]t is our belief that the market is inefficient in the short term—thus mispricing company stock. As value investors, we can exploit these periodic, inefficient valuations of individual sectors and companies." ValueInvest Asset Management SA, http://www.valueinvest.lu/UK/Philosophy/Investment_philosophy.aspx (last visited Dec. 19, 2012). CSC also cites Ontario Teachers' 2011 annual report, which stated that "[o]ur internally managed absolute return strategies generally look to capitalize on market inefficiencies." Ontario Teachers' Pension Plan Board, 2011 Annual Report at 32.

CSC's reliance on these statements to show that the NYSE is inefficient in the sense here defined is misplaced. The use of the term "market inefficiencies" in this context means not that the market fails to reflect a collective assessment by buyers and sellers of all of the currently available public information about a company, but instead simply means that ValueInvest and Ontario Teachers assess and evaluate that information differently from the collective assessment. Most investors purchase stock based on the belief that the market is, in some way and for some reason, undervaluing the stock and that the stock will thereafter appreciate; the investor's decision is not a statement that the market does not reflect a collective assessment of currently available information.[12]

---

[12] Of course, investors with insider information are not alleged to be members of this class.

19

In sum, Ontario Teachers' various trading strategies do not serve to erase Ontario Teachers' typicality, or to show that Ontario Teachers did not rely on the efficiency of the market in making its purchases. Therefore, Ontario Teachers' trading strategies do not alter the conclusion that Ontario Teachers' interest and claims are typical of the class, nor do they prevent Ontario Teachers from serving as an appropriate and effective class representative.

## Ontario Teachers' Purchases of Stock after the End of the Class Period

CSC next claims that Ontario Teachers' stock purchases after the corrective disclosures and after the filing of this suit subject it to unique defenses and therefore prevent Ontario Teachers from being typical of the class, as required by Rule 23(a)(3). In this regard, CSC correctly notes that as of the time that Ontario Teachers sought class certification, 24.8% of the CSC shares held by Ontario Teachers had been purchased after the corrective disclosures. More specifically, CSC argues that the post-corrective disclosure purchases render Ontario Teachers atypical because Ontario Teachers will have to explain why it purchased stock in a company that Ontario Teachers believed had misled investors. CSC also argues that the post-disclosure purchases show that Ontario Teachers did not rely on the allegedly fraudulent statements and would have purchased CSC stock in any event.

Contrary to CSC's contention, these purchases do not make Ontario Teachers subject to unique defenses and do not destroy Ontario Teachers' typicality as class representative. First, post-disclosure purchases will not destroy a lead plaintiff's typicality unless they threaten to become the focus of the litigation, which they do not in this case. *See In re Mills Corp. Sec. Litig.*, 257 F.R.D. at 105. Second, post-disclosure purchases may well make sound economic sense in an efficient market because the market reflects news of any corrective disclosures in the

stock price, typically lowering the stock price. The purchase of the stock at the lower post-corrective disclosure price in no way indicates that plaintiff would have purchased the stock at the pre-disclosure, inflated price absent the allegedly fraudulent statements. Therefore, post-disclosure purchases do not demonstrate that Ontario Teachers failed to rely on the market and hence do not defeat the fraud-on-the-market theory or subject Ontario Teachers to a unique defense by refuting their claim that CSC deceived them.

Although published decisions are divided on this point, the substantial majority of these cases hold that post-disclosure purchases do not disqualify a potential class representative. *See* cases collected at 1 Newberg on Class Actions § 3:41 (5th ed.). Post-disclosure purchases are consistent with the fraud-on-the-market theory and may be entirely rational and indeed a sound investment where the stock is traded in an efficient market. Once the market has been made aware of a company's fraud or other financial misstatements, that information is reflected in the stock price, typically lowering the price. This decrease may make the stock attractive to an investor despite any earlier misstatements. The decision to purchase after a post-disclosure drop, however, does not carry the inference that Ontario Teachers would have purchased at the inflated pre-disclosure price had it known the truth. And, "[r]eliance on the integrity of the market prior to disclosure of alleged fraud (i.e. during the class period) is unlikely to be defeated by post-disclosure reliance on the integrity of the market….both the high [pre-disclosure] and low [post-disclosure] prices were assumed accurate since the stocks were traded on an efficient market." *Feder v. Electronic Data Systems Corp.*, 429 F.3d 125, 137-38 (5th Cir. 2005).[13]

---

[13] *See also In re K-V Pharm. Co. Sec. Litig.*, No. 11-cv-01816, 2012 WL 1570118, at *6 (E.D. Mo. May 3, 2012) (finding that courts have consistently rejected the idea that post-disclosure purchases defeat the proposed lead plaintiff's ability to rely on the fraud-on-the-market theory); *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 576-77 (N.D. Cal. 2009) (holding that post-

In sum, Ontario Teachers' post-corrective disclosure purchases of CSC stock do not alter the fact that Ontario Teachers has the same claims and interests as the class and do not suggest that the purchases will distort the focus of the case. Therefore, these purchases do not render Ontario Teachers atypical under Rule 23(a)(3).

## Ontario Teachers' Continued Holding of CSC Stock Creates no Conflict with Other Class Members

Finally, CSC contends that by continuing to hold nearly 1 million shares of CSC stock, Ontario Teachers faces conflicting duties to the beneficiaries of its pension fund and to members of the class, rendering it unable adequately to represent the class as required by Rule 23(a)(4).[14]

---

disclosure stock purchases did not destroy the proposed class representative's typicality); *In re Recoton Corp. Sec. Litig.*, 248 F.R.D. 606, 619 (M.D. Fla. 2006) (finding that the proposed class representative's post-disclosure purchases did not defeat typicality because the proposed class representatives "were exposed to the same pattern of fraudulent conduct as other class members"). *But see Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (finding that the class representative's purchases made after the revelation of an alleged fraud make the class representative subject to a unique defense that precludes the purchaser from being the class representative); *Rolex Employees Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991) (finding Rolex atypical and refusing to certify it as class representative, saying "[t]he fact that Schmidt, acting on behalf of Rolex, continued to trade in the stock in Mentor Graphics after he learned of the alleged misrepresentations of defendants severs the link between the alleged misrepresentations of defendants and the stock purchases made by Schmidt and acts to rebut the presumption that Schmidt relied on the alleged misrepresentations in making his purchases"); *In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (finding that lead plaintiff's increase in his holdings following the disclosure of the fraud made him atypical and therefore disqualified him as class representative).

[14] There is an irony in this argument that is worth noting. The attack mounted by CSC on Ontario Teachers' candidacy as class representative has to be characterized as formidable and thorough. The energy devoted to the attack reflects the fact that CSC actually considers Ontario Teachers to be a strong and potentially effective opponent. If CSC truly thought that Ontario Teachers would not vigorously and competently pursue its duties as class representative, it is unlikely that CSC would fight so hard to prevent the appointment of Ontario Teachers as class representative.

Ontario Teachers has an obligation to the beneficiaries of its pension fund to maximize the value of its holdings, including its holdings in CSC. CSC argues that this duty to maximize the value of its holdings in CSC may mean that Ontario Teachers will not pursue the interests of the class as vigorously as it otherwise might.

CSC's argument was best articulated in a case commonly referred to as *Seagate II*. In that case, the District Court for the Northern District of California held that "[t]hose plaintiffs who still own shares of the relevant security at the date of suit have divided loyalties: on the one hand, they hope for recovery for themselves; as equity holders in the relevant issuer, however, they also wish to minimize the overall liability of the company." *In re Seagate Technology II Sec. Litig.*, 843 F. Supp. 1341, 1362 (N.D. Cal. 1994). CSC's expert goes so far as to state that for every dollar Ontario Teachers seeks to recover, it will suffer 4.61 times as much in losses to its current holdings in CSC stock, incentivizing it not to provide the best representation for the class.

CSC's argument fails for three reasons. First, most courts have rejected the holding in *Seagate II* and have found that class representatives can still represent the class adequately even though they continue to hold stock in the defendant company. *See* 1 Newberg on Class Actions § 3:62 (5th ed.) (collecting cases). Some courts have avoided adopting the *Seagate II* logic because doing so "would be inconsistent with the Court of Appeals' strongly favorable view of the class action device in securities cases generally." *Connecticut Ret. Plans & Trust Funds v. Amgen, Inc.*, No. CV 07-2536, 2009 WL 2633743, at *6 (C.D. Cal. Aug. 12, 2009) (citing *In re Honeywell Intern. Inc. Sec. Litig.*, 211 F.R.D. 255, 261 (D.N.J. 2002)), *aff'd sub nom. Connecticut Ret. Plans & Trust Funds v. Amgen Inc.*, 660 F.3d 1170 (9th Cir. 2011). Other courts have rejected *Seagate II* because, as with the post-disclosure purchases, "the antagonism

that supposedly exists between equity holders is not 'at the very heart of the suit.' Rather, it is 'peripheral' to the Class' 'overriding common interest in establishing the existence and materiality of misrepresentations.'" *Id.* (quoting *Blackie v. Barrack*, 524 F.2d 891, 908-10 (9th Cir. 1975)). *See also In re Daimler Chrysler AG Sec. Litig.*, 216 F.R.D. 291, 297-98 (D. Del. 2003) (finding that any potential conflicts between those continuing to hold shares and those who no longer hold shares did not bar certification and might be dealt with by creating subclasses of plaintiffs, if necessary); *In re Schering-Plough Corp. Sec. Litig.*, No. Civ. A. 01-0829, 2003 WL 25547564, at *10 (D.N.J. Oct. 10, 2003) (certifying a class in which lead plaintiff had a substantial holding in the company's stock); *In re Honeywell Int'l Inc. Sec. Litig.*, 211 F.R.D. 255, 261 (D.N.J. 2002) (noting that "[t]he *Seagate II* approach has been rejected by an overwhelming majority of courts"); *In re Tyco Int'l Ltd.*, 236 F.R.D. 62, 70 (D.N.H. 2006) (certifying a non-equity holder as lead plaintiff of a class consisting of both equity holders and non-equity holders, saying that "the possible existence of an equity conflict does not prevent the lead plaintiff from serving as adequate representatives of a class that includes only those equity holders who elect to remain in the class after receiving notice of the conflict").

As these cases reflect, any potential conflict between Ontario Teachers and other class members is speculative at best, and the alleged conflict is not at the heart of the suit. The suit will focus on liability issues, and there is nothing persuasive to indicate at this point that Ontario Teachers will fail to pursue the liability claims fully.

There is some suggestion that because Ontario Teachers' holdings in CSC are so large, its ownership should be regarded with additional skepticism. While Ontario Teachers does hold more than 1 million shares of CSC stock, this represents only 0.64% of the 155 million CSC shares currently outstanding. This percentage is not large enough to merit treating Ontario

Teachers differently from any other non-controlling shareholder. At least one court has found that holding a large interest is not disqualifying. In *In re Schering-Plough Corporate Securities Litigation*, lead plaintiff Florida State Board of Administration ("FSBA") purchased more than 2.5 million shares of Schering-Plough stock for more than $125 million during the class period. FSBA continued to hold a "significant equity interest" in the company at the time of the suit, but the district court there found that holding the stock did not disqualify FSBA as class representative. *In re Schering-Plough Corp. Sec. Litig.*, No. Civ. A. 01-0829, 2003 WL 25547564, at *6 (D.N.J. Oct. 10, 2003). The court also correctly noted that any potential conflict could be dealt with by dividing the class into subclasses either during settlement negotiations or at the damages phase. *Id.* At this time, Ontario Teachers' sizable holding of CSC stock is not a sufficient reason to disqualify Ontario Teachers as class representative.

Second, CSC's expert's report suffers from a substantial flaw. The computation in which the expert concludes that Ontario Teachers will lose $4.61 in stock value for every dollar it is awarded in damages assumes that every shareholder who purchased during the class period will receive the same damages. This is not a valid assumption; according to CSC's calculation, the average share of CSC stock traded more than five times during the class period. While a class member who both bought and sold CSC shares when the share price was artificially inflated suffered damages, those damages are clearly not as large as the damages suffered by a class member who bought at the highest inflated price and who was still holding the shares when the stock price dropped after the corrective disclosures. CSC's expert fails to account for this difference, computing the impact to Ontario Teachers using the same damages award for every person who purchased during the class period. In so doing, CSC assigns disproportionately large

damages to those class members who both bought and sold during the period, artificially increasing the impact on a continuing shareholder like Ontario Teachers.

Third, at this point there is no way of knowing whether a judgment in this lawsuit might negatively impact the stock price. In an efficient market, whether or not there is likely to be such an impact would depend on the market's estimate of the size of any potential judgment. In this respect, Ontario Teachers even points to several studies that suggest that companies' stock prices do not fall when such judgments are announced, but instead often rise.

## IV.

In summary, Ontario Teachers has borne its burden of showing that CSC stock traded in an efficient market, that its claims and interests are typical of the class, as required by Rule 23(a)(3), and that it will fairly and adequately protect the interests of the class, as required by Rule 23(a)(4). Thus, lead plaintiff Ontario Teachers' motion for class certification and appointment of the class representative and class counsel must be granted.

An appropriate order has issued.

Alexandria, Virginia
December 19, 2012

T. S. Ellis, III
United States District Judge

26