UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

IN RE COMPUTER SCIENCES
CORPORATION SECURITIES LITIGATION

Civ. A. No. 1:11-cv-610-TSE-IDD

**JOINT DECLARATION OF JOSEPH A. FONTI, BENJAMIN G. CHEW, AND
SUSAN R. PODOLSKY IN SUPPORT OF
PROPOSED CLASS SETTLEMENT, PLAN OF ALLOCATION
AND AWARD OF ATTORNEYS' FEES AND EXPENSES**

We, Joseph A. Fonti, Benjamin G. Chew, and Susan R. Podolsky declare as follows:

1.      We, Joseph A. Fonti, Benjamin G. Chew, and Susan R. Podolsky, are members and/or directors of the law firms of Labaton Sucharow LLP ("Labaton Sucharow"), Patton Boggs LLP, and the Law Offices of Susan R. Podolsky, respectively (collectively "Plaintiff's Counsel"). By Court-appointment, Labaton Sucharow is Lead Counsel and Class Counsel ("Class Counsel") and Patton Boggs LLP is Local Counsel for the Lead Plaintiff, Ontario Teachers' Pension Plan Board ("Ontario Teachers'," "Lead Plaintiff" or "Class Representative") and the Certified Class, in this consolidated securities class action (the "Action"). Susan R. Podolsky is additional trial counsel for Ontario Teachers' and the Certified Class. We have personal knowledge of the matters set forth herein based on our participation in the prosecution and settlement of the claims asserted in the Action.[1]

_____

[1] All capitalized terms not otherwise defined herein have the same meaning as that set forth in the Stipulation and Agreement of Settlement, dated as of May 14, 2013 (the "Stipulation").

1

2.      We respectfully submit this Joint Declaration in support of Class Representative's

motion for final approval of the proposed Settlement with defendants Computer Sciences

Corporation ("CSC" or the "Company"), Michael W. Laphen, and Donald G. DeBuck (together

with CSC, the "Defendants").[2]  The Settlement will resolve all claims asserted in this Action

against all Defendants, including the Former Individual Defendant, on behalf of a settlement

class that consists of: all persons or entities that purchased or acquired CSC common stock

during the period between August 5, 2008 and December 27, 2011, inclusive, (the "Settlement

Class Period"), and who were allegedly damaged thereby (the "Settlement Class").  The Court

preliminarily certified the Settlement Class and approved the Settlement by its Order entered

May 24, 2013 (the "Preliminary Approval Order").  ECF No. 313.

3.      We also respectfully submit this Joint Declaration in support of Class Counsel's

motion for an award of attorneys' fees and payment of litigation expenses (the "Fee and Expense

Application") and Class Representative's request for reimbursement of expenses, including lost

wages, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

I.      **PRELIMINARY STATEMENT: A SIGNIFICANT RECOVERY ACHIEVED**

4.      This Action began approximately two years ago and was actively and vigorously

litigated by Plaintiff's Counsel until the Parties agreed to settle—one month shy of trial.  During

that period, Class Counsel worked tirelessly, dedicating certain attorneys solely to the

advancement of this case, and managing the allocation of work among Plaintiff's Counsel so as

to optimize the efficiency of the work performed on the case while avoiding duplication of effort.

---

ECF No. 309-1.  For ease of reference, the definitions from the Stipulation are summarized in the
attached Glossary of Defined Terms.

    [2] "Individual Defendants" are Michael W. Laphen and Donald G. DeBuck.  The Court
previously granted Michael J. Mancuso's motion to dismiss all claims alleged against him.  ECF
No. 80.  Accordingly, Mr. Mancuso is referred to herein and in the Stipulation as the "Former
Individual Defendant."

Only after significant effort, further described below, did Plaintiff's Counsel and Class Representative succeed in obtaining a very favorable recovery for the Settlement Class totaling $97.5 million in cash, which has been deposited in an interest-bearing escrow account.

5.      As set forth in the Stipulation, in exchange for this payment, the proposed Settlement resolves all claims asserted, or that could have been asserted, by Class Representative and the Settlement Class against all Defendants, including the Former Individual Defendant, in the Action.

6.      The proposed Settlement was reached only after multiple formal and informal mediation and settlement conference sessions were conducted.  In January 2013, the Parties participated in a one-day mediation session conducted by Mediator David M. Brodsky of Brodsky ADR LLC.  That mediation was unsuccessful.  *See generally* Declaration of David M. Brodsky ("Brodsky Decl."), Ex. 1, hereto.[3]  Thereafter, in April 2013, settlement negotiations successfully concluded following a two-day settlement conference conducted by United States District Judge Leonie M. Brinkema.  In connection with these settlement efforts, the Parties submitted and/or exchanged several mediation submissions, expert damage reports and rebuttal reports.  In addition, the Parties participated in informal discussions with each other and others prior to each session, detailing analyses of liability and the Parties' respective damages methodology, assumptions and calculations.

7.      The Parties were able to reach the Settlement with Judge Brinkema presiding over a two-day settlement conference only after Plaintiff's Counsel conducted an exhaustive investigation into the events and transactions underlying the claims alleged in the Consolidated

---

[3] Citations to "Ex. ___" herein refer to exhibits to this Joint Declaration.  For clarity, exhibits that themselves have attached exhibits will be referenced as "Ex. ___ - ____."  The first numerical reference refers to the designation of the entire exhibit attached hereto and the second reference refers to the exhibit designation within the exhibit itself.

Complaint and conducted wide-ranging discovery and trial preparation.  These tasks included, among other things:

   (a)     conducting a significant legal and factual investigation into CSC, including developing numerous sources of non-public information that were critical in enabling Class Representative to overcome, in part, Defendants' motion to dismiss;

   (b)     drafting a detailed consolidated and amended complaint;

   (c)     researching the law pertinent to the claims against Defendants and potential defenses thereto;

   (d)     prevailing, in part, on Defendants' motion to dismiss;

   (e)     successfully moving for class certification;

   (f)     defeating Defendants' Rule 23(f) Petition to the Fourth Circuit Court of Appeals;

   (g)     conducting thorough discovery, including reviewing more than five million pages of documents produced by Defendants and third-parties, deposing 27 fact witnesses throughout the United States and in London, England, defending five fact witness depositions, and seeking the Court's intervention with respect to certain discovery;

   (h)     engaging in extensive expert analysis and discovery, including the following: working with consultants and experts to analyze damages, causation, accounting, internal control, health IT-industry, market efficiency, and materiality issues throughout the course of the litigation; preparing four expert reports concerning subjects fundamental to the trier of fact's ability to resolve the case; responding to Defendants' *Daubert* challenge to Class Representative's accounting and internal controls expert; and taking or defending four expert depositions;

(i)      conducting rigorous jury research and working with experienced jury and trial consultants to prepare Class Representative's case for trial;

(j)      preparing substantial pre-trial materials (including an exhibit list of over 1,400 exhibits, deposition designations from 27 witnesses, and a witness list of 38 witnesses while also responding and objecting to Defendants' pre-trial submissions) and participating in a pre-trial hearing before the Court;

(k)      briefing the Parties' competing motions for summary judgment (which totaled 10,634 pages, including exhibits) and preparing for the hearing on these motions and Defendants' *Daubert* motion; and

(l)      thoroughly vetting both sides' damages assumptions, methodologies, and calculations during expert discovery and additionally through the settlement discussions referenced herein.

8.      Thus, at the time the Settlement was reached, Plaintiff's Counsel had a thorough and realistic understanding of the strengths and weaknesses of the Parties' positions concerning liability and damages and their respective ability to prove or defend the claims at trial.

9.      We believe that the Settlement Amount of $97.5 million, when viewed in the context of the risks and the uncertainties in this litigation, as discussed below, is an outstanding result for the Settlement Class.  It has the full support of the Class Representative.  *See* Declaration of Gregory Harnish of Ontario Teachers', at ¶¶ 8-11, Ex. 2 hereto ("Harnish Decl."). It will result in a significant recovery of between approximately 14% and 38% of the maximum damages that were estimated by each side's experts in connection with the alleged misrepresentations and omissions at issue in this Action.  *See* Declaration of Chad Coffman,

5

CFA in Further Support of Class Action Settlement and the Proposed Plan of Allocation ("Coffman Decl."), Ex. 3, hereto.

10.     Indeed, the Settlement Amount of $97.5 million is far above both the median ($8.3 million) and the average ($55.2 million) settlement recoveries in securities class actions since the passage of the PSLRA.[4]  Based on our research, it also represents the third largest all-cash settlement of a securities case in the Fourth Circuit and the second largest all-cash settlement of a securities case in the Eastern District of Virginia.[5]  When compared against these statistics, we believe that the $97.5 million recovered here for the Settlement Class truly is excellent.

## II.     FACTUAL SUMMARY OF CLASS REPRESENTATIVE'S CLAIMS AGAINST DEFENDANTS

11.     Class Representative's claims in the Action are stated in the Corrected Consolidated Class Action Complaint filed October 19, 2011 (the "Consolidated Complaint"). ECF No. 63.  The Consolidated Complaint asserts claims against Defendants for violations of the federal securities laws, specifically, Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.  ¶¶ 320-47.[6]

12.     Class Representative's claims arise from, among other things, the Company's issuance of statements and omissions that allegedly misled investors regarding: (a) CSC's performance and accounting on the NHS Contract (the operative agreement between CSC and the U.K.'s National Health Service for the implementation of an electronic patient records system within the U.K.) and (b) deficiencies in CSC's internal controls.

---

[4] *See* Ex. 4 at 3.

[5] *See also* Ex. 5 (excerpt).

[6] All references herein to "¶ __" refer to paragraph cites of the Consolidated Complaint.

13.     First, the Consolidated Complaint alleges that Defendants misrepresented the Company's performance and accounting for its $5 billion NHS Contract—one of CSC's most visible and lucrative contracts.  Defendants consistently represented that the NHS Contract was profitable, that CSC expected to recover its investment, and that CSC's accounting under the contract was appropriate.  The Consolidated Complaint alleges that Defendants concealed that the NHS Contract was in fact unachievable under the Contract's express terms and that the Company was improperly accounting for it in violation of Generally Accepted Accounting Principles ("GAAP").

14.     Second, the Consolidated Complaint alleges that Defendants misrepresented the effectiveness of CSC's internal controls.

15.     Class Representative alleges that, as a result of Defendants' misrepresentations, class members paid artificially inflated prices for CSC's stock during the Class Period.  ¶ 291.

## III.   RELEVANT PROCEDURAL HISTORY

16.     In response to Company disclosures concerning the above-alleged matters and the immediate and significant response from the market, this Action was commenced on June 3, 2011, by the filing of an initial complaint alleging that certain Defendants violated the federal securities laws.  Thereafter, several additional securities class action complaints were filed and later consolidated into this Action by Order entered August 29, 2011.  ECF No. 36.

### A.     Appointment of Ontario Teachers'

17.     On August 2, 2011, Ontario Teachers' moved for appointment as lead plaintiff and requested that its counsel, Labaton Sucharow, be appointed Lead Counsel and Patton Boggs be appointed local counsel.  ECF No. 16.  An additional two shareholders also moved for appointment as lead plaintiff.  ECF Nos. 13 &19.

18.     Ontario Teachers' fully briefed its position and participated in a hearing on the motions for appointment as lead plaintiff.  Thereafter, on August 29, 2011, the Court formally appointed Ontario Teachers' as Lead Plaintiff and approved its selection of Labaton Sucharow as Lead Counsel and Patton Boggs as local counsel to represent the putative class.  ECF No. 36.

### B.     The Consolidated Complaint and Motions to Dismiss

19.     On September 26, 2011, Class Representative filed a Consolidated Class Action Complaint for Violation of the Federal Securities Laws, thereafter superseded by the Corrected Consolidated Class Action Complaint filed October 19, 2011 (the Consolidated Complaint). ECF No. 63.  The Consolidated Complaint was filed against CSC, Michael W. Laphen (former CSC Board Chairman, President and CEO), Donald G. DeBuck (former CSC Controller and interim CFO), and Michael J. Mancuso (former CSC CFO and Vice President).  The securities fraud claims arose from the Company's issuance of allegedly misleading statements and omissions regarding CSC's ability to achieve the NHS Contract, the Company's accounting for this contract, and the adequacy of the Company's internal controls.  The claims also arose from false statements and omissions that allegedly misled investors regarding CSC's accounting in the Nordic region.  The Consolidated Complaint alleged that when the truth was revealed concerning the alleged fraud, investors who purchased during the period between August 5, 2008 and August 9, 2011, inclusive (the "Class Period"), were harmed.

20.     The 116-page Consolidated Complaint was the result of Class Counsel's significant undertaking.  Prior to filing the Consolidated Complaint, and indeed prior to the appointment of lead plaintiff, Class Counsel developed a plan to coordinate a thorough investigation of Class Representative's claims, preserve relevant discovery, and access all relevant information from public and non-public sources.

21.     Investigators employed by Class Counsel initially gathered responsive public information concerning Class Representative's claims.  Marshaling these sources of information, Class Counsel developed leads for potential witnesses and ultimately contacted 261 former CSC employees, interviewing 142 former CSC employees and other individuals in the United States, Canada, Norway, Denmark, Sweden, Germany, and Australia, who were identified as possible sources of information, including former employees of the NHS.  Some of these witnesses also provided Class Counsel with documentation supporting their assertions.

22.     From those interviews, five confidential witnesses were used in the Consolidated Complaint, including a former CSC Director of Internal Audit and Corporate Risk Management, who sent a letter to CSC's Board members and Defendants Laphen and DeBuck complaining of ineffective internal controls at the outset of the Class Period, and a former CSC Deputy Head of Testing who stated that testing and test results for "Lorenzo" (the software at issue in the NHS Contract) were abysmal and that the NHS project could not be delivered on time.  Class Counsel included these confidential witness statements in the Consolidated Complaint only after extensive vetting.  For instance, with respect to CSC's former Director of Internal Audit, senior attorneys and Class Counsel's Director of Investigations travelled to California to meet and discuss the basis of this witness's prior statements and to assess in person the credibility of that witness.  Class Counsel also spoke directly with several other witnesses ascribed to allegations in the Consolidated Complaint.

23.     In addition to interviewing witnesses with relevant information, Class Counsel's investigation included, among other things: (a) review and analysis of documents CSC filed with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, news articles, and other public statements issued by or concerning Defendants and

CSC's auditors; (c) review and analysis of research reports issued by financial analysts concerning CSC's securities and business; (d) review and analysis of news articles, media reports, and other publications concerning CSC, its relationship with the NHS, and its internal control related deficiencies; and (e) review and analysis of pending regulatory investigations and lawsuits naming CSC or the Individual Defendants related to the alleged fraud.  In addition, in preparing the Consolidated Complaint, Class Counsel consulted with several experts in the areas of accounting, internal controls, causation and damages.

24.    Defendants' motion to dismiss the Consolidated Complaint and supporting 30-page memorandum of law was served on October 18, 2011.  ECF Nos. 58 & 59.  CSC argued, *inter alia*, that: (a) Class Representative failed to adequately allege that any Defendant acted with scienter; (b) Class Representative did not sufficiently allege that Defendants made false statements or omissions of material fact regarding any of the alleged frauds; (c) many of the challenged statements were forward-looking statements protected under the PSLRA safe-harbor provision; (d) many of the alleged misstatements constitute inactionable "puffery"; and (e) the information allegedly omitted from the alleged NHS-related misstatements was publicly disclosed.  One week later, on October 25, 2011, Class Representative filed its 30-page opposition to Defendants' motion to dismiss.  ECF No. 70.  The opposition was followed by Defendants' reply in further support of their motion to dismiss, entered October 28, 2011.  ECF No. 71.  The Court heard oral argument on November 4, 2011, and took the matter under advisement.

25.    While the motion to dismiss was under advisement, Class Counsel continued with its investigation into the allegations in the Consolidated Complaint.  Among other tasks, Class Counsel continued to develop leads for potential witnesses; analyzed emerging news concerning

the status of the NHS Contract, certain management departures from the Company, and on-going accounting charges taken by the Company; and performed substantive legal and factual analysis in order to further develop the allegations in the Consolidated Complaint.  Class Counsel also commenced drafting of discovery-related materials so as to be prepared to immediately serve discovery on Defendants, should the Court sustain the Consolidated Complaint.

26.     On August 29, 2012, the Court issued its order (ECF No. 80) and opinion granting in part and denying part Defendants' motions to dismiss ("MTD Opinion") (ECF No. 79).  In its opinion, the Court sustained the Consolidated Complaint, in part, after concluding that the facts alleged supported a strong inference that Defendant Laphen acted with scienter when making the allegedly misleading statements about CSC's performance on the NHS Contract.  MTD Opinion at 26.  The Court also concluded that the Consolidated Complaint sufficiently alleged that Defendants Laphen and DeBuck possessed the requisite scienter while making false statements concerning the Company's maintenance of the appropriate internal accounting controls and evaluation of those controls for effectiveness. *Id*. at 21.  At the same time, the Court dismissed false and misleading statements concerning improper accounting in the Nordic region on the basis of scienter.  *Id*.   The Court also dismissed Former Individual Defendant Michael Mancuso from the Action.

27.     Following the Court's Order, Defendants answered the Consolidated Complaint on October 9, 2012.  ECF No. 89.  The mandatory PSLRA discovery stay was lifted on September 21, 2012, following Class Representative's decision not to amend the Consolidated Complaint.  The September 21, 2012 Order further directed the Parties to complete discovery by January 11, 2013.  ECF No. 82.

C.      The Certification of the Class and Denial of Defendants'
        Rule 23(f) Petition to the Court of Appeals

28.     On September 22, 2011, Ontario Teachers' and Lead Counsel filed its motion for class certification and appointment of class representative and class counsel.  ECF No. 44. Ontario Teachers' argued that the Action was particularly well-suited for class action treatment and that all the requirements of Federal Rule of Civil Procedure 23 were satisfied.

29.     In connection with the class certification motion, Ontario Teachers' submitted a declaration from Jeffrey M. Davis, Vice President and Associate General Counsel for Ontario Teachers', demonstrating Ontario Teachers' adequacy to represent the proposed class.  ECF No. 46-2.

30.     Defendants vigorously opposed class certification, resulting in numerous rounds of briefing, telephonic and in person hearings, and several expert reports, as detailed below. Defendants served their opposition on October 14, 2011.  ECF No. 53.  In support of their opposition, Defendants included an expert report from Dr. Mukesh Bajaj, which contended that the market for CSC stock did not display the indicia of efficiency.  Specifically, Dr. Bajaj opined that the market for CSC stock violated "weak-form efficiency," a standard of market efficiency that, even if met, is weaker than what the fraud on the market presumption requires.  He also opined that Ontario Teachers' economic interests were at odds with those of other putative class members and that Ontario Teachers' trading strategies were atypical as compared to the trading strategies of other putative class members.  ECF No. 54-2.

31.     In order to address Dr. Bajaj's expert report, Ontario Teachers' class certification reply memorandum included three expert rebuttal declarations from Jane D. Nettesheim, Hugh R. Lamle, and Howard M. Crane.

32.     Based on his extensive experience in financial analysis, Mr. Lamle opined that Dr. Bajaj's opinion regarding the impact on CSC's stock's price in the wake of a large class action settlement was highly speculative and not supported by the facts, sound financial analysis, or empirical data.

33.     Mr. Crane opined that Ontario Teachers' post-Class Period purchases of CSC stock were entirely consistent with the present organizational structure and practice of large public pension funds.  This opinion was based on Mr. Crane's background providing consulting services to both private and public pension funds.

34.     The most substantial of these three declarations was a detailed rebuttal expert declaration from Ms. Nettesheim, a Vice President at Stanford Consulting Group, Inc.  ECF No. 65-3.  Ms. Nettesheim's 22-page report (with more than 38 pages of exhibits) set forth her opinion that the market for the common stock of CSC, which traded on the New York Stock Exchange, was open, developed, and efficient during the Class Period.  Ms. Nettesheim also highlighted that Dr. Bajaj had no supporting evidence or analysis to conclude that Ontario Teachers' trading strategies were atypical of putative class members and that his analysis as to the so-called economic conflict between Ontario Teachers' and other putative class members was similarly devoid of support in the academic literature or in the application of the methodologies and standards typically applied in securities litigation.

35.     In response, Defendants filed a Motion to Strike the Declarations of Lead Plaintiff's three experts on October 21, 2011.  ECF Nos. 66 & 67.  On November 1, 2011, Ontario Teachers' filed its Opposition to the Motion to Strike, arguing that: (a) as an initial matter, in accordance with Fourth Circuit standards, Ontario Teachers' class certification motion set forth sufficient evidence of market efficiency without expert testimony and (b) Ontario

Teachers' was compelled to submit the rebuttal declarations in response to Defendants' expert report.  ECF No. 73.

36.     On November 4, 2011, the Court heard oral argument on the Motion for Class Certification and took the matter under advisement.  On August 29, 2012, the Court denied the Motion for Class Certification without prejudice to the motion being renewed after the filing of an amended complaint and denied the Motion to Strike as moot.  ECF No. 80.

37.     On September 24, 2012, Lead Plaintiff renewed its Motion for Class Certification. ECF No. 83.

38.     On October 11, 2012, Defendants renewed their previously entered motion to strike Ms. Nettesheim's declaration, and the declarations of Class Representative's other two rebuttal experts.  ECF Nos. 91 & 92.  Class Representative rested on its previously submitted Opposition in response.  ECF No. 73.

39.     On October 12, 2012, the Parties participated in a telephonic hearing with the Court concerning these motions.  At the conclusion of that telephonic hearing, the Court ordered that all pending motions would be heard and resolved on November 1, 2012.  ECF Nos. 94 & 95. Due to the effects of Hurricane Sandy and the displacement of counsel for Class Representative, a joint motion to continue the November 1 hearing was made and granted, postponing the hearing to November 15th.  ECF No. 104.  On November 15, both sides extensively argued the merits of the motion for class certification and the motion to strike.  On that same day, the Court issued an Order denying Defendants' motion to strike the expert declarations and further ordering that the Parties file supplemental expert affidavits in response to the points raised in the initial expert declarations submitted in support of and against class certification.  ECF No. 120. The Court also scheduled a final hearing on class certification for November 30, 2012.  *Id.*

40.     On November 30, 2012, after a telephonic hearing with the Parties, the Court issued an Opinion and entered an Order granting Ontario Teachers' motion to certify the Certified Class, appointing it as class representative, and appointing Labaton Sucharow as Class Counsel.  ECF No. 131.  The Court's November 30, 2012 Order granting Class Certification defined the Certified Class to include "all persons or entities that purchased or acquired Computer Sciences Corporation common stock between August 5, 2008 and August 9, 2011, inclusive, and who were damaged thereby," subject to certain exclusions.  *Id.*  On December 19, 2012, the Court issued a Memorandum Opinion (ECF No. 169) further to its ruling certifying the Certified Class.

41.     Defendants continued to aggressively litigate the class certification issue.  In an effort to challenge Class Representative's claims, Defendants sought discovery from Class Representative.  In response, Class Representative produced nearly 130,000 pages of documents. Defendants also sought to depose (and ultimately did depose) multiple representatives from Class Representative.  The Parties conferred on the scope of such depositions as well as the appropriate witnesses.  However, the Parties were unable to reach agreement.  Class Counsel thereafter filed a motion for a protective order arguing *inter alia* that the information was duplicative of prior discovery and that it was not warranted in light of the Court's certification order.  Defendants opposed the motion for protective order.  Magistrate Judge Davis denied the protective order and allowed the depositions to proceed.  ECF No. 138.  Thus, in addition to the deposition of Class Representative's Rule 30(b)(6) designee, Jeffrey M. Davis, taken in October 2011, in December 2012 and January 2013, Defendants took, and Class Counsel defended, the depositions of four employees of Class Representative responsible for investment decisions.

Class Counsel met with each of these witnesses on several occasions and reviewed their documentation to prepare for their testimony and thereafter defended each of these depositions.

42.     On December 14, 2012, Defendants filed a petition in the United States Court of Appeals for the Fourth Circuit pursuant to Rule 23(f) of the Federal Rules of Civil Procedure seeking permission to appeal the Court's ruling on class certification.

43.     On February 20, 2013, Class Representative opposed that Petition.

44.     On March 5, 2013, the Fourth Circuit denied Defendants' petition.

45.     Also at this time, Class Representative moved the Court to approve (a) the form and content of the proposed Notice of Pendency of Class Action ("Class Notice"); (b) the proposed method of disseminating the proposed Class Notice and the proposed Summary Notice of Pendency of Class Action to the Certified Class; and (c) the selection of the notice administrator.  On March 15, 2013, the Court, by Order, granted the relief requested and the Class Notice was sent to Class Members beginning on March 19, 2013.  ECF No. 243.  Among other things, the Court found that the Class Notice met the requirements of Rule 23(c)(2)(B) – "as it clearly and concisely states in plain and easily understood language, the nature of the action, the definition of the class certified, the class claims, issues or defenses, that a class member may enter an appearance through an attorney if the member so desires, that the Court will exclude from the class any member who requests exclusion, the time and manner for requesting exclusion and the binding effect of a class judgment on members under Federal Rule of Civil Procedure 23(c)(3)." *Id.*

46.     The Class Notice provided Class Members with the opportunity to request exclusion from the Certified Class.  The notice explained Class Members' right to request exclusion, set forth the procedure for doing so, stated that it was within the Court's discretion

whether to permit a second opportunity to request exclusion if there is a settlement, and provided a deadline of April 30, 2013 for the submission of requests for exclusion.  The Order approving the Class Notice further stated that "Class Members shall be bound by all determinations and judgments in this Action, whether favorable or unfavorable, unless such persons and entities request exclusion from the Class in a timely and proper manner, as hereinafter provided." ECF No. 243.[7]

## IV.   EXTENSIVE FACT DISCOVERY, INVESTIGATION, AND ANALYSIS

47.     Under the PSLRA, discovery was stayed in the Action pending the Court's resolution of  Defendants' motion to dismiss.  Nonetheless, Class Counsel continued to investigate and develop the allegations and claims in order to be able to advance the case immediately following the Court's ruling on the motion to dismiss.  Following the lifting of the PSLRA stay, discovery moved forward without delay.  Plaintiff's Counsel promptly propounded detailed discovery requests and ultimately reviewed and analyzed millions of pages of documents produced by Defendants and non-parties, took 27 depositions of fact witnesses, defended four depositions of Class Representative and its investment advisors, negotiated and resolved various significant discovery disputes with Defendants (with the aid of the Court where necessary), exchanged voluminous expert reports, and participated in four expert depositions.

### A.     Party Discovery

#### 1.     Class Representative Served Multiple Discovery Requests on the Defendants and Engaged in Multiple Meet-and-Confer Conferences

48.     One week after the Court's order lifting the stay, Class Representative served two sets of document requests on Defendants.  Among other items, these requests sought documents that CSC had previously produced to governmental entities, including the SEC; documents

---

[7] Eighteen valid exclusion requests from the Certified Class were received. ECF No. 307 ¶ 4.

concerning CSC's NHS Contract and the various agreements under which CSC and the NHS performed work; documents concerning internal control deficiencies, including those in the Nordic region; and documents related to CSC's audit committee investigation.  Thereafter, Class Representative served its first sets of interrogatories on Defendants.

49.     Defendants' objections, responses, and answers to Class Representative's initial discovery requests prompted numerous meet-and-confer conferences with Defendants as to the scope and manner of their document production.[8]  Through this effort, the Parties successfully came to agreement on many issues.

50.     One significant area of disagreement pertained to Class Counsel's insistence that documents pertaining to the Nordic region remained relevant to Class Representative's claims based on allegedly false statements concerning CSC's internal controls, apart from the statements concerning the Nordic region, which the Court had dismissed.  Defendants disagreed.

51.     In light of this continuing disagreement over the production of documents that we believe bore significantly on the class's claims, Class Representative moved to compel production.  On November 16, 2012, the Parties participated in a hearing before Magistrate Judge Davis on this matter.  The same day, Magistrate Davis entered an Order granting in part and denying in part Class Representative's motion to compel.  ECF No. 118.

52.     Between October 2012 and January 2013, Class Representative propounded several additional sets of requests for production, interrogatories, requests for admission, and a request for inspection of the Lorenzo software, and pursued issuance of letters rogatory to take

---

[8] Several meet and confers took place during this time while Class Counsel was displaced from their office space as a result of damage caused by Hurricane Sandy.  Notwithstanding this displacement, Class Counsel made every effort, working through difficult and limited circumstances, to keep the process moving expeditiously in light of the Court's discovery schedule.

the depositions of individuals in the United Kingdom, including current and former employees of the NHS.  In total, this discovery included seven sets of document requests containing 106 individual requests, five sets of interrogatories containing a total of 20 individual interrogatories, and a request for the issuance of five letters rogatory.

53.     The Parties engaged in many additional months of meet and confer sessions as to the scope and manner of Defendants' document production.  Despite protracted disagreements, the Parties ultimately were able to come to reach an understanding as to the appropriate scope of Defendants' discovery, with a few notable exceptions that required the Court's assistance.  *See infra* ¶¶ 80-83 (Resolution of Discovery Disputes).

54.     A related set of meet-and-confer sessions occurred in the context of authenticating the documents that Defendants produced, in advance of trial.  The Parties met and conferred several times and exchanged several proposals and counter-proposals, but were unable to resolve this issue, necessitating motion practice.

## 2.     Document Discovery from Defendants

55.     As a result of Class Counsel's efforts, Defendants produced more than five million pages of documents.  Among the types of documents CSC produced in response to Class Representative's requests and the Court's Order were: (a) documents from relevant CSC employees' email files, which included communications between CSC officers and employees and NHS and Deloitte LLP ("Deloitte," CSC's external auditor) personnel; (b) documents CSC previously produced to the SEC in connection with its investigation of the NHS Contract; and (c) communications between the SEC and CSC.

56.     To properly analyze and process this vast amount of information within the discovery period, Class Counsel tapped a number of resources to accomplish this task in the most time and cost efficient manner possible.

57.     First, to review Defendants' enormous document production, a team of attorneys from Class Counsel was assembled.  These attorneys were focused on reviewing Defendants' document production for the purpose of preparing for depositions, and ultimately trial, with many of them assisting in additional stages of deposition preparation.  These attorneys utilized review guidelines and protocols that were put in place and monitored to ensure efficient and accurate review of the documents.

58.     The review was structured to limit overall cost, with the bulk of the initial review being conducted by attorneys experienced in electronic document discovery, and deposition and trial preparation.  These attorneys were assembled and employed by Class Counsel.  Many of them had at least six years of legal experience and some more than 15 years.

59.     All aspects of the attorney review were carefully supervised to eliminate inefficiencies and to ensure a high quality work-product.  This supervision included multiple in-person training sessions, the creation of a set of relevant materials and information, presentations regarding the key legal and factual issues in the case, and in-person instruction from more senior attorneys.  There were also frequent conferences to discuss important documents, discovery preparation efforts, and case strategy.

60.     Second, in order to further facilitate the cost and time-efficient nature of this process, all of the documents were placed in an electronic database that was created by and maintained at Merrill Corporation, an external technology and litigation support vendor.  The database, called Lextranet, allowed Class Counsel to search for documents through Boolean-type searches, as well as by multiple categories, such as by author and/or recipients, type of document (*e.g.*, emails, memoranda, SEC filings), date, Bates number, etc.

61.     This capability was used to search the more than five million pages of documents on an exceedingly efficient and expedited basis.  Rather than simply review each document in the linear order in which it was produced, Class Counsel maximized the benefit of the technology by searching the document production for information concerning key witnesses and case-related concepts.  This approach was forensic in nature, utilizing the document "metadata" (*e.g*, the imbedded bibliographic information that was inherent in the documents) to identify the key witnesses, document custodians, and highly relevant documents in short order.

62.     In other words, rather than reviewing every document to identify those most relevant, Class Counsel was able to search through the documentary database for the best evidence, at the same time it was also reviewing the entire production.  By using this technology, Class Counsel was prepared to, and did, initiate depositions by December 4, 2012, despite receiving Defendants' production of documents on a rolling basis beginning October 29, 2012 and ending on March 15, 2013.

63.     Furthermore, these technological tools enabled Class Counsel to assemble witness-specific exhibits for each deposition in the most efficient manner.  For instance, if a document pertained to one witnesses, the document database could be programmed to link it to the exhibits being identified for any of the other witnesses.  Thus, the key evidence was efficiently maintained for each of the depositions.  By effectively implementing and utilizing these technological tools, Class Counsel was able to effectively prepare for and take a total of 27 depositions, seven of which took place over the course of five consecutive days in London, England.

64.     Further, the electronic database was securely accessible through the Internet, allowing Class Counsel located in New York and experts and consultants located in Chicago and

California, to review documents and coordinate discovery remotely.  It also allowed counsel to review documents remotely when conducting or defending one of the 32 fact depositions in 11 cities nationwide and in London, England.  For example, when attorneys in one location identified "hot" documents, that designation was saved so attorneys in other locations would be aware of which documents carried that designation and could immediately review them.  This allowed Plaintiff's Counsel to conduct a highly time and cost efficient review of those documents identified from the searches as most relevant to Class Representative's claims.

65.     Moreover, any documents identified as "hot" were all subject to further analysis and assessment by senior attorneys (with the assistance of Class Representative's experts and consultants) on an on-going basis.

66.     In addition, use of Merrill was also extremely cost efficient.  Just one hard-copy set, and more than one set would have been needed, of the more than five million pages produced would have cost more than $1 million (at $0.20/page), which is more than four times what Class Counsel incurred in connection with the document depository.

67.     Simultaneously, consultants and experts ran their own searches and assisted counsel in their review, in order to efficiently and substantively identify and analyze the more valuable documents within their fields of expertise.  For instance, forensic accounting experts conducted targeted searches of the millions of pages of CSC documents, and assisted in analyzing technical accounting and internal control documentation from the searches.  Additionally, Class Counsel retained two other consultants with expertise in the health IT area to review CSC and NHS documents with an eye to the operational and technical deficiencies with the NHS software and the NHS program overall.  These consultants conducted searches of the entire document database and conferred with counsel as to their findings.

68.     With this assistance, throughout the discovery process, Class Counsel was able to efficiently and thoroughly analyze not only what was produced, but also to identify areas requiring follow-up with Defendants.  During numerous meet and confers, Class Counsel raised its concerns about the completeness of the production.  The result was a comprehensive production of documents and discovery, which Class Counsel used as a platform on which to prepare for depositions, summary judgment, and trial.

### 3.      Class Representative's Depositions of Fact Witnesses

69.     Building upon the information obtained through the extensive document discovery process, Plaintiff's Counsel conducted 27 fact-witness depositions of both current and former employees in 11 cities nationwide and in London, England.  Given the scope of the alleged fraud and geographic location of the witnesses with relevant information, and the fact that many witnesses would not be available for trial, counsel for both Parties met and conferred to create a schedule that would allow both sides to take/defend the depositions in a cost and time effective manner.  For instance, the Parties were able to agree on scheduling certain depositions within a certain time period in the same city, including seven depositions taken in London over a single five-day period.  The Parties also agreed to proceed with multiple depositions on the same day as needed, resulting in the Parties taking up to four depositions simultaneously.

70.     The depositions were conducted in a streamlined and resourceful manner.  Certain depositions were preemptively designated by Class Counsel as "half-day" depositions, so as not to exceed 3.5 hours of testimony.  This facilitated conducting multiple depositions in a single day and location.

71.     During this process, Plaintiff's Counsel deposed several high-level CSC executives, including the former CEO (Defendant Laphen), the current CEO (Mike Lawrie), the former Controller and interim CFO (Defendant DeBuck), the former CFO (Former Individual

Defendant Mancuso), and the President, International (Guy Hains).  Plaintiff's Counsel believe these witnesses provided information concerning the alleged lack of contractual coverage with the NHS, CSC's accounting for the contract as if there was contractual coverage, Defendants' involvement with monitoring the NHS program, and Defendants' alleged knowledge of internal control deficiencies.

72.     Plaintiff's Counsel also deposed key mid-level employees with relevant information, including, *inter alia*:

(a)     Members of the 2008 Delivery Assurance Team, the CSC Corporate Program that conducted independent review of key Company contracts including the NHS Contract: (1) Brian Fillebrown, CSC's Vice President and Head of Delivery Assurance; (2) Andrew Kearley, Delivery Assurance Manager; (3) Susan Lake, CSC Director, Delivery & Quality Assurance EMEA; (4) William Holland, CSC Member, Delivery Assurance Team; (5) Bernard Cunningham, CSC Member, Delivery Assurance Team; and (6) Dennis Fitzgerald, Former CSC Director of Internal Audit and Corporate Risk Management and a member of both the April 2008 Delivery Assurance Team and the NHS Red Team.

(b)     Mid and Senior-Level Managers of the NHS Contract with direct involvement in client communications, NHS contract negotiations, and technical and operational performance on the Contract: (1) Gerry O'Keeffe, NHS Account Executive; (2) Sheri Thureen, President of UK Healthcare; (3) Bob Brauburger, Former CSC Lorenzo Delivery Executive (in charge of the technical delivery of the Lorenzo software); (4) Rick Kelly, Executive Program Director; (5) John Guda, Vice President, Lorenzo Delivery Executive (Mr. Guda served in a newly created joint role, replacing both Messrs. Kelly and Brauburger during the middle of the

Class Period); (6) Richard Bradley, Transformation Program Director; and (7) Jo Carruthers, Commercial Director.

(c)     Finance, Accounting and Internal Audit Executives who made decisions and/or were involved in the accounting for the NHS Contract and/or dealt with CSC's external auditors: (1) Paul Fowler, CSC Director, EMEA Finance & Administration; (2) Robert Sutcliffe, CSC NHS Finance Director for the NHS Programme and Contracts; (3) Dennis Dooley, CSC Vice President, Financial Controls & Compliance; (4) Scott Delanty, Former Vice President of Internal Audit; (5) Andrew Mears, Vice President of Corporate Internal Audit; (6) Kathleen Ramey, Former Vice President of Finance and Administration.

(d)     Other relevant, high-ranking CSC personnel, including (1) Bryan Brady, Vice President, Investor Relations; (2) Stephen Baum, Former Chairman of the Audit Committee (responsible for leading the review and investigation of the accounting and internal controls allegations presented in a letter by Dennis Fitzgerald, a former Director of Internal Audit); and (3) Russ Owen, Former President of the Americas Commercial Group (who was part of the Red Team review of the NHS Contract).

73.     We believe that information elicited during these depositions was supportive of Class Representative's claims.

74.     We recognize, however, that there was also information elicited during these depositions that a jury could view as supportive of Defendants' positions.

75.     Nevertheless, these depositions, and the documents discussed therein, provided Plaintiff's Counsel with a solid foundation from which to understand the risks and strengths of the case and on which to move for and defend against summary judgment and to prepare for trial.

### 4.      Responding to Defendants' Discovery Requests and Interrogatories

76.      As set forth in more detail above, in connection with attempts to challenge class certification and later to build a record to attempt to decertify the class, Defendants aggressively sought discovery from the Class Representative.  Ultimately, Defendants' discovery requests led to production of tens of thousands of pages of documents, several depositions of Class Representative personnel, participation in multiple meet-and-confer sessions, and contentious motion practice.

77.      At the outset of the litigation and again prior to discovery, Class Counsel attempted to position itself in such a way as to be able to efficiently produce this discovery.  For instance, Class Counsel met with Ontario Teachers' to analyze its transactions in CSC, gain a further understanding of Ontario Teachers' electronic data storage and preservation systems, and to ensure timely preservation of relevant documents in accordance with sound discovery practices and compliance with electronically stored information ("ESI") discovery rulings.

78.      Defendants served two sets of document requests and interrogatories on Ontario Teachers'.  In both instances, Class Representative objected on the basis that CSC's discovery requests were exceedingly broad, many calling for production far beyond the normal scope of discovery of a Class Representative in a federal securities action.  As a result of the breadth of CSC's requests, the Parties engaged in a series of meet-and-confer conferences to negotiate the scope of Ontario Teachers' production.  In the end, the Parties were able to come to agreement on the scope of these requests without resorting to motion practice.

### B.      Non-Party Discovery

79.      Both Parties also served non-party discovery, including, among other things, subpoenas on CSC's former Director of Internal Audit (Dennis Fitzgerald), and Class Representative's subpoenas on Navigant Consulting (the consulting firm that assisted with the

independent investigation conducted by CSC's Audit Committee) and Deloitte seeking documents relevant to the claims.  Counsel for both Parties took the deposition of Mr. Fitzgerald, and Deloitte produced certain documents following a substantive meet and confer process, which Class Representative utilized to support its allegations.

### C.    Resolution of Discovery Disputes

80.    As described above, discovery in this matter was both intense and voluminous. The Parties held dozens of meet-and-confer sessions throughout discovery and, for the most part, were able to cooperatively resolve disputes in the absence of Court intervention.  On several occasions, however, Plaintiff's Counsel sought the assistance of the Court to either ensure that discovery was complete or to streamline the process of preparing for trial.

81.    For example, as discussed above, early in fact discovery, Class Representative sought all documents produced by CSC to the SEC and all documents relating to the independent investigation conducted by CSC's Audit Committee.  Defendants opposed Class Representative's requests in part.  Because the Parties were unable to resolve the dispute, Class Representative moved to compel production of such documents.  ECF Nos. 109 & 110.  Judge Davis granted in part and denied in part that motion.  ECF No. 119.

82.    Additionally, in an effort to economically prepare for trial and save both sides endless hours of wasteful review and motion practice concerning materials produced by Defendants, Plaintiff's Counsel served Requests for Admission asking Defendants to stipulate to the authenticity and business records nature of documents produced from Defendants' own files. Defendants were not willing to respond to the entirety of Class Representative's Requests. Plaintiff's Counsel made various proposals to Defendants concerning the terms of possible stipulations, service of requests for admission, and/or noticing a Rule 30(b)(6) deposition of CSC's custodian of records, in order to come to an early resolution of these issues.  Both Parties

engaged in substantial meet-and-confer conferences on these issues of authenticity and admissibility without success.

83.     Unable to reach agreement, motion practice ensued, and Judge Davis ultimately entered an Order setting forth a process by which the Parties could address key authenticity and admissibility issues well in advance of trial.  ECF No. 213.

### D.     Expert Discovery

84.     In addition to the expert reports prepared and utilized in the class certification stage, described above, the Parties employed experts in their primary case presentations.

#### 1.     Testifying Experts

85.     Class Representative proffered two experts in support of issues concerning materiality, market efficiency, causation, damages, accounting and internal controls, as follows:

> (a)     Chad Coffman, CFA
> Market Efficiency, Loss Causation, Damages, Materiality
>
> (b)     Douglas Carmichael, Ph.D.
> Accounting, Internal Controls

Each expert served initial reports on November 9, 2012, which were superseded by supplemental and reply reports served by these experts on February 18, 2013.  Subsequent to the supplemental reports, each expert provided a final reply report on March 25, 2013.  These reports are discussed below.

86.     Mr. Coffman was retained by Class Counsel in 2012 to provide his expert opinion as to: (a) the materiality of Defendants' alleged misrepresentations and omissions; (b) whether and to what degree investor losses were proximately caused by Defendants' alleged violations of the federal securities laws; (c) the damages suffered by Class members on a per share basis under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated hereunder; and (d) the efficiency of the market for CSC common stock.

87.     Mr. Coffman prepared and served a 100-page report, along with 32 exhibits totaling another 47 pages of supporting graphs, in which he opined *inter alia* that: (a) the alleged misstatements and omissions in this case were material; (b) declines in the price of CSC common stock were attributable to and substantially caused by identifiable news events relating to the disclosure of the alleged fraud; and (c) the total abnormal price movement net of market and industry effects associated with the corrective disclosure events for CSC common stock; and (d) the market for CSC stock was efficient during the Class Period.

88.     Dr. Carmichael was retained by Class Counsel to provide an expert opinion regarding: (a) the effectiveness of CSC's internal control over financial reporting; (b) the opinions and certifications expressed by CSC and its management regarding CSC's disclosure controls and procedures; and (c) the propriety of CSC's accounting for the NHS Contract in accordance with GAAP.

89.     Dr. Carmichael prepared and served a 90-page report in which he opined *inter alia* that: (a) CSC had many deficiencies in company-level controls that, in some cases individually, and clearly in the aggregate, constituted a material weakness; (b) CSC's deficient financial reporting controls were exemplified by CSC's inability to prevent or detect and correct the improper accounting for the NHS Contract; (c) CSC had an ineffective information and communication function as evidenced by the failure to identify, capture, and communicate the uncertainties associated with the NHS Contract; (d) the pervasiveness of CSC's deficient financial reporting controls was also demonstrated in the presence of other material weaknesses, including those in the Nordic region; and (e) ultimately, CSC's opinions on its financial reporting controls during the Class Period were an extreme departure from the ordinary standard

of care because those opinions characterized CSC's financial reporting controls as effective when in fact there were one or more material weaknesses.

90.     Defendants designated the following two experts and served their respective reports on March 13, 2013:

(a)     Vinita M. Juneja, Ph.D.
        Loss Causation, Damages, Materiality

(b)     Harvey R. Kelly, CPA
        Accounting, Internal Controls

91.     Dr. Juneja, a Senior Vice President at NERA Economic Consulting, was retained by Defendants to opine on issues related to alleged inflation, loss causation and damages. Specifically, counsel for Defendants asked Dr. Juneja to review and comment upon the February 18, 2013 expert report served by Chad Coffman.

92.     In her 41-page expert report with 42 pages of exhibits ("Juneja Expert Report"), Dr. Juneja opined that several of Mr. Coffman's calculations of alleged inflation were erroneous, and that a proper analysis results in lower estimates of alleged inflation derived from the market-adjusted stock price reactions on each date.

93.     Mr. Kelly, a Managing Director and co-head of the Corporate Investigations unit of AlixPartners, and formerly a partner with PricewaterhouseCoopers, was retained by Defendants as an accounting expert to opine on: (a) CSC's internal audit function and, more specifically, whether it lacked independence; (b) the conclusions reached by Class Representative's expert, Dr. Carmichael, with respect to CSC's internal controls over financial reporting and the related certifications of CSC and CSC's management with respect to the Company's disclosure controls and procedures; (c) CSC's internal controls over financial reporting and disclosures related to its agreements with the NHS; and (d) CSC's analysis and reporting of certain Nordic Region internal control matters.

94.     In his 54-page expert report with 97 pages of exhibits and appendices ("Kelly Expert Report"), Mr. Kelly opined that: (a) the claim that CSC's Internal Audit function lacked independence was contradicted by available evidence; (b) Dr. Carmichael's opinions with respect to CSC's internal controls and related certifications of CSC and CSC's management was not based upon generally accepted methods and standards of review for assessing internal controls; (c) CSC maintained reasonable internal controls over financial reporting and disclosures with respect to the NHS Contract; and (d) Dr. Carmichael's use of CSC's reported issues from its Nordic Region to reach conclusions regarding CSC's internal controls was inconsistent with the Court's ruling on the motion to dismiss.

95.     Following the initial round of expert reports by both sides, the Parties agreed to a compressed expert deposition schedule, which allowed Class Counsel to depose Defendants' experts as to the opinions expressed in their initial reports, prior to submitting Class Representative's experts' reply reports.

96.     Class Counsel deposed Mr. Kelly on March 21, 2013 and Dr. Juneja two days later on March 23.  Class Counsel promptly digested the deposition testimony and on March 25, 2013, Class Representative served Defendants with reply expert reports.  The reply report of Mr. Coffman further refined his initial assessment of damages per share, in view of Dr. Juneja's testimony.  Two days after these reply reports were served, Defendants deposed Class Representative's experts, Mr. Coffman on March 27, 2013, followed by the deposition of Dr. Carmichael, on March 29, 2013.

97.     The Parties' expert reports, rebuttal/reply reports, and expert depositions demonstrated very clearly a significant and entrenched disagreement between the Parties as to accounting and internal controls and concerning damages and causation issues.

98.     On the issue of internal controls and accounting, the Parties' disagreement resulted in Defendants filing a *Daubert* motion at the summary judgment stage against the Class Representative's expert, Dr. Carmichael.  Plaintiff's Counsel anticipated filing a similar *Daubert* motion regarding Defendants' expert, Mr. Kelly, along with other *in limine* motions.

99.     On the issue of damages and causation, the experts' respective opinions also made clear that there was considerable disagreement as to the amount of alleged damages and the manner and methodology used to arrive at those alleged damages.  Those disagreements and the risk stemming therefrom is further discussed *infra*, at Section VII. C. (Risks Concerning Loss Causation and Damage), ¶¶ 131-138.  The hotly contested nature of the damages issue made it the main focus for the Parties during the litigation process and in preparing for and participating in the mediation and settlement conference sessions.

## 2.     Consulting Experts

100.     Class Counsel also relied extensively on two consultants, Dr. Joanne Spetz and Dr. Steve Parente, to help interpret information in Defendants' document production as to the technical and operational feasibility of the NHS program and software (the "NHS Consultants").  Both NHS Consultants had extensive experience in health information technologies, health economics, healthcare implementation, healthcare solutions, and the feasibility of large-scale healthcare change.

101.     Utilizing the experience and background of the NHS Consultants, on multiple occasions, Class Counsel met with them to better understand key documents concerning the operational and technical feasibility of the NHS Contract.  Many of these documents were highly technical in nature, involving discussion of the coding and implementation of the contracted software under the NHS Contract and would have taken significant resources and time to decipher, absent the use of the NHS Consultants.  The NHS Consultants further assisted counsel

in analyzing CSC's performance with respect to the timescales and costs indicated in CSC's

public disclosures.

## V.     THE PENDING SUMMARY JUDGMENT MOTIONS AND
##         *DAUBERT* MOTION AT THE TIME OF SETTLEMENT

102.     On March 18, 2013, both Parties filed motions for summary judgment concerning

the elements of scienter, reliance, materiality, and damages.  Shortly thereafter, both Parties filed

related motions to strike inadmissible and irrelevant evidence submitted in connection with the

summary judgment motions (*see, e.g.,* ECF Nos. 272, 273, 278, 280, 293, 295) and opposition

briefs (ECF Nos. 282, 283, 292, 294).

103.     In its 34-page partial summary judgment memorandum of law with 1,282 pages

of accompanying exhibits, Class Representative contended that there was no genuine dispute as

to any material fact regarding: (a) the materiality of Defendants' MD&A disclosures about the

NHS Contract and certifications required by Sarbanes-Oxley Act of 2002 ("SOX"); (b) class-

wide reliance; and (c) economic loss due to Defendants' alleged misrepresentations and

omissions on February 9, 2011 and May 3, 2011—two of the corrective disclosure dates.  ECF

Nos. 254, 258, 259.  As for materiality, Class Representative argued that Defendants were

required by law to issue the MD&A statements and the SOX Certifications, making them plainly

material; that Class Representative's accounting and economic experts, Dr. Carmichael and Mr.

Coffman, respectively, each opined that these categories of Defendants' statements were

material; and that Defendants' experts did not disagree.  Class Representative's arguments on the

issue of economic loss focused on both Parties' experts' acknowledgement of the inflation per

share of CSC stock on two specific disclosure dates (February 9, 2011 and May 3, 2011).

Finally, Class Representative argued that the element of class-wide reliance was also ripe for

resolution given that Mr. Coffman opined that the market for CSC shares was efficient and that,

contrary to Defendants' position at class certification,  Dr. Juneja did not take issue with that opinion or present any evidence or opinion to rebut the presumption of class-wide reliance.

104.    Defendants also moved for summary judgment submitting a 40-page memorandum of law with accompanying exhibits totaling 3,359 pages, on the principal ground that there were no triable issues of fact regarding Defendants' scienter.  ECF Nos. 244-245, 248, 249, 251, 252.  Defendants' summary judgment motion was a dispositive motion that, if granted, would have led to dismissal of the case.

105.    In this motion, Defendants argued that the undisputed facts: (a) demonstrate that Laphen and DeBuck believed their public statements were true; (b) establish that Laphen and DeBuck relied in good faith on the advice of CSC's auditors; (c) show that Laphen and DeBuck disclosed negative information to the public throughout the Class Period; and (d) are devoid of any suggestion that Laphen or DeBuck had motive to commit fraud.  ECF No. 245.

106.    Class Representative opposed Defendants' motion for summary judgment and filed a related motion to strike on April 8, 2013.  ECF Nos. 272-273, 283.  In opposition, Class Representative submitted 140 exhibits, which included key documentary evidence, deposition testimony, and expert opinions and analysis that supported what we believe to be triable issues of fact as to Defendants' scienter.

107.    Defendants opposed Class Representative's summary judgment motion and its motion to strike on April 8, 2013, and April 15, 2013, respectively.  ECF Nos. 282 & 293.  Reply briefs were filed on April 15, 2013, and oral argument on the motions for summary judgment and the related motions to strike was set to occur on April 19, 2013.  ECF Nos. 294 & 296.

108.    Contemporaneously, on April 12, 2013, Defendants filed a motion (ECF No. 288) and memorandum of law (ECF No. 289), seeking to exclude the opinions and testimony of

Dr. Carmichael, Class Representative's accounting and internal controls expert.  Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), Defendants sought to exclude the opinions and testimony of Dr. Carmichael at both summary judgment and at trial.  A hearing regarding the exclusion of Dr. Carmichael's opinion was scheduled to be heard on the same day as the Parties' summary judgment motions, April 19, 2013.

109.     Class Representative undertook significant efforts in advance of the April 19, 2013 hearing to prepare for argument in support of its summary judgment motion and against Defendants' motion for summary judgment and *Daubert* motion.  Indeed, at the time of settlement, Class Representative had prepared its opposition to Defendants' *Daubert* motion, which was scheduled to be filed on the day the Settlement was reached, April 17, 2013.

110.     Although Class Representative had a high degree of confidence in the strength and merits of its opposition to Defendants' summary judgment and *Daubert* motions, a ruling in Defendants' favor on either motion would have had negative consequences for Class Representative's ability to present evidence in support of its claims, if not result in a complete dismissal of the action.

## VI.     CLASS REPRESENTATIVE'S TRIAL PREPARATION EFFORTS

111.     This case was prepared within a seven-month schedule that included a pretrial conference with the Court on January 17, 2013, at which the Court set a May 21, 2013 trial date.

112.     Plaintiff's Counsel's preparation for this trial included the aforementioned: (a) searching through more than five million pages of documents; (b) participation in 32 fact depositions in the United States and in London; (c) submission or review of eight expert reports or affidavits (including those in support of class certification) and the taking or defending of four expert depositions; (d) numerous discovery motions; (e) extensive jury and trial research;

(f) summary judgment briefing; and (g) prolonged and extensive mediation and settlement conference participation, which included detailed analyses by both Parties of damages and liability.

113.     All of this was undertaken with a focus on efficiently transitioning the use of this information to trial.  Doing so allowed Plaintiff's Counsel to commence the preparation and submission of trial-related materials, while also simultaneously engaging in summary judgment motion practice, expert discovery, and the mediation process.  The Parties submitted to the Court extensive pre-trial materials, including: (a) a Joint Stipulation of Uncontested Facts; (b) deposition transcript designations and counter designations; (c) trial witness lists; (d) trial exhibit lists; (e) objections to deposition designations and counter-designations; and (f) exhibits—prior to reaching a settlement in principle.  ECF Nos. 246, 247, 250, 255, 257, 265, 266, 267, 268.  *Daubert* motions, motions *in limine*, verdict forms and jury instructions had been either filed or were in the process of being prepared by both sides.  ECF Nos. 288 & 289.

114.     The Parties' trial preparation materials were extensive and detailed.  Class Representative's exhibit list included over 1400 entries, while Defendants' exhibit list was just under 1000 entries.  ECF Nos. 247 & 255.  For instance, Class Representative submitted deposition designations from 27 witnesses that Class Representative expected to, or anticipated it may, call at trial—many of whom were outside the outside the jurisdiction in the United States and located in the United Kingdom.  ECF No. 250.  Defendants similarly submitted designations for 23 such witnesses.  ECF No. 255.  Thereafter, objections and counter-designations were served in response to each side's exhibit lists and deposition designations.  ECF Nos. 265 - 268.  Witness lists were also exchanged, including 38 named witnesses and 23 witnesses that Class Representative and Defendants, respectively, expected or anticipated they may call at trial.

ECF No. 257.  These trial preparation materials were the product of intensive analysis and culling of millions of pages of documents and thousands of pages of deposition testimony.

115.    By the time of the Settlement, Plaintiff's Counsel had also commenced work on the proposed jury instructions, verdict form, and numerous demonstratives and graphics for trial.

116.    Plaintiff's Counsel and Class Representative also engaged in jury research with jury consultants to assist in jurisdiction-specific risk assessment and trial preparation.  The information gathered from this research was used for mediation and for trial preparation.  In addition, Class Representative also engaged and, at the time of settlement had met extensively with, graphic/video consultants experienced with the jurisdiction who assisted in the creation of graphics and demonstratives for trial and for other litigation purposes.  Plaintiff's Counsel had also made office space and accommodation arrangements in proximity to the Courthouse for the expected duration of the trial.

117.    The result was that at the time the Settlement was reached by the Parties, Plaintiff's Counsel and Class Representative were actively engaged in, and had dedicated significant resources to, preparing for trial and were acutely aware of the strengths and weaknesses of the claims and defenses.

## VII.    RISKS FACED BY CLASS REPRESENTATIVE IN THE ACTION

118.    Based on publicly available documents, information and internal documents obtained through Plaintiff's Counsel's own investigation, discussions with consultants, and the extensive fact and expert discovery conducted in the Action, Plaintiff's Counsel believe that they have adduced substantial evidence to support Class Representative and the class's claims and were prepared to proceed to trial.  Plaintiff's Counsel also realize, however, that this is not a case with a public restatement or criminal indictments of Defendants, which would have aided the Class Representative in proving certain elements of the case, like materiality, falsity, or improper

accounting.  Instead, Plaintiff's Counsel and Class Representative faced considerable challenges and defenses on each and every element of its claims if the Action were to continue through trial, as well as the inevitable appeals that would follow even if Class Representative was able to obtain a favorable verdict against Defendants.

119.     In agreeing to settle, Class Representative and Counsel considered, among other things, the substantial cash benefit to the Settlement Class Members under the terms of the Agreement weighed against the outstanding risks facing the class, including: (a) the uncertainty of prevailing on some or all of the claims at trial and the difficulties and challenges involved in proving (i) materiality, (ii) scienter with respect to the Company *and* the Individual Defendants, and (iii) loss causation and damages where, as here, partial disclosures occurred over an extended period of time and were of the nature that Defendants would claim they were confounded with the release of information that was unrelated to the fraud; (b) the uncertainties inherent in Defendants' outstanding dispositive summary judgment motion, *Daubert* motion, and the upcoming *in limine* motions, which could result in the termination of the action or further limit the presentation of documents and witnesses at trial; (c) the fact that, even if Class Representative prevailed at trial, any monetary recovery could potentially have been less than the Settlement Amount; and (d) the delays inherent in such litigation, including appeals.

120.     Class Representative and Plaintiff's Counsel also considered that the alleged violations of complex accounting and SEC rules and regulations might not have been easily understood by a jury and were vigorously disputed by Defendants, represented by sophisticated trial counsel, who offered credible alternate explanations and defenses supported by experts and numerous exhibits.

121.    Some of the most serious risks are discussed in the following paragraphs.  Class Representative and Plaintiff's Counsel carefully considered these hurdles during the months and weeks leading up to trial and prior to and during the settlement discussions with Defendants and Judge Brinkema.  Ultimately, consideration of the risks and unique complexities of the claims, as discussed with Judge Brinkema at the settlement conference, informed Class Counsel and Class Representative's decision as to an appropriate settlement amount.

### A.    Jury and Trial Risk

122.    At the time the Settlement was reached, the Parties were weeks away from their May 21, 2013 trial date.  Class Representative and Plaintiff's Counsel had a thorough understanding of the strengths and weaknesses of the Action.  While Class Representative and Plaintiff's Counsel believe that the claims asserted against the Defendants have substantial merit, we also recognize that there are considerable risks involved in pursuing the Action to verdict.

123.    Associated with the trial was the risk that given the venue of this case, a sizable portion of the potential jury pool would either be employed by government contractors (like CSC) or somehow be involved in government contracts, similar to the NHS Contract.  These jurors could credit CSC's defense that the U.K. government changed the direction of the NHS project, either placing blame with the NHS instead of CSC for the alleged NHS Contract failures or viewing the facts as "business as usual" in the government contracting world.

124.    Additionally, some of the technical matters at issue here would have been addressed solely through the use of experts opining on accounting, internal controls over financial reporting, loss causation, and damages, with the concomitant risk that (a) the experts could be subject to a successful *Daubert* motion prior to trial, permitting little or no expert testimony on loss causation, damages, internal controls, or accounting failures; or (b) if allowed

to testify, the jury would evaluate the "battle of the experts" and decide to credit the Defendants' experts over Class Representative's experts.

125.    In addition to these specific jury risks, Plaintiff's Counsel also faced additional trial-related risks, including, among other things: (a) presenting the factual case through adverse witnesses controlled by the Defendants, including Defendants Laphen and DeBuck and high level current and former CSC employees; (b) the main, formerly confidential, witness in this Action, Mr. Fitzgerald, who sent Defendants Laphen and DeBuck a letter concerning CSC's internal controls deficiencies at the outset of the Class Period, was outside the Court's subpoena power and Class Counsel expected that Defendants would make every effort to try and discredit his deposition testimony if he did not appear voluntarily at trial; (c) the admission of certain documents may have been limited or restricted by the Court, given their nature of being from third-parties, including the NHS and outside auditor Deloitte; and (d) the claims at issue, including GAAP and SOX violations, involve an inherently complex subject matter that would present challenges with a jury.

126.    Even if Class Representative prevailed at trial, there is no assurance that it would have recovered an amount equal to, much less greater than, the proposed Settlement Amount given Defendants' challenges to loss causation and damages.  Moreover, even a positive outcome at trial is not a guarantee of an ultimate positive result for the class.  Indeed, since the passage of the PSLRA, two of the five securities class action cases that have been tried to verdict for the plaintiff have been reversed by the trial court.  *See* Ex. 6 at 39.  The risks that faced this case are no different.

### B.    Risks Concerning Liability of Defendants

127.    The claims against the Defendants presented significant risks given, among other things, the highly complex nature of the alleged fraud at issue and the vigorous opposition

Defendants were advancing.  To succeed, Class Representative needed to prove that the terms of the NHS Contract were unachievable and that the contract was being improperly accounted for in violation of GAAP.  Class Representative then needed to prove that the disclosure and accounting failures concerning the NHS Contract were examples of Defendants' failure to satisfy CSC's internal control obligations under SOX.  Finally, Class Representative had to show that rather than disclose this information, Defendants knew or consciously disregarded these violations and internal control failures, while making false statements and omissions to the market, resulting in economic loss.  All elements of liability were vigorously disputed by Defendants.

128.    For instance, Defendants likely would argue at trial, as they had at summary judgment, that Class Representative could not establish scienter—that is, that Defendants knew or recklessly disregarded that CSC's internal controls were ineffective and that among the consequences of these failed internal controls was improper accounting for the NHS Contract and related false statements and omissions concerning CSC's inability to perform on the NHS Contract.  ECF No. 245.  Defendants also likely would focus the jury on the absence of insider trading allegations in this Action to prove that the Individual Defendants had no motive to profit from the alleged fraud.  Defendants likely would also argue that the challenged statements in terms of the accounting for the NHS Contract and the internal controls maintained by CSC were made based on advice of third-parties, including outside accountants—further negating an inference of scienter.

129.    In response, Class Representative would present evidence of internal reports and communications, which we believe kept Defendants apprised that the NHS Contract was unachievable under its terms, show that the lack of contract coverage was recognized internally

as a Company top risk, and demonstrate that Defendants made their SOX certifications attesting to internal control adequacy while in possession of a letter from a former Director of Internal Audit that alleged a lack of independence in CSC's internal audit function.  Class Representative would further respond that reliance on an outside auditor for an assessment of internal controls is impermissible under the securities laws and accounting standards.  Moreover, Class Representative would argue that there was no admissible evidence that Defendants' reliance on the outside auditors was reasonable or in good faith by highlighting evidence demonstrating that Defendants repeatedly provided knowingly false representations to CSC's outside auditor, while concealing critical facts regarding the state of affairs of the NHS Contract, thereby undercutting Defendants' ability to establish as a matter of law the defense of having operated in good faith reliance on the auditors.

130.    How the issue of scienter ultimately would have been determined by the Court at summary judgment or by the jury if the Action proceeded to trial was far from certain.

C.    **Risks Concerning Loss Causation and Damages**

131.    Class Representative also faced significant barriers to establishing loss causation and resulting damages with respect to each of the claims asserted against Defendants.  If a jury were to find that any of the alleged corrective disclosures identified in the Consolidated Complaint were not true corrective disclosures, the potential recovery for the class would be significantly diminished.

132.    For instance, Class Representative faced the distinct possibility that the jury could find that all alleged misstatements were fully cured during the Class Period based on Defendants' damages expert, Dr. Juneja, who opined that certain information was not corrective because it had been previously disclosed.  In support of this argument, Dr. Juneja relied on certain company statements and news articles in opining that disclosures after May 26, 2011 (through December

27, 2011) were not corrective because their content was timely or a materialization of previously publicly disclosed risks.  In response, Class Representative, through its expert, Mr. Coffman, marshaled evidence showing that the market remained uncertain of the truth surrounding the alleged fraud until the final corrective disclosure on December 27, 2011, which revealed that CSC may have to write-down its entire accrued net investment of $1.5 billion in the NHS Contract (*i.e.*, two years of Company profits), which ultimately resulted in a stock drop of 9% on that day.  However, if the Defendants were able to convince the jury that no new material information relating to the alleged fraud was publicly disclosed after a given date, the jury could very well materially reduce the damages that could be awarded against Defendants.

133.    The Parties' experts further disagreed as to whether declines related to the Nordic region were recoverable.  Dr. Juneja assumed (at the request of Defendants' Counsel) that declines specifically related to the Nordic region were not recoverable due the Court's prior opinion dismissing false statements concerning the Nordic region's accounting errors.  Class Representative's expert, Mr. Coffman, disagreed, opining that such declines are recoverable as related to the remaining internal control claim.

134.    There was also disagreement between the Parties' experts concerning each other's assessment of the appropriate level of statistical significance.  For example, Dr. Juneja opined that the $.95 of inflation per share that Mr. Coffman estimated resulted from the corrective disclosure on April 1, 2010 was in fact $0.  Dr. Juneja's opinion that no inflation resulted from the alleged fraud on this date stemmed from her opinion that the price decline was not statistically significant at the 5% level, after she adjusted for Mr. Coffman's multiple statistical analysis.  Mr. Coffman responded that Dr. Juneja's adjustments were neither standard nor statistically appropriate in this context.  Mr. Coffman highlighted that Dr. Juneja failed to dispute

that his event study demonstrated the probability that the price decline on April 1, 2010 occurred by chance is less than 1%, *i.e.*, that his result for this specific date is significant at the 99% confidence level.  Mr. Coffman also responded that Dr. Juneja did not dispute that any price movement was caused by the information he identified, and that she could point to no alternative reason CSC's stock price would have declined on April 1, 2010.  Nonetheless, if the Court or jury had determined that Dr. Juneja's analysis was correct, any damages awarded would be significantly reduced.

135.    The Parties' damages experts also strongly disagreed with each other's assumptions and their respective methodologies, including the method of disaggregating potentially confounding news from the alleged fraud-related cause of the stock drop.  The result was that while Mr. Coffman opined that the maximum per share inflation resulting from the Class Representative's allegations was $13.25 per share, Dr. Juneja strongly disagreed.  Coffman Decl. Ex. 3 ¶¶ 10, 17-20.

136.    Indeed, Dr. Juneja's opinion was that the alleged inflation per share was zero.  Dr. Juneja based her opinion that there was no inflation per share on her belief that several of Mr. Coffman's assumptions regarding the disclosures of allegedly corrective NHS-related information and the associated stock price reactions on those dates that he used to calculate alleged inflation from the beginning of the Class Period were incorrect.  Accordingly, Dr. Juneja opined that the alleged inflation per share would be zero.  In the alternative, Dr. Juneja opined that, even if Coffman's assumptions were accepted, correcting for certain purported errors in those assumptions and in the implementation of Mr. Coffman's methodologies would result in at most $4.11 of inflation per share—or *$9.14* less than Mr. Coffman's assessment.  *Id.* ¶ 18.

44

137.    Therefore, the risk that the jury, or Court during pre-trial motion practice, would credit Defendants' damages position over that of Class Representative had considerable consequences in terms of the amount of recovery for the Certified Class, even assuming liability was proven.  Instead, the Parties settled for $97.5 million, an amount that equates to 38% of Dr. Juneja's maximum inflation per share number and 14% of Mr. Coffman's maximum damages. Coffman Decl. Ex. 3 ¶¶ 15-20.

138.    Given the challenges of continuing to pursue the claims against Defendants, and the immediate recovery the Settlement provides for the Settlement Class, Plaintiff's Counsel and Class Representative respectfully submit that the Settlement is fair, reasonable, and adequate and should be approved.  *See also* Harnish Decl. Ex. 2.

## VIII.   VALUE OF THE SETTLEMENT IN RELATION TO MAXIMUM ESTIMATED DAMAGES

139.    In contrast to the risks described above, we believe that the Settlement provides a very substantial and certain immediate recovery.  As noted above, Mr. Coffman has opined that the per share inflation resulting from the Class Representative's allegations was $13.25. Applying an "institutional/two-trader" model to the inflation per share, Mr. Coffman estimates that there were approximately 200.5 million shares of CSC common stock traded during the Settlement Class Period that may have been damaged as a result of the alleged wrongdoing.  *See* Coffman Decl. Ex. 3 ¶ 15.  After factoring in inflationary gains and offsets, the average alleged damages per share, if Class Representative was to prove liability, would be $3.51 resulting in estimated aggregate damages of approximately $704 million.  *Id.*  Assuming 200.5 million damaged shares, the $97.5 million Settlement would return an average recovery of $0.49 per allegedly damaged share, or 14% of the alleged damages estimated by Class Representative's

expert.  *Id*. ¶ 16.  We therefore believe that the Settlement represents a very favorable recovery for the Settlement Class.

140.    As noted above, Dr. Juneja did not agree with Mr. Coffman's calculations of artificial inflation per share that would be recoverable if Class Representative prevailed on all claims.  *Id*. ¶¶ 17-19.  Indeed, she opined that inflation per share could be as low as $0, but not higher than $4.11, depending on which, if any, of Mr. Coffman's assumptions were adopted by the jury.  In any event, after applying Mr. Coffman's methodology for determining the number of damaged shares to Dr. Juneja's "maximum" inflation per share, there would be 114.5 million damaged shares with average damages of $2.22  per share if gains are considered, resulting in estimated aggregate damages of approximately $254 million.  *Id*. ¶ 19.  The lower damaged share figure stems from Dr. Juneja's recognition of only two corrective disclosure dates that resulted in inflation, in comparison with Mr. Coffman's six dates.   The proposed settlement amount of $97.5 million would represent an average recovery of $0.85 per share or 38% under this model.  *Id*.

141.    Accordingly, the proposed Settlement will return what we believe to be a significant recovery, measured as between 14% and 38% of the maximum provable damages asserted by each Party's experts.

## IX.    NEGOTIATION OF THE SETTLEMENT

### A.    Successful Settlement Discussions with Defendants

142.    Plaintiff's Counsel and Defense Counsel attended two intensive formal mediation/settlement conference sessions totaling three days and participated in several informal settlement discussions, including those with damages experts and the mediators, prior to the Parties reaching a settlement in principle.

143.     The first mediation took place after the Court's denial, in part, of Defendants' motion to dismiss, certification of the class, and extensive discovery (including several fact depositions).  By joint consent of Class Representative, Defendants, and Defendants' insurance carriers, David M. Brodsky, of Brodsky ADR LLC, was selected as the independent mediator and subsequently presided over a mediation session held in New York City on January 23, 2013. *See generally* Brodsky Decl. Ex. 1.

144.     Prior to the January 23 mediation, the Parties engaged in extensive discussions among themselves, and with their damages experts, the mediator, and insurance carriers.  These pre-session discussions were focused, substantially, on the Parties' respective damages calculations.  These discussions included a pre-mediation call with both Parties and their respective damages experts in order to set forth and discuss each side's damages methodologies, assumptions, and calculations.

145.     Thereafter, Defendants and Class Representative simultaneously exchanged mediation statements and submitted them to the mediator, Mr. Brodsky, accompanied by submissions from their respective damages experts as to their theory and estimation of damages.

146.     Following that initial round of exchanged mediation statements and memoranda, the Parties submitted a second round of mediation statements and expert rebuttal damages submissions to address and respond to issues raised by each sides' counsel and their damages experts.  This second submission was for the mediator's eyes only.  Finally, the Parties also separately exchanged discrete information about their aggregate damages calculations in connection with mediation.  Issues surrounding damages—the assumptions made, the methodologies used, and the calculations arrived at—were hotly contested and thoroughly vetted

with the mediator and between the Parties prior to the commencement of the formal mediation session.  The mediation followed.

147.    The mediation was held on January 23, 2013 in New York City.  Class Counsel attended in person, including a strong presence from senior attorneys with extensive experience in litigating and mediating successful class actions, including Lawrence Sucharow, Thomas Dubbs, Joseph Fonti, and Susan Podolsky.  They were accompanied by a representative of Class Representative.  Defendants' Counsel's attendees included senior attorneys from Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), including Jay Kasner, along with CSC's General Counsel, William Deckelman.  Also in attendance were counsel representing CSC's insurance carriers.

148.    At the outset of the mediation, joint presentations were made by both sides.  Class Counsel's oral presentation was accompanied by slides that articulated the strengths of Class Representative's case and addressed Defendants' defenses.  One focus of this presentation was damages and a response to Defendants' position regarding damages.  Class Counsel's presentation was followed by a thorough and responsive presentation from Defendants.

149.    Thereafter, the Parties were separated for the majority of the day, with Mr. Brodsky participating in various *ex parte* communications with both sides.  Mr. Brodsky probed Class Counsel on the merits of the case, and spent considerable time asking challenging questions concerning Class Representative's damages arguments.  Based on our observations, Mr. Brodsky was similarly probing of Defendants' contentions and defenses.  The day lasted nearly 14 hours during which the Parties tried diligently to find common ground and to enter into what each side considered a fair settlement.  Despite all the efforts during—and prior to—the mediation session, the Parties agreed that they were unable to resolve the matter at that time.

150.     Nonetheless, this mediation, and the extensive communications, briefing, and damages discussion and analysis that preceded it, allowed Class Counsel to more fully understand Defendants' defenses and position on liability and damages and was useful to our further understanding the strengths and weaknesses of each Party's case.

151.     As described herein, immediately following the conclusion of the mediation, the Parties embarked on an intense deposition schedule involving 27 depositions between January 24 and February 15, 2013, in 11 cities, including 7 depositions in London, England.  *Supra* at ¶ 47, 63. The Parties also embarked on trial preparation, expert witness discovery, the exchange and submission of trial preparation materials, including the exchange of witness and exhibit lists, and pre-trial disclosures.  *Supra* at ¶¶ 111-117  Summary judgment motion practice followed.  *Supra* at ¶¶ 102-110.

152.     Subsequently, after the close of discovery and approximately one month before trial, Judge Brinkema conducted a two-day settlement conference on April 16 and 17, 2013. Class Counsel attended the settlement conference in person, again with strong senior attorney participation, including Lawrence Sucharow, Jonathan Plasse, Joseph Fonti, Susan Podolsky, and Benjamin Chew.  Also in attendance was a representative of Class Representative.  Defendants' Counsel attended, along with CSC's General Counsel, William Deckelman.  Also in attendance were counsel for certain of CSC's insurance carriers.

153.     Plaintiff's Counsel comprehensively prepared for this settlement conference, anticipating scores of potential arguments and counter-arguments that might have been presented concerning both damages and liability.  Multiple demonstratives were created in addition to the exhibits that accompanied the detailed settlement briefing submitted to Judge Brinkema.

154.     With the close attention of Judge Brinkema, after an extensive two-day settlement process that included detailed presentations from senior counsel for both sides (as well as informed and intense arm's-length negotiations), Class Counsel and Defendants' Counsel, on behalf of their respective clients, entered into an agreement in principle to settle and release all claims asserted, or that could have been asserted, against Defendants in consideration for a cash payment of $97,500,000 by and on behalf of Defendants for the benefit of the Settlement Class, subject to certain terms and conditions and the execution of a customary stipulation and agreement of settlement and related papers.

155.     One material element of this proposed Settlement was that the Settlement Class Period would be extended beyond the original Class Period certified by this Court.  The "Extended Class Period" is the period between August 10, 2011, and December 27, 2011, inclusive.

156.     The rationale for extending the Class Period was as follows: After the Consolidated Complaint was filed and Class Representative moved for class certification, additional news concerning the NHS Contract emerged on December 27, 2011, when the Company reported that it would be required to write down its net investment in the contract—which could amount to $1.5 billion.  Class Representative sought damages for the share price decline on December 27, 2011 on behalf of members of the Certified Class who purchased CSC shares during the Class Period.  However, the Consolidated Complaint did not assert claims for purchases on or after August 10, 2011.  The Extended Class Period thus covers these August 10, 2011 through December 27, 2011 purchases.  Accordingly, for the purposes of settlement, the Class Period has been extended approximately 4.5 months to include purchases through

December 27, 2011.  The Extended Class Period increases the number of effected shares by an estimated 15 million shares.  *See* Coffman Decl., Ex. 3 at n.11.

157.    The Extended Class Period's inclusion in the Settlement was separately discussed by the Parties and Judge Brinkema near the conclusion of the settlement discussions.  It was a critical factor for Defendants and key to achieving the $97.5 million recovery for investors.

158.    Class Representative and Defendants memorialized the final terms of proposed settlement in the Stipulation, which was filed with the Court on May 15, 2013.  ECF No. 309.

159.    On May 15, 2013, Class Representative moved for preliminary approval by the Court of the Settlement, which included preliminary approval of the Settlement Class and the Settlement Class Period.  The Court held a preliminary approval hearing on May 24, 2013, at which time the Court granted the motion.  ECF No. 313.

## X.    PLAN OF ALLOCATION

160.    Pursuant to the Preliminary Approval Order, and as set forth in the Settlement Notice, Settlement Class Members who wish to participate in the distribution of the proceeds from the Settlement must submit a valid Proof of Claim and all required information postmarked no later than October 8, 2013.  As provided in the Settlement Notice, after deduction of any Court-awarded attorneys' fees and expenses (which may include reimbursement of lost wages and expenses to Class Representative), notice and administration costs, banking fees, and all applicable Taxes, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the plan of allocation approved by the Court (the "Plan of Allocation").

161.    The proposed Plan of Allocation is designed to achieve an equitable and rational distribution of the Net Settlement Fund, consistent with Class Representative's damages theory during the prosecution of the Action.  Class Counsel developed the Plan of Allocation in close consultation with Class Representative's damages expert and believes that the plan provides a

fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.  *See also* Ex. 3 ¶ 23.

162.    The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on a formula tied to liability and damages.  In developing the Plan, Class Representative's damages expert considered the amount of artificial inflation allegedly present in CSC's common stock throughout the Settlement Class Period that was purportedly caused by the alleged fraud.  This analysis entailed studying the price declines associated with CSC's allegedly corrective disclosures, adjusted to eliminate the effects attributable to general market or industry conditions.  In this respect, an artificial inflation table was created and presented as part of the Settlement Notice.  This table will be utilized in calculating Recognized Loss Amounts for Authorized Claimants.

163.    The Garden City Group, Inc. ("GCG"), as the Court-approved Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Loss compared to the aggregate Recognized Losses of all Authorized Claimants, as calculated in accordance with the Plan of Allocation.  The Calculation of Recognized Loss will depend upon several factors, including when the Authorized Claimant's CSC stock was purchased and whether the stock was sold during the Settlement Class Period and, if so, when.

164.    In sum, the proposed Plan of Allocation, developed in consultation with Class Representative's damages expert, was designed to fairly and rationally allocate the Net Settlement Funds among Authorized Claimants based on the amount of alleged artificial inflation present in CSC's common stock that was purportedly caused by the Company's overstatement of its financial condition throughout the Settlement Class Period.  Accordingly, Class Counsel

respectfully submits that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

## XI.  CLASS REPRESENTATIVE'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER  REQUIRING ISSUANCE OF THE SETTLEMENT NOTICE

165.    The terms of the Settlement are set forth in the Stipulation and in the Settlement Notice, which provides potential Settlement Class Members with information concerning, among other things: their right to object to any aspect of the Settlement, the Plan of Allocation, or the Fee and Expense Application; the nature of the Action; the definition of the Settlement Class; the claims and issues in the Action; the claims that will be released; the Plan of Allocation; and the manner for submitting a Proof of Claim in order to be eligible for a payment from the proceeds of the Settlement.  *See* Affidavit Regarding (A) Mailing of the Settlement Notice and Proof of Claim Form;  (B) Publication of Summary Settlement Notice; (C) Website and Telephone Hotline; and (D) Report on Requests for Exclusions and Opt-Ins Received to Date, dated August 12, 2013 ("GCG Affidavit" or "GCG Aff."), Ex. 7 - A hereto.  The Settlement Notice also informs Settlement Class Members of Class Counsel's intention to apply for an award of attorneys' fees of no more than 19.5% of the Settlement Fund, for payment of litigation expenses in an amount not to exceed $3.35 million, and for the reasonable expenses and lost wages of Class Representative directly related to its representation of the class in an amount not to exceed $250,000.  *Id.* at 2.

166.    With respect to the procedures for seeking exclusion, the previously disseminated Class Notice advised Certified Class Members that they could seek exclusion from the Certified Class.  ECF No. 270, Ex. A at 3.  The deadline for seeking exclusion passed on April 30, 2013 and eighteen Class Members validly sought exclusion.  ECF No. 307.

167.    In connection with the Settlement, members of the Settlement Class who only purchased CSC common stock during the original Class Period, *i.e.* members of the Certified Class, cannot seek exclusion at this time.  However, members of the Settlement Class that only purchased CSC common stock during the Extended Class Period, *i.e.* persons who were not Certified Class Members, may seek exclusion, and members of the Settlement Class that purchased CSC common stock during both the original Class Period and the Extended Class Period may seek exclusion for shares purchased during the Extended Class Period.  Lastly, members of the Certified Class who sought exclusion will be able to "opt-back" into the Settlement Class in order to participate in the recovery.  Ex. 7 - A at 7-8.  The deadline for seeking exclusion or opting back in for qualifying Class members is August 29, 2013.

168.    The Settlement Notice was approved by the Court in its Preliminary Approval Order entered May 24, 2013.  Pursuant to the Order, the Court also appointed GCG as Claims Administrator and instructed GCG to disseminate copies of the Settlement Notice and Proof of Claim ("Claim Packet") by mail and to publish the Summary Notice of Proposed Settlement of Class Action, Extended Class Period, and Motion for Attorneys' Fees and Expenses (the "Summary Settlement Notice").

169.    As detailed in GCG's Affidavit, on June 10, 2013, GCG began mailing Claim Packets to potential Settlement Class Members as well as banks, brokerage firms, and other third party nominees using the name and address information gathered during the mailing of the Class Notice.  GCG Aff. ¶ 6.  In total, to date 227,966 Claim Packets have been mailed to the Settlement Class.  *Id*. ¶ 9.  On June 19, 2013, GCG caused the Summary Settlement Notice to be published in *The Wall Street Journal* and to be transmitted over *PR Newswire*.  *Id*. ¶ 10.

170.     GCG also maintains and posts information regarding the Settlement on a dedicated website established for the Action, www.cscsecuritieslitigation.com, to provide class members with information concerning the Settlement, as well as downloadable copies of the Claim Packet and the Stipulation.  *Id*. ¶ 11.   In addition, Class Counsel has made available relevant documents concerning the Settlement on its firm website.

## XII.   CLASS COUNSEL'S REASONABLE APPLICATION FOR AN AWARD OF ATTORNEYS' FEES

171.     In addition to seeking final approval of the Settlement and Plan of Allocation, Class Counsel is making a collective application for a fee award of 19.5 % of the Settlement Fund (which includes accrued interest).  Class Counsel also requests payment of litigation expenses incurred in connection with the investigation, prosecution, and resolution of the Action from the Settlement Fund in the amount of $3,064,815.86.  These requests are fully supported by Class Representative.  Ex. 2 ¶¶ 12-15.  Class Counsel further requests reimbursement of the costs and expenses incurred by Ontario Teachers', pursuant to 15 U.S.C. § 78u-4(a)(4), directly related to its representation of the class in the total amount of $60,905.70 (as detailed below and in the Harnish Decl. Ex. 2 ¶¶ 16-23).  These amounts are well below the $3,350,000 and $250,000 maximum expense amounts that the Settlement Class was advised could be requested.  The legal authorities supporting the requested fees and expenses are set forth in Class Counsel's separate Fee Memorandum.  Below is a summary of the primary factual bases for the requested fees and expenses.

### A.     The Risks and Unique Complexities of the Litigation

172.     Although Class Representative consistently maintained that the evidence evaluated during discovery supported a finding of securities fraud, this Action still presented substantial challenges from the outset of the case.  The unique risks Class Representative faced

in proving Defendants' liability, loss causation, and damages, along with challenges and risks in proceeding to trial, are detailed in Section VII ¶¶ 118-138, above.  These case-specific risks are in addition to the more typical risks accompanying securities litigation, such as the fact that this prosecution was undertaken on a contingent-fee basis.

173.    From the outset, Plaintiff's Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of being fully compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable costs that a case such as this requires.  With several outside experts and consultants, vendors and trial preparation costs, and a fast-approaching trial date, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.

174.    Counsel also bore the risk that no recovery would be achieved.  Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.  Counsel knows from experience that the commencement of a class action does not guarantee a recovery.  *See, e.g.*, Ex. 6 at 39.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

175.    Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only

occur if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders.  If this important public policy is to be carried out, courts should award fees that adequately compensate Plaintiff's Counsel, taking into account the risks undertaken in prosecuting a securities class action.

176.    Here, Plaintiff's Counsel's persistent efforts in the face of substantial risks and uncertainties have resulted in what we believe to be a significant and immediate recovery for the benefit of the Settlement Class.  In circumstances such as these, and in consideration of Counsel's hard work and the extraordinary result achieved, we submit that the requested fee of 19.5% of the Settlement Amounts and reimbursement of $3,064,815.86 in litigation expenses is reasonable and should be approved.

### B.    The Work and Skill of Plaintiff's Counsel

177.    The work undertaken by Plaintiff's Counsel in investigating and prosecuting this case and arriving at the present Settlement in the face of substantial risks has been time-consuming and challenging.  As more fully set forth above, the Action settled only after Counsel overcame multiple legal and factual challenges and the Parties had litigated the case to the eve of trial.  Among other efforts, Plaintiff's Counsel conducted an exhaustive investigation into the class's claims; researched and prepared a detailed amended complaint; prevailed, in part, on Defendants' motions to dismiss; successfully moved for class certification and opposed Defendants' efforts to appeal the Court's Class Certification order; consulted extensively with experts and consultants; obtained, organized and reviewed more than five million pages of documents obtained from Defendants and non-parties; took or defended 32 depositions; moved for summary judgment and briefed an extensive opposition to Defendants' motion for summary judgment; prepared for a trial scheduled to begin on May 21, 2013 (including conducting jury research, service of exhibits lists, deposition designations, witnesses lists, and the

commencement of the preparation of jury instructions and a verdict form); and engaged in a hard-fought and protracted settlement process with experienced and tenacious defense counsel.

178.    At all times throughout the pendency of the Action, Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the Certified Class, whether through settlement or trial, by the most efficient means necessary.  We believe that the substantial time and expense incurred by Plaintiff's Counsel have achieved precisely such an outcome, and accordingly, this factor weighs strongly in favor of Counsel's fee request.

179.    Attached hereto as Exs. 8 & 9 are declarations from Joseph Fonti and Benjamin Chew, respectively, in support of the request for an award of attorneys' fees and reimbursement of litigation expenses.  Included with these declarations are schedules that summarize the lodestar of their respective firms, as well as the expenses incurred by category (the "Fee and Expense Schedules").  The attached declarations and the Fee and Expense Schedules indicate the amount of time spent by each attorney and professional support staff on the case, and the lodestar calculations based on their current billing rates.  As set forth in each declaration, they were prepared from contemporaneous daily time records regularly prepared and maintained by the respective firms, which are available at the request of the Court.  Ms. Podolsky has submitted a declaration explaining that her legal fees and expenses are being paid by Labaton Sucharow, and providing a schedule of her expenses for informational purposes.  *See* Podolsky Decl. Ex. 10.

180.    For Class Counsel specifically, the hourly billing rates here ranged from $750 to $975 for partners, $725 for Of Counsels, and $325 to $665 for other attorneys.  *See* Fonti Decl. Ex. 8 - A.  Defense firm billing rates, including the firm representing Defendants in this Action,

58

analyzed and gathered by Labaton Sucharow from bankruptcy court filings in 2012, in many cases exceeded these rates. *See* Ex. 11.

181.    The reasonableness of the attorneys rates are further supported by the 2012 National Law Journal (NLJ) survey detailing the billable rates for partners and associates across the country. *See* http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?germane=1202581351631 &id=1202581266427&interactive=true&slreturn=20130713221000.

182.    With respect to the four Washington, DC firms and the four New York, NY firms discussed in the survey:

(a)    The median 2012 partner billable rate for four DC-based firms ranged from $560-$750.  The "high" partner rate was $1,200 for Hogan Lovells, $1,250 for Dickstein Shapiro, $990 for Patton Boggs, and $985 for Holland & Knight.  The median 2012 partner billable rate for four New York-based firms ranged from $535 to $895.  The "high" partner rate was $1,200 for DLA Piper, $950 for Kelley Drye & Warren, $995 for Schulte Roth & Zabel, and $750 for Epstein Becker & Green.  In comparison, for Class Counsel, the partner rates on this case range from $750 to $975.

(b)    The median billable rate for associates at these four DC-based firms was $310-$465, with a high of $655 at Hogan Lovells.  The median billable rate for associates at these four New York-based firms was $330 to $585, with a high of $760 at DLA Piper.  Class Counsel rates are comparable, with associates ranging from $440 to $665, for the most senior associates.

183.    Labaton Sucharow and Patton Boggs have collectively expended more than 34,457 hours in the prosecution and investigation of the Action.  The resulting collective lodestar is $16,031,271.25.  Pursuant to a lodestar cross-check, a requested fee equal to 19.5% of the

Settlement Amount ($19,012,500) results in a multiplier of less than 1.2 on this lodestar and does not include any time that will necessarily be spent from the time the Settlement was preliminarily approved through the administration and distribution of the Settlement.

184.    Plaintiff's Counsel are experienced in prosecuting securities class actions and worked diligently and efficiently to prosecute the Action.

185.    Class Counsel is among the most experienced and skilled firms in the securities litigation field, and has a long and successful track record in such cases.  *See* Fonti Decl. Ex. 8 - C (Firm Resume).  Class Counsel also has experience representing Ontario Teachers' for nearly a decade in a number of matters in which it has served, and sought to serve, as a representative plaintiff and class representative.  Some of the most senior and experienced attorneys at Labaton Sucharow, indeed within the field of securities class actions, were included among the attorneys dedicated to this case.  Lawrence Sucharow, Jonathan Plasse, and Thomas Dubbs used their expertise to contribute to both the prosecution and successful settlement of this Action.

186.    Additionally, Plaintiff's Counsel, Benjamin Chew and Susan Podolsky, are also highly-regarded and experienced litigators before the Court, with prior experience as both defense and plaintiff's counsel, long and successful track records in cases in which they have litigated, and extensive trial experience in the jurisdiction.  *See* Chew Decl. Ex. 9 - C; Podolsky Decl. Ex. 10 - B.

187.    While Class Counsel took the lead during the pendency of this Action, it allocated work among Plaintiff's Counsel to avoid duplication of effort and to ensure the efficient prosecution of the Action.

### 1.      Standing and Caliber of Defense Counsel

188.     Skadden, as counsel to the Defendants, brought to bear a sophisticated and impressive defense.  Roughly two dozen Skadden attorneys, including partners from Skadden offices around the world, advocated on behalf of their clients with conviction.

189.     The quality of the work performed by Plaintiff's Counsel in attaining the Settlement should be evaluated in light of the quality of this opposition.  In 2012, while prosecuting this action against Class Representative, Skadden was named Securities Group of the Year by Law360, and two of its main partners in this action, Jay Kasner (head of the securities litigation practice at Skadden) and Scott Musoff were both recognized as Law360's 2012 Securities MVPs.  Skadden vigorously represented the interests of Defendants, leaving no issue unchallenged.  In the face of this experienced and formidable opposition, Plaintiff's Counsel were nonetheless able to secure what we believe to be a Settlement that is highly favorable to the Settlement Class.

## XIII.  REQUEST FOR REIMBURSEMENT OF LITIGATION EXPENSES

### A.      Counsel Seek Reimbursement of Reasonable
### and Necessary Litigation Expenses

190.     Labaton Sucharow and Patton Boggs seek reimbursement from the Settlement Fund of $3,064,815.86 in litigation expenses reasonably and necessarily incurred in connection with commencing and prosecuting the claims against Defendants.  *See* Exs. 8 - B & 9 - B.

191.     From the beginning of the case, Counsel were aware that they might not recover their expenses, and, at the very least, would not recover them until the Action was successfully resolved.  Thus, Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable while vigorously and efficiently prosecuting the case.

192.    As set forth in the Fee and Expense Schedules, Labaton Sucharow and Patton Boggs have incurred a total of $3,064,815.86 in litigation expenses in connection with the prosecution of the Action.  As attested to, these expenses are reflected on the books and records maintained by the firms and are presented in accordance with each firm's expense policies. These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred.  These expenses are set forth in detail in each firm's declaration, which identifies the specific category of expense—*e.g.*, online/computer research, experts' fees, travel costs, the costs of electronic discovery litigation support services, photocopying, telephone, fax and postage expenses, and other costs incurred for which Counsel seek reimbursement.  These expense items are billed separately and such charges are not duplicated in the firm's billing rates.  Exs. 8 – B & 9 – B.

193.    Of the total amount of expenses, more than $2,259,689.89, or almost 75%, was expended on experts and consultants.  As noted above, after Defendants submitted an expert report at the class certification stage regarding market inefficiency, Class Counsel retained experts to rebut Defendants' opinion concerning the efficiency of the market for CSC common stock and the arguments Defendants' expert advanced against Class Representative.  Although Class Representative prevailed at class certification, this was a highly contested issue requiring significant analysis.  Moreover, Class Counsel separately retained an accounting and internal control violations expert and consultant to respond to Defendants' defenses, and to help prosecute this Action through trial.  Class Counsel also retained a damages expert to help prosecute this Action on matters concerning materiality, causation, and the amount of damages suffered by the class and later, to assist in mediation-related valuation efforts, and to help develop a fair and reasonable Plan of Allocation.  Class Counsel also retained two industry

consultants focused on the technical and operational feasibility of CSC's ability to implement the NHS Contract for healthcare provider use at healthcare facilities with the NHS. Accordingly, these professionals were essential to the overall prosecution of the Action.

194.    Another large component of the expenses, $263,776.24, related to travel, business transportation, and meals. Class Counsel was required to regularly travel between New York and Virginia in connection with this case, and seeks payment for the costs of this travel. For instance, counsel traveled to Virginia on numerous occasions to attend hearings, status conferences, and depositions. In addition, Plaintiff's Counsel took or defended 32 depositions in 11 cities throughout the United States and in London, England and seeks payment for the costs of this travel as well (including the cost of economy airfare).

195.    Class Counsel also incurred significant expenses in connection with establishing an electronic discovery database for document review and production, which total $214,057.03. Class Counsel hired an outside vendor, Merrill, provider of the Lextranet discovery software and database, which has crucial expertise in collecting, organizing, and enabling the efficient review of ESI. As described above, Class Representative received more than five million pages of documents from Parties and non-parties during discovery. Using Lextranet allowed Class Counsel to efficiently coordinate the review of this large number of documents among attorneys, consultants, and experts.

196.    Additionally, Class Counsel paid $157,165.02 for court reporting services in connection with the 36 depositions taken or defended during the Action.

197.    The other expenses for which Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the

hour.  These expenses include, among others, court fees, computer research, copying costs, long distance telephone and facsimile charges, and postage and delivery expenses.

198.    All of the litigation expenses incurred by Labaton Sucharow and Patton Boggs, which total $3,064,815.86, were necessary for the successful investigation, prosecution, and resolution of the claims asserted in the Action.  Counsel's expense application has been approved by Class Representative.  *See* Ex. 2 ¶ 14.

### B.    Reimbursement of the Costs and Expenses of Class Representative Is Fair and Reasonable

199.    Additionally, Class Representative seeks reimbursement of its reasonable lost wages and expenses, pursuant to the PSLRA, 15 U.S.C. §78u-4(a)(4), that it directly incurred in connection with its representation of the class in the total amount of $60,905.70.  Specifically, Class Representative seeks $28,881 in lost wages related to the five employees who spent more than 300 hours supervising and prosecuting the Action.  Ex. 2 ¶¶ 16-23.  It also seeks $32,024.70 in reimbursement for expenses primarily related to traveling in connection with the case, such as to hearings and depositions.  *Id*.  The amount of time and effort devoted to this Action by the Class Representative is detailed in the Harnish Declaration.  *Id*.

200.    Class Counsel respectfully submits that this award, which is paid directly to Class Representative, is fully consistent with Congress's intent, as expressed in the PSLRA, of encouraging institutional and other highly experienced plaintiffs to take an active role in bringing and supervising actions of this type.  As set forth in the Fee Memorandum and in the supporting declaration submitted on behalf of Class Representative, Ontario Teachers' has been fully committed to pursuing the Certified Class's claims against the Defendants.  This institution has actively and effectively fulfilled its obligations as representative of the Certified Class, complying with all of the many demands placed upon it during the litigation and settlement of

this Action, and providing valuable assistance to Plaintiff's Counsel.  The efforts expended by the representatives of Ontario Teachers' during the course of this Action are precisely the types of activities courts have found to support reimbursement to class representatives, and fully support Class Representative's request for reimbursement of costs and expenses.

201.    The Settlement Notice apprised the Settlement Class that Class Counsel may seek reimbursement of the costs and expenses of Class Representative in an amount not to exceed $250,000.  *See* GCG Aff. Ex. 7 – A at 2.  The total amount requested herein by Class Representative (*i.e.*, $60,905.70) is well below this cap.

## XIV.   THE REACTION OF THE SETTLEMENT CLASS

202.    As mentioned above, consistent with the Preliminary Approval Order, almost 228,000 Claim Packets were mailed to potential Settlement Class Members advising them of the Settlement, the Plan of Allocation, and that Plaintiff's Counsel would seek an award of attorneys' fees not to exceed 19.5% of the Settlement Fund, and reimbursement of expenses in an amount not greater than $3,600,000.  *See* GCG Aff. Ex. 7 - A.  On June 19, 2013, the Summary Settlement Notice was also published in *The Wall Street Journal* and transmitted over *PR Newswire*.  *Id.* ¶ 10. The Settlement Notice and the Stipulation have also been available on the Settlement specific website maintained by GCG and on Class Counsel's website.  *Id.* ¶ 11. The notices advised Settlement Class Members that the deadline to seek exclusion from the Settlement Class, to the extent applicable, or to object to the Settlement, the proposed Plan of Allocation, and/or the requested fees and expenses is August 29, 2013.

203.    To date, only one request for exclusion from the Settlement Class has been received.  However, the request does not satisfy the requirements in the Settlement Notice or Preliminary Approval Order because it was not submitted by a Settlement Class Member and is

therefore invalid.  GCG Aff. Ex. 7 ¶ 14.  Accordingly, to date no valid requests for exclusion have been received.

204.    To date, we have also only received two purported "objections" to the Settlement and no objections to the request for attorneys' fees, the request for expenses, or the proposed Plan of Allocation.

205.    Rose Watkins mailed a letter to Class Counsel, dated June 17, 2013, that was styled an "objection," however it is not in fact objecting to any aspect of the Settlement, the Plan of Allocation, or the application for attorneys' fees and expenses.  *See* Ex. 12, attached hereto. Instead, Ms. Watkins asks why Class Representative, an Ontario pension plan, is able to file a claim with the Court when she, a U.S. citizen, was unable to file a claim against a former employer in the United States District Court for the Southern District of New York.  As the Court is aware, Ontario Teachers' was twice found to be an adequate representative for the class, first in connection with its appointment as Lead Plaintiff and second in connection with its appointment as Class Representative.  Class Counsel is not in a position to advise Ms. Watkins about the apparent dismissals of her employment claims in the Southern District of New York.

206.    Michael David submitted a timely objection to the Court, ECF No. 316, that is critical of the fact that to be eligible to recover from the Settlement, Settlement Class Members must submit a claim form.  He believes that because he received a Settlement Notice, the Parties must have information about his investments in CSC and be able to complete a claim form for him.  He also does not think that the Settlement Notice provided enough information to allow him to estimate his recovery.  Respectfully, Mr. David is mistaken on all points.  The Parties do not have access to his personal and confidential investment information and cannot complete a claim form for him, or any other Settlement Class Member.  GCG has advised Class Counsel that

Mr. David's name and address were provided by a broker.  That broker may be able to assist Mr. David and we have advised him of this fact.  Mr. David's objection is responded to in full in Class Representative's memorandum of law in support of final approval of the settlement, submitted herewith.

207.    Class Representative will report on all exclusion requests and any additional objections that are received in its reply submission, which must be filed with the Court by September 12, 2013.

## XV.    MISCELLANEOUS EXHIBITS

208.    Attached hereto as Ex. 13 is a true and correct copy of the transcript of the hearing on Class Representative's motion for preliminary approval of the proposed Settlement held on May 24, 2013.

209.    Attached hereto as Exhibit 14 is a compendium of unreported cases, in alphabetical order, cited in the accompanying Memorandum of Law in Support of Plaintiff's Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses and Class Representative's Request for Reimbursement of Expenses.

## XVI.   CONCLUSION

210.    In view of the significant recovery to the Settlement Class, the substantial risks of this litigation, and the efficient and zealous manner in which this case was litigated, as described above and in the accompanying memorandum of law, Plaintiff's Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of Allocation should likewise be approved as fair, reasonable, and adequate.  Additionally, in view of the significant recovery in the face of substantial risks, the complex issues faced, the quality of work performed, the contingent nature of the fee, and the standing and experience of Plaintiff's Counsel, as described above and in the accompanying memorandum of law, Plaintiff's

Counsel respectfully submit that a fee in the amount of 19.5% of the Settlement Amount be awarded to Plaintiff's Counsel, that litigation expenses in the amount of $3,064,815.86 be reimbursed in full, and that the Class Representative's lost wages and expenses in the amount of $60,905.70 be similarly reimbursed in full.

We each declare, under penalty of perjury, that the foregoing facts are true and correct. Executed on August 14, 2013.

Joseph A. Fonti          Benjamin G. Chew          Susan R. Podolsky

Counsel respectfully submit that a fee in the amount of 19.5% of the Settlement Amount be awarded to Plaintiff's Counsel, that litigation expenses in the amount of $3,064,815.86 be reimbursed in full, and that the Class Representative's lost wages and expenses in the amount of $60,905.70 be similarly reimbursed in full.

We each declare, under penalty of perjury, that the foregoing facts are true and correct. Executed on August 14, 2013.

_____          _____          _____
Joseph A. Fonti                      Benjamin G. Chew                    Susan R. Podolsky

## GLOSSARY OF DEFINED TERMS

| Term | Definition |
|------|------------|
| "Action" | The civil action captioned *In re Computer Sciences Corporation Securities Litigation,* Civ. No. 11-610-TSE-IDD, pending in the United States District Court for the Eastern District of Virginia before the Honorable T.S. Ellis, III. |
| "Alternative Judgment" | A form of final judgment that may be entered by the Court herein but in a form other than the form of Judgment provided for in the Stipulation and where none of the Parties hereto elects to terminate this Settlement by reason of such variance. |
| "Appendix 1" | List of valid and timely requests for exclusion received in response to the Class Notice, or as amended by agreement of Class Counsel and Defendants' Counsel (ECF 309-1). |
| "Authorized Claimant" | A Settlement Class Member who timely submits a valid Proof of Claim and Release form to the Claims Administrator that is accepted for payment by the Court. |
| "Certified Class" | Previously certified class of all persons or entities that purchased or acquired Computer Sciences Corporation common stock between August 5, 2008 and August 9, 2011, inclusive, and who were damaged thereby.  Excluded from the Certified Class are: (i) the Defendants; (ii) members of the immediate family of any Defendant; (iii) any person who was an officer or director of CSC during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (v) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party; and (vii) any Person with an accepted request for exclusion as set forth on Appendix 1. |
| "Certified Class Member" | A person or entity that is a member of the Certified Class. |
| "Claims Administrator" | GCG, Inc., the firm retained by Class Counsel, subject to Court approval, to provide all notices approved by the Court to Settlement Class Members, to process proofs of claim and to administer the Settlement. |
| "Class Counsel" | Law firm of Labaton Sucharow LLP. |
| "Class Notice" | Notice previously authorized by the Court's March 15, 2013 Order, |

| | |
|---|---|
| | which was made in accordance with that Order. |
| "Class Period" | Period between August 5, 2008 and August 9, 2011, inclusive. |
| "Class Representative" | Ontario Teachers' Pension Plan Board. |
| "Consolidated Complaint" | On September 26, 2011, Ontario Teachers' filed a Consolidated Class Action Complaint for Violations of the Federal Securities Laws, asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934; on October 19, 2011, Ontario Teachers' filed a Corrected Consolidated Class Action Complaint for Violations of the Federal Securities Laws. |
| "Court" | United States District Court for the Eastern District of Virginia. |
| "Defendants" | CSC, Michael W. Laphen, and Donald G. DeBuck. |
| "Defendants' Counsel" | Law firm of Skadden, Arps, Slate, Meagher & Flom LLP. |
| "Distribution Order" | Order of the Court approving the Claims Administrator's determinations concerning the acceptance and rejection of the claims submitted and approving any fees and expenses not previously paid, including the fees and expenses of the Claims Administrator and, if the Effective Date has occurred, directing payment of the Net Settlement Fund to Authorized Claimants. |
| "Effective Date" | Date upon which the Settlement shall become effective, as set forth in ¶ 39 of the Stipulation. |
| "Escrow Account" | Separate escrow account designated by Class Counsel at one or more national banking institutions into which the Settlement Amount will be deposited for the benefit of the Settlement Class. |
| "Escrow Agent" | Class Counsel. |
| "Excluded Settlement Class Member" | Any Person with an accepted request for exclusion as set forth on Appendix 1 (ECF 309-1) who does not opt back into the Settlement Class in accordance with the requirements set forth in the Settlement Notice; (ii) a member of the Settlement Class who only purchased or acquired shares during the Extended Class Period, but who submits a valid and timely request for exclusion in accordance with the requirements set forth in the Settlement Notice; and (iii) a member of the Settlement Class who purchased or acquired shares during the Class Period and the Extended Class Period, but who properly excludes the shares purchased during the Extended Class Period by submitting a valid and timely request for exclusion of those Extended Class Period shares in accordance with the |

| | requirements set forth in the Settlement Notice. |
|---|---|
| "Extended Class Period" | Period between August 10, 2011 and December 27, 2011, inclusive. |
| "Final" | With respect to a court order, means the later of: (i) if there is an appeal from a court order, the date of final affirmance on appeal and the expiration of the time for any further judicial review whether by appeal, reconsideration or a petition for a *writ of certiorari* and, if *certiorari* is granted, the date of final affirmance of the order following review pursuant to the grant; or (ii) the date of final dismissal of any appeal from the order or the final dismissal of any proceeding on *certiorari* to review the order; or (iii) the expiration of the time for the filing or noticing of any appeal or petition for *certiorari* from the order (or, if the date for taking an appeal or seeking review of the order shall be extended beyond this time by order of the issuing court, by operation of law or otherwise, or if such extension is requested, the date of expiration of any extension if any appeal or review is not sought). However, any appeal or proceeding seeking subsequent judicial review pertaining solely to the Plan of Allocation of the Net Settlement Fund, or to the Court's award of attorneys' fees or expenses, shall not in any way delay or affect the time set forth above for the Judgment or Alternative Judgment to become Final, or otherwise preclude the Judgment or Alternative Judgment from becoming Final. |
| "Former Individual Defendant" | Michael J. Mancuso. |
| "Fourth Circuit" | United States Court of Appeals for the Fourth Circuit. |
| "Individual Defendants" | Michael W. Laphen and Donald G. DeBuck. |
| "Judgment" | Proposed judgment to be entered approving the Settlement substantially in the form attached as Exhibit B to the Stipulation (ECF 309-1). |
| "Local Counsel" | Patton Boggs LLP. |
| "Net Settlement Fund" | The Settlement Fund less: (i) Court-awarded attorneys' fees and expenses; (ii) Notice and Administration Expenses; (iii) Taxes; and (iv) any other fees or expenses approved by the Court, including any award to Class Representative for reasonable costs and expenses (including lost wages) pursuant to the PSLRA. |
| "Notice and | All costs, fees, and expenses incurred in connection with providing |

| | |
|---|---|
| Administration Expenses" | notice to the Certified Class, notice to the Settlement Class, and administering the Settlement, including but not limited to: (i) providing notice to the Certified Class and Settlement Class by mail, publication, and other means; (ii) receiving and reviewing claims; (iii) applying the Plan of Allocation; (iv) communicating with Persons regarding the proposed Settlement and claims administration process; (v) distributing the proceeds of the Settlement; and (vi) fees related to the Escrow Account and investment of the Settlement Fund. |
| "Party" or "Parties" | The Defendants and Class Representative, on behalf of itself and the other Settlement Class Members. |
| "Person" or "Persons" | Any individual, corporation (including all divisions and subsidiaries), general or limited partnership, association, joint stock company, joint venture, limited liability company, professional corporation, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any other business or legal entity. |
| "Preliminary Approval Order" | The Preliminary Approval Order Providing for Notice and Hearing in Connection with Proposed Class Action Settlement entered by the Court on May 24, 2013. |
| "Proof of Claim" | The Proof of Claim and Release form for submitting a claim, which was approved by the Court. |
| "PSLRA" | Private Securities Litigation Reform Act of 1995. |
| "Released Claims" | Any and all claims, rights, causes of action, duties, obligations, demands, actions, debts, sums of money, suits, contracts, agreements, promises, damages, and liabilities of every nature and description, including both known claims and Unknown Claims (defined below), whether arising under federal, state, foreign or statutory law, common law or administrative law, or any other law, rule or regulation, whether fixed or contingent, accrued or not accrued, matured or unmatured, liquidated or un-liquidated, at law or in equity, whether class or individual in nature, that Class Representative or any other Settlement Class Member: (i) asserted in the Action; or (ii) could have asserted in the Action or any other action or in any forum, that arise out of, relate to, or are in connection with the claims, allegations, transactions, facts, events, acts, disclosures, statements, representations or omissions or failures to act involved, set forth, or referred to in the complaints filed in the Action and that relate to the purchase or acquisition of the publicly traded common stock of CSC during the Settlement |

| | |
|---|---|
| | Class Period.<br><br>For the avoidance of doubt, Released Claims do not include: (i) claims to enforce the Settlement; (ii) claims in *Che Wu Hung v. Michael W. Laphen, et al.*, CL 2011 13376 (Circuit Court of Fairfax Cty, Virginia), *Judy Bainto v. Michael W. Laphen, et al.*, No. A-12-661695-C (District Court, Clark Cty, Nevada), *Daniel Himmel v. Michael W. Laphen, et al.*, No. A-12-670190-C (District Court, Clark Cty, Nevada), and *Shirley Morefield v. Irving W. Bailey, II, et al.*, No. 1:120V1468GBL/TCB (E.D. Va.); and (iii) any governmental or regulatory agency's claims in, or any right to relief from, any criminal or civil action against any of the Released Defendant Parties. |
| "Released Defendant Parties" | The Defendants, the Former Individual Defendant, their past or present or future subsidiaries, parents, affiliates, principals, successors and predecessors, assigns, officers, directors, shareholders, trustees, partners, agents, fiduciaries, contractors, employees, attorneys, auditors, insurers; the spouses, members of the immediate families, representatives, and heirs of the Individual Defendants or the Former Individual Defendant, as well as any trust of which any Individual Defendant or Former Individual Defendant is the settlor or which is for the benefit of any of their immediate family members; and any firm, trust, corporation, or entity in which any Defendant or Former Individual Defendant has a controlling interest; and any of the legal representatives, heirs, successors in interest or assigns of the Defendants or the Former Individual Defendant. |
| "Released Defendants' Claims" | All claims, including both known claims and Unknown Claims (as defined below), whether arising under federal, state, common or administrative law, or any other law, that the Defendants could have asserted against any of the Released Plaintiff Parties that arise out of or relate to the commencement, prosecution, or settlement of the Action (other than claims to enforce the Settlement). |
| "Released Parties" | The Released Defendant Parties and the Released Plaintiff Parties. |
| "Released Plaintiff Parties" | Each and every Settlement Class Member, Class Representative, Class Counsel, Local Counsel, and their respective past, current, or future trustees, officers, directors, partners, employees, contractors, auditors, principals, agents, attorneys, predecessors, successors, assigns, parents, subsidiaries, divisions, joint ventures, general or limited partners or partnerships, and limited liability companies; and the spouses, members of the immediate families, representatives, and heirs of any Released Plaintiff Party who is an individual, as well as any trust of which any Released Plaintiff |

|  | Party is the settlor or which is for the benefit of any of their immediate family members.  Released Plaintiff Parties does not include any Excluded Settlement Class Member. |
|---|---|
| "Settlement" | The resolution of the Action as against the Defendants in accordance with the terms and provisions of this Stipulation. |
| "Settlement Amount" | The total principal amount of ninety-seven million five hundred thousand dollars ($97,500,000) in cash.  For the avoidance of doubt, under no circumstances shall the total to be paid by the Defendants pursuant to the Stipulation exceed the Settlement Amount. |
| "Settlement Class" | All persons or entities that purchased or acquired Computer Sciences Corporation common stock during the Settlement Class Period, and who were allegedly damaged thereby.  Excluded from the Settlement Class are: (i) the Defendants; (ii) members of the immediate family of any Defendant; (iii) any person who was an officer or director of CSC during the Settlement Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (v) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party; and (vii) any Excluded Settlement Class Member. |
| "Settlement Class Member" | A person or entity that is a member of the Settlement Class. |
| "Settlement Class Period" | The period between August 5, 2008 and December 27, 2011, inclusive. |
| "Settlement Fund" | The Settlement Amount and any interest earned thereon. |
| "Settlement Hearing" | Hearing to be held by the Court to determine whether the proposed Settlement is fair, reasonable, and adequate and should be approved. |
| "Settlement Notice" | Notice of Proposed Settlement of Class Action, Extended Class Period, and Motion for Attorneys' Fees and Expenses, which was approved by the Court and sent to Settlement Class Members. |
| "Stipulation" | Stipulation and Agreement of Settlement made and entered into by and between the Class Representative on behalf of itself and all members of the Certified Class and proposed Settlement Class, and |

| | |
|---|---|
| | the Defendants, entered on May 15, 2013 (ECF 309-1). |
| "Summary Settlement Notice" | The Summary Notice of Proposed Settlement of Class Action, Extended Class Period, and Motion for Attorneys' Fees and Expenses for publication which was approved by the Court. |
| "Taxes" | All federal, state, or local taxes of any kind on any income earned by the Settlement Fund and reasonable expenses and costs incurred in connection with the taxation of the Settlement Fund (including, without limitation, interest, penalties and the reasonable expenses of tax attorneys and accountants). |