# Exhibit 4



For more than twenty-five years, Cornerstone Research staff have provided economic and financial analysis in all phases of commercial litigation and regulatory proceedings.

We work with a broad network of testifying experts, including faculty and industry practitioners, in a distinctive collaboration. Our staff consultants contribute expertise in economics, finance, accounting, and marketing, as well as business acumen, familiarity with the litigation process, and a commitment to produce outstanding results. The experts with whom we work bring the specialized expertise of researchers or practitioners required to meet the demands of each assignment.

Cornerstone Research has more than four hundred fifty staff and offices in Boston, Chicago, Los Angeles, Menlo Park, New York, San Francisco, and Washington.

www.cornerstone.com

Securities Class Action Settlements—2012 Review and Analysis | i

## TABLE OF CONTENTS

Key Findings ....................................................................................................................................................1

Research Sample ...............................................................................................................................................1

2012 Review and Analysis ...............................................................................................................................2

    Figure 1: Total Settlement Amounts...........................................................................................................2

    Figure 2: Settlement Summary Statistics....................................................................................................3

    Figure 3: Mega-Settlements........................................................................................................................4

    Figure 4: Cumulative Distribution of Settlement Amounts .......................................................................5

    Figure 5: Duration from Filing Date to Settlement Hearing Date ..............................................................6

Settlements and Damages Estimates .................................................................................................................7

    Figure 6: Median and Average "Estimated Damages" ..............................................................................7

    Figure 7: Median Settlements as a Percentage of "Estimated Damages" by Year ....................................8

    Figure 8: Median Settlements as a Percentage of "Estimated Damages" by Damages Ranges..................8

    Figure 9: Median Settlements as a Percentage of "Estimated Damages" and Litigation Stage..................9

    Figure 10: Median Settlements as a Percentage of DDL by DDL Range..................................................10

Analysis of Settlement Characteristics ...........................................................................................................11

    Figure 11: Settlements by Nature of Claim .............................................................................................11

    Figure 12: Median Settlements as a Percentage of "Estimated Damages" and Accounting Allegations .12

    Figure 13: Median Settlements as a Percentage of "Estimated Damages" and Third-Party Defendants..13

    Figure 14: Median Settlement Amounts and Public Pensions .................................................................14

    Figure 15: Frequency of Companion Derivative Actions ........................................................................15

    Figure 16: Frequency of Corresponding SEC Actions ............................................................................16

Tiered Estimated Damages..............................................................................................................................17

    Figure 17: Tiered Estimated Damages......................................................................................................17

Settlements by Jurisdiction .............................................................................................................................18

    Figure 18: Settlements by Court Circuit ..................................................................................................18

Settlements by Industry ..................................................................................................................................19

    Figure 19: Settlements by Industry Sector...............................................................................................19

Cornerstone Research's Settlement Prediction Analysis .................................................................................20

Concluding Remarks .......................................................................................................................................21

Data Sources....................................................................................................................................................21

Endnotes ..........................................................................................................................................................22

Reports like this one are purposely brief, often summarizing published works or other research by Cornerstone Research staff and affiliated experts. The views expressed herein are solely those of the authors, who are responsible for the contents of this report, and do not necessarily represent the views of Cornerstone Research.

## KEY FINDINGS

In this report, we explore underlying causes and implications of the findings summarized below and discuss additional observations related to securities class action settlements in 2012. We also introduce new analyses related to the stage to which the litigation had progressed at the time of settlement.

- Fourteen-year low in the number of settlements approved (page 2)

- Total settlement dollars increased by more than 100 percent from 2011 due in part to an increased number of "mega-settlements" (settlements in excess of $100 million) (page 2)

- Mega-settlements accounted for nearly 75 percent of all settlement dollars in 2012—the highest proportion in the last five years (page 4)

- Median "estimated damages," a simplified measure of damages that is the single most important factor in determining settlement amounts, at an all-time high among post–Reform Act settlements (page 7)

- Settlement amounts in relation to "estimated damages" at a post–Reform Act low (page 8)

- Cases progressing to more advanced litigation stages settle for higher dollar amounts (page 9)

- The proportion of settlements involving a public pension plan as lead plaintiff continues to increase, reaching almost 50 percent in 2012 (page 14)

## RESEARCH SAMPLE

Our database focuses on cases alleging fraudulent inflation in the price of a corporation's common stock (i.e., excluding cases with alleged classes of only bondholders, preferred stockholders, etc., and excluding cases alleging fraudulent depression in price). Our sample is limited to cases alleging Rule 10b-5, Section 11, and/or Section 12(a)(2) claims brought by purchasers of a corporation's common stock. These criteria are imposed to ensure data availability and to provide a relatively homogeneous set of cases in terms of the nature of the allegations. Our current sample includes 1,325 securities class actions filed after passage of the Reform Act (1995) and settled from 1996 through 2012. These settlements are identified based on a review of case activity collected by Securities Class Action Services, LLC (SCAS).[1] The designated settlement year, for purposes of our study, corresponds to the year in which the hearing to approve the settlement was held.[2] Cases involving multiple settlements are reflected in the year of the most recent partial settlement, provided certain conditions are met.[3]

## 2012 REVIEW AND ANALYSIS

For 2012, we report 53 court-approved settlements, representing a 14-year low in the number of settlements. Since cases historically have taken several years to reach settlement, the decline in the number of settlements in 2012 may be due in part to the relatively low number of securities class actions filed in 2009 and 2010 (e.g., an average of approximately 148 cases per year during those two years compared with an average of approximately 200 cases filed per year during 2007 and 2008).[4]

Despite the decrease in the number of cases settled, total settlement dollars increased by more than 100 percent in 2012 from 2011 (Figure 1). This was due in large part to a number of mega-settlements (settlements in excess of $100 million) with settlement hearing dates in 2012.

### FIGURE 1: TOTAL SETTLEMENT AMOUNTS
### 2003–2012
*Dollars in Millions*



Settlement dollars adjusted for inflation; 2012 dollar equivalent figures used.

Reversing the decrease observed in 2011, the median settlement amount increased from $5.9 million (the inflation-adjusted 2011 median) to $10.2 million in 2012—an increase of more than 70 percent (Figure 2).

The average reported settlement amount also dramatically increased in 2012 from the prior year. This increase was in excess of 150 percent (from the inflation-adjusted amount of $21.6 million in 2011 to $54.7 million in 2012). Excluding the top three post–Reform Act settlements (WorldCom, Enron, and Tyco), the average settlement amount of $54.7 million in 2012 is well above the historical average of $36.8 million.

## FIGURE 2: SETTLEMENT SUMMARY STATISTICS

*Dollars in Millions*

|  | 2012 | 1996–2011 | Excluding Top Three Settlements 1996–2011 |
|---|---|---|---|
| Minimum | $0.5 | $0.1 | $0.1 |
| Median | $10.2 | $8.3 | $8.1 |
| Average | $54.7 | $55.2 | $36.8 |
| Maximum | $822.6 | $8,325.1 | $2,878.5 |
| Total Amount | $2,901.5 | $70,181.0 | $46,687.6 |

Settlement dollars adjusted for inflation; 2012 dollar equivalent figures used.

## MEGA-SETTLEMENTS

Mega-settlements (settlements in excess of $100 million) accounted for nearly 75 percent of all settlement dollars in 2012—the highest proportion in the last five years (Figure 3). The number of mega-settlements has fluctuated substantially over time—for example, there were 14 such settlements in 2006, three in 2011, and six in 2012.

The average settlement dollar amount among 2012 mega-settlement cases increased more than 90 percent from the 2011 mega-settlement average, further contributing to the increase in the combined total dollar value of 2012 settlements.

### FIGURE 3: MEGA-SETTLEMENTS

■ Total Mega-Settlement Dollars as a Percentage of All Settlement Dollars
■ Number of Mega-Settlements as a Percentage of All Settlements



## SETTLEMENT SIZE

More than half of post–Reform Act cases that have reached a settlement have settled for less than $10 million. However, in 2012, fewer than 50 percent of settlements were less than $10 million, reflecting a possible shift in the typical case size. Despite the publicity that often accompanies mega-settlements, relatively few cases have settled for more than $100 million (fewer than 8 percent) (Figure 4).

### FIGURE 4: CUMULATIVE DISTRIBUTION OF SETTLEMENT AMOUNTS
### 1996–2012

*Dollars in Millions*



Settlement dollars adjusted for inflation; 2012 dollar equivalent figures used.

Using publicly available information from settlement materials and issuer filings,[5] we observed that less than 60 percent of settlements in 2012 were funded entirely by Directors and Officers (D&O) insurance proceeds, compared with almost 80 percent in 2011. This apparent decrease in the proportion of settlement amounts covered by D&O insurance policies may be due to the higher settlement amounts that occurred in 2012.

## TIME TO SETTLEMENT

For cases settled in recent years (2007–2011), the median time to reach settlement was 3.3 years. In 2012, there was a substantial increase in the proportion of cases settling within two years of the filing date (Figure 5). Of the cases that settled in 2012 within two years of filing, the median asset size for these issuer defendant firms was approximately $175 million compared with median assets of more than $2.5 billion for the rest of the sample. The median settlement amount for cases settling within two years of the filing date was only $2.9 million compared with a median of $18 million for cases settling after two years.

Not only was there a decrease in the time from filing to settlement for a subset of 2012 cases, but cases settling in 2012 moved through the court system somewhat more quickly once tentative settlements were publicly announced. Specifically, public announcements of preliminary settlements are often made in the media well in advance of the actual hearing to approve the settlement. In 2012, on average, more than half of the cases were heard in court within six months of a public announcement of settlement terms—up nearly 10 percent from the average speed at which 2011 settlements were heard.

Overall, larger cases tend to take longer to reach settlement. Not surprisingly, these larger cases may be more complex to litigate as evidenced by the average number of docket entries. In 2012, the average number of docket entries for cases settled within two years of the filing date was 112; the average number of docket entries for cases settling within three to four years was almost double this figure.

### FIGURE 5: DURATION FROM FILING DATE TO SETTLEMENT HEARING DATE



Litigation stage at the time of settlement is also closely tied to the duration of the case. Among all post-Reform Act settlements, we found that 28 percent of cases settled prior to a ruling on motion to dismiss, 64 percent settled after a ruling on a motion to dismiss but prior to a ruling on motion for summary judgment, and approximately 7 percent settled after a ruling on motion for summary judgment.[6] On average, these cases took 2.3 years, 3.5 years, and 4.9 years, respectively, to reach settlement. Further discussion of litigation stage attributes can be found on page 9.

## SETTLEMENTS AND DAMAGES ESTIMATES

As we have noted in prior reports, a measure of shareholder losses is the single most important factor in determining settlement amounts. For purposes of our research, we use a highly simplified approach to calculate these losses, which we refer to as "estimated damages." This measure is based on a modified version of a calculation method historically used by plaintiffs in securities class actions.[7] We make no attempt to link these simplified calculations of shareholder losses to the allegations included in the associated court pleadings. Accordingly, we do not intend for any damages estimates presented in this report to be indicative of actual economic damages borne by shareholders. Various models and alternative calculations could be used to assess defendants' potential exposure in securities class actions, but our application of a consistent method allows us to identify and examine trends.[8]

While median "estimated damages" decreased substantially for settlements in 2011 from 2010, we observed a nearly 80 percent year-over-year increase in median "estimated damages" in 2012. In fact, the median "estimated damages" for 2012 is an all-time high among post–Reform Act settlements. Since "estimated damages" is the most important factor in determining settlement amounts, this increase was the major contributor to the higher settlement amounts in 2012 (Figure 6).

### FIGURE 6: MEDIAN AND AVERAGE "ESTIMATED DAMAGES"
### 2003–2012
*Dollars in Millions*



"Estimated damages" are adjusted for inflation based on class period end dates.

Average "estimated damages" for 2012 reached a six-year high and was the second highest average in the post–Reform Act era. This increase was driven by a number of extremely large cases, a significant portion of which were related to the credit crisis.

In 2012, the median settlement as a percentage of "estimated damages" was substantially lower than for earlier post–Reform Act settlements. In fact, the median of 1.8 percent for cases settled in 2012 was a historic low among all post–Reform Act years (Figure 7). Credit-crisis cases, as well as an increase in mega-settlements, which have traditionally settled for a smaller proportion of "estimated damages," are contributing factors.

### FIGURE 7: MEDIAN SETTLEMENTS AS A PERCENTAGE OF "ESTIMATED DAMAGES" BY YEAR
#### 2003–2012



Settlement amounts generally increase as "estimated damages" increase; however, settlements as a percentage of "estimated damages" typically decrease as "estimated damages" increase. In 2012, in cases with "estimated damages" of less than $50 million, the median settlement amount as a percentage of "estimated damages" was 17.3 percent, whereas the median was 1.3 percent for cases with "estimated damages" in excess of $5 billion (Figure 8).

### FIGURE 8: MEDIAN SETTLEMENTS AS A PERCENTAGE OF "ESTIMATED DAMAGES" BY DAMAGES RANGES
#### Dollars in Millions



**LITIGATION STAGE**

This year we introduce analyses related to the stage to which the litigation had progressed at the time of settlement. We study three stages: Stage 1—settlement prior to a ruling on motion to dismiss; Stage 2—settlement after a ruling on motion to dismiss but prior to a ruling on motion for summary judgment; and Stage 3—settlement after a ruling on motion for summary judgment.

Settlement amounts are slightly higher for cases that progress to Stage 2 and substantially higher for cases that advance to Stage 3 (Figure 9). It might be expected that cases that progress to more advanced stages in the litigation process would settle for higher amounts either because the case may be more meritorious (having survived a motion to dismiss) or because plaintiff counsel have more invested in litigating these cases.

However, when considered in relation to "estimated damages," the positive relation between settlements and case progression is not supported. Specifically, cases settling in Stage 1 settled for the highest percentage of "estimated damages," and there was virtually no difference in the percentage between cases settling in Stage 2 versus Stage 3. These results are likely due in part to differences in the size of shareholder losses associated with cases settling at the different stages. The sample of cases reaching Stage 3 had median "estimated damages" more than two and a half times the median "estimated damages" of cases settling in Stage 1. In other words, larger cases (as measured by "estimated damages") tend to settle at more advanced stages of litigation. This is consistent with our previous observation that larger cases tend to take longer to reach settlement.

We have tested the relationship between settlement size and litigation stage using a regression model that simultaneously controls for many factors affecting settlement amounts. We find that settlement stage is highly correlated not only with case size, but also with other factors related to the complexity of the case.

**FIGURE 9: MEDIAN SETTLEMENTS AS A PERCENTAGE OF "ESTIMATED DAMAGES" AND LITIGATION STAGE**

*Dollars in Millions*





## DISCLOSURE DOLLAR LOSS

Disclosure Dollar Loss (DDL) is another simplified measure of shareholder losses. DDL is calculated as the decline in the market capitalization of the defendant firm from the trading day immediately preceding the end of the class period to the trading day immediately following the end of the class period.[9] DDL captures the price reaction—using closing prices—of the disclosure that resulted in the first filed complaint. As in the case of "estimated damages," we do not attempt to link DDL to the allegations included in the associated court pleadings. This measure also does not incorporate additional stock price declines during the alleged class period that may affect certain purchasers' potential damages claims. Thus, as this measure does not isolate movements in the defendant's stock price that are related to case allegations, it is not intended to represent an estimate of damages.

The median DDL associated with settled cases in 2012 increased more than 60 percent from 2011, to $174 million. With settlements as a percentage of DDL declining as DDL increases, the relationship between settlements and DDL is similar to that between settlements and "estimated damages" (Figure 10).

### FIGURE 10: MEDIAN SETTLEMENTS AS A PERCENTAGE OF DDL BY DDL RANGE
*Dollars in Millions*



## ANALYSIS OF SETTLEMENT CHARACTERISTICS

In addition to "estimated damages" and DDL, there are a number of important determinants of settlement outcomes that we have identified from the more than 60 variables related to each case that we collected and analyzed as part of our research. We describe several of these factors below.

### NATURE OF CLAIMS

A small portion of the settled cases involved only Section 11 and/or Section 12(a)(2) claims (i.e., they do not include Rule 10b-5 claims). Nearly half of these were settled in 2009 through 2011; however, there were only three of this case type among 2012 settlements. The decrease in cases alleging only Section 11 and/or Section 12(a)(2) claims is tied to the significant slowdown in the IPO market in 2008 and 2009. However, as has been widely reported, the U.S. IPO market has improved in recent years, and cases of this type may return to the mix of settlements over the next few years.[10]

The median settlement amount of $3.3 million for cases from 1996 through 2012 involving only Section 11 and/or Section 12(a)(2) claims was lower than the median settlement amount for cases involving Rule 10b-5 claims, while median settlements as a percentage of "estimated damages" were higher at 7.5 percent. "Estimated damages" tended to be smaller for cases involving only Section 11 claims, and therefore we expect these cases to have higher median settlement as a percentage of "estimated damages" compared with cases with only Rule 10b-5 claims (Figure 11).

For 2012 settlements, Section 11 claims were included in fewer cases (whether alone, or in conjunction with Rule 10b-5 claims) compared with recent years.

### FIGURE 11: SETTLEMENTS BY NATURE OF CLAIM
#### 1996–2012
*Dollars in Millions*

|  | Number of Cases | Median Settlement | Median Settlement as a Percentage of "Estimated Damages" |
|---|---|---|---|
| Section 11 and/or 12(a)(2) Only | 71 | $3.3 | 7.5% |
| Both Rule 10b-5 and Section 11 and/or 12(a)(2) | 238 | $11.0 | 3.5% |
| Rule 10b-5 Only | 997 | $6.8 | 2.9% |
| All Post–Reform Act Settlements | 1,306 | $7.0 | 3.2% |

## ACCOUNTING ALLEGATIONS

Accounting allegations play a central role in many securities class actions and are typically associated with higher settlement amounts, as well as higher settlements as a percentage of "estimated damages." The degree of association between accounting allegations and higher settlements varies based on the allegations (Figure 12).

- Settlements of cases involving generally accepted accounting principles (GAAP) allegations that are not accompanied by announcements of financial statement restatements (or possible restatements) settled for only a slightly higher percentage of "estimated damages," compared with cases not involving GAAP allegations.

- Cases involving a restatement of the financial statements settled for a higher percentage of "estimated damages," compared with GAAP cases not involving restatements.

- Settlements were even higher in cases in which the defendant has reported the occurrence of accounting irregularities (intentional misstatements or omissions) in its financial statements.

In 2012, allegations related to violations of GAAP were included in about 60 percent of settled cases compared with only 45 percent of settled cases in 2011. Allegations related to a restatement of financials were largely unchanged from 2011 and continued to be noticeably less frequent than in earlier years. As we have observed in the past, it is possible that declines in restatements in recent years may be a function of improved corporate governance following the passage of the Sarbanes-Oxley Act of 2002. Additionally, the percentage of credit-crisis cases involving GAAP violations is significantly higher than in other types of cases, while the percentage of credit-crisis cases involving financial restatements is significantly lower.

### FIGURE 12: MEDIAN SETTLEMENTS AS A PERCENTAGE OF "ESTIMATED DAMAGES" AND ACCOUNTING ALLEGATIONS
#### 1996–2012



### THIRD-PARTY DEFENDANTS

The presence of third-party defendants is also associated with higher settlements as a percentage of "estimated damages." Third parties are often named as codefendants in larger, more complex cases and provide an additional source of settlement funds.

The inclusion of third-party defendants is closely related to the type of allegations involved in the case. Historically, outside auditors have been named in approximately 30 percent of cases involving restatements of financial statements, and this level was slightly lower, at 25 percent, in 2012 settlements. Cases in which an outside auditor was named as a defendant have settled for relatively higher percentages of "estimated damages" compared with cases not involving auditor defendants (Figure 13).

The presence of underwriter defendants is highly correlated with the inclusion of Section 11 claims. The percentage of settlements involving underwriters in 2012 was slightly less than 15 percent—similar to the rate for all post–Reform Act years. In our sample, an underwriter may be an investment bank engaged in a public offering by the issuer or in some other advisory function.

In addition to the presence of additional funding that may be available when a third-party defendant is involved, the presence of an underwriter may indicate a more complex matter or a matter including purchasers of securities in addition to common stock as potential claimants. All of these factors could contribute to the higher settlement as a percentage of "estimated damages."

**FIGURE 13: MEDIAN SETTLEMENTS AS A PERCENTAGE OF "ESTIMATED DAMAGES" AND THIRD-PARTY DEFENDANTS 1996–2012**



## INSTITUTIONAL INVESTORS

Institutional investors play an active role as lead plaintiffs in post–Reform Act class actions. Since 2006, more than half of the settlements in our sample in any given year have involved institutional investors as lead plaintiffs with an increasing presence from public pensions. In 2012, public pensions served as lead plaintiff in 49 percent of settled cases compared with only 6 percent in 2003 (Figure 14).

### FIGURE 14: MEDIAN SETTLEMENT AMOUNTS AND PUBLIC PENSIONS
### 2003–2012
*Dollars in Millions*



Settlement dollars adjusted for inflation; 2012 dollar equivalent figures used.

      In our analysis of institutional investors, we continued to find that the presence of public pensions as lead plaintiffs is associated with significantly higher settlement amounts.[11] The median "estimated damages" for settlements involving public pensions in 2012 was five times the median "estimated damages" figure for settlements without a public pension as lead plaintiff.

      As relatively sophisticated investors, public pensions could choose to participate in stronger cases and/or tend to be involved in larger cases that may have the potential for larger claims. However, our analysis of the association between settlement amounts and participation of public pensions as lead plaintiffs showed that even when controlling for "estimated damages" (a proxy for case size) and other observable factors that affect settlements, the presence of a public pension as a lead plaintiff continued to be associated with a statistically significant increase in settlement size.[12] (A list of control variables used in this analysis can be found on page 20.) Accordingly, it is possible that the association between higher settlements and the presence of a public pension plan lead plaintiff is due to public pension plans' greater bargaining power.

**COMPANION DERIVATIVE ACTIONS**

More than 50 percent of cases settled in 2012 were accompanied by a derivative action filing, compared with an average of approximately 30 percent of such cases in prior post–Reform Act years (Figure 15). Although settlement of a derivative action does not necessarily result in a cash payment,[13] settlement amounts for class actions that are accompanied by derivative actions are significantly higher than those for cases without companion derivative actions. This is true whether or not the settlement of the derivative action coincides with the settlement of the underlying class action, or occurs at a different time.

When considered as a percentage of "estimated damages," settlements for cases with accompanying derivative actions are typically lower than settlements for cases with no identifiable derivative action. This lower percentage reflects the larger "estimated damages" that are associated with these cases. In fact, overall, the median "estimated damages" for cases involving derivative actions is more than two and a half times larger than for cases without an accompanying derivative action.

Accompanying derivative actions were filed in the state of Delaware for 10 percent of settled cases in our sample. Median "estimated damages" associated with these cases is more than two and a half times the median "estimated damages" for cases that had accompanying derivative actions filed in other states. Consistent with the higher median "estimated damages," our data indicated that a case with a companion derivative action filed in Delaware is associated with higher settlement amounts compared with a case with a companion derivative action filed elsewhere.



FIGURE 15: FREQUENCY OF COMPANION DERIVATIVE ACTIONS
2003–2012

It is important to analyze the relationship between companion derivative actions and class action settlement amounts in a multivariate context (i.e., allowing multiple variables to be considered simultaneously) because of the potential confounding effects of these factors. Using regression analysis to control for "estimated damages" and other observable factors that influence securities class action settlements, we found that cases involving companion derivative actions continued to be associated with significantly higher settlement amounts. In addition to their correlation with higher "estimated damages," class actions accompanied by derivative actions tend to be associated with other factors discussed in this

report, including accounting allegations, corresponding actions brought by the Securities and Exchange Commission (SEC), and public pensions as lead plaintiffs—factors that we have consistently found to be important determinants of settlement amounts.

### CORRESPONDING SEC ACTIONS

The percentage of settled cases that involved a corresponding SEC action (evidenced by the filing of a litigation release or administrative proceeding) prior to the settlement of the class action was more than 20 percent in 2012, up considerably from 2011 but still at a relatively low level compared with earlier years. As SEC enforcement activity has continued at a strong pace in the last few years, including two consecutive years of record enforcement actions filed in 2011 and 2012,[14] we expect an increase in the percentage of class action settlements with corresponding SEC actions as these enforcement actions are resolved (Figure 16).

Cases that involve corresponding SEC actions are associated with significantly higher settlement amounts and have higher settlements as a percentage of "estimated damages." It could be that the merits in such cases are stronger, or simply that the presence of an accompanying SEC action provides plaintiffs with increased leverage when negotiating a settlement. For settlements through 2012, the median settlement amount ($13 million) for cases involving corresponding SEC actions was more than twice the median ($6 million) for cases without such regulatory actions.

**FIGURE 16: FREQUENCY OF CORRESPONDING SEC ACTIONS
2003–2012**



## TIERED ESTIMATED DAMAGES

The landmark decision in 2005 by the U.S. Supreme Court in *Dura Pharmaceuticals v. Broudo* (*Dura*) determined that plaintiffs must show a causal link between alleged misrepresentations and the subsequent actual losses suffered by plaintiffs. As a result of this decision, damages cannot be attributed to shares sold before information regarding the alleged fraud reaches the market. *Dura* has had considerable influence on securities class action damages calculations, and we have analyzed its effect in our settlements research. Using a sub-sample of settlements—namely, cases filed subsequent to 2005 —we have tested an alternative damages measure that we refer to as tiered estimated damages. This alternative measure is based on the stock-price drops on alleged corrective disclosure dates per the complaint. It utilizes a single value line when there is only one alleged corrective disclosure date (at the end of the class period) or a tiered value line when there are multiple alleged corrective disclosure dates (Figure 17).

While the tiered estimated damages measure has not yet surpassed our traditional measure of "estimated damages" as a predictor of settlement outcomes (see page 20 for a related discussion), it is highly correlated with settlement amounts and provides an alternative measure of investor losses for more recent securities class action settlements.

### FIGURE 17: TIERED ESTIMATED DAMAGES
### 2006–2012
*Dollars in Millions*



## SETTLEMENTS BY JURISDICTION

The Second and Ninth Circuits continue to dominate in terms of securities class action activity.[15] The relative activity levels for these two circuits are related in part to the concentrations of cases by industry sector (i.e., technology firms in the Ninth Circuit and financial-sector firms in the Second Circuit). Accordingly, the prevalence of litigation against financial institutions in recent years contributed to the large number of cases settled in the Second Circuit in 2012 (Figure 18).

### FIGURE 18: SETTLEMENTS BY COURT CIRCUIT

*Dollars in Millions*

| Circuit | Number of Cases | | Median Settlements | |
|---|---|---|---|---|
| | 2012 | 1996–2011 | 2012 | 1996–2011 |
| First | – | 74 | – | $7.1 |
| Second | 14 | 239 | $28.8 | 10.5 |
| Third | 2 | 122 | 24.3 | 8.5 |
| Fourth | 2 | 44 | 15.5 | 7.4 |
| Fifth | 3 | 98 | 1.5 | 6.9 |
| Sixth | 2 | 61 | 98.6 | 15.8 |
| Seventh | 5 | 64 | 1.5 | 9.0 |
| Eighth | 2 | 41 | 2.6 | 10.1 |
| Ninth | 17 | 324 | 7.0 | 8.7 |
| Tenth | 2 | 49 | 2.3 | 8.6 |
| Eleventh | 3 | 115 | 10.5 | 5.3 |
| DC | – | 4 | – | 27.8 |
| State Courts | 1 | 37 | 7.3 | 5.0 |
| All Cases | 53 | 1,272 | $10.2 | $8.3 |

## SETTLEMENTS BY INDUSTRY

Approximately one-third of settlements in 2012 were for issuers in the financial industry. The next most prevalent industry sectors, in terms of the number of cases settled, were technology and pharmaceuticals.

The financial industry continues to rank the highest in median settlement value across all post–Reform Act years (Figure 19). However, industry sector is not a significant determinant of settlement amounts when controlling for other variables (such as "estimated damages," asset size, and the presence of third-party defendants) that influence settlement outcomes.

### FIGURE 19: SETTLEMENTS BY INDUSTRY SECTOR
#### 1996–2012
*Dollars in Millions*

| Industry | Median Settlements | Median "Estimated Damages" | Median Settlements as a Percentage of "Estimated Damages" |
|---|---|---|---|
| Financial | $13.4 | $567.8 | 3.1% |
| Telecommunications | 8.4 | 372.6 | 2.4% |
| Pharmaceuticals | 8.0 | 413.4 | 2.4% |
| Healthcare | 6.3 | 212.1 | 3.5% |
| Technology | 5.9 | 224.0 | 3.0% |
| Retail | 5.8 | 183.2 | 4.3% |

## CORNERSTONE RESEARCH'S SETTLEMENT PREDICTION ANALYSIS

Features of securities cases that may affect settlement outcomes are often correlated. Regression analysis makes it possible to examine the effects of these factors simultaneously. Accordingly, as part of our ongoing research on securities class action settlements, we applied regression analysis to study factors associated with settlement outcomes. Analysis performed on our sample of post–Reform Act cases settled through December 2012 revealed that the variables that were important determinants of settlement amounts included the following:[16, 17]

- "Estimated damages"
- DDL
- Most recently reported total assets of the defendant firm
- Number of entries on the lead case docket
- The year in which the settlement occurred
- Whether intentional misstatements or omissions in financial statements were reported by the issuer
- Whether a restatement of financials related to the alleged class period was announced
- Whether there was a corresponding SEC action against the issuer or whether other defendants are involved
- Whether an auditor is a named codefendant
- Whether an underwriter is a named codefendant
- Whether a companion derivative action is filed
- Whether a public pension is a lead plaintiff
- Whether noncash components, such as common stock or warrants, make up a portion of the settlement fund
- Whether securities other than common stock are alleged to be damaged
- Whether criminal charges/indictments were brought with similar allegations to underlying class action
- Whether Section 11 claims accompanied Rule 10b-5 claims
- Whether the issuer traded on a non-major exchange

Settlements were higher when "estimated damages," DDL, defendant asset size, or number of docket entries were larger. Settlements were also higher in cases involving: intentional misstatements or omissions in financial statements reported by the issuer, a restatement of financials, a corresponding SEC action, an underwriter and/or auditor was named as codefendant, a corresponding derivative action, a public pension involved as lead plaintiff, a noncash component to the settlement, criminal charges were filed, or securities other than common stock alleged to be damaged. Settlements were lower if the settlement occurred in 2004 or later, and if the issuer traded on a non-major exchange.

While our primary approach is designed toward understanding and predicting the total settlement amount, we also are able to estimate the probabilities associated with reaching alternative settlement levels. These probabilities can be a useful analysis for our clients in considering the different layers of insurance coverage available and likelihood of contributing to the settlement fund. Regression analysis can also be used to explore hypothetical scenarios, including but not limited to the effects on settlement amounts given the presence or absence of particular factors that we have found to significantly affect settlement outcomes.

## CONCLUDING REMARKS

Last year's report, *Securities Class Action Settlements—2011 Review and Analysis*, predicted an increase in the total value of cases settled in 2012. The materialized total value of 2012 settlements surpassed 2011 by more than 100 percent, in spite of a substantial decline in the number of settlements approved.

We observed broad-based increases in settlement amounts in 2012, as evidenced by higher levels for both the median and average settlement amounts. These increases were likely due to greater shareholder losses associated with cases settled in 2012. In fact, "estimated damages" reached an all-time high in 2012.

As a result, median settlements as a percentage of "estimated damages" in 2012 were the lowest among all post–Reform Act years. This low level of settlement amounts in relation to "estimated damages" was likely due to several different factors. First, larger cases tend to settle for smaller proportions of shareholder losses. In addition, in 2012 there was a decrease in the presence of several qualitative factors that are typically associated with higher settlements in relation to "estimated damages." Specifically, we observed declines in the number of settlements of cases involving only Section 11 and/or Section 12(a)(2) claims, as well as below-average instances of accompanying SEC actions and financial statement restatements.

We often look to characteristics of cases filed in recent years to anticipate settlement trends in future years. Although we expect that the extremely low number of settlements reached in 2012 is unlikely to persist, it may be some time before we see the settlement counts from the prior decade. It is also difficult to project future trends related to settlement values. This is due to the fact that shareholder losses associated with case filings in recent years have fluctuated substantially.

## DATA SOURCES

In addition to SCAS, data sources include Dow Jones Factiva, Bloomberg, Center for Research in Security Prices (CRSP) at University of Chicago Booth School of Business, Standard & Poor's Compustat, court filings and dockets, SEC registrant filings, SEC litigation releases and administrative proceedings, LexisNexis, and public press.

## ENDNOTES

1   Available on a subscription basis.

2   Movements of partial settlements between years can cause differences in amounts reported for prior years from those presented in earlier reports.

3   Our categorization is based on the timing of the settlement approval. If a new partial settlement equals or exceeds 50 percent of the then-current settlement fund amount, the entirety of the settlement amount is recategorized to reflect the settlement hearing date of the most recent partial settlement. If a subsequent partial settlement is less than 50 percent of the then-current total, the partial settlement is added to the total settlement amount, but the settlement hearing date is not changed.

4   See *Securities Class Action Filings—2012 Year in Review*, Stanford Law School Securities Class Action Clearinghouse in cooperation with Cornerstone Research, 2013. Our sample excludes merger and acquisition cases since those cases do not meet our sample criteria.

5   Since reporting the amount of D&O insurance contributed towards a settlement is an optional disclosure by firms, we caveat these results with the observation that they could be affected by firms' disclosure choices in any given year.

6   Litigation stage data obtained from Stanford Law School's Securities Class Action Clearinghouse. Sample does not add to 100 percent as there is a small sample of cases with other litigation stage classifications.

7   Our simplified "estimated damages" model is applied to common stock only. For all cases involving Rule 10b-5 claims, damages are determined from a market-adjusted, backward-pegged value line. For cases involving only Section 11 and/or Section 12(a)(2) claims, damages are determined from a model that caps the purchase price at the offering price. Volume reduction assumptions are based on the location of the exchange on which the issuer's common stock traded. Finally, no adjustments for institutions, insiders, or short sellers are made to the float.

8   We exclude 19 settlements out of the 1,325 cases in our sample from calculations involving simplified "estimated damages" due to stock data availability issues. The WorldCom settlement was also excluded from these calculations because most of the settlement in that matter related to liability associated with bond offerings (and our research does not compute damages related to securities other than common stock).

9   The DDL calculation also does not apply a model of investors' share-trading behavior to estimate the number of shares damaged.

10  See "IPO Outlook Promising," *CFO Magazine*, February 7, 2013. The U.S. IPO table reported by Renaissance Capital indicates the number of IPOs in 2010 was nearly three times the number of new issuances in 2009. IPOs in 2011 and 2012 were approximately 200 percent of 2009 issuances.

11  The extraordinarily high median settlement amount for public-pension-led settlements in 2006 was driven by six separate settlements in excess of $1 billion.

12  This regression analysis may not control for the potential endogeneity in the choice by public pension plans to participate in a class action.

13  Derivative cases are often resolved with changes made to the issuer's corporate governance practices, accompanied by little or no cash payment; this continues to be true despite the increase in corporate controls introduced after the passage of the Sarbanes-Oxley Act of 2002. For purposes of the analyses in this report, a derivative action—generally a case filed against officers and directors on behalf of the issuer corporation—must have allegations similar to the class action in nature and time period to be considered an accompanying action.

14  *Fiscal Year 2012 Agency Financial Report*, U.S. Securities and Exchange Commission, https://www.sec.gov/about/secpar/secafr2012.pdf.

15  *Securities Class Action Filings—2012 Year in Review*, Stanford Law School Securities Class Action Clearinghouse in cooperation with Cornerstone Research, 2013.

16  Our settlement database includes publicly available and measurable information about settled cases. Nonpublic or nonmeasurable factors, such as relative case merits or the limits of available insurance, are not reflected in the model to the extent that such factors are not correlated with the variables that are accessible to us (i.e., publicly available and measurable factors).

17  Due to the presence of a small number of extreme observations in the data, we apply logarithmic transformations to all continuous variables.

## ABOUT THE AUTHORS

Ellen M. Ryan

M.B.A., American Graduate School of International Management
B.A., Saint Mary's College

Ellen Ryan is a manager in the securities practice in Cornerstone Research's Boston office. She has consulted on economic and financial issues in a variety of cases, including securities class action lawsuits, financial institution breach of contract matters, and antitrust litigation. Ms. Ryan also has worked with testifying witnesses in corporate governance and breach of fiduciary duty matters. Prior to joining Cornerstone Research, Ms. Ryan worked for Salomon Brothers in New York and Tokyo. Currently Ms. Ryan focuses on post–Reform Act settlement research as well as general practice area business and research.

Laura E. Simmons

Ph.D., University of North Carolina at Chapel Hill
M.B.A., University of Houston
B.B.A., University of Texas at Austin

Laura Simmons is a senior advisor at Cornerstone Research. She is a certified public accountant and has nearly 20 years of experience in accounting practice and economic and financial consulting. Her consulting experience has focused on damages and liability issues in securities litigation, as well as accounting issues arising in a variety of complex commercial litigation matters. She has served as a testifying expert in cases involving accounting analyses, securities case damages, and research on securities lawsuits.

Dr. Simmons's research on pre– and post–Reform Act securities litigation settlements has been published in a number of reports and is frequently cited in the public press and legal journals. She has spoken at various conferences and appeared as a guest on CNBC addressing the topic of securities case settlements. She has also published in academic journals, with recent research focusing on the intersection of accounting and securities litigation. Dr. Simmons was previously an accounting faculty member at the Mason School of Business at the College of William & Mary. From 1986 to 1991, she was an accountant with Price Waterhouse.

The authors acknowledge the research efforts and significant contributions of their colleagues at Cornerstone Research. Please direct any questions and requests for additional information to the settlement database administrator at settlement.database@cornerstone.com. The authors request that you reference Cornerstone Research in any reprint of the charts and tables included in this study and include a link to the report: www.cornerstone.com/post_reform_act_settlements.

Additional information about our research and analysis in securities class action filings and settlements can be found at www.cornerstone.com/securities.

**Boston**
617.927.3000

**Chicago**
312.345.7300

**Los Angeles**
213.553.2500

**Menlo Park**
650.853.1660

**New York**
212.605.5000

**San Francisco**
415.229.8100

**Washington**
202.912.8900

www.cornerstone.com



© 2013 by Cornerstone Research, Inc. All Rights Reserved.
Cornerstone Research is a registered service mark of Cornerstone Research, Inc. C logo and design is a registered trademark of Cornerstone Research, Inc.